No. 19-1330

# In the United States Court of Appeals for the Tenth Circuit

---

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY, ET AL., PLAINTIFFS-APPELLEES

*v.*

SUNCOR ENERGY (U.S.A.) INC., ET AL., DEFENDANTS-APPELLANTS

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO (CIV. NO. 18-1672) (THE HONORABLE WILLIAM J. MARTINEZ, J.)*

---

## APPENDIX OF APPELLANTS

---

THEODORE V. WELLS, JR.
DANIEL J. TOAL
JAREN JANGHORBANI
NORA AHMED
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   *1285 Avenue of the Americas*
   *New York, NY 10019*

COLIN G. HARRIS
FAEGRE BAKER DANIELS LLP
   *1470 Walnut Street, Suite 300*
   *Boulder, CO 80302*

KANNON K. SHANMUGAM
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   *2001 K Street, N.W.*
   *Washington, DC 20006*
   *(202) 223-7300*

HUGH QUAN GOTTSCHALK
EVAN B. STEPHENSON
WHEELER TRIGG O'DONNELL LLP
   *370 Seventeenth Street, Suite 4500*
   *Denver, CO 80202*

# TABLE OF CONTENTS

Page

Docket entries of district court ...............................................................1

Notice of removal, D. Ct. Dkt. No. 1 (June 29, 2018).........................12

Oil and gas lease between the United States Department of the
    Interior and Exxon Corporation (Aug. 28, 1979),
    filed as D. Ct. Dkt. No. 1-22 (June 29, 2018)....................................49

Oil and gas lease between the United States Department of the
    Interior and Exxon Mobil Corporation (June 30, 2016),
    filed as D. Ct. Dkt. No. 1-23 (June 29, 2018)....................................61

Amended complaint, D. Ct. Dkt. No. 7 (June 29, 2018)....................70

Order granting plaintiffs' motion to remand,
    D. Ct. Dkt. No. 69 (Sept. 5, 2019).................................................197

Notice of appeal, D. Ct. Dkt. No. 72 (Sept. 6, 2019)........................253

Order denying motion for a stay, D. Ct. Dkt. No. 80 (Oct. 7, 2019)...............255

Certificate of service of remand order by e-mail to
    marizela.cano@judicial.state.co.us, D. Ct. Dkt. No. 83 (Oct. 8, 2019)......272

APPEAL,JD1,MJ CIV PP,NDISPO,TERMED

## U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:18–cv–01672–WJM–SKC

Board of County Commissioners of Boulder et al v. Suncor Energy (U.S.A.) Inc. et al
Assigned to: Judge William J. Martinez
Referred to: Magistrate Judge S. Kato Crews
Case in other court:  Tenth Circuit, 19–01330
                  District Court, Boulder County,
                  2018–cv–030349
Cause: 42:9607 Real Property Tort to Land

Date Filed: 06/29/2018
Date Terminated: 09/05/2019
Jury Demand: Both
Nature of Suit: 893 Environmental Matters
Jurisdiction: Federal Question

**Plaintiff**

**Board of County Commissioners of Boulder County**

represented by

**David G. Bookbinder**
Niskanen Center
820 First Street, NE
Suite 675
Washington, DC 20002
301–751–0611
Email: dbookbinder@niskanencenter.org
*ATTORNEY TO BE NOTICED*

**Kevin Scott Hannon**
Hannon Law Firm, LLC
1641 Downing Street
Denver, CO 80218
303–861–8800
Fax: 861–8855
Email: khannon@hannonlaw.com
*ATTORNEY TO BE NOTICED*

**Marco B. Simons**
EarthRights International
1612 K Street NW
Suite 800
Washington, DC 20006
202–466–5188
Fax: 202–466–5189
Email: marco@earthrights.org
*ATTORNEY TO BE NOTICED*

**Michelle C. Harrison**
EarthRights International
1612 K Street N.W.
Suite 401
Washington, DC 20006
202–466–5188
Fax: 202–466–5189
Email: michelle@earthrights.org
*ATTORNEY TO BE NOTICED*

**Richard Lawrence Herz**
EarthRights International
1612 K Street NW
Suite 800
Washington, DC 20006
860–233–4938
Email: rick@earthrights.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**App. 1**

**Board of County Commissioners of
San Miguel County**

represented by **David G. Bookbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Scott Hannon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marco B. Simons**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michelle C. Harrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard Lawrence Herz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**City of Boulder**

represented by **David G. Bookbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Scott Hannon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marco B. Simons**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michelle C. Harrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard Lawrence Herz**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Suncor Energy (U.S.A.) Inc.**

represented by **Hugh Q. Gottschalk**
Wheeler Trigg O'Donnell, LLP–Denver
370 17th Street
Suite 4500
Denver, CO 80202–5647
303–244–1800
Fax: 303–244–1879
Email: gottschalk@wtotrial.com
*ATTORNEY TO BE NOTICED*

**Evan Bennett Stephenson**
Wheeler Trigg O'Donnell LLP–Denver
370 17th Street
Suite 4500
Denver, CO 80202–5647
303–244–1800
Fax: 303–244–1879
Email: stephenson@wtotrial.com
*ATTORNEY TO BE NOTICED*

**App. 2**

**Defendant**

**Suncor Energy Sales Inc.**                     represented by   **Hugh Q. Gottschalk**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Evan Bennett Stephenson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Suncor Energy Inc.**                     represented by   **Hugh Q. Gottschalk**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Evan Bennett Stephenson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Exxon Mobil Corporation**                     represented by   **Colin G. Harris**
Faegre Baker Daniels LLP–Boulder
1470 Walnut Street
Suite 300
Boulder, CO 80302–5335
303–447–7700
Fax: 303–447–7800
Email: colin.harris@FaegreBD.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore V. Wells , Jr.**
Paul, Weiss, Rifkind, Wharton & Garrison,
LLP–New York
1285 Avenue of the Americas
New York, NY 10019–6064
212–373–3000
Fax: 212–492–0089
Email: twells@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel J. Toal**
Paul Weiss Rifkind Wharton & Garrison,
LLP–New York
1285 Avenue of the Americas
New York, NY 10019–6064
212–373–3000
Fax: 212–757–3990
Email: dtoal@paulweiss.com
*ATTORNEY TO BE NOTICED*

**Evan Bennett Stephenson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jaren Janghorbani**
Paul Weiss Rifkind Wharton & Garrison,
LLP–New York
1285 Avenue of the Americas
New York, NY 10019–6064
212–373–3000
Fax: 212–492–0211

**App. 3**

Email: jjanghorbani@paulweiss.com
*ATTORNEY TO BE NOTICED*

**Kannon K. Shanmugam**
Paul Weiss Rifkind Wharton & Garrison
LLP–DC
2001 K. Street NW
Washington, DC 20006
202–223–7300
Fax: 202–223–7420
Email: kshanmugam@paulweiss.com
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
Paul Weiss Rifkind Wharton & Garrison,
LLP–New York
1285 Avenue of the Americas
New York, NY 10019–6064
212–373–3000
Email: nahmed@paulweiss.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/29/2018 | 1 | NOTICE OF REMOVAL by Suncor Energy Inc., Suncor Energy (U.S.A.) Inc., Suncor Energy Sales Inc. from District Court of Boulder County, Colorado, Case Number 2018–cv–030349. (Filing fee $ 400, Receipt Number 1082–6178341), filed by Suncor Energy Inc., Suncor Energy (U.S.A.) Inc., Suncor Energy Sales Inc.. (Attachments: # 1 Exhibit A – State Court Pleading Index, # 2 Exhibit A–1 – 2018–04–17 11–26–18 Summons – Exxon Mobil, # 3 Exhibit A–2 – 2018–04–17 11–25–01 Summons – Suncor Energy Inc., # 4 Exhibit A–3 – 2018–04–17 11–24–14 Summons – Suncor Energy Sales, # 5 Exhibit A–4 – 2018–04–17 11–22–53 Summons – Suncor Energy (USA), # 6 Exhibit A–5 – 2018–04–17 11–19–05 District Case Civil Cover Sheet, # 7 Exhibit A–6 – 2018.04.17 – Complaint with Jury Demand, # 8 Exhibit A–7 – 2018.04.27 – Pro Hac Vice Application of Marco Simons, # 9 Exhibit A–8 – 2018.04.27 – Pro Hac Vice Application of Alison Borochoff–Porte, # 10 Exhibit A–9 – 2018.04.27 – Pro Hac Vice Application of Michelle Harrison, # 11 Exhibit A–10 – 2018.05.01 – Order – Granting Pro Hac Vice Admission – Simons, # 12 Exhibit A–11 – 2018.05.01 – Order – Granting Pro Hac Vice Admission – Borochoff–Porte, # 13 Exhibit A–12 – 2018.05.01 – Order – Granting Pro Hac Vice Admission – Harrison, # 14 Exhibit A–13 – 2018.05.14 – Notice From Attorney Registration Office to Practice Pro Hac Vice, # 15 Exhibit A–14 – 2018.05.22 – Pro Hac Vice Application of David Bookbinder, # 16 Exhibit A–15 – 2018.05.25 – Notice of Pro Hac Vice for David Bookbinder, # 17 Exhibit A–16 – 2018.05.29 – Order – Granting Pro Hac Vice Admission – Bookbinder, # 18 Exhibit A–17 – 2018.06.11 – Amended Complaint and Jury Demand, # 19 Exhibit A–18 – 2018–06–16 13–25–05 Affidavit of Service – Exxon, # 20 Exhibit A–19 – 2018–06–16 13–24–31 Affidavit of Service – Suncor Energy USA Inc, # 21 Exhibit A–20 – 2018–06–16 13–24–20 Affidavit of Service – Suncor Energy Sales, # 22 Exhibit B – 1979.09.01 408065 OCS P 0329, # 23 Exhibit C – 2011 Sample Gulf of Mexico Lease, # 24 Civil Cover Sheet)(Stephenson, Evan) (Entered: 06/29/2018) |
| 06/29/2018 | 2 | CORPORATE DISCLOSURE STATEMENT identifying Corporate Parent Suncor Energy (U.S.A.) Inc., Corporate Parent Suncor Energy (U.S.A.) Holdings Inc., Corporate Parent Suncor Energy Inc. for Suncor Energy Sales Inc.. (Stephenson, Evan) (Entered: 06/29/2018) |
| 06/29/2018 | 3 | CORPORATE DISCLOSURE STATEMENT identifying Corporate Parent Suncor Energy (U.S.A.) Holdings Inc., Corporate Parent Suncor Energy Inc. for Suncor Energy (U.S.A.) Inc.. (Stephenson, Evan) (Entered: 06/29/2018) |
| 06/29/2018 | 4 | CORPORATE DISCLOSURE STATEMENT. (Stephenson, Evan) (Entered: 06/29/2018) |

| 06/29/2018 | 5 | Case assigned to Magistrate Judge Michael E. Hegarty. Text Only Entry (dbera, ) (Entered: 07/02/2018) |
| 06/29/2018 | 6 | COMPLAINT and Jury Demand against Exxon Mobil Corporation, Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc., filed by Board of County Commissioners of Boulder County, City of Boulder, Board of County Commissioners of San Miguel County.(dbera, ) (Entered: 07/02/2018) |
| 06/29/2018 | 7 | AMENDED COMPLAINT and Jury Demand against Exxon Mobil Corporation, Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc., filed by Board of County Commissioners of Boulder County, City of Boulder, Board of County Commissioners of San Miguel County.(dbera, ) (Entered: 07/02/2018) |
| 06/29/2018 | 8 | AFFIDAVIT/RETURN of Service of Summons, Amended Complaint and Jury Demand, Complaint and Jury Demand, Civil Case Cover Sheet, Orders Granting Pro Hac Vice Admission upon Cole Stender for Exxon Mobil Corporation on 06/14/2018 (dbera, ) (Entered: 07/02/2018) |
| 06/29/2018 | 9 | AFFIDAVIT/RETURN of Service of Summons, Amended Complaint and Jury Demand; Complaint and Jury Demand, Civil Case Cover Sheet, Orders Granting Pro Hac Vice Admission upon Emily Rauch for Suncor Energy (USA) Inc on 06/13/2018 (dbera, ) (Entered: 07/02/2018) |
| 06/29/2018 | 10 | AFFIDAVIT/RETURN of Service of Summons, Amended Complaint and Jury Demand, Complaint and Jury Demand, Civil Case Cover Sheet, Orders Granting Pro Hac Vice Admission upon Emily Rauch for Suncor Energy Sales Inc on 06/13/2018 (dbera, ) (Entered: 07/02/2018) |
| 06/29/2018 | 11 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. (dbera, ) (Entered: 07/02/2018) |
| 06/29/2018 | 12 | FIRST AND FINAL NOTICE TO ALL ATTORNEY(S) AND UNREPRESENTED PARTIES IN REMOVED, TRANSFERRED, OR OTHER CASES. To receive any further notice in a case removed or transferred to this court, or special matters including discovery disputes, bankruptcy appeals, or withdrawls of reference, Multi–district litigation (MDL), etc., all attorneys and unrepresented parties must enter an appearance under D.C.COLO.LAttyR 5(a). An attorney must be an active member of this court's bar and be in good standing in accordance with D.C.COLO.LAttyR 3. A waiver of the fee for bar admission may apply in limited situations. (dbera, ) (Entered: 07/02/2018) |
| 07/02/2018 | 13 | NOTICE of Entry of Appearance by Theodore V. Wells, Jr on behalf of Exxon Mobil Corporation (Wells, Theodore) (Entered: 07/02/2018) |
| 07/02/2018 | 14 | NOTICE of Entry of Appearance by Daniel J. Toal on behalf of Exxon Mobil CorporationAttorney Daniel J. Toal added to party Exxon Mobil Corporation(pty:dft) (Toal, Daniel) (Entered: 07/02/2018) |
| 07/02/2018 | 15 | NOTICE of Entry of Appearance by Jaren Janghorbani on behalf of Exxon Mobil CorporationAttorney Jaren Janghorbani added to party Exxon Mobil Corporation(pty:dft) (Janghorbani, Jaren) (Entered: 07/02/2018) |
| 07/02/2018 | 16 | NOTICE of Entry of Appearance by Hugh Q. Gottschalk on behalf of Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc.Attorney Hugh Q. Gottschalk added to party Suncor Energy (U.S.A.) Inc.(pty:dft), Attorney Hugh Q. Gottschalk added to party Suncor Energy Inc.(pty:dft), Attorney Hugh Q. Gottschalk added to party Suncor Energy Sales Inc.(pty:dft) (Gottschalk, Hugh) (Entered: 07/02/2018) |
| 07/02/2018 | 17 | STIPULATION for Extension of Time to Answer or Respond to the Complaint by Defendants Suncor Energy Inc., Suncor Energy (U.S.A.) Inc., Suncor Energy Sales Inc., Exxon Mobil Corporation. Suncor Energy Inc. answer due 8/10/2018; Suncor Energy (U.S.A.) Inc. answer due 7/26/2018; Suncor Energy Sales Inc. answer due 7/26/2018; Exxon Mobil Corporation answer due 7/26/2018. (Stephenson, Evan) (Entered: 07/02/2018) |

| 07/02/2018 | 18 | CORPORATE DISCLOSURE STATEMENT identifying Corporate Parent No Parent Corporation for Exxon Mobil Corporation. (Wells, Theodore) (Entered: 07/02/2018) |
|---|---|---|
| 07/02/2018 | 19 | NOTICE of Entry of Appearance by Colin G. Harris on behalf of Exxon Mobil Corporation (Harris, Colin) (Entered: 07/02/2018) |
| 07/02/2018 | 20 | NOTICE *of Related Cases* by Defendants Exxon Mobil Corporation, Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc. (Wells, Theodore) (Entered: 07/02/2018) |
| 07/02/2018 | 21 | NOTICE of Entry of Appearance by Kevin Scott Hannon on behalf of Board of County Commissioners of Boulder County, Board of County Commissioners of San Miguel County, City of BoulderAttorney Kevin Scott Hannon added to party Board of County Commissioners of Boulder County(pty:pla), Attorney Kevin Scott Hannon added to party Board of County Commissioners of San Miguel County(pty:pla), Attorney Kevin Scott Hannon added to party City of Boulder(pty:pla) (Hannon, Kevin) (Entered: 07/02/2018) |
| 07/03/2018 | 22 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 7/3/2018. Scheduling Conference set for 8/2/2018 10:00 AM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. (tsher, ) (Entered: 07/03/2018) |
| 07/20/2018 | 23 | MOTION *Joint Motion to Set Briefing Schedule for Remand Motion and to Stay Discovery Until Plaintiffs' Remand Motion is Decided filed by Plaintiffs and* by Defendants Exxon Mobil Corporation, Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc.. (Stephenson, Evan) Modified on 7/23/2018 to correct document type (mdave, ). (Entered: 07/20/2018) |
| 07/24/2018 | 24 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 7/24/2018 granting in part and denying without prejudice in part 23 Joint Motion to Set Briefing Schedule for Remand Motion and to Stay Discovery until Plaintiff's Remand Motion is Decided. (tsher, ) (Entered: 07/24/2018) |
| 07/25/2018 | 25 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiffs Board of County Commissioners of Boulder County, Board of County Commissioners of San Miguel County, City of Boulder All parties do not consent.. (Hannon, Kevin) (Entered: 07/25/2018) |
| 07/25/2018 | 26 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 7/25/2018 re: 25 Consent to Jurisdiction of Magistrate Judge filed by Board of County Commissioners of San Miguel County, City of Boulder, Board of County Commissioners of Boulder County. Parties do not consent. The Court directs the Clerk of the Court to reassign this case under D.C. Colo. LCivR 40.1(a). (tsher, ) (Entered: 07/25/2018) |
| 07/25/2018 | 27 | CASE REASSIGNED pursuant to 25 Consent to Jurisdiction of Magistrate Judge. All parties do not consent. This case is randomly reassigned to Judge Wiley Y. Daniel. All future pleadings should be designated as 18–cv–01672–WYD. (Text Only Entry) (tsher, ) (Entered: 07/25/2018) |
| 07/26/2018 | 28 | NOTICE of Entry of Appearance by David G. Bookbinder on behalf of All Plaintiffs Attorney David G. Bookbinder added to party Board of County Commissioners of Boulder County(pty:pla), Attorney David G. Bookbinder added to party Board of County Commissioners of San Miguel County(pty:pla), Attorney David G. Bookbinder added to party City of Boulder(pty:pla) (Bookbinder, David) (Entered: 07/26/2018) |
| 07/26/2018 | 29 | ORDER REFERRING CASE to Magistrate Judge Michael E. Hegarty for non–dispositive matters. That pursuant to 28 U.S.C. Section 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this matter is referred to the assigned United States Magistrate Judge is designated to conduct proceedings in this civil action as follows: (1) Convene a scheduling conference under Fed.R.Civ.P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2. (2) Conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause. (3) Hear and determine pretrial matters, including discovery and other non–dispositive motions. (4) Alternative Dispute Resolution Authority: Court sponsored alternative dispute resolution is governed by D.C.COLOLCivR 16.6. On the recommendation or informal request of the magistrate judge, or on the request of the |

**App. 6**

| | | |
|---|---|---|
| | | parties by motion, the court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. It is further ORDERED that parties and counsel shall be familiar and comply with the above judge's requirements found at www.cod.uscourts.gov. By Judge Wiley Y. Daniel on 7/26/18. Text Only Entry (rkeec) (Entered: 07/26/2018) |
| 07/26/2018 | 30 | MINUTE ORDER by Magistrate Judge Michael E. Hegarty on 7/26/2018. Scheduling Conference is VACATED and RESET to 8/16/2018 10:15 AM in Courtroom A 501 before Magistrate Judge Michael E. Hegarty. (tsher, ) (Entered: 07/26/2018) |
| 07/26/2018 | 31 | MOTION to Vacate 30 Minute Order *(to Vacate the July 26, 2018 Deadline to Submit a Proposed Scheduling Order)* by Defendants Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc.. (Stephenson, Evan) (Entered: 07/26/2018) |
| 07/27/2018 | 32 | MEMORANDUM regarding 31 MOTION to Vacate 30 Minute Order *(to Vacate the July 26, 2018 Deadline to Submit a Proposed Scheduling Order)* filed by Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc. Motion referred to Magistrate Judge Michael E. Hegarty by Judge Wiley Y. Daniel on 7/27/18. Text Only Entry (rkeec) (Entered: 07/27/2018) |
| 07/27/2018 | 33 | MINUTE ORDER denying as moot 31 Motion to Vacate the July 26, 2018 Deadline to Submit a Proposed Scheduling Order, by Magistrate Judge Michael E. Hegarty on 7/27/2018. (tsher, ) (Entered: 07/27/2018) |
| 07/30/2018 | 34 | MOTION to Remand *And Notice of Motion to Remand* by Plaintiffs Board of County Commissioners of Boulder County, Board of County Commissioners of San Miguel County, City of Boulder. (Hannon, Kevin) (Entered: 07/30/2018) |
| 08/06/2018 | 35 | REASSIGNING MAGISTRATE JUDGE. This action is reassigned to Magistrate Judge S. Kato Crews, upon his appointment. All future pleadings should reference Magistrate Judge Crews at the end of the civil action number as 18–cv–01672–WYD–SKC. Unless otherwise ordered, the dates and times for all previously scheduled matters will be maintained and will now be handled by Magistrate Judge Crews in Courtroom C–204. His chambers are located in Room C–253 of the Byron G. Rogers Courthouse. His telephone number is 303–335–2117. (Text only entry) (evana, ) (Entered: 08/06/2018) |
| 08/06/2018 | 36 | NOTICE of Entry of Appearance by Nora Ahmed on behalf of Exxon Mobil CorporationAttorney Nora Ahmed added to party Exxon Mobil Corporation(pty:dft) (Ahmed, Nora) (Entered: 08/06/2018) |
| 08/09/2018 | 37 | Joint MOTION to Stay *Discovery and Initial Disclosures Until After the Court Rules on the Motion to Remand and to Vacate the August 16, 2018 Scheduling Conference* by Defendants Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc.. (Stephenson, Evan) (Entered: 08/09/2018) |
| 08/09/2018 | 38 | MEMORANDUM regarding 37 Joint MOTION to Stay *Discovery and Initial Disclosures Until After the Court Rules on the Motion to Remand and to Vacate the August 16, 2018 Scheduling Conference* filed by Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc. Motion referred to Magistrate Judge S. Kato Crews by Judge Wiley Y. Daniel on 8/9/18. Text Only Entry (rkeec) (Entered: 08/09/2018) |
| 08/10/2018 | 39 | ORDER granting 37 Motion to Stay. The Scheduling Conference set for 8/16/2018 is VACATED. The case is STAYED pending a ruling on the motion for remand. If the motion is denied, counsel shall jointly contact the court (303.335.2117) within 72 hours of a ruling to set a Scheduling Conference. Telephone Status Conference is set for 12/17/2018 at 09:00 AM in Courtroom C204 before Magistrate Judge S. Kato Crews, to discuss the status of the case. Parties participating in the hearing shall initiate a conference call amongst themselves before calling the court (303.335.2117) at the scheduled time. By Magistrate Judge S. Kato Crews on 8/10/18. Text Only Entry (amont, ) (Entered: 08/10/2018) |
| 08/28/2018 | 40 | NOTICE OF CASE ASSOCIATION *(Supplemental Notice of Related Cases)* by Evan Bennett Stephenson on behalf of Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc. (Stephenson, Evan) (Entered: 08/28/2018) |

| 08/30/2018 | 41 | NOTICE of Entry of Appearance by Michelle C. Harrison on behalf of All Plaintiffs Attorney Michelle C. Harrison added to party Board of County Commissioners of Boulder County(pty:pla), Attorney Michelle C. Harrison added to party Board of County Commissioners of San Miguel County(pty:pla), Attorney Michelle C. Harrison added to party City of Boulder(pty:pla) (Harrison, Michelle) (Entered: 08/30/2018) |
|---|---|---|
| 08/31/2018 | 42 | NOTICE of Entry of Appearance *on behalf of all Plaintiffs* by Richard Lawrence Herz on behalf of Board of County Commissioners of Boulder County, Board of County Commissioners of San Miguel County, City of BoulderAttorney Richard Lawrence Herz added to party Board of County Commissioners of Boulder County(pty:pla), Attorney Richard Lawrence Herz added to party Board of County Commissioners of San Miguel County(pty:pla), Attorney Richard Lawrence Herz added to party City of Boulder(pty:pla) (Herz, Richard) (Entered: 08/31/2018) |
| 08/31/2018 | 43 | NOTICE of Entry of Appearance by Marco B. Simons on behalf of All Plaintiffs Attorney Marco B. Simons added to party Board of County Commissioners of Boulder County(pty:pla), Attorney Marco B. Simons added to party Board of County Commissioners of San Miguel County(pty:pla), Attorney Marco B. Simons added to party City of Boulder(pty:pla) (Simons, Marco) (Entered: 08/31/2018) |
| 08/31/2018 | 44 | BRIEF in Support of 34 MOTION to Remand *And Notice of Motion to Remand* filed by Plaintiffs Board of County Commissioners of Boulder County, Board of County Commissioners of San Miguel County, City of Boulder. (Hannon, Kevin) (Entered: 08/31/2018) |
| 09/10/2018 | 45 | DESIGNATION OF NON−PARTY *at Fault by Defendants Exxon Mobil and* by Defendants Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc.. (Gottschalk, Hugh) (Entered: 09/10/2018) |
| 09/10/2018 | 46 | MOTION for Extension of Time to File Answer or Otherwise Respond re 45 Designation of Non−Party *(Motion for Extension of Time to Supplement their Designation of Non−Parties at Fault Pursuant to Colorado Revised Statutes Section 31−21−111.5(3)(B)* by Defendants Exxon Mobil Corporation, Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc.. (Attachments: # 1 Proposed Order (PDF Only) Granting Motion for Extension of Time to File Designation of Non Parties at Fault)(Gottschalk, Hugh) (Entered: 09/10/2018) |
| 09/11/2018 | 47 | MEMORANDUM regarding 46 MOTION for Extension of Time to File Answer or Otherwise Respond re 45 Designation of Non−Party *(Motion for Extension of Time to Supplement their Designation of Non−Parties at Fault Pursuant to Colorado Revised Statutes Section 31−21−111.5(3)( filed by Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc., Exxon Mobil Corporation. Motion referred to Magistrate Judge S. Kato Crews by Judge Wiley Y. Daniel on 9/11/18. Text Only Entry (rkeec) (Entered: 09/11/2018)* |
| 10/12/2018 | 48 | RESPONSE to 34 MOTION to Remand *And Notice of Motion to Remand* filed by Defendants Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc.. (Gottschalk, Hugh) (Entered: 10/12/2018) |
| 11/08/2018 | 49 | STIPULATION for Extension of Time *For A One−Day Extension For Plaintiffs To File Their Reply In Support Of Their Motion For Remand* by Plaintiffs Board of County Commissioners of Boulder County, Board of County Commissioners of San Miguel County, City of Boulder. (Hannon, Kevin) (Entered: 11/08/2018) |
| 11/13/2018 | 50 | REPLY to Response to 34 MOTION to Remand *And Notice of Motion to Remand* filed by Plaintiffs Board of County Commissioners of Boulder County, Board of County Commissioners of San Miguel County, City of Boulder. (Attachments: # 1 Exhibit 1 Ninth Circuit Kivalina Brief, # 2 Exhibit 2 Milwaukee I Brief)(Hannon, Kevin) (Entered: 11/13/2018) |
| 11/28/2018 | 51 | ORDER re 46 Motion for Extension of Time. In their Motion, Defendants indicate that Plaintiffs oppose the requested extension. The Court observes, however, that Plaintiffs have chosen not to file a response explaining the basis for such opposition. Having reviewed Defendants' Motion, the Court concludes that the request should be GRANTED. Therefore, Defendants may supplement their Designation of Non−Parties At Fault within 60 days following the date that discovery commences in this matter. By Magistrate Judge S. Kato Crews on 11/28/2018. Text Only Entry (skclc1) (Entered: 11/28/2018) |

| 12/11/2018 | 52 | Joint MOTION to Vacate *December 17, 2018 Telephone Status Conference* by Defendant Exxon Mobil Corporation. (Wells, Theodore) (Entered: 12/11/2018) |
|---|---|---|
| 12/12/2018 | 53 | MEMORANDUM regarding 52 Joint MOTION to Vacate *December 17, 2018 Telephone Status Conference* filed by Exxon Mobil Corporation. Motion referred to Magistrate Judge S. Kato Crews by Judge Wiley Y. Daniel on 12/12/18. Text Only Entry (rkeec) (Entered: 12/12/2018) |
| 12/12/2018 | 54 | ORDER granting 52 Motion to Vacate. The Status Conference set for December 17, 2018, is VACATED. If the motion to remand is denied, the parties shall contact Judge Crews' chambers within 72 hours to set a scheduling conference. By Magistrate Judge S. Kato Crews on 12/12/2018. Text Only Entry (skclc1) (Entered: 12/12/2018) |
| 12/13/2018 | 55 | Joint MOTION for Hearing/Conference re 34 MOTION to Remand *And Notice of Motion to Remand (Joint Motion to Request Oral Argument on Plaintiffs' Motion to Remand)* filed by Plaintiffs, Defendant Exxon and by Defendants Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc.. (Gottschalk, Hugh) (Entered: 12/13/2018) |
| 02/27/2019 | 56 | MINUTE ORDER by Judge Wiley Y. Daniel on 02/27/2019. The Joint Motion to Request Oral Argument on Plaintiff's Motion to Remand (ECF No. 55 ) is GRANTED. A hearing on Plaintiffs' Motion to Remand is set for Thursday, May 30, 2019, at 10:00 a.m. in Courtroom A1002 before Judge Wiley Y. Daniel. (athom, ) (Entered: 02/27/2019) |
| 05/01/2019 | 57 | NOTICE of Entry of Appearance by Kannon K. Shanmugam on behalf of Exxon Mobil CorporationAttorney Kannon K. Shanmugam added to party Exxon Mobil Corporation(pty:dft) (Shanmugam, Kannon) (Entered: 05/01/2019) |
| 05/15/2019 | 58 | MINUTE ORDER Per the authority of Chief Judge Philip A. Brimmer, the hearing on Plaintiffs' Motion to Remand scheduled for Thursday, May 30, 2019, at 10:00 a.m. is **VACATED**, on 5/15/2019. (evana, ) (Entered: 05/15/2019) |
| 05/20/2019 | 59 | This action is reassigned to Judge Daniel D. Domenico upon his appointment and the passing of Judge Wiley Y. Daniel. Unless otherwise ordered, the dates and times for all previously scheduled matters will be maintained and will now be handled by Judge Domenico in Courtroom A−702. His chambers are located in A−738 of the Alfred A. Arraj Courthouse. His telephone number is 303−335−2468. All future pleadings should be designated as 18−cv−01672−DDD. Text only entry. (agarc, ) (Entered: 05/20/2019) |
| 05/23/2019 | 60 | ORDER OF RECUSAL by Judge Daniel D. Domenico on 5/23/2019. The Clerk of Court shall reassign this case to another judge. Text Only Entry (dddlc1, ) (Entered: 05/23/2019) |
| 05/23/2019 | 61 | CASE REASSIGNED pursuant to 60 Order of Recusal. This case is randomly reassigned to Judge Robert E. Blackburn. All future pleadings should be designated as 18−cv−01672−REB−SKC. (Text Only Entry) (athom, ) (Entered: 05/23/2019) |
| 05/28/2019 | 62 | MEMORANDUM Exercising my prerogative as a Senior Judge, I request that this civil action be reassigned, by Judge Robert E. Blackburn. This case has been randomly reassigned to Judge William J. Martinez for all future proceedings. (cthom, ) (Entered: 05/28/2019) |
| 06/03/2019 | 63 | **ORDER: Counsel for the parties and all counsel who may later enter an appearance shall review and familiarize themselves with the undersigned's Revised Practice Standards (as most recently revised effective December 1, 2018 and as they may be amended from time to time), which may be downloaded here.** SO ORDERED by Judge William J. Martinez on 6/ 3/2019. Text Only Entry (wjmsec, ) (Entered: 06/03/2019) |
| 06/25/2019 | 64 | NOTICE of Supplemental Authorities re: 44 Brief in Support of Motion, 50 Reply to Response to Motion, by Plaintiffs Board of County Commissioners of Boulder County, Board of County Commissioners of San Miguel County, City of Boulder (Attachments: # 1 Exhibit 1 City of Baltimore v. BP P.L.C.)(Hannon, Kevin) (Entered: 06/25/2019) |

| 07/16/2019 | 65 | NOTICE of Change of Address/Contact Information *for Certain Attorneys for Plaintiffs* by Michelle C. Harrison (Harrison, Michelle) (Entered: 07/16/2019) |
| 07/22/2019 | 66 | NOTICE of Supplemental Authorities re: 44 Brief in Support of Motion, 50 Reply to Response to Motion, by Plaintiffs Board of County Commissioners of Boulder County, Board of County Commissioners of San Miguel County, City of Boulder (Attachments: # 1 Exhibit 1 State of Rhode Island v. Chevron Corp.)(Hannon, Kevin) (Entered: 07/22/2019) |
| 08/12/2019 | 67 | MOTION to Reset *(Defendants' Motion to Reschedule Oral Argument on Plaintiffs' Motion to Remand (Resetting ECF No. 56)* by Defendants Exxon Mobil Corporation, Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc.. (Shanmugam, Kannon) (Entered: 08/12/2019) |
| 08/20/2019 | 68 | RESPONSE to 67 MOTION to Reset *(Defendants' Motion to Reschedule Oral Argument on Plaintiffs' Motion to Remand (Resetting ECF No. 56)* filed by Plaintiffs Board of County Commissioners of Boulder County, Board of County Commissioners of San Miguel County, City of Boulder. (Hannon, Kevin) (Entered: 08/20/2019) |
| 09/05/2019 | 69 | ORDER: Plaintiffs Motion to Remand (ECF No. 34 ) is GRANTED. Defendants Motion to Reschedule Oral Argument on Plaintiffs Motion to Remand (ECF No. 67 ) is DENIED. The Clerk shall REMAND this case to Boulder County District Court, and shall terminate this action. SO ORDERED by Judge William J. Martinez on 9/5/2019.(wjmlc2) (Entered: 09/05/2019) |
| 09/06/2019 | 70 | Emergency MOTION to Stay re 69 Order on Motion to Remand,, Order on Motion to Reset, by Defendant Exxon Mobil Corporation. (Shanmugam, Kannon) (Entered: 09/06/2019) |
| 09/06/2019 | 71 | ORDER: This matter is before the Court on 70 Defendants' Emergency Motion for a Temporary Stay of Execution of the Remand Order. That Motion is GRANTED for good cause shown. Execution of the Court's 69 Remand Order is hereby STAYED pending the filing of Defendants' proposed motion for stay pending appeal, as well as the Court's ruling on that motion. Any motion for stay pending appeal the Defendants choose to file must be filed no later than **Friday, September 13, 2019**. Once such motion is filed, the Court will set an expedited briefing schedule on the motion. SO ORDERED by Judge William J. Martinez on 9/6/2019. Text Only Entry(wjmlc2) (Entered: 09/06/2019) |
| 09/06/2019 | 72 | NOTICE OF APPEAL as to 69 Order on Motion to Remand,, Order on Motion to Reset, by Defendant Exxon Mobil Corporation (Filing fee $ 505). (Shanmugam, Kannon) # 1 Receipt) (angar, ). Modified on 9/9/2019 to attach the receipt (angar, ). (Entered: 09/06/2019) |
| 09/09/2019 | 73 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 72 Notice of Appeal filed by Exxon Mobil Corporation to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Preliminary Record and Docket Sheet)(angar, ) (Entered: 09/09/2019) |
| 09/09/2019 | 74 | USCA Case Number 19–1330 for 72 Notice of Appeal filed by Exxon Mobil Corporation. (angar, ) (Entered: 09/09/2019) |
| 09/13/2019 | 75 | MOTION to Stay re 69 Order on Motion to Remand,, Order on Motion to Reset, by Defendants Exxon Mobil Corporation, Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc.. (Shanmugam, Kannon) (Entered: 09/13/2019) |
| 09/13/2019 | 76 | ORDER: This matter is before the Court on Defendants Motion for a Stay of the Remand Order Pending Appeal 75 . Plaintiffs are DIRECTED to file a Response to the Motion on or before **September 19, 2019**. Defendants shall file a Reply in support of their Motion on or before **September 23, 2019**. SO ORDERED by Judge William J. Martinez on 9/13/2019. Text Only Entry(wjmlc2) (Entered: 09/13/2019) |
| 09/19/2019 | 77 | RESPONSE to 75 MOTION to Stay re 69 Order on Motion to Remand,, Order on Motion to Reset, filed by Plaintiffs Board of County Commissioners of Boulder County, Board of County Commissioners of San Miguel County, City of Boulder. (Hannon, Kevin) (Entered: 09/19/2019) |

| 09/23/2019 | 78 | REPLY to Response to 75 MOTION to Stay re 69 Order on Motion to Remand,, Order on Motion to Reset, filed by Defendants Exxon Mobil Corporation, Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc.. (Shanmugam, Kannon) (Entered: 09/23/2019) |
|---|---|---|
| 10/02/2019 | 79 | LETTER TO USCA and all counsel certifying the record is complete as to 72 Notice of Appeal, filed by Exxon Mobil Corporation. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 19–1330) Text Only Entry (angar, ) (Entered: 10/02/2019) |
| 10/07/2019 | 80 | ORDER denying 75 Motion to Stay. Defendants Motion for Stay of Remand Pending Appeal filed September 13, 2019 (ECF No. 75 ) is DENIED. The Clerk shall REMAND this case to Boulder County District Court, and shallterminate this action. by Judge William J. Martinez on 10/7/2019.(wjmlc2) (Entered: 10/07/2019) |
| 10/08/2019 | 81 | Emergency MOTION to Stay re 80 Order on Motion to Stay, by Defendants Exxon Mobil Corporation, Suncor Energy (U.S.A.) Inc., Suncor Energy Inc., Suncor Energy Sales Inc.. (Shanmugam, Kannon) (Entered: 10/08/2019) |
| 10/08/2019 | 82 | ORDER: This matter is before the Court on Defendants' Emergency Motion for a Temporary Stay of Execution of the Remand Order 81 . Yesterday evening this Court entered its Order 80 denying Defendants' earlier Motion to Stay Order on Motion to Remand 75 . In this Order the Court based its decision to deny the original Motion to Stay on the grounds that Defendants had failed to show a likelihood of success on the merits, or an irreparable injury, or that other factors weighed in favor of a stay. The Defendants' Motion now before the Court is a Motion for Reconsideration of that Order in all but name. Defendants fail, however, to advance in the instant Motion any grounds warranting a reconsideration of the Court's prior Order, including no reference to an intervening change in the controlling law, no citation to new evidence previously unavailable, or the need to correct clear error or prevent manifest injustice. *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). For these reasons the Defendants' Emergency Motion for a Temporary Stay of Execution of the Remand Order 81 is DENIED. The Clerk of the Court is DIRECTED to forthwith REMAND this case to Boulder County District Court, and terminate this action. SO ORDERED by Judge William J. Martinez on 10/8/2019. Text Only Entry(wjmsec, ) (Entered: 10/08/2019) |
| 10/08/2019 | 83 | CERTIFICATE of Service by E–mail by Clerk of Court re: 80 Order and 82 Order to Marizela.cano@judicial.state.co.us. (angar, ) (Entered: 10/08/2019) |
| 10/17/2019 | 84 | ORDER of USCA as to 72 Notice of Appeal, filed by Exxon Mobil Corporation. (USCA Case No. 19–1330) (angar, ) (Entered: 10/18/2019) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-1672

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY;
BOARD OF COUNTY COMMISSIONERS OF SAN MIGUEL COUNTY; and
CITY OF BOULDER,

       Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC.;
SUNCOR ENERGY SALES INC.;
SUNCOR ENERGY INC.; and
EXXON MOBIL CORPORATION,

       Defendants.

---

## NOTICE OF REMOVAL

---

TO:   THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLORADO

     PLEASE TAKE NOTICE THAT Defendants Suncor Energy (U.S.A.) Inc., a Delaware

corporation, Suncor Energy Sales Inc., a Colorado corporation, Suncor Energy Inc., a Canadian

corporation, and Exxon Mobil Corporation ("ExxonMobil"; collectively, "Defendants") remove,

with reservation of all defenses, Case No. 2018-cv-30349, filed in the Boulder County Combined

Court (the "State Court Action" or "action"), to the United States District Court for the District

of Colorado pursuant to 28 U.S.C. §§ 1331, 1334, 1441(a), 1442, 1452 and 1367(a), and

43 U.S.C. § 1349(b).  Without conceding that each defendant has been properly joined and

served in this action, all Defendants consent to the removal of the State Court Action to this

1

**App. 12**

Court and join in this notice of removal (the "Notice of Removal" or "Notice").  In support of removal, Defendants state as follows:

## INTRODUCTION

1.       In this action, Plaintiffs seek to hold Defendants liable for the impacts of climate change in their respective jurisdictions based on Defendants' lawful production, promotion, refining, marketing and sales of fossil fuels, not only in the United States, but throughout the world.[1]  Plaintiffs alleged injuries result from greenhouse gas emissions associated with the use of fossil fuels by billions of consumers worldwide, including Plaintiffs themselves.  Despite Plaintiffs' efforts to artfully plead their claims as novel state torts, this Court has federal question jurisdiction over these claims on several independent grounds.

2.       First and foremost, Plaintiffs' claims can only arise—if at all—under federal common law.  Federal common law applies where, as here, "uniquely federal interests" make application of state law inappropriate.  *See, e.g.*, *Am. Elec. Power Co., Inc.* v. *Connecticut*, 564 U.S. 410, 414 (2011) ("*AEP*"); *Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 504, 507 (1988).  One such area is "the general subject of environmental law and specifically . . . ambient or interstate air and water pollution."  *Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012); *AEP*, 564 U.S. at 421.  Plaintiffs' claims, rooted in the effects of global greenhouse gas emissions, implicate uniquely federal interests in environmental, energy, and national security policy—which necessitate a uniform approach under federal common law.  Courts in the Tenth Circuit and other federal courts have recognized that such transboundary environmental lawsuits, targeting the broad mix of federal policies and regulations pertaining to

---

[1] Defendant Suncor Energy, Inc. is a Canadian corporation that is not registered to do business in any state in the U.S.

climate change, are governed by federal, not state, law.  *See United States* v. *Questar Gas Mgmt. Co.,* No. 2:08CV167DAK, 2010 WL 5279832, at *3 (D. Utah Dec. 14, 2010); *AEP*, 564 U.S. at 424; *Kivalina*, 696 F.3d at 855; *City of Oakland et al* v. *BP p.l.c.*, No. C 17-06011 WHA, 2018 WL 1064293, at *2 (N.D. Cal. Feb. 27, 2018).

        3.      Applying these same principles, the United States District Court for the Northern District of California recently held that federal court is the proper forum for claims indistinguishable from those asserted against Defendants here.  On June 25, 2018, Judge William H. Alsup granted a motion to dismiss claims brought by the municipalities of San Francisco and Oakland because, among other reasons, the state law causes of action pled in those cases were displaced by uniquely federal interests.  *City of Oakland et al.* v. *BP P.L.C., et al.*, Nos. C 17-6011, C 17-6012, 2018 WL 3109726 (N.D. Cal. June 25, 2018).  In so ruling, Judge Alsup noted that in those cases, as in *AEP*, "Congress has vested in the EPA the problem of greenhouse gases and has given it plenary authority to solve the problem at the point of emissions." *Id.* at *6. Judge Alsup likewise found the state law claims brought by San Francisco and Oakland raise the prospect of liability based on "defendants' placement of fossil fuels into the flow of international commerce," which triggers federal concerns related to the foreign affairs of the United States. *Id.*  Given this close nexus with uniquely federal areas of authority, Judge Alsup found that it was "proper for the scope of plaintiffs' claims to be decided under federal law," although he ultimately concluded that "regulation of the worldwide problem of global warming should be determined by our political branches," not the courts. *Id.* at *9.  Consistent with the foregoing precedent and recognizing the uniquely federal interests implicated by this climate change lawsuit, Plaintiffs' claims are properly heard in this federal forum.

3

**App. 14**

4.    Further, as discussed in more detail below, removal is authorized on the following additional grounds:

● Plaintiffs' claims are completely preempted by the Clean Air Act, which provides an exclusive federal remedy for plaintiffs seeking stricter regulation of the greenhouse gas emissions challenged in this action.

● This action necessarily and unavoidably raises disputed and substantial "federal issues" that, under *Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Manufacturing*, a federal court may "entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." 545 U.S. 308, 314 (2005).

● Plaintiffs' claims arise from incidents occurring in federal enclaves, particularly Rocky Mountain National Park and Uncompahgre National Forest, making them removable to a federal court. *See* U.S. Const., art. I, § 8, cl. 17; *Akin* v. *Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998).

● This Court has original jurisdiction over this lawsuit and removal is proper pursuant to the Outer Continental Shelf Lands Act ("OCSLA"). 43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline* v. *Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

● Plaintiffs' allegations pertain to actions certain Defendants took at the direction of federal officers, and their claims can be met with colorable federal defenses. *See Equity Staffing Grp. Inc.* v. *RTL Networks, Inc.*, No. 13-CV-3510-WJM-KLM, 2014 WL 2566316, at *2 (D. Colo. June 6, 2014) (citing *Greene* v. *Citigroup, Inc.*, 215 F.3d 1336 (Table), 2000 WL 647190, at *2 (10th Cir. 2000)).

**App. 15**

●    Plaintiffs' state-law claims are related to bankruptcy proceedings under Title 11 of the United States Code. 28 U.S.C. §§ 1334(b) and 1452(a).

5.    For all the foregoing reasons, removal is authorized and this action is properly before this Court.

**<u>TIMELINESS OF REMOVAL</u>**

6.    Plaintiffs filed their original complaint against Defendants in the Boulder County Combined Court, Case No. 2018-cv-03049, on April 17, 2018, and filed their amended complaint against Defendants on June 11, 2018 (the "Amended Complaint").  Plaintiffs served Suncor Energy (U.S.A.) Inc. and Suncor Energy Sales Inc. with the Amended Complaint on June 13, 2018 and served[2] Suncor Energy Inc. on June 15, 2018.  Plaintiffs served ExxonMobil on June 14, 2018.  Copies of all process, pleadings, or orders served on Defendants are attached as <u>Exhibit A</u>.

7.    This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed fewer than 30 days after service.  28 U.S.C. § 1446(b)(1).  All Defendants consent to this removal.[3]

---

[2] Suncor Energy Inc. reserves the right to challenge service of process or sufficiency of service.

[3] In filing or consenting to this Notice of Removal, Defendants do not waive, and expressly preserve, their right to challenge personal jurisdiction, service of process, or sufficiency of service in any federal or state court with respect to this action.  A number of Defendants contend that personal jurisdiction in Colorado is lacking over them, and these Defendants will file motions at the appropriate time to dismiss for lack of personal jurisdiction. *See Saucedo* v. *Martinez*, No. 18-CV-00080-NYW, 2018 WL 774342, at *2 (D. Colo. Feb. 8, 2018) (citing *Morris & Co.* v. *Skandinavia Ins. Co.,* 279 U.S. 405, 409 (1929) ("holding removal of a case to federal court does not constitute a waiver of the right to object to lack of personal jurisdiction")).

**App. 16**

## GROUNDS FOR REMOVAL

8.      This action is removable on the basis of federal question jurisdiction.  Any "civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed . . . to the district court of the United States for the district and division embracing the place where such action is pending" unless Congress has expressly provided otherwise.  28 U.S.C. § 1441(a).  Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Specifically, removal is proper on seven grounds, each of which is independently sufficient to permit removal.  Each of these separate grounds is addressed in detail below.

9.      Should Plaintiffs challenge this Court's jurisdiction, Defendants reserve the right to assert further grounds in support of removal in addition to those specified in this Notice.  *See Dart Cherokee Basin Operating Co.* v. *Owens*, 135 S. Ct. 547, 551 (2014) ("To remove a case from a state court to a federal court, a defendant must file in the federal forum a notice of removal 'containing a short and plain statement of the grounds for removal'. . . . A statement 'short and plain' need not contain evidentiary submissions." (citing 28 U.S.C. § 1446(a))).

## I.      REMOVAL IS PROPER BECAUSE PLAINTIFFS' CLAIMS ARISE ONLY UNDER FEDERAL COMMON LAW

10.      First, this Court has federal question jurisdiction over Plaintiffs' claims because Plaintiffs' claims can only arise—if at all—under federal common law. 28 U.S.C. § 1331 grants federal courts original jurisdiction over "claims founded upon federal common law as well as those of a statutory origin."  *Nat'l Farmers Union Ins. Companies* v. *Crow Tribe of Indians*, 471 U.S. 845, 850 (1985) (quoting *Illinois* v. *City of Milwaukee*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*")).  Although "[t]here is no federal general common law," *Erie R.R. Co.* v.

**App. 17**

*Tompkins*, 304 U.S. 64, 78 (1938), there remain "some limited areas" in which the governing legal rules will be supplied, not by state law, but by "what has come to be known as 'federal common law.'" *Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *United States* v. *Standard Oil Co. of Cal.*, 332 U.S. 301, 308 (1947)).

11.     Federal common law governs in areas in which there are "uniquely federal interests" such that application of state law would be inappropriate. *Boyle*, 487 U.S. at 504–07. *See generally* Henry J. Friendly, *In Praise of* Erie—*and the New Federal Common Law*, 39 N.Y.U. L. Rev. 383 (1964). Uniquely federal interests exist, for example, where the issue is one that by its nature is "within national legislative power" and there is a "demonstrated need for a federal rule of decision" on that issue. *AEP*, 564 U.S. at 421–22 (citation omitted). Such interests are also present where "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 641.

12.     The general subject of environmental law and the regulation of "air and water in their ambient or interstate aspects" are areas of uniquely federal interests. *AEP*, 564 U.S. 410, 421 (2011) (quoting *Milwaukee I,* 406 U.S. at 103); *see Kivalina*, 696 F.3d at 855.

13.     In *AEP*, the Supreme Court held that tort claims arising from climate change are governed by federal common law. Plaintiffs, including eight states, sued five electric utilities contending that "defendants' carbon-dioxide emissions" contributed to global warming and "created a 'substantial and unreasonable interference with public rights,' in violation of the federal common law of interstate nuisance, or, in the alternative, of state tort law." 564 U.S. at 418. Like Plaintiffs here, the *AEP* plaintiffs "alleged that public lands, infrastructure, and health were at risk from climate change," and they sought to impose liability on utility companies for

**App. 18**

contributing to climate change. *Id.* Holding that the plaintiffs' federal common law claims were displaced by the Clean Air Act, the Supreme Court agreed that "federal common law" governs a public nuisance claim involving the interstate aspects of air and water. *AEP*, 564 U.S. at 421–22. "Environmental protection," the Court reasoned, "is undoubtedly an area 'within national legislative power,' [and] one in which federal courts may fill in 'statutory interstices.'" *Id.* at 421 (quoting *Erie R.R. Co.*, 304 U.S. at 421–22).

14.     Similarly, in *Kivalina*, the Ninth Circuit found tort claims involving climate change subject to federal common law. Kivalina, an Alaskan village and city, asserted public nuisance claims for damages to its property and infrastructure as a result of "sea levels ris[ing]" and other impacts allegedly resulting from energy companies' "emissions of large quantities of greenhouse gases." *Id.* at 853–54. Concluding that the suit fell within federal common law, the Ninth Circuit explained that "federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.* at 855. As such, as the Ninth Circuit concluded, claims arising from injuries allegedly caused by *global* warming involves interstate and, indeed, international aspects that inherently implicate uniquely federal interests and responsibilities. *Id.*; *see also Massachusetts* v. *EPA*, 549 U.S. 497, 498 (2007) ("The sovereign prerogatives to force reductions in greenhouse gas emissions, to negotiate emissions treaties with developing countries, and (in some circumstances) to exercise the police power to reduce motor-vehicle emissions are now lodged in the Federal Government.").

15.     The Amended Complaint itself references the unbounded nature of greenhouse gas emissions, diversity of sources, and magnitude of the attendant consequences. *See, e.g.*, Am. Compl. ¶¶ 125–30. Causes of action arising from global climate change are not constrained to

particular sources, cities, counties, or states.  They implicate inherently national and international interests, including federal and international regulatory schemes.  Embracing a supra-national agenda, Plaintiffs fault ExxonMobil for having "supplied a substantial portion of all fossil fuels used *worldwide*."  Am. Compl. ¶ 81 (emphasis added).  But "transboundary pollution suits," like Plaintiffs' suit, have long been governed by "federal common law."  *Kivalina*, 696 F.3d at 855; *see also Milwaukee I*, 406 U.S. at 107 n.9 ("Federal common law and not the varying common law of the Individual States is . . . entitled and necessary to be recognized as a basis for dealing in uniform standard with the environmental rights of a State against improper impairment by sources outside its domain.").

16.    Consistent with the conclusions of the Supreme Court and the Ninth Circuit, federal courts in this circuit have also acknowledged the global nature of climate change and climate policy.  *See, e.g.*, *Amigos Bravos* v. *U.S. Bureau of Land Mgmt.*, 816 F. Supp. 2d 1118, 1135 (D.N.M. 2011) (recognizing that "climate change is a global phenomenon whose manmade causes originated decades or centuries ago with the advent of the industrial revolution and continue today.  Thus, climate change is dependent on an unknowable multitude of GHG sources and sinks.").

17.    Under that precedent, Plaintiffs' claims are governed by federal common law.[4] The gravamen of Plaintiffs' claims is that Defendants "*knowingly* caused and contributed to the

---

[4]  Although Plaintiffs purport to style their claims as arising under state law, the law is well settled that, in determining whether a case arises under federal law and is properly removable, the Plaintiffs' proffered position on a question of law is not entitled to any deference but is instead subject to independent and *de novo* review by the court.  *See Lovell* v. *State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006) ("This Court reviews a district court's ruling on the propriety of removal de novo.").

9

**App. 20**

alteration of the climate by producing, promoting, refining, marketing and selling fossil fuels at levels that have caused and continue to cause climate change, while concealing and/or misrepresenting the dangers associated with fossil fuels' intended use." Am. Compl. ¶ 5.[5]  These claims implicate uniquely federal interests in environmental protection, which "is undoubtedly an area 'within national legislative power,'. . . in which federal courts may fill in 'statutory interstices.'" *AEP*, 564 U.S. at 421 (quoting *Erie R.R. Co.*, 304 U.S. at 421–22).  Plaintiffs' claims also involve the regulation of "air and water in their ambient or interstate aspects," which are areas of uniquely federal interests governed by federal common law.  *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103).  As in *AEP* and *Kivalina*, federal common law applies here.

18.    A uniform federal approach to greenhouse gas emissions is needed because "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum." *AEP*, 564 U.S. at 427.  Rather, "as [a] question[] of national [and] international policy," "the environmental benefit potentially achievable" must be weighed against "energy needs and the possibility of economic disruption." *Id.*  For example, the imposition of tort liability for allegedly unreasonable contributions to *global* warming would require a balancing of worldwide emissions traceable to sales of Defendants' products and the benefits of Defendants' global activities.  A patchwork of 50 states' common law rules cannot properly be applied to such claims without impairing federal interests in environmental protection, energy production, and economic development.  As a result, the Supreme Court

---

[5]  Defendants dispute that they have engaged in any wrongful conduct, including that they allegedly concealed or misrepresented any facts related to Plaintiffs' allegations.

**App. 21**

expressly recognized in *AEP* that, in the circumstances of global climate change, "borrowing the law of a particular State would be inappropriate." *Id.* at 422. Global warming-related tort claims are governed by federal common law.

19.    These commonsense principles were recently applied to underscore that a federal court is the proper forum for claims indistinguishable from those asserted against ExxonMobil in this case. On June 25, 2018, Judge William H. Alsup of the United States District Court for the Northern District of California granted ExxonMobil's motion to dismiss claims brought by the municipalities of San Francisco and Oakland because, among other reasons, the state law causes of action pled in those cases were displaced by uniquely federal interests. *City of Oakland et al.* v. *BP P.L.C., et al.*, Nos. C 17-6011, C 17-6012, 2018 WL 3109726 (N.D. Cal. June 25, 2018). Judge Alsup ruled that for such cases "Congress has vested in the EPA the problem of greenhouse gases and has given it plenary authority to solve the problem at the point of emissions." *Id.* at *6. Judge Alsup likewise found that plaintiffs' state law claims sought to hold the defendants liable for their "placement of fossil fuels into the flow of international commerce," once again triggering federal concerns implicated by foreign affairs. *Id.* Judge Alsup held that it "remain[ed] proper for the scope of plaintiffs' claims to be decided under federal law, given the international reach of the alleged wrong" even though plaintiffs had not asserted viable claims. *Id.* at *9. So too here.

20.    A federal court's authority to assert jurisdiction over a federal common law claim does not turn on whether the underlying claim has merit or would survive a motion to dismiss. At this stage of the litigation, the relevant question before this Court is whether this uniquely federal case belongs in federal court. *See Morrison* v. *Nat'l Australia Bank*, 561 U.S. 247, 254

11

**App. 22**

(2010). The decision that federal common law applies to a particular issue inherently reflects a determination that state law does *not* apply. *Helfrich* v. *Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1096 (10th Cir. 2015) ("[A] few areas, involving uniquely federal interests, are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced [by] . . . federal common law") (quoting *Boyle*, 487 U.S. at 504; *see also City of Milwaukee* v. *Illinois & Michigan*, 451 U.S. 304, 313 n.7 (1981) ("*Milwaukee II*") ("[I]f federal common law exists, it is because state law cannot be used."). Whether the suit might suffer from an impediment, even a fatal one, once in federal court, is irrelevant to the removability inquiry.

21.    Accordingly, Plaintiffs' claims are governed by federal common law and may be removed on that basis.

## II.    PLAINTIFFS' CLAIMS ARE COMPLETELY PREEMPTED BY FEDERAL LAW

22.    Second, this action is removable under the doctrine of complete preemption. Complete preemption makes a case "removable from state to federal court from the outset." *Hansen* v. *Harper Excavating, Inc.*, 641 F.3d 1216, 1221 (10th Cir. 2011).

23.    The Supreme Court has held that a federal court will have jurisdiction over an action, even one alleging only state-law claims, on the basis of complete preemption where "the extraordinary pre-emptive power [of federal law] converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metro. Life Ins. Co.* v. *Taylor*, 481 U.S. 58, 65 (1987).

24.    A cause of action pled as a state law claim is preempted under the "complete preemption" doctrine when (a) a federal statutory scheme "provide[s] the exclusive cause of

action for the claim asserted," *Beneficial Nat'l Bank* v. *Anderson*, 539 U.S. 1, 8 (2003); and

(b) the state law claim "duplicates, supplements, or supplants" the federal cause of action, *Aetna*

*Health Inc.* v. *Davila*, 542 U.S. 200, 209 (2004).  Both of these elements are satisfied here.

      25.     First, the Clean Air Act provides the exclusive cause of action for challenging the

regulation of nationwide emissions.

      26.     The Clean Air Act empowers the Environmental Protection Agency (the "EPA")

to "protect and enhance the quality of the Nation's air resources so as to promote the public

health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).

Pursuant to this authority, "emissions have been extensively regulated nationwide" in a

comprehensive regulatory scheme setting emissions limits for various pollutants.  *North*

*Carolina* v. *Tenn. Valley Auth.,* 615 F.3d 291, 298 (4th Cir. 2010).  This scheme extends to

greenhouse gas emissions, which have been the subject of many EPA regulations.  *See, e.g.*,

40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(1)(i) (regulation of greenhouse gases through the Act's

prevention of significant deterioration of air quality permitting program); 77 Fed. Reg. 62,624

(Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); 81 Fed.

Reg. 73,478 (Oct. 25, 2016) (regulation of greenhouse gas emissions from medium- and

heavy-duty engines and motor vehicles).

      27.     The Clean Air Act permits private parties, as well as state and municipal

governments, to challenge EPA rulemakings (or the absence of such) and to petition the EPA to

undertake new rulemakings.  *See, e.g.*, 5 U.S.C. § 553(e); 42 U.S.C. §§ 7604, 7607.  For

example, the Commonwealth of Massachusetts obtained, pursuant to this process, a judicial

determination that greenhouse gases were air pollutants that could be regulated under the Act,

*Massachusetts,* 549 U.S. at 534–35, which eventually led to the regulation of greenhouse gases from motor vehicles under section 202(a) of the Act, 75 Fed. Reg. 25,324 (May 7, 2010).

28.    Congress's intent that judicial review of the Clean Air Act take place only in federal court is unmistakable.  Challenges to EPA rulemaking under the Act must occur within the U.S. Courts of Appeals.  42 U.S.C. § 7607(b)(1).  In light of the federal forum's exclusive authority over this subject matter, federal courts have recognized that the Clean Air Act preempts state common law nuisance claims.  And for good reason: "If courts across the nation were to use the vagaries of public nuisance doctrine to overturn the carefully enacted rules governing airborne emissions, it would be increasingly difficult for anyone to determine what standards govern.  Energy policy cannot be set, and the environment cannot prosper, in this way."  *North Carolina,* 615 F.3d at 298.  Accordingly, the process established by the Clean Air Act to challenge emissions restrictions is the exclusive mechanism for review.

29.    Second, Plaintiffs' claims duplicate, supplement, or supplant the Clean Air Act's review procedures.

30.    In their Amended Complaint, Plaintiffs directly attack the reasonableness of Defendants' production, promotion, and sale of fossil fuels and the emissions that result from those activities.  *See, e.g.*, Am. Compl. ¶ 453 (Defendants' "interference with public rights is unreasonable.").  Plaintiffs do not allege, however, that Defendants' conduct has violated any federal statute or regulation, including the Clean Air Act or the EPA's nationwide emissions standards.  Rather than petitioning the EPA to amend its emissions standards and revise its regulations, Plaintiffs have improperly brought this action that attempts to usurp the regulatory authority of the federal government by seeking to impose civil liability through novel state tort

14

**App. 25**

claims.  Federal preemption applies to just such an end-run around a comprehensive and exclusive regulatory program.

31.    State tort law is a form of public regulation. The Supreme Court has recognized that "[s]tate power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute."  *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 572 n.17 (1996); *see also N.Y. Times Co.* v. *Sullivan*, 376 U.S. 254, 278 (1964) ("Plainly the Alabama law of civil libel is a 'form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law.'" (citation omitted)).

32.    Plaintiffs' state-law tort claims seek to declare unreasonable nationwide emissions that conform to EPA emission standards.  It is irrelevant that Plaintiffs have attempted to artfully craft their pleadings to focus on Defendants' sale or promotion of fossil fuels—as all of Plaintiff's alleged injuries only arise (if at all) from *the emissions* generated from the use and combustion of those fossil fuels by third parties, including Plaintiffs themselves.  Specifically, the Amended Complaint argues that concentrations of greenhouse gases in the atmosphere are too high, unreasonable, and have caused excessive global warming, Am. Compl. ¶¶ 14–15, 123–31, 148–96, and that Plaintiffs' alleged injuries result from a global and undifferentiated atmospheric phenomenon caused by worldwide greenhouse-gas emissions. *Id.* ¶ 15.  In summary, it is the emissions that Plaintiffs are trying to regulate through their claims that commerce relating to fossil fuels—the source of the challenged emissions—is tortious.

33.    Such claims, if allowed to proceed, would supplant rulemaking regarding greenhouse gas emissions.  *See, e.g.*, *San Diego Bldg. Trades Council* v. *Garmon*, 359 U.S. 236, 247 (1959) ("[R]egulation can be as effectively exerted through an award of damages as through

**App. 26**

some form of preventive relief."); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) (same).  Plaintiffs' claims would require precisely the cost-benefit analysis of emissions that the EPA is charged with undertaking and, accordingly, would directly interfere with the EPA's determinations.  Because Congress has established an exclusive mechanism to petition the EPA for stricter nationwide emissions standards, Plaintiffs must pursue that process to obtain the regulations they seek.  They cannot invoke state nuisance law to obtain that result while disregarding the process Congress mandated as the sole means to influence nationwide emissions.  Accordingly, Plaintiffs' claims are preempted by the Clean Air Act and removable on that basis.  *See, e.g.*, *City of Oakland*, 2018 WL 3109726 at *6 (noting that, to the extent state law nuisance claims implicate emissions from within the United States, they are displaced by the Clean Air Act).

34.     Moreover, to the extent Plaintiffs seek to challenge inherently transnational activity, to do so in state court would inevitably intrude on the foreign affairs power of the federal government and is completely preempted.  *See Am. Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 418 (2003) ("[S]tate action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state [action], and hence without any showing of conflict.").

III.    **REMOVAL IS AUTHORIZED UNDER *GRABLE & SONS METAL PRODUCTS, INC.* v. *DARUE ENGINEERING & MANUFACTURING*, 545 U.S. 308 (2005)**

35.     Third, Plaintiffs' claims are also removable pursuant to *Grable & Sons Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*, because this action necessarily and unavoidably raises disputed and substantial "federal issues" that should be resolved in a federal forum.  5454 U.S. at 312.  Even if Plaintiffs had only pled state-law claims (which is not the case), *Grable* would

16

nevertheless call for removal.  Under *Grable*, "a state law claim could give rise to federal

question jurisdiction so long as it 'appears from the [complaint] that the right to relief depends

upon the construction or application of [federal law]." *Id.* at 313.  Specifically, a claim pled

under state law may be removed pursuant to federal question jurisdiction when "the federal issue

is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in

federal court without disrupting the federal-state balance approved by Congress." *Gunn* v.

*Minton*, 568 U.S. 251, 258 (2013).

36.    Determining whether these factors are present "calls for a common-sense

accommodation of judgment to [the] kaleidoscopic situations that present a federal issue" and

thus "justify resort to the experience, solicitude, and hope of uniformity that a federal forum

offers on federal issues." *Grable*, 545 U.S. at 312–13 (alterations in original) (quoting *Gully* v.

*First Nat'l Bank in Meridian*, 299 U.S. 109, 117 (1936)).

37.    The Amended Compliant raises federal issues under *Grable* because it seeks to

have a court determine for the entire United States, as well as Canada and other foreign actors,

the appropriate balance between the production, sale, and use of fossil fuels and addressing the

risks of climate change.  Such an inquiry necessarily entails the resolution of substantial federal

questions concerning important federal regulations, contracting, and diplomacy.  Any one of

those three federal prerogatives would be sufficient to confer jurisdiction on this Court.  That all

three are present here makes federal jurisdiction indisputable.

A.     **The Amended Complaint's Second-Guessing of Congress and Designated
Federal Agencies Raises a Substantial Federal Issue under *Grable***

38.    Plaintiffs raise questions about federal policies and regulations pertaining to

energy and the environment.  Plaintiffs fault Defendants for selling "an enormous amount of

17

fossil fuels," which they contend "caused and contributed to climate change."  Am. Compl. ¶¶

322, 326.  For a court to determine whether Plaintiffs' nuisance and related tort claims are even

legally viable, it would have to evaluate whether it was reasonable for Defendants to place fossil

fuels into the stream of interstate and foreign commerce and promote the use of those products.

*See Safe Sts. All.* v. *Hickenlooper*, 859 F.3d 865, 886 (10th Cir. 2017); *Pub. Serv. Co. of Colo.* v.

*Van Wyk*, 27 P.3d 377, 391 (Colo. 2001).  The inquiry, in turn, must focus on the background

regulatory scheme against which the reasonableness of Defendants' conduct can be judged.

     39.     That context is federal in nature.  Congress and the EPA have weighed the costs

and benefits of reliance on fossil fuels, considering both energy and environmental policy.  The

federal government has permitted the sale of fossil fuels because affordable energy is

fundamental to economic growth and prosperity generally, as well as the national defense.  *Cf.*

*City of Oakland*, 2018 WL 3109726, at *5 ("[O]ur industrial revolution and the development of

our modern world has literally been fueled by oil and coal.  Without those fuels, virtually all of

our monumental progress would have been impossible.").  Likewise, protecting the environment

is a critical imperative that the United States Government has recognized for decades as

fundamental to health and quality of life.  Given the diffuse and broad impact of greenhouse gas

emissions, Congress has acted through a variety of federal statutes, primarily but not exclusively

the Clean Air Act, to strike a balance between energy production, on the one hand, and

environmental protection, on the other.  *See* Clean Air Act, 42 U.S.C. § 7401(c) (Congressional

statement that the goal of the Clean Air Act is "to encourage or otherwise promote reasonable

Federal, State, and local governmental actions . . . for pollution prevention"); *see also, e.g.*,

**App. 29**

Energy Reorganization Act of 1974, 42 U.S.C. § 5801(a); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201; Mining and Minerals Policy Act, 30 U.S.C. § 21a.

40.    Congress has also directed federal agencies to facilitate, and even promote, the maximum production of fossil fuels, while balancing environmental protection.  *See, e.g.*, 42 U.S.C. § 13384 ("[T]he Secretary shall transmit a report to Congress containing a comparative assessment of alternative policy mechanisms for reducing the generation of greenhouse gases.").  Likewise, the Executive has ordered federal agencies to "assess both the costs and benefits of [an] intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs."  Executive Order 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993).

41.    To determine whether Defendants' conduct is reasonable in light of the existing regulatory framework, a court must evaluate how the federal government struck the balance between energy promotion and environmental protection.[6]  *See, e.g.*, *City of Oakland*, 2018 WL 3109726 at *5.  That inquiry is "inherently federal in character." *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001); *see also Pet Quarters, Inc.* v. *Depository Tr. &*

---

[6]  Insofar as Plaintiffs ask a court to substitute its judgment on these issues for that of the federal government, it would constitute a "collateral attack on an entire regulatory scheme . . . premised on the notion that [the scheme] provides inadequate protection." *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E.* v. *Tenn. Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 724 (5th Cir. 2017) (internal quotations omitted).  Such an action should be not only removed but also dismissed. *See, e.g.*, *id.* at 724 ("The validity of [Plaintiffs'] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law.").

**App. 30**

*Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law).

42.     Insofar as Plaintiffs claim that Defendants misled the United States Government about the relevant policy trade-offs, *see* Am. Compl. ¶¶ 12, 408, they must establish that the government would have adopted different energy and climate policies and consumption patterns absent the alleged misrepresentations.  Such determinations would require a court to construe federal regulatory decision-making standards, and determine how federal regulators would have applied those standards under counterfactual circumstances.  Doing so would also raise a federal issue.

**B.     Plaintiffs' Action Attacks the Federal Government's Own Contracts Requiring Fossil Fuels to Be Developed and Sold, Which Is a Significant Federal Issue under *Grable***

43.     Plaintiffs' action raises a significant federal issue under *Grable* for the further reason that it attacks the decision of the federal government to enter into contracts with Defendant ExxonMobil to (i) extract, develop, and sell fossil fuel resources on federal lands and (ii) supply the federal government with petroleum-based fuels, including the military.  Plaintiffs believe that such activity has harmed them and seek to impose further costs on that activity, which will have the natural effect of reducing Defendants' ability to conduct those activities in an economic manner—if at all.

44.     Further, the Amended Complaint seeks to deprive the federal government of a mechanism for carrying out vital governmental functions and, if successful, would starve the federal treasury of billions of dollars in revenue.  Courts have recognized that the frustration of federal objectives constitutes a federal interest under *Grable*.  *See Gilmore* v. *Weatherford*,

**App. 31**

694 F.3d 1160, 1174 (10th Cir. 2012) ("As explained in *Grable*, a 'substantial federal issue' is one that 'indicat[es] a serious federal interest in claiming the advantages thought to be inherent in a federal forum.' Such an interest is present here." (citation omitted)); *Nicodemus* v. *Union Pac. Corp.*, 440 F.3d 1227, 1236 (10th Cir. 2006) ("We agree that the contested interpretation of the federal land-grant statutes as between these parties involves a substantial federal issue."). The potential for Plaintiffs' lawsuit to deprive the United States Government of its preferred means of implementing federal policy presents another federal issue.

### C.    Plaintiffs' Action Threatens to Interfere with the Political Branches' Conduct of Foreign Affairs, Which Is Another Significant Federal Issue under *Grable*

45.    Plaintiffs' claims also satisfy *Grable* because they have far "more than incidental effect[s] on foreign affairs." *Garamendi*, 539 U.S. at 418. Claims that implicate the "exercise of state power that touches on foreign relations" in a significant way "must yield to the National Government's policy." *Id.* at 13. That is due to "the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Id.* (quoting *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 427 n.25 (1964)).

46.    Addressing climate change has been the subject of international negotiations for decades, from the adoption of the United Nations Framework Convention on Climate Change in 1992 through the Paris Agreement in 2016. The United States' approach to these delicate negotiations has evolved over time but has always sought to balance environmental policy with robust economic growth. *See, e.g.*, *Massachusetts*, 549 U.S. at 509, 523–24 (describing Senate rejection of the Kyoto Protocol because emissions-reduction targets did not apply to "heavily

**App. 32**

polluting nations such as China and India," and EPA's determination that predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), https://www.whitehouse.gov/the-press-office/2017/06/01/statement-president-trump-paris-climate-accord (announcing United States' withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to impose proportionate restrictions on Chinese emissions).

47.    Plaintiffs' lawsuit asks a court to weigh in on precisely those issues.  To adjudicate their claims, a court must consider whether restrictions and burdens beyond those established in international agreements should limit Defendants' ability to extract, refine, and distribute energy.[7]  That raises another significant federal issue sufficient to satisfy the first element of *Grable*.

48.    All three of the federal issues raised in the Amended Complaint are disputed and substantial, thus satisfying the second and third elements of *Grable* as well.  The issues are disputed because Defendants will seek dismissal of Plaintiffs' claims based on their incompatibility with federal regulations and policy, including those pertaining to energy and the environment, and because the claims undermine federal contracting decisions and the conduct of foreign affairs.  The issues are substantial because they pertain to vital elements of federal

---

[7]  To the extent Plaintiffs seek to regulate global greenhouse gas emissions in a manner inconsistent with the treaties and international commitments of the United States Government, their Complaint is subject not only to removal, but to dismissal as well.  "No State can rewrite our foreign policy to conform to its own domestic policies.  Power over external affairs is not shared by the States; it is vested in the national government exclusively."  *United States* v. *Pink*, 315 U.S. 203, 233–34 (1942).

**App. 33**

authority: (i) national energy and environmental policy; (ii) federal contracts for energy development and supply; and (iii) international agreements pertaining to the environment and economic development.  And an adverse ruling could have significant consequences on those issues.  *See, e.g.*, *Tenn. Gas*, 850 F.3d at 724 (finding federal issues substantial where "the validity of [Plaintiffs'] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law.").  Each of these weighty concerns is independently sufficient to satisfy *Grable*'s requirement that the federal issue be substantial.

D.    **The Significant Federal Issues Plaintiffs Have Raised are Disputed, Substantial, and Properly Resolved in a Federal Forum**

49.    Finally, the exercise of federal jurisdiction over this action is fully "consistent with congressional judgment about the sound division of labor between state and federal courts," *Grable*, 545 U.S. at 313, satisfying *Grable*'s fourth element.  At their core, the issues raised in the Amended Complaint pertain to the appropriate trade-off between national energy production and pollution control.  Those issues are federal in nature, involving the regulation of vital national resources, environmental law, foreign policy and national security.  Federal courts are the traditional forums for adjudicating such claims.  Indeed, permitting state courts to hear these claims would threaten the balance in federal-state relations.  State governments must yield to the federal government in such matters so that its exclusively national power is "entirely free from local interference."  *Hines* v. *Davidowitz*, 312 U.S. 52, 63 (1941).  As Judge Alsup concluded just days ago in *City of Oakland*, the "international reach of the alleged wrong" of climate change requires "the scope of plaintiffs' claims to be decided under federal law," thereby opening the doors to a federal forum for that decision to be made.  2018 WL 3109726, at *9.

23

**App. 34**

50.     Accordingly, the Amended Complaint raises federal issues that satisfy the requirements of *Grable* and provide another basis for removal to federal court.

## IV.    PLAINTIFFS' CLAIMS ARISE IN PART FROM INCIDENTS THAT OCCURRED IN FEDERAL ENCLAVES LOCATED WITHIN PLAINTIFFS' BORDERS

51.     Federal enclave jurisdiction provides another basis for removal.  "The United States has power and exclusive authority 'in all Cases whatsoever . . . over all places purchased' by the government 'for the erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings.'"  *Akin*, 156 F.3d at 1034 (quoting U.S. Const. art. I, § 8, cl. 17).  "Such places are 'federal enclaves' within which the United States has exclusive jurisdiction."  *Id.* Causes of action "which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction."  *Id.*

52.     Here, Plaintiffs' claims arise, in part, from incidents occurring in two federal enclaves within their borders: (i) Rocky Mountain National Park, and (ii) Uncompahgre National Forest.

53.     Rocky Mountain National Park is a federal enclave.  The federal government "purchased" the land comprising Rocky Mountain National Park within the meaning of Article I, Section 8, Clause 17 of the Constitution.  The State of Colorado ceded these lands, and exclusive jurisdiction over them, to the federal government.  C.R.S. § 3-1-130 ("Exclusive jurisdiction shall be and the same is hereby ceded to the United States of America over and within all of the territory which is now included in that tract of land in the state of Colorado set aside and dedicated for park purposes by the United States, known as the Rocky Mountain National Park").  No later than January 26, 1915, the federal government accepted jurisdiction over Rocky

**App. 35**

Mountain National Park when President Woodrow Wilson signed the Rocky Mountain National Park Act, making it a federal enclave.  *See* 16 U.S.C. §§ 191–195a; *see also* Grand Lake Colo., *History of Rocky Mountain National Park*, https://grandlakechamber.com/rocky-mountain-national-park-history/ (last visited June 27, 2018).  A substantial portion of Rocky Mountain National Park is within the borders of Boulder County.

54.     Plaintiffs' allegations regarding the impact of climate change on their communities arise in part from incidents occurring in the portion of Rocky Mountain National Park that is within Boulder County.  Plaintiffs support their claims by asserting in the Amended Complaint that Defendants are responsible for a recent severe insect outbreak across Rocky Mountain National Park.  Am. Compl. ¶ 183.  Plaintiffs also allege that "climate change will bring more (and more serious) heat waves, wildfires, droughts, and floods to the State," which necessarily includes Rocky Mountain National Park.  *Id.* ¶ 3.  Plaintiffs further allege that "Boulder is projected to see an increase in the intensity of short duration rain events," and "an increased risk of flooding, which threatens people, property and infrastructure in all of Plaintiff[s'] communities," necessarily including Rocky Mountain National Park.  *Id.* ¶¶ 162–63. The Amended Complaint's claims, therefore, arise from incidents in a federal enclave**.**

55.     Uncompahgre National Forest is a federal enclave.  The federal government "purchased" the land comprising the Uncompahgre National Forest within the meaning of Article I, Section 8, Clause 17 of the Constitution.  The State of Colorado ceded these lands, and exclusive jurisdiction over them, to the federal government.  C.R.S. § 3-1-122.  No later than President Theodore Roosevelt's June 14, 1905 proclamation, the federal government accepted jurisdiction of the Uncompahgre National Forest Reserve and designated it the "The

**App. 36**

Uncompahgre Forest Reserve."  Proclamation No. 576 (June 14, 1905).  A significant portion of Uncompahgre National Forest is within the borders of San Miguel County.

56.     Plaintiffs' allegations regarding the impact of climate change on their communities arise from incidents occurring in the portion of Uncompahgre National Forest that is within San Miguel County.  For example, the Amended Complaint alleges that the San Miguel River "connects the communities of the County from the high alpine headwater towns dependent on consistent snow pack, forested landscapes and a healthy river system to the agricultural communities dependent on healthy spring runoff and summer flows."  Am. Compl. ¶ 31.  This connecting stretch of the San Miguel River runs through the portion of Uncompahgre National Forest that is within San Miguel County.  The Amended Complaint alleges that global warming has increased the risk of flooding in this area: "San Miguel County is extremely susceptible to riverine flooding given the steep mountainous terrain and the multitude of creeks and streams that eventually flow into the San Miguel River."  *Id.* ¶ 236.  Those phenomena occur in the portion of Uncompahgre National Forest where the San Miguel River is found, which is within the borders of San Miguel County.  The Amended Complaint's claims, therefore, arise in part from incidents that have occurred or will allegedly occur in a federal enclave.

57.     Where, as here, the Amended Complaint alleges injuries arising from incidents in federal enclaves, removal is appropriate.

## V.     THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

58.     This Court also has original jurisdiction over this action pursuant to the Outer Continental Shelf Lands Act ("OCSLA"). 43 U.S.C. § 1349(b).  "OCSLA was passed . . . to establish federal ownership and control over the mineral wealth of the [outer Continental Shelf

**App. 37**

("OCS")] and to provide for the development of those natural resources." *EP Operating Ltd. P'ship* v. *Placid Oil Co.*, 26 F.3d 563, 566 (5th Cir. 1994). The OCS includes all submerged lands that belong to the United States but are not part of any state. 43 U.S.C. §§ 1301, 1331.

59. "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary reason for OCSLA." *Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988). And OCSLA declares it "to be the policy of the United States that . . . the outer Continental Shelf . . . should be made available for expeditious and orderly development." 43 U.S.C. § 1332(3). It further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the federal government relating to exploration for, and development and production of, minerals of the outer Continental Shelf." *Id.* § 1332(4) (emphasis added).

60. Under OCSLA, the Department of Interior administers an extensive federal leasing program to develop and exploit the oil and gas resources of the OCS. 43 U.S.C. § 1334 *et seq.* Pursuant to that authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres. In FY 2015, production from these leases generated $4.4 billion in leasing revenue . . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production." Statement of Abigail

**App. 38**

Ross Hopper, Director, Bureau of Ocean Energy Mgmt., Before the H. Comm. on Nat. Res.

(Mar. 2, 2016), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.

61.    OCSLA provides for federal jurisdiction over any action that "aris[es] out of, or in

connection with . . . any operation conducted on the outer Continental Shelf which involves

exploration, development, or production of the minerals, or the subsoil or seabed of the outer

Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b)(1).[8]

62.    Courts have construed OCSLA's statutory language as "straightforward and

broad."  *See In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014).  The breadth of this

grant of jurisdiction reflects the Act's "expansive substantive reach."  *See EP Operating Ltd.*

*P'ship*, 26 F.3d at 569.  When enacting Section 1349(b)(1), "Congress intended for the judicial

power of the United States to be extended to the entire range of legal disputes that it knew would

arise relating to resource development on the [OCS]."  *Laredo Offshore Constructors, Inc.* v.

*Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985); *see also Ronquille* v. *Aminoil Inc.*, 2014 WL

4387337, at *2 (E.D. La. Sept. 4, 2014) (finding the arising out of prong satisfied because "at

least part of the work that Plaintiff allege[d] caused his exposure to asbestos arose out of or in

connection with Shell's OCS operations").  Consistent with Congress' intent, courts have

repeatedly found OCSLA jurisdiction where resolution of the dispute could foreseeably affect

the efficient exploitation of minerals from the OCS.

---

[8]  Likewise, 43 U.S.C. § 1333(a)(1) states that "[t]he Constitution and laws . . . of the
United States are extended to the subsoil and seabed of the outer Continental Shelf . . . to the
same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction
located within a State . . . ."

**App. 39**

63. OCSLA jurisdiction can exist even if a complaint pleads no substantive OCSLA claims. *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163. Likewise, courts are not limited to the facts a plaintiff chooses to allege. To determine whether claims fall within OCSLA jurisdiction, courts may consider facts outside the operative complaint. *See, e.g.*, *Plains Gas Solutions* v. *Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014).

64. Plaintiffs' claims fall within the reach of OCSLA jurisdiction because they arise from, or are connected to, Defendant ExxonMobil's activities in the OCS. For decades, Defendant ExxonMobil and/or its affiliated companies have participated in the OCS leasing program, and they continue to conduct oil and gas operations on the OCS. *See* Bureau of Ocean Energy Mgmt., Lease Owner Online Query, https://www.data.boem.gov/Leasing/LeaseOwner/Default.aspx (search in "Company Name" field for "Exxon Mobil Corporation").

65. Defendant ExxonMobil is a long-standing participant in the program and currently owns lease interests in "one of the largest [deepwater producing] discoveries in the Gulf of Mexico," which is capable of producing up to 250,000 barrels of oil per day. ExxonMobil, Worldwide Operations, Crude Trading, Thunder Horse, http://corporate.exxonmobil.com/en/company/worldwide-operations/crude-oils/thunder-horse.

66. In their Amended Complaint, Plaintiffs accuse Defendants of releasing "billions of tons of excess greenhouse gas emissions in the atmosphere" and take issue with all of Defendants' conduct that allegedly "exacerbated dangerous alterations in the climate." Am. Compl. ¶¶ 15, 445. By making all of Defendants' conduct the subject of their lawsuit, Plaintiffs necessarily sweep in Defendant ExxonMobil's activities on the OCS. Likewise, Plaintiffs'

**App. 40**

requested relief seeks to impose further costs on the extraction and development of fossil fuels, which will have consequences on Defendants' OCS development activities.  Because Plaintiffs' claims could "alter[] the progress of production activities on the OCS," they "threaten[] to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS."  *Amoco Prod. Co.*, 844 F.2d at 1211.  Where, as here, those concerns are present, "Congress intended such a dispute to be within the grant of federal jurisdiction contained in § 1349."  *Id.*  Because Plaintiffs' claims are connected to Defendant ExxonMobil's operations on the OCS, they are subject to removal under OCSLA jurisdiction.

## VI.   THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

67.    The action is removable under the Federal Officer Removal Statute because federal officers directed Defendant ExxonMobil to engage in the activities challenged in the Amended Complaint.

68.    The Federal Officer Removal Statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  "A private corporation may remove a case under § 1442(a)(1) if it can show: (1) that it acted under the direction of a federal officer; (2) that there is a causal nexus between the plaintiff's claims and the acts the private corporation performed under the federal officer's direction; and (3) that there is a colorable federal defense to the plaintiff's claims."  *Greene*, 2000 WL 647190 at * 2 (citing

*Winters* v. *Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398–400 (5th Cir. 1998)).  All three elements are satisfied here.[9]

69.    First, Defendant ExxonMobil's alleged improper conduct was undertaken, in part, at the direction of federal officials.  Defendants have long explored for and produced oil and gas on federal lands pursuant to leases issued by the federal government.  *See, e.g.*, Ex. B.  Under these leases, parties such as Defendant ExxonMobil, are required to conduct exploration, development and production activities that, "in the absence of a contract with a private firm, the Government itself would have had to perform."  *Watson* v. *Phillip Morris Companies, Inc.*, 551 U.S. 142, 154 (2007).  OCS leases obligate Defendant ExxonMobil to "develop[] . . . the leased area" diligently, including carrying out exploration, development and production activities approved by Interior Department officials for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area."  Ex. C § 10.

70.    Defendant ExxonMobil's OCSLA leases instruct that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions, and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee *shall drill* such wells and produce at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles."  Ex. B § 10 (emphasis added).  All drilling takes place "in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations

---

[9]  Defendant ExxonMobil is a corporation that constitutes a "person" within the meaning of the statute.  The Amended Complaint alleges that Defendants are private corporations, Am. Compl. ¶¶ 47, 58, 72, which the Tenth Circuit has found to have the right to remove a case under § 1442(a)(1).  *See Greene*, 2000 WL 647190 at *2.

coordination document (DOCD) [as well as] approval conditions"—all of which must undergo extensive review and approval by federal authorities, and all of which had to conform to "diligence" and "sound conservation practices."  Ex. C §§ 9, 10.  Federal officers further have reserved the rights to control the rates of mining, Ex. B § 10, and to obtain "prompt access" to facilities and records.  Ex. B § 11; Ex. C § 12.

71.    The government also maintains certain controls over the disposition of the leased oil and gas after it is removed from the ground.  For example, the government can precondition a lease on a right of first refusal to purchase all materials "[i]n time of war or when the President of the United States shall so prescribe," Ex. B § 15(d), Ex. C § 15(d), and mandate that 20% of all crude and natural gas produced pursuant to drilling leases be offered "to small or independent refiners," Ex. B § 15(c); Ex. C § 15(c).

72.    In light of these restrictions, obligations, and directives, Defendant ExxonMobil was acting at the direction of a federal officer within the meaning of Section 1442(a)(1) when it fulfilled its obligations under the leases.  The Tenth Circuit reached a similar conclusion when adjudicating claims arising from an EPA-mandated cleanup.  In that case, the Tenth Circuit held that a chemical company was acting under federal direction when it "implemented a remedy selected by the EPA" that governed the cleanup.  *Greene*, 2000 WL 647190 at *2.  When carrying out its duties under federal leases, Defendant ExxonMobil is likewise following the direction of the federal government.

73.    Second, there is a causal nexus between Plaintiffs' claims and the conduct Defendant ExxonMobil performed at the federal officer's direction.  Plaintiffs complain about Defendant ExxonMobil's development and promotion of fossil fuels.  Am. Compl. ¶¶ 321–26.

**App. 43**

They allege that the drilling and production operations Defendant ExxonMobil performed led to the sale of fossil fuels, including to the federal government, which led to the release of greenhouse gases by end-users. But that activity was precisely what the federal leases called upon Defendant ExxonMobil to do. Furthermore, the oil and gas Defendant ExxonMobil extracted—which the federal government (i) reserved the right to buy in total in the event of a time of war or whenever the President so prescribed and (ii) has purchased from Defendant ExxonMobil to fuel its military operations—is the very same oil and gas that Plaintiffs allege has created a nuisance and a trespass. Plaintiffs' claims therefore challenge the same conduct that was mandated by the leases.

74.    Third, Defendants have several federal defenses to Plaintiffs' claims that are not just colorable (as required under Section 1442(a)), but meritorious. *See Willingham* v. *Morgan*, 395 U.S. 402, 407 (1969) (a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed"). These defenses include preemption, *see Colorado Dept. of Pub. Health and Envtl., Hazardous Materials and Waste Mgmt. Div.* v. *U.S.*, 693 F.3d 1214, 1222 (10th Cir. 2012); the government contractor defense, *see Boyle*, 487 U.S. at 511–12; *Equity Staffing Grp. Inc.*, 2014 WL 2566316, at *2–3, and that Plaintiffs' claims are barred by the Commerce Clause, Due Process Clause, the First Amendment, and the foreign affairs doctrine. Each of these colorable federal defenses is sufficient to satisfy Section 1442.

75.    Accordingly, the Federal Officer Removal Statute authorizes removal.

## VII.    THE ACTION IS REMOVABLE UNDER THE BANKRUPTCY REMOVAL STATUTE

76.    The Amended Complaint is also removable because it relates to bankruptcy proceedings.

33

**App. 44**

77.     The Bankruptcy Removal Statute allows removal of "any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power," 28 U.S.C. § 1452(a), so long as the civil proceedings arise under or are "related to cases under" the bankruptcy code.  28 U.S.C. § 1334(b).

78.     An action is "related" to a bankruptcy case if it "could conceivably have any effect on the estate being administered in bankruptcy."  *In re Gardner*, 913 F.2d 1515, 1518 (10th Cir. 1990).  Removal is appropriate not just for pending bankruptcy cases but even for those in post-confirmation status so long as the action would affect the creditors' recovery under a particular plan.  *See In re CF Fabricators of Utah, Inc.*, 150 F.3d 1233, 1237 (10th Cir. 1998).

79.     There are many other bankrupt entities that, while not yet joined, are crucial to Plaintiffs' action.  Plaintiffs' claims are purportedly predicated on historical activities of Defendants, including predecessor companies and companies that Defendants may have acquired or with which they may have merged, as well as the historical activities of numerous unnamed but now bankrupt entities.  Am. Compl. ¶¶ 48–62, 73–79.  The claims Plaintiffs raise here could very well have some effect on at least one of those bankrupt estates.

80.     Accordingly, the Bankruptcy Removal Statute provides a further basis for removal to federal court.

81.     Based on the foregoing, this Court has original jurisdiction over this action under 28 U.S.C. § 1331.  Accordingly, removal of this action is proper under 28 U.S.C. §§ 1334, 1441, 1442, 1452, and 1446, as well as 43 U.S.C. § 1349(b).

**App. 45**

## VENUE

82.    The United States District Court for the District of Colorado is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiffs originally filed this case, in the Boulder County Combined Court.  *See* 28 U.S.C. § 84(a); 28 U.S.C. § 1441(a).

83.    Venue is proper in the District of Colorado pursuant to 28 U.S.C. §§ 1391(b)(2) and 1446(a)

## FILING OF NOTICE OF REMOVAL

84.    Pursuant to 28 U.S.C. § 1446(d), the filing of a copy of this Notice of Removal with the Clerk of the State Court effects the removal of the State Court Action.  A copy of the Notice of Filing of Notice of Removal, filed contemporaneously in the State Court Action, is attached hereto as Exhibit A.

## NO WAIVER

85.    No waiver, and no admission of fact, law, or liability, including, without limitation, the amount of damages, if any, is intended by this Notice of Removal, and all defenses, affirmative defenses, and rights are reserved.

## UNANIMITY

86.    All Defendants have consented to removal of this action.

## CONCLUSION

For the reasons set forth above, Defendants remove this action to the United States District Court for the District of Colorado.

**App. 46**

Dated:  June 29, 2018

Respectfully submitted,

*Below-signed counsel certifies that he is a member in good standing of the bar of this Court.*

s/ Evan Bennett Stephenson
Hugh Q. Gottschalk
Evan Bennett Stephenson
Wheeler Trigg O'Donnell LLP
370 17th Street, Suite 4500
Denver, Colorado 80202
303-244-1800
gottschalk@wtotrial.com
stephenson@wtotrial.com

Attorneys for Defendants,
Suncor Energy (U.S.A.) Inc., Suncor Energy Sales Inc., and Suncor Energy Inc.

s/ Colin G. Harris
Colin G. Harris, Atty. Reg. 18215
FAEGRE BAKER DANIELS LLP
1470 Walnut St., Suite 300
Boulder, CO 80302
Telephone: (303) 447-7700
Fax: (303) 447-7800
E-mail: colin.harris@FaegreBD.com

s/ Theodore V. Wells, Jr.
Theodore V. Wells, Jr.
NY Atty. Reg. 3936770
Daniel J. Toal
N.Y. Atty. Reg. 2811578
Jaren Janghorbani N.Y. Atty. Reg. 4284329
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: twells@paulweiss.com
E-mail: dtoal@paulweiss.com
E-mail: jjanghorbani@paulweiss.com

*Attorneys for Defendant Exxon Mobil Corporation*

36

**App. 47**

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of June 2018, a true and accurate copy of the

foregoing **NOTICE OF REMOVAL** was filed via ECF and served via electronic mail on the

following:

Kevin S. Hannon
THE HANNON LAW FIRM, LLC
1641 Downing Street
Denver, CO 80218
Telephone: (303) 861-5188
Fax: (202) 466-5189
E-mail: khannon@hannonlaw.com

David Bookbinder
D.C. Bar No. 455525
NISKANEN CENTER
820 First Street, NE, Suite 675
Washington, DC 20002
E-mail: dbookbinder@niskanencenter.org

Michelle C. Harrison
Marco Simons
Alison Borochoff-Porte
EARTHRIGHTS INTERNATIONAL
1612 K Street NW #401
Washington, DC 20006
Telephone: (202) 466-5188
Fax: (202) 466-5189
E-mail: michelle@earthrights.org
E-mail: marco@earthrights.org
E-mail: alison@earthrights.org

*Counsel for Plaintiffs*

s/ *Evan Bennett Stephenson*

37

**App. 48**

Form 3300—1
(September 1978)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT**

| Office | Serial number |
|---|---|
| Los Angeles, CA | OCS-P 0329 |
| Cash bonus | Rental rate |
| $17,115,000.00 | $3.00 per acre |
| Minimum royalty rate | Royalty rate Fixed |
| $3.00 per acre | Sliding Scale |
| Work commitment | Profit share rate |

This lease is effective as of **SEP 1 1979**                    (hereinafter called the "Effective Date") by and
between the United States of America (hereinafter called the "Lessor"), by the Manager, Pacific OCS Office,
Bureau of Land Management, its authorized officer, and

Exxon Corporation                                    100%

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor
and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s)
numbered 1-A, 2, 3, 4, 5, 6 and 8                    attached hereto, the Lessee and Lessor agree as follows:
Sec. 1. Statutes and Regulations. This lease is issued pursuant to the Outer Continental Shelf Lands Act of August
7, 1953, 67 Stat. 462 as amended; 43 U.S.C. 1331 et. seq. (hereinafter called the "Act"). The lease is issued sub-
ject to the Act; Sections 302 and 303 of the Department of Energy Organization Act, 91 Stat. 578, 42 U.S.C. 7152
and 7153; all regulations issued pursuant to such statutes and in existence upon the effective date of this lease; all
regulations issued pursuant to such statutes in the future which provide for the prevention of waste and the conserva-
tion of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other
applicable statutes and regulations.

Sec. 2. Rights of Lessee. The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to
drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Conti-
nental Shelf described as follows:

All Block 52N 76W, OCS Leasing Map, Channel Islands Area, CAL-Map No. 6A

Exhibit B

(Continued on reverse)

containing approximately 5760.00 acres or _____ hectares (hereinafter referred to as the "leased area").
These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the United States Geological Survey or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

Sec. 3. Term. This lease shall continue for an initial period of $five$ years from the Effective Date of the lease and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon.

Sec. 4. Rentals. The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental of $3.00 per acre ( _____ per hectare) or fraction thereof.

Sec. 5. Minimum Royalty. The Lessee shall pay the Lessor at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty of $3.00 per acre ( _____ per hectare) or fraction thereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

* Sec. 6. Royalty on Production. (a) ~~The Lessee shall pay a fixed royalty of _____ percent in amount or value of production saved, removed, or sold from the leased area~~ Gas of all kinds (except helium) is subject to royalty. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated, will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty paid in amount in excess of tankage required when royalty is paid in value. When royalties are paid in amount, the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

Sec. 7. Payments. The Lessee shall make all payments to the Lessor by check, bank draft, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the United States Geological Survey and tendered to the Director, except that filing charges, bonuses, first year's rental, and other payments due upon lease issuance, shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

*Sec. 8. Bonds.* The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

Sec. 9. Plans. The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans, and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

Sec. 10. Performance. The Lessee shall comply with all regulations and orders relating to exploration, development, and production. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

Sec. 11. Directional Drilling. A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Sec. 12. Safety Requirements. The Lessee shall (a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the leased area;

(b) maintain all operations within the leased area in compliance with regulations intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

Sec. 13. Suspension and Cancellation. (a) The Lessor may suspend or cancel this lease during the initial lease term or thereafter pursuant to Section 5 of the Act and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in Section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

Sec. 14. Indemnification. The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

Sec. 15. Disposition of Production. (a) As provided in Section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16-2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price, or if no regulated price applies, at the fair market value at the well head of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) As provided in Section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal agency pursuant to Section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price, or if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in Section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war, or when the President of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

App. 50

Approved for Release: 2019/03/11 Document ID: b73a16c32cb6bd51

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Director may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60–1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60–1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60–1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights include:

(a) the right to authorize geological and geophysical exploration in the leased area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in Section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being with an area needed for national defense, and so long as such designation remains in effect no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within, any designated area are suspended pursuant to this paragraph, any time shall likewise be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Transfer of Lease.** The Lessee shall file for approval with the appropriate field office of the Bureau of Land Management any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Bureau of Land Management a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of one year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.** (a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of Section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of Section 24 of the Act. Furthermore, pursuant to Section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified, and during this continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 7, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431–433, relating to contracts made or entered into, or accepted by or on behalf of the United States, from a part of this lease insofar as they may be applicable.

---

\* For amendment to Sec. 6.(a) "Royalty on Production" see rider attached.

---

EXXON CORPORATION
(Lessee)

*W. M. Selvidge*
(Signature of Authorized Officer)

W. M. SELVIDGE
(Name of Signatory)

ATTORNEY-IN-FACT
(Title)

AUGUST 14, 1979
(Date)

*SEAL*

P. O. Box 2180
Houston, Texas 77001

(Address of Lessee)

---

THE UNITED STATES OF AMERICA, Lessor

*William E. Grant*
(Signature of Authorized Officer)

Manager, Pacific OCS Office
Bureau of Land Management
(Name of Signatory)

WILLIAM E. GRANT
(Title)

AUG 28 1979
(Date)

---

(Continued on reverse)

**App. 51**

_____
_____ (Signature of Lessee)

_____
_____ (Signature of Lessee)

_____
_____ (Signature of Lessee)

_____
_____ (Signature of Lessee)

_____
_____ (Signature of Lessee)

_____
_____ (Signature of Lessee)

_____
_____ (Signature of Lessee)

_____
_____ (Signature of Lessee)

_____
_____ (Signature of Lessee)

_____
_____ (Signature of Lessee)

_____
_____ (Signature of Lessee)

_____
_____ (Signature of Lessee)

**App. 52**

_If this lease is executed by a corporation, it must bear the corporate seal._

GPO 848 – 137

Rider for Amendment to Sec. 6.(a) of Lease Form 3300-1 (September 1978)

Sec. 6. Royalty on Production. (a)  The Lessee agrees to pay the lessor a royalty of that percent in amount or value of production saved, removed or sold from the leased area as determined by the sliding scale royalty formula as follows.  When the quarterly value of production, adjusted for inflation, is less than or equal to $13.236229 million, a royalty of 16.66667 percent in amount or value of production saved, removed or sold will be due on the unadjusted value or amount of production.  When the adjusted quarterly value of production is equal to or greater than $13.236230 million, but less than or equal to $1662.854082 million, the royalty percent due on the unadjusted value or amount of production is given by

$$R_j = b[Ln\ (V_j/S)]$$

where

$R_j$ = the percent royalty that is due and payable on the unadjusted amount or value of all production saved, removed or sold in quarter j

b = 10.0

Ln = natural logarithm

$V_j$ = the value of production in quarter j, adjusted for inflation, in millions of dollars

S = 2.5

When the adjusted quarterly value of production is equal to or greater than $1662.854083 million, a royalty of 65.00000 percent in amount or value of production saved, removed or sold will be due on the unadjusted quarterly value of production.  Thus, in no instance will the quarterly royalty due exceed 65.00000 percent in amount or value of quarterly production saved, removed or sold.

In determining the quarterly percent royalty due, $R_j$, the calculation will be rounded to five decimal places (for example, 18.17612 percent).  This calculation will incorporate the adjusted quarterly value of production, $V_j$, in millions of dollars, rounded to the sixth digit, i.e., to the nearest dollar (for example, 15.392847 millions of dollars).

**App. 53**

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026     BLOCK NO. 52N 76W     MAP NO. CAL 6A     OCS-P 0329,

The area described in Section 2 of this instrument is subject to the following
stipulation:

Stipulation No. 1-A

(a)  The lessee agrees that prior to operating or causing to be operated on its behalf
boat or aircraft traffic into individual, designated warning areas, the lessee shall
coordinate and comply with instructions from the Commander, Space and Missile Test
Center (SAMTEC) and the Commander, Pacific Missile Test Center (PMTC), or other
appropriate military agency.  Such coordination and instruction will provide for
positive control of boats and aircraft operating into the warning areas at all times.

(b)  The lessee, recognizing that mineral exploration and exploitation and recovery
operations on the leased areas of submerged lands can impede tactical military
operations, hereby recognizes and agrees that the United States reserves and has the
right to temporarily suspend operations of the lessee under this lease in the
interests of national security requirements.  Such temporary suspension of operations,
including the evacuation of personnel, and appropriate sheltering of personnel not
evacuated (an appropriate shelter shall mean the protection of all lessee personnel
for the entire duration of any Department of Defense activity from flying or falling
objects or substances), will come into effect upon the order of the Supervisor, after
consultation with the Commander, Space and Missile Test Center (SAMTEC) and the
Commander, Pacific Missile Test Center (PMTC), or other appropriate military agency,
or higher authority, when national security interests necessitate such action.  It is
understood that any temporary suspension of operations for national security may not
exceed seventy-two hours; however, any such suspension may be extended by order of the
Supervisor.  During such periods equipment may remain in place.

(c)  The lessee agrees to control his own electromagnetic emissions and those of his
agents, employees, invitees, independent contractors or subcontractors emanating from
individual, designated defense warning areas in accordance with requirements specified
by the Commander, Space and Missile Test Center (SAMTEC) and the Commander, Pacific
Missile Test Center (PMTC), or other appropriate military agency, to the degree
necessary to prevent damage to, or unacceptable interference with, Department of
Defense flight, testing or operational activities conducted within individual,
designated warning areas.  Necessary monitoring, control, and coordination with the
lessee, his agents, employees, invitees, independent contractors or subcontractors,
will be effected by the Commander of the appropriate onshore military installation
conducting operations in the particular warning area:  Provided, however, that control
of such electromagnetic emissions shall permit at least one continuous channel of
communication between a lessee, its agents, employees, invitees, independent
contractors or subcontractors and onshore facilities.

**App. 54**

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026      BLOCK NO. 52N 76W      MAP NO. CAL 6A      OCS-P 0329

The area described in Section 2 of this instrument is subject to the following stipulation:

## Stipulation No. 2

Whether or not compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the lessee assumes all risks of damage or injury to persons or property, which occurs in, on, or above the Outer Continental Shelf, to any person or persons or to any property of any person or persons who are agents, employees or invitees of the lessee, its agents, independent contractors or subcontractors doing business with the lessee in connection with any activities being performed by the lessee in, on, or above the Outer Continental Shelf, if such injury or damage to such person or property occurs by reason of the activities of any agency of the U.S. Government, its contractors, or subcontractors, or any of their officers, agents or employees, being conducted as a part of, or in connection with, the programs and activities of the Space and Missile Test Center (SAMTEC), the Pacific Missile Test Center (PMTC), or other appropriate military agency.

Not withstanding any limitations of the lessee's liability in section 14 of the lease, the lessee assumes the risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of their officers, agents, or employees. The lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the lessee, and to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the agents, employees, or invitees of the lessee, its agents or any independent contractors or subcontractors doing business with the lessee in connection with the programs and activities of the aforementioned military installations and agencies, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of their officers, agents, or employees and whether such claims might be sustained under theories of strict or absolute liability or otherwise.

**App. 55**

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026    BLOCK NO. 52N 76W    MAP NO. CAL 6A    OCS-P 0329

The area described in Section 2 of this instrument is subject to the following
stipulation:

Stipulation No. 3

If the Supervisor, having reason to believe that a site, structure or object of
historical or archaeological significance, hereinafter referred to as a "cultural
resource," may exist in the lease area, gives the lessee written notice that the
lessor is invoking the provisions of this stipulation, the lessee shall upon receipt
of such notice comply with the following requirements:

Prior to any drilling activity or the construction or placement of any structure for
exploration or development on the lease, including but not limited to, well drilling
and pipeline and platform placement, hereinafter in this stipulation referred to as
"operation," the lessee shall conduct remote sensing surveys to determine the
potential existence of any cultural resource that may be affected by such operations.
All data produced by such remote sensing surveys as well as other pertinent natural
and cultural environmental data shall be examined by a qualified marine survey
archaeologist to determine if indications are present suggesting the existence of a
cultural resource that may be adversely affected by any lease operation.  A report of
this survey and assessment prepared by the marine survey archaeologist shall be
submitted by the lessee to the Supervisor and the Manager, Bureau of Land Management
(BLM), Outer Continental Shelf (OCS) Office for review.

If such cultural resource indicators are present the lessee shall (1) locate the site
of such operation so as not to adversely affect the identified location; or (2)
establish, to the satisfaction of the Supervisor, on the basis of further
archaeological investigation conducted by a qualified marine survey archaeologist or
underwater archaeologist using such survey equipment and techniques as deemed
necessary by the Supervisor, either that such operation shall not adversely affect the
location identified or that the potential cultural resource suggested by the
occurrence of the indicators does not exist.

A report of this investigation prepared by the marine survey archaeologist or
underwater archaeologist shall be submitted to the Supervisor and the Manager, BLM OCS
Office for their review.  Should the Supervisor determine that the existence of a
cultural resource which may be adversely affected by such operation is sufficiently
established to warrant protection, the lessee shall take no action that may result in
an adverse effect on such cultural resource until the Supervisor has given directions
as to its preservation.

The lessee agrees that if any site, structure, or object of historical or archae-
ological significance should be discovered during the conduct of any operations on the
leased area, he shall report immediately such findings to the Supervisor and make
every reasonable effort to preserve and protect the cultural resource from damage
until the Supervisor has given directions as to its preservation.

**App. 56**

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026        BLOCK NO. 52N 76W        MAP NO. CAL 6A        OCS-P 0329

The area described in Section 2 of this instrument is subject to the following
stipulation:

Stipulation No. 4

(a) Wells:  Subsea well-heads and temporary abandonments, or suspended operations
that leave protrusions above the sea floor, shall be protected, if feasible, by a
shroud which will allow commercial trawl gear to pass over the structure without
snagging or otherwise damaging the structure or the fishing gear.  Latitude and
longitude coordinates of these structures along with water depths, shall be submitted
to the Supervisor.  The coordinates of such structures will be determined by the
lessee utilizing state-of-the-art navigation systems with accuracy of at least $\pm$ 50
feet (15.25 meters) at 200 miles (322 kilometers).

(b) Pipelines:  All pipelines, unless buried, including gathering lines, shall have a
smooth-surface design.  In the event that an irregular pipe surface is unavoidable due
to the need for valves, anodes or other structures, they shall be protected by shrouds
which will allow trawl gear to pass over the object without snagging or otherwise
damaging the structure or the fishing gear.

**App. 57**

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026    BLOCK NO. 52N 76W    MAP NO. CAL 6A    OCS-P 0329

The area described in Section 2 of this instrument is subject to the following
stipulation:

## Stipulation No. 5

(a)  If the Supervisor has reason to believe that areas of special biological interest
in the lease area contain biological communities or species of such extraordinary or
unusual value (even though unquantifiable) that no threat of damage, injury, or other
harm to the community or species would be acceptable, he shall give the lessee written
notice that the lessor is invoking the provisions of this stipulation and the lessee
shall comply with the following requirements:  Prior to any drilling activity or the
construction or placement of any structure for exploration or development on lease
areas including, but not limited to, well drilling and pipeline and platform
placement, hereinafter referred to as "operation," the lessee shall conduct site
specific surveys as approved by the Supervisor and in accordance with prescribed
biological survey requirements to determine the existence of any special biological
resource including, but not limited to:

    (1)  Very unusual, rare, or uncommon ecosystems or ecotones.

    (2)  A species of limited regional distribution that may be adversely affected by
        any lease operations

If the results of such surveys suggest the existence of a special biological resource
that may be adversely affected by any lease operation, the lessee shall:  (1) relocate
the site of such operation so as not to adversely affect the resources identified; (2)
establish to the satisfaction of the Supervisor, on the basis of the site-specific
survey, either that such operation will not have a significant adverse effect upon the
resource identified or that a special biological resource does not exist.  The
Supervisor will review all data submitted and determine, in writing, whether a special
biological resource exists or may be significantly affected by lessee's operations.
The lessee may take no action until the Supervisor has given the lessee written
directions on how to proceed.

(b)  The lessee agrees that if any area of biological significance should be
discovered during the conduct of any operations on the leased area, he shall report
immediately such findings to the Supervisor, and make every reasonable effort to
preserve and protect the biological resource from damage until the Supervisor has
given the lessee directions with respect to its protection.

**App. 58**

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026      BLOCK NO. 52N 76W      MAP NO. CAL 6A      OCS-P 0329

The area described in Section 2 of this instrument is subject to the following
stipulation:

Stipulation No. 6

(a) Pipelines will be required, (1) if pipeline rights-of-way can be determined and
obtained, (2) if laying of such pipelines is technologically feasible and
environmentally preferable, and (3) if, in the opinion of the lessor, pipelines can be
laid without net social loss, taking into account any incremental costs of pipelines
over alternative methods of transportation and any incremental benefits in the form of
increased environmental protection or reduced multiple use conflicts. The lessor
specifically reserves the right to require that any pipeline used for transporting
production to shore be placed in certain designated management areas. In selecting
the means of transportation, consideration will be given to any recommendation of the
intergovernmental planning program for leasing and management of transportation of
Outer Continental Shelf oil and gas with the participation of Federal, State, and
local government and the industry. Where feasible, and environmentally preferable,
all pipelines, including both flow lines and gathering lines for oil and gas, shall be
buried to a depth suitable for adequate protection from water currents, sand waves,
storm scouring, fisheries' trawling gear, and other uses as determined on a
case-by-case basis.

(b) Following the completion of pipeline installation, no crude oil production will
be transported by surface vessel from offshore production sites, except in the case of
emergency. Determinations as to emergency conditions and appropriate responses to
these conditions will be made by the Supervisor. Where the three criteria set forth
in the first sentence of this stipulation are not met and surface transporation must
be employed, all vessels used for carrying hydrocarbons to shore from the leased area
will conform with all standards established for such vessels, pursuant to the Ports
and Waterways Safety Act of 1972 (46 U.S.C., 391a), as amended.

**App. 59**

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026        BLOCK NO. 52N 76W        MAP NO. CAL 6A        OCS-P 0329

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 8

(a)  The royalty rate on production saved, removed or sold from this lease is subject to consideration for reduction under the same authority that applies to all other oil and gas leases on the Outer Continental Shelf (30 CFR 250.12 (e)).  The Director, Geological Survey, may grant a reduction for only one year at a time.  Reduction of royalty rates will not be approved unless production has been underway for one year or more.

(b)  Although the royalty rate specified in Sec. 6 (a) of this lease or as subsequently modified in accordance with applicable regulations and stipulations is applicable to all production under this lease, not more than 16 2/3 percent of the production saved, removed or sold from the lease area may be taken as royalty in amount, except as provided in Sec. 15 (d) of this lease:  the royalty on any portion of the production saved, removed or sold from the lease in excess of 16 2/3 percent may only be taken in value of the production saved, removed or sold from the lease area.

**App. 60**

Reviewed and Filed 11/2/2016 1:36:13 PM



# United States Department of the Interior    RECEIVED

### BUREAU OF OCEAN ENERGY MANAGEMENT

Gulf of Mexico OCS Region
1201 Elmwood Park Boulevard
New Orleans, LA  70123-2394

JUN 1 6 2016

LAND

OCS-G 35896

| | | |
|---|---|---|
| | Offering Date<br>03/23/2016 | Map Area and Block Number<br>NG15-06 - Walker Ridge - 274 |
| **DECISION** | Rental<br>$63,360.00 | Balance of Bonus<br>$1,920,096.00 |
| | Total Amount Due | $1,983,456.00 |

**Exxon Mobil Corporation**
**Post Office Box 4778**
**Houston, Texas 77210-4778**

## LEASE FORMS TRANSMITTED FOR EXECUTION

Pursuant to Section 8 of the Outer Continental Shelf Lands Act (67 Stat. 462; 43 U.S.C. 1337) as amended (92 Stat. 629), and the regulations pertaining thereto (30 CFR 556), your bid for the block described above is accepted. Accordingly, in order to perfect your rights hereunder, the following actions must be taken:

1.  A signatory, authorized pursuant to the qualification records on file with the Bureau of Ocean Energy Management (BOEM), Gulf of Mexico Region (GOMR), Adjudication Section, must execute on behalf of the Lessee, each of the three lease forms attached hereto; and return same to the BOEM GOMR Office of Leasing and Plans, Adjudication Section.

2.  You must pay, by Electronic Funds Transfer, the balance of the bonus and the first year's rental indicated above, by following the detailed instructions contained on the BOEM website for the specific lease sale this Decision Letter pertains to or on the Payment Information Webpage found on the Office of Natural Resources and Revenue (ONRR) website. Payment must be received by the Federal Reserve Bank of New York no later than noon, eastern standard time, on the 11th business day after receipt of this decision (30 CFR 556.47).  That day is **July 1, 2016.**

You must comply with the two requirements enumerated above not later than the 11th business day after receipt of this decision.  Failure to comply with the above requirements will result in forfeiture of the 1/5 bonus deposit and your rights to acquire the lease.

Additionally, you must comply with bonding requirements according to 30 CFR 556, Subpart I, and with the regulations at 30 CFR 550.143, addressing designations of operator.

IMPORTANT: *The lease form requires the attachment of the* CORPORATE SEAL *to all leases executed by corporations.*

Regional Director

June 15, 2016

Attachments                                    Date

Exhibit C
**App. 61**

Lease # 007-6064

| | Office **New Orleans, LA** | Serial number **OCS-G 35896** |
|---|---|---|
| | Cash bonus **$2,400,120.00** | Rental rate per acre, hectare or fraction thereof **See Addendum** |

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT
**OIL AND GAS LEASE OF SUBMERGED LANDS**
**UNDER THE OUTER CONTINENTAL SHELF LANDS ACT**

| Minimum royalty rate per acre, hectare or fraction thereof | Royalty rate |
|---|---|
| **$11.00 per acre** | **18 3/4 percent** |
| | Profit share rate |

**Paperwork Reduction Act of 1995 statement:** *This form does not constitute an information collection as defined by 44 U.S.C. 3501 et seq., and therefore does not require approval by the Office of Management and Budget.*

This lease is effective as of **JUL 0 1 2016** (hereinafter called the "Effective Date") and shall continue for an initial period of **ten** years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Director, Gulf of Mexico OCS Region**, Bureau of Ocean Energy Management (BOEM), its authorized officer, and

**Exxon Mobil Corporation**                                                                 **100%**


RECEIVED
JUN 2 2 2016
ADJUDICATION SECTION

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered **8** attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1. Statutes and Regulations.** This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953; 43 U.S.C.1331 *et seq.*, as amended, (hereinafter called "the Act"). This lease is subject to the Act, regulations promulgated pursuant thereto, and other statutes and regulations in existence upon the Effective Date of the lease, and those statutes enacted (including amendments to the Act or other statutes) and regulations promulgated thereafter, except to the extent they explicitly conflict with an express provision of this lease. It is expressly understood that amendments to existing statutes and regulations, including but not limited to the Act, as well as the enactment of new statutes and promulgation of new regulations, which do not explicitly conflict with an express provision of this lease may be made and that the Lessee bears the risk that such may increase or decrease the Lessee's obligations under the lease.

In accordance with the regulations at 2 CFR, parts 180 and 1400, the Lessee must comply with the U.S. Department of the Interior's debarment and suspension (nonprocurement) requirements and must communicate this requirement to comply with these regulations to all persons with whom the Lessee does business as it relates to this lease by including this term as a condition when entering into contracts and transactions with others.

**Sec. 2. Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately **5,760.000000** acres or hectares (hereinafter referred to as the "leased area"), described as follows:

**All of Block 274, Walker Ridge, OCS Official Protraction Diagram, NG 15-06.**

**This lease is amended by addendum pursuant to the Final Notice of Sale for Outer Continental Shelf (OCS) Oil and Gas Lease Sale 241. The addendum shall become a part of the lease and supersede any inconsistent provisions of the lease form.**

**App. 62**

Document ID:   312129491
Label:   312129491
Library: DefaultIMS:FB_PROD:FileNet
Page:   1

Note: 1
Verified lease and updated obligations and provisions in QLS. No further action necessary. 11/2/16 CSC.

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Secretary of the Interior or the Secretary's delegate (hereinafter called the "Secretary"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3.  Term.**  This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4.  Rentals.**  The Lessee shall pay the Lessor on or before the first day of each lease year before the discovery of oil or gas on the lease, then on or before the last day of each full lease year in which royalties on production are not due, a rental as shown on the face hereof.

**Sec. 5.  Minimum Royalty.**  The Lessee shall pay the Lessor on or before the last day of each lease year beginning with the year in which royalty-bearing production commences, and notwithstanding any royalty suspension that may apply, a minimum royalty as shown on the face hereof, with credit applied for actual royalty paid during the lease year. If actual royalty paid exceeds the minimum royalty requirement, then no minimum royalty payment is due.

**Sec. 6.  Royalty on Production.**

(a) The Lessee shall pay a royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty. All helium produced shall remain the property of the United States. The Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty shall be the reasonable value of the production as determined by the Lessor. The value upon which royalty will be paid is established under 30 CFR Chapter XII or applicable successor regulations.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty production to such delivery point.

**Sec. 7.  Payments.**  The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Office of Natural Resources Revenue and tendered to the Lessor. Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and payable as due.

**Sec. 8.  Bonds.**  The Lessee shall at all times maintain the bond(s) required by regulation prior to the issuance of the lease. The Lessee shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor determines additional security is necessary to ensure compliance with Lessee's obligations under this lease and the regulations.

**Sec. 9.  Plans.**  The Lessee shall conduct all operations on the lease or unit in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD), approval conditions, and any other applicable requirements provided by law or regulation. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10.  Diligence and Prevention of Waste.**

(a) The Lessee must exercise diligence in the development of the leased area and in the production of wells located thereon and must prevent unnecessary damage to, loss of, or waste of leased resources.

(b) The Lessee shall comply with all applicable laws, regulations and orders related to diligence, sound conservation practices and prevention of waste. EPs, DPPs and DOCDs, are to conform to sound conservation practices to preserve, protect, and develop minerals resources and maximize the ultimate recovery of hydrocarbons from the leased area.

**Sec. 11.  Directional Drilling.**  A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. Drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

**Sec. 12.  Safety and Inspection Requirements.**  The Lessee shall:

(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;

(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and provide any documents and records that are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sale 241 Lease Addendum – R23**
**Leases in Water Depths Greater Than or Equal To 1,600 Meters**

*This lease is amended by addendum pursuant to the Final Notice of Sale for OCS Oil and Gas Lease Sale 241. The addendum shall become a part of the lease and supersede any inconsistent provisions of the lease form.*

**Sec. 4. Rentals.**

Notwithstanding the language in Sec. 4 of the lease instrument, annual rental rates are as follows:

| Rental Rates per Acre or Fraction Thereof ||
| Years 1-5 | Years 6, 7, & 8+ |
| --- | --- |
| $11.00 | $16.00 |

R23-Page 2a

**App. 65**

**Stipulation No. 8 – Protected Species**

A. The Endangered Species Act (16 U.S.C. 1531 *et seq.*) and the Marine Mammal Protection Act (MMPA) (16 U.S.C. 1361 *et seq.*) are designed to protect threatened and endangered species and marine mammals and apply to activities on the Outer Continental Shelf (OCS). The OCS Lands Act (43 U.S.C. 1331 *et seq.*) provides that the OCS should be made available for expeditious and orderly development subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs (see 43 U.S.C. 1332). The Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE) comply with these laws on the OCS.

B. The lessee and its operators must:

    1) Collect and remove flotsam resulting from activities related to exploration, development, and production of this lease;

    2) Post signs in prominent places on all vessels and platforms used as a result of activities related to exploration, development, and production of this lease detailing the reasons (legal and ecological) why release of debris must be eliminated;

    3) Observe for marine mammals and sea turtles while on vessels, reduce vessel speed to 10 knots or less when assemblages of cetaceans are observed, and maintain a distance of 91 meters or greater from whales and a distance of 45 meters or greater from small cetaceans and sea turtles;

    4) Employ mitigation measures prescribed by BOEM/BSEE or the National Marine Fisheries Service (NMFS) for all seismic surveys, including the use of an "exclusion zone" based upon the appropriate water depth, ramp-up and shutdown procedures, visual monitoring, and reporting;

    5) Identify important habitats, including designated critical habitat, used by listed species (e.g., sea turtle nesting beaches, piping plover critical habitat), in oil spill contingency planning and require the strategic placement of spill cleanup equipment to be used only by personnel trained in less-intrusive cleanup techniques on beaches and bay shores; and

    6) Immediately report all sightings and locations of injured or dead protected species (e.g., marine mammals and sea turtles) to the appropriate stranding network. If oil and gas industry activity is responsible for the injured or dead animal (e.g., because of a vessel strike), the responsible parties should remain available to assist the stranding network. If the injury or death was caused by a collision with the lessee's vessel, the lessee must notify BSEE within 24 hours of the strike.

C. BOEM and BSEE issue Notices to Lessees and Operators (NTLs), which more fully describe measures implemented in support of the above-mentioned implementing statutes and regulations, as well as measures identified by the U.S. Fish and Wildlife Service and NMFS arising from, among others, conservation recommendations, rulemakings pursuant to the MMPA, or

**App. 66**

consultation.  The lessee and its operators, personnel, and subcontractors, while undertaking activities authorized under this lease, must implement and comply with the specific mitigation measures outlined in NTL No. 2012-JOINT-G01 (Vessel Strike Avoidance and Injured/Dead Protected Species Reporting), NTL No. 2012-JOINT-G02 (Implementation of Seismic Survey Mitigation Measures and Protected Species Observer Program), and NTL No. 2015-BSEE-G03 (Marine Trash and Debris Awareness and Elimination).  At the lessee's option, the lessee, its operators, personnel, and contractors may comply with the most current measures to protect species in place at the time an activity is undertaken under this lease, including, but not limited to, new or updated versions of the NTLs identified in this paragraph.  The lessee and its operators, personnel, and subcontractors will be required to comply with the mitigation measures, identified in the above referenced NTLs, and any additional measures in the conditions of approvals for their plans or permits.

**Sec. 13. Suspension or Cancellation.**
(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.
(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14. Indemnification.** The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:
(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or
(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15. Disposition of Production.**
(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.
(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.
(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.
(d) In time of war or when the President of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees. Segregated facilities include those that are segregated by explicit directive or those that are in fact segregated on the basis of race, color, religion, sex, or national origin, because of habit, local custom, or otherwise; provided, that separate or single-user restrooms and necessary dressing or sleeping areas shall be provided to assure privacy as appropriate. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to awarding contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights included:
(a) the right to authorize geological and geophysical exploration in the leased area that does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;
(b) the right to grant leases for any minerals other than oil and gas, and to issue leases or grants for renewable energy or alternative uses within the leased area, except that operations under such leases or grants shall not unreasonably interfere with or endanger operations under this lease; and
(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof, which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense and, so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended. During such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Assignment of Lease.** The Lessee shall file for approval with the appropriate regional BOEM OCS office any instrument of assignment or other transfer of any rights or ownership interest in this lease in accordance with applicable regulations.

**Sec. 21. Relinquishment of Lease.** The Lessee may relinquish this lease or any officially designated subdivision thereof by filing with the appropriate regional BOEM OCS office a written relinquishment, in triplicate, that shall be effective on the date it is filed. No relinquishment of this lease or of any portion of the leased area shall relieve the Lessee of the continuing obligation to pay all accrued rentals, royalties, and other financial obligations or to plug all wells and remove

all platforms and other facilities on the area to be relinquished in accordance with applicable regulations.

**Sec. 22. Decommissioning.**

(a) When wells, platforms, pipelines or other facilities are no longer useful for operations, the Lessee shall permanently plug such wells, remove such platforms and other facilities, decommission such pipelines, and clear the seafloor of all associated obstructions created by the lease operations.

(b) The Secretary may determine that a well, platform, pipeline or other facility is no longer useful and require its immediate decommissioning.

(c) All platforms and other facilities shall be removed within 1 year after the lease terminates unless the Lessor grants approval to conduct other activities.

(d) All decommissioning operations shall be conducted in accordance with applicable laws and regulations and in a manner that is safe, does not unreasonably interfere with other uses of the OCS, and does not cause undue or serious harm or damage to the human, marine, or coastal environment.

**Sec. 23. Remedies in Case of Default.**

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may

exercise any other remedies that the Lessor may have, including, but not limited to the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom, except to the extent that such benefit is obtained by the general public as well. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

\*\*\*

| Exxon Mobil Corporation | THE UNITED STATES OF AMERICA, Lessor |
|---|---|
| (Lessee) | |
| *[signature]* | *[signature]* |
| (Signature of Authorized Officer) | (Signature of Authorized Officer) |
| Paul W. Watson | Michael A. Celata |
| (Name of Signatory) | (Name of Signatory) |
| Attorney-in-Fact | Regional Director |
| (Title) | (Title) |
| June 20, 2016 | JUN 3 0 2016 |
| (Date) | (Date) |

Post Office Box 4778
Houston, Texas 77210-4778

(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal*

*[Exxon Mobil Corporation corporate seal — "EXXON MOBIL CORPORATION 1882 NEW JERSEY CORPORATE SEAL"]*

<table>
<tr><td>

DISTRICT COURT, COUNTY OF BOULDER
STATE OF COLORADO
Boulder County Combined Court
1777 Sixth Street
Boulder, CO 80302

</td><td>

DATE FILED: June 11, 2018 6:34 PM
FILING ID: F382A71DFA2C3
CASE NUMBER: 2018CV30349

</td></tr>
</table>

**Plaintiffs:**
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY; BOARD OF COUNTY COMMISSIONERS OF SAN MIGUEL COUNTY; CITY OF BOULDER

v.

**Defendants**:
SUNCOR ENERGY (U.S.A.), INC.; SUNCOR ENERGY SALES, INC.; SUNCOR ENERGY, INC.; EXXON MOBIL CORPORATION

▲COURT USE ONLY▲

_____

Case Number: 2018CV30349

Division: 2

Kevin S. Hannon, #16015
THE HANNON LAW FIRM, LLC
1641 Downing Street
Denver, CO 80218
Tel: (303) 861-8800
Fax: (303) 861-8855
Email: khannon@hannonlaw.com

**AMENDED COMPLAINT AND JURY DEMAND**

Plaintiffs Board of County Commissioners of Boulder County, Board of County Commissioners of San Miguel County and the City of Boulder, through counsel, allege the following against Defendants Suncor Energy (U.S.A), Inc., Suncor Energy Sales, Inc., Suncor Energy, Inc. and Exxon Mobil Corporation.

Exhibit A-17

**App. 70**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

  I.   PARTIES ..................................................................................................... 5

     A.  Plaintiffs .............................................................................................. 5

     B.  Defendants ......................................................................................... 12

  II.  JURISDICTION AND VENUE ............................................................... 21

  III. STATEMENT OF FACTS ....................................................................... 30

     A.  Defendants' actions have altered the climate in Colorado................... 30

         1.*The climate has been altered because of Defendants' fossil fuel
            activities* ................................................................................. 30

         2.*The impacts of a climate altered by Defendants' conduct are being
            felt in Plaintiffs' communities* .................................................. 34

     B.  Plaintiffs have acted to prevent climate change, but are still being harmed
        by, and must act to mitigate, its impacts on their property and residents ............ 46

         1.*Plaintiffs have made substantial efforts to reduce their own GHG
            emissions* ................................................................................. 46

         2.*Plaintiffs and their residents have already been injured because of
            climate change caused and contributed to by Defendants' actions.
            They are mitigating current climate impacts and will be forced to
            continnue mitigating and adapting to climate change for the
            foreseeable future* ................................................................... 51

     C.  Defendants' fossil fuel activities have caused and will continue to cause
        Plaintiffs' damages and losses .......................................................... 75

         1.*Defendants knew their fossil fuel activities would result in
            dangerous changes in the climate* ........................................... 76

         2.*Defendants contributed to, accelerated, and exacerbated climate
            change by promoting and selling huge amounts of fossil fuels* ............... 87

3. *Defendants concealed and misrepresented to the public what they knew about climate change and the dangers of continued and increasing fossil fuel use* ........................................................................... 93

IV. PLAINTIFFS' CLAIMS ................................................................................ 101

V.  RELIEF REQUESTED ................................................................................ 121

VI. JURY TRIAL DEMANDED ......................................................................... 124

**App. 72**

# INTRODUCTION

1.      The Plaintiffs in this case are three local governmental entities in the State of Colorado that face substantial and rising costs to mitigate the impacts of Defendants' alteration of the climate ("climate change") on their property, and on the health, safety and welfare of their residents.

2.      Plaintiffs bring this lawsuit against Exxon Mobil Corporation ("Exxon") and Suncor Energy (U.S.A), Inc., Suncor Energy Sales, Inc., and Suncor Energy, Inc. (collectively, the "Suncor Defendants") for the substantial role that their production, promotion, refining, marketing and sale of fossil fuels played and continues to play in causing, contributing to and exacerbating alteration of the climate, thus damaging Plaintiffs' property, and the health, safety and welfare of their residents.

3.      As recognized by both Colorado's Governor and General Assembly, climate change will bring more (and more serious) heat waves, wildfires, droughts, and floods to the State, as well as myriad other consequences caused by rapidly rising temperatures.

4.      These impacts have already harmed Plaintiffs' property and impacted the health, safety and welfare of their residents.  The damages will only multiply as climate change worsens. Plaintiffs are taking reasonable and necessary measures to address and abate these impacts within their respective jurisdictions.  As the impacts of climate change grow more severe, they will do more harm to Plaintiffs and cause greater expense.

5.      Alone, Plaintiffs and their taxpayers cannot pay the full costs of all that is needed to attempt to mitigate the harm caused by climate change, nor should they.  The costs should be shared by Exxon and the Suncor Defendants because they *knowingly* caused and contributed to

**App. 73**

the alteration of the climate by producing, promoting, refining, marketing and selling fossil fuels at levels that have caused and continue to cause climate change, while concealing and/or misrepresenting the dangers associated with fossil fuels' intended use.

6.      Plaintiffs are not asking this Court to stop or regulate the production of fossil fuels in Colorado or elsewhere, and they are not asking this Court to stop or regulate emissions in Colorado or elsewhere; they ask only that Defendants help remediate the harm caused by their intentional, reckless and negligent conduct, specifically by paying their share of the costs Plaintiffs have incurred and will incur because of Defendants' contribution to alteration of the climate.

7.      **Changes to the climate were caused, and continue to be exacerbated, by unchecked fossil fuel activities**.  Since the 1960s, unchecked production, promotion, refining, marketing and sale of fossil fuels – which in turn led to unchecked fossil fuel use – has caused an unprecedented rapid rise in the concentration of greenhouse gases (GHGs) in the atmosphere. Fossil fuel use has occurred at a rate that accounts for nearly 80 percent of all GHG emissions between 1970 and 2010.  As a result, more heat has been, is being and will continue to be, trapped by the atmosphere, triggering changes to the climate.

8.      **The hazards created by climate change are real, recognized by every level of the government in the United States, and pose a clear and present threat to property and public health in Colorado**.  Climate change impacts in Colorado are and will continue to be severe.  For example, in 2017, the federal government reported that "[t]he frequency and intensity of extreme high temperature events are *virtually certain* to increase" and "[t]he incidence of large forest fires in the western United States [which has already increased on

2

**App. 74**

account of climate change] . . . is projected to further increase in those regions as the climate changes, with profound changes to regional ecosystems."

9.     These and other changes "are particularly important for human safety, infrastructure, agriculture, water quality and quantity, and natural ecosystems."

10.     **Plaintiffs have taken substantial steps to prevent climate change, but have been harmed, and will continue to suffer harms regardless.**  Climate change has already injured Plaintiffs, as well as people and property in their communities.  Recognizing this, Plaintiffs have taken substantial steps to reduce their own GHG emissions.  They have taxed their residents to fund emission reduction efforts, limited their own fossil fuel use and/or tried to prohibit or reduce the environmental impacts of fossil fuel production within their borders.

11.     In spite of these efforts, and in light of the hazards that are here and worsening, Plaintiffs are spending, and must continue to spend, millions of dollars to protect their property and their residents from the impacts of climate change.

12.     **Defendants cannot contest the reasonableness or necessity of Plaintiffs' climate response.**  While Defendants publicly fought against climate science – to protect their profits from the impacts of regulation and informed public choice – they privately relied on the same established science to protect their businesses from climate change impacts.  Now that Plaintiffs are also forced to grapple with and respond to climate change, Defendants cannot contest the necessity of a response or Plaintiffs' reliance on climate science.

13.     **While Plaintiffs have acted reasonably, Defendants have acted recklessly.** Decades ago, Defendants understood that their fossil fuel activities were occurring at such a level to contribute to a dramatic rise in the concentration of GHGs in the atmosphere; that "significant

3

**App. 75**

temperature changes" were likely to result, which would, in turn, "bring about climatic changes"; that "there [was] <u>no</u> leeway" time for remedial action; and that "[w]e can either adapt our civilization to a warmer planet or avoid the problem by sharply curtailing the use of fossil fuels." They were specifically warned that inaction could cause "dramatic climatic changes," including a temperature rise of 9°F, complete snow loss "in the contiguous states, except on higher mountains," and "major shifts in weather patterns in the northern hemisphere."

14.    Despite receiving the warning that "fossil fuel use should not be encouraged," Defendants spent decades producing, promoting, refining, marketing and selling fossil fuels (hereinafter "fossil fuel activities") at levels that have caused and contributed to alteration of the climate without disclosing the dangers that continued fossil fuel overuse posed.

15.    **Defendants' fossil fuel activities have caused, contributed to and exacerbated the impacts of human-caused climate change, thereby contributing to Plaintiffs' injuries.** Defendants are responsible for billions of tons of the excess greenhouse gas emissions in the atmosphere.  Their fossil fuel activities produced a substantial percentage of all the fossil fuels whose intended and foreseeable use – i.e., combustion – caused, contributed to and exacerbated the impacts of climate change.

16.    Moreover, long after they became aware of the dangers of climate change, Defendants continued their fossil fuel activities in an unchecked manner.  Defendants chose to develop fuel sources that create substantially more GHGs than traditional fossil fuels when produced and burned, notably those developed from the Canadian tar sands[1] and refined in Colorado.

---

[1] Tar sands are also known as oil sands.

**App. 76**

17.    **Defendants' present and planned fossil fuel activities will accelerate and exacerbate climate change and its impacts.**  Defendants continue their fossil fuel activities at levels which will significantly contribute to climate change.  While they may now acknowledge the reality of climate change, Defendants plan to increase their fossil fuel activities in the future. The harm to Plaintiffs, including Plaintiffs' costs of adapting to climate change, will only increase if this happens.

18.    **Defendants acted to prevent and forestall changes in energy use and supply that they knew were needed to limit climate change, exacerbating the harms suffered by Plaintiffs and their residents**.  By hiding the dangers and harm they knew were occurring and would occur because of their levels of fossil fuel activities and affirmatively misrepresenting the dangers of unchecked fossil fuel use, Defendants protected fossil fuel demand, worked to lull consumers into a false sense of security with regard to the impacts of fossil fuels on climate change, and obstructed the changes needed to prevent or at least minimize the impacts of climate change.

I.    **PARTIES**

   A.  **Plaintiffs**

19.    The Plaintiffs in this case are the Board of County Commissioners of Boulder County ("Boulder County"), the Board of County Commissioners of San Miguel County ("San Miguel County") and the City of Boulder (occasionally referenced hereafter as the "City").[2]

---

[2] References in the Complaint to "Boulder," or the "Boulder area," refer to the geographic area of Boulder County, which includes both the incorporated towns and cities, including the City of Boulder, in addition to the unincorporated areas of the County.

**App. 77**

**BOULDER COUNTY**

20.     Plaintiff Boulder County, a subdivision of the State of Colorado, is a body corporate and politic in the State of Colorado empowered to sue and be sued.  It lies in north central Colorado, on the eastern slopes of the Rocky Mountains in the Front Range Urban Corridor, encompassing 753 square miles.

21.     Land within the County contains sub-alpine and alpine ecosystems and a shrinking glacier.  The County's west contains forests, slopes, mountain communities and canyons, which hold creeks that bring water to the cities, high plains, grasslands and farmlands of the County's east.

22.     The County is home to roughly 319,000 people, and includes both unincorporated areas – the rural, mountainous and plains communities – and incorporated towns and cities, including Plaintiff City of Boulder.

23.     Boulder County has long held a commitment to stewardship of the land, environment and community.  The eastern plains are rich in agricultural farmland, lakes and rolling pastures filled with distinctly defined cities and communities, while the foothills and mountains to the west feature prominent rock formations, forests and high-altitude valleys and sweeping vistas.  Preserving the County's future in a way that maintains its agricultural landscape, character and unique way of life is a top priority for County residents.

24.     As a governmental entity, Boulder County takes its stewardship responsibilities to heart and works daily to further the County's long-term vision for well-planned urban development, economic vitality and the preservation of its rural and mountain communities.

25.     In its unincorporated areas, Boulder County owns and/or maintains hundreds of

**App. 78**

miles of paved and unpaved roads, over 80 major bridges, hundreds of large culverts and smaller bridges/access points, as well as thousands of small culverts.

26.    The County provides a wide range of services to residents in unincorporated areas, including health and human services, emergency services, wildfire mitigation and other necessary governmental functions.  It also provides services to residents living in the incorporated areas of Boulder County, including housing and human health programs, as well as emergency services.

27.    Boulder County owns or holds conservation easements over a substantial amount of real and other property for its own benefit and for that of its residents.  This includes 65,316 acres of publicly owned "open space", i.e., County-owned public land preserved for recreation, conservation, and agricultural purposes.  The County has a duty to preserve and maintain this open space for future generations.  The County also holds conservation easements over roughly 40,000 acres of privately owned land, which protect agricultural land, wildlife habitat and scenic open space from development.

28.    The County leases 25,000 acres of its open space to sixty-seven agricultural tenants, generating approximately $125,000 in annual net income.  In addition, the County also owns, leases, and maintains and/or operates more than 45 public buildings, and the County housing authority owns more than 800 units of affordable or subsidized housing.

29.    People, property (including County-owned property), and infrastructure within Boulder County have been and will continue to be damaged on account of climate change caused and contributed to by Defendants' actions.  Boulder County has taken substantial steps to abate these hazards, and will and must continue to do so.

**App. 79**

## SAN MIGUEL COUNTY

30.     Plaintiff San Miguel County is a body corporate and politic of the State of Colorado empowered to sue and be sued.  It lies in southwest Colorado, on the western slopes of the Rocky Mountains, encompassing 1,289 square miles.  The County encompasses the high mountain communities of Telluride (the County seat) and Mountain Village at the eastern end of the County and arid ranching communities in the County's western end.  In 2017, San Miguel County had an estimated population of 7,967.  Telluride, the County's largest town, had an estimated population of approximately 2,500.

31.     San Miguel County has historically valued preservation of natural resources and land stewardship, starting with the land ethic of the early ranching pioneers who established the Town of Norwood, and continuing through its commitment to preserving wild lands for recreational opportunities and ecosystem services.  The San Miguel River connects the communities of the County from the high alpine headwater towns dependent on consistent snow pack, forested landscapes and a healthy river system to the agricultural communities dependent on healthy spring runoff and summer flows.

32.     In 2001, voters approved a mill levy for open space and historic preservation.  In 2005, San Miguel County partnered with local governments to establish a regional sustainability program whose mission was to reduce GHG emissions through an inventory and education program.  The mission of the San Miguel County Board of Commissioners is to "ensure our residents are healthy and flourishing and that our communities are safe and vibrant by: providing essential community services, practicing responsible stewardship of our environment, prioritizing long-term fiscal stability, and partnering with others to enhance the quality of life in

8

San Miguel County and the region."

33.     San Miguel County provides emergency response services in the event of wildfires, floods, road washouts and other threats to public health and safety.  In addition, the County owns and/or maintains hundreds of miles of roads, including paved and gravel roads; as well as dozens of bridges, numerous culverts and public buildings.

34.     People, property (including County-owned property) and infrastructure within San Miguel County have been and will continue to be damaged on account of human-caused climate change caused and contributed to by Defendants' actions.  San Miguel County has taken substantial steps to abate these hazards, and will and must continue to do so.

### THE CITY OF BOULDER

35.     The City of Boulder is a home rule municipality in the State of Colorado empowered to sue and be sued.  It lies in Boulder Valley at the foothills of the Rocky Mountains, 25 miles northwest of Denver.  The City's 25.8 square miles is surrounded by over 70 square miles of preserved City public land and parks space.  It is bordered on one side by the iconic Flatirons rock formations and on the other side by the Great Plains.

36.     The City of Boulder sits 5,430 feet above sea level and is surrounded by a greenbelt of City trails and open spaces.  It is known for its natural beauty, outdoor recreation, natural product retailers and restaurants, outstanding alternative transportation options, diverse businesses and technological and academic resources.

37.     The City is home to roughly 108,000 people.  It serves as both the seat and the most populous municipality in Boulder County and is home to approximately one-third of the County's residents.  The City is also home to the main campus of the University of Colorado and

boasts a high concentration of employment in STEM fields. In addition to the well-renowned researchers at the University of Colorado Boulder, the City hosts a number of science and environmental organizations, including research facilities for the National Center for Atmospheric Research and the National Oceanic and Atmospheric Administration.

38.     The City and its residents have a long history of planning for the challenges of tomorrow and fostering sustainability. For decades, the City has taken, and the community has supported, some of the most progressive sustainability activities in the country, including a 40-plus year legacy of open space preservation and pioneering commitments to climate action goals. Stewardship and sustainability are part of the Boulder community DNA. The City not only protects the health, security and livelihoods of its residents, it is a steward that protects the fabric of the community, its ecosystems and way of life, including for future generations.

39.     The City of Boulder owns and/or maintains hundreds of miles of paved roads, over 40 major bridges, fourteen reservoirs, two water treatment plants, sewage and stormwater drainage systems and other critical infrastructure.

40.     The City provides a myriad of services that are essential to the health, safety and welfare of its residents, including: emergency services; public utilities, such as water supply and treatment; transportation infrastructure; fire protection; flood controls; and parks and public outdoor space.

41.     The City also owns a substantial amount of real and other property for its own benefit and for the benefit of its residents. This includes over 45,000 acres of "open space." The City leases 15,000 acres of that open space to 26 agricultural tenants. In addition to its open space holdings, the City owns, leases, maintains, and/or operates many buildings and other

**App. 82**

structures.

42.    The City of Boulder also owns substantial and senior water rights, which it uses to supply water to its residents and businesses, as well as to others outside the City limits, and from which it derives revenue.[3]

43.    The City's water supply comes from both the East and West Slopes of the Continental Divide of the Rocky Mountains.  The City's East Slope sources are diverted from North Boulder Creek and Middle Boulder Creek through City infrastructure; its West Slope sources are conveyed from the upper Colorado River and delivered to the City for treatment through Northern Colorado Water Conservancy District facilities.

44.    The City stores its water in fourteen different City-owned and -operated reservoirs.  The City treats its water at two City-owned and -maintained facilities, and the City transports its water – including, ultimately to residents – through City-owned and -operated infrastructure.

45.    People, property (including City-owned property) and infrastructure within the City of Boulder have been and will continue to be damaged on account of climate change caused and contributed to by Defendants' actions.  The City of Boulder has taken substantial steps to abate the hazards facing its residents, public property and infrastructure, and will and must continue to do so.

---

[3] Over the course of a year, the majority of the water supplied by the City goes towards indoor uses, i.e., drinking and sanitation, with a smaller share going towards irrigation.  The balance shifts based on seasons and water availability: a greater portion of the water goes towards irrigation in the warmer and drier summer months though water for irrigation purposes is curtailed when water is in shorter supply.  The City also leases some of the water for agricultural purposes, when supplies permit.

**App. 83**

**B.  Defendants**

46.    The Defendants in this case are Suncor Energy, Inc. ("Suncor Energy"), Suncor Energy (U.S.A.) Inc. ("Suncor USA"), Suncor Energy Sales, Inc. ("Suncor Energy Sales"), and Exxon Mobil Corporation ("Exxon").

**THE SUNCOR DEFENDANTS**

47.    Defendant Suncor Energy is a Canadian corporation with its registered and head office located in Calgary, Alberta.  Suncor Energy does business in Colorado through its numerous subsidiaries.

48.    Suncor Energy began as the Sun Company of Canada, a subsidiary of Sun Oil, an American company.  Suncor Energy was later known as Suncor Inc., an entity formed in 1979 by the amalgamation under the *Canada Business Corporations Act* of Sun Oil Company Limited, incorporated in 1923, and Great Canadian Oil Sands Limited, incorporated in 1953.  In 1997, Suncor Energy adopted its current name, Suncor Energy, Inc.  In 2009, Suncor Energy amalgamated with Petro-Canada to form a single corporation continuing the same name, which to date has operated as an independent company.  Suncor Energy benefited from, continues to benefit from and is responsible for the actions of its predecessor entities.

49.    Suncor Energy is the parent company of a multinational, integrated oil and gas enterprise that explores for, produces, refines, markets and sells fossil fuels (including oil, natural gas, petroleum coke and other products).  Suncor Energy publicly has stressed the "integrated" nature of its operations stating that "the integration of our business, both financially and physically, creates the conditions for our success."  Suncor Energy files consolidated regulatory filings that include its subsidiaries, claiming profit and responsibility for the

12

**App. 84**

production, marketing, refining, transportation and fossil fuel sales of its subsidiaries.

50.    Suncor Energy controls and directs fossil fuel activities – including the fossil fuel activities associated with the Canadian tar sands – across its corporate family, which include many other subsidiaries and joint ventures, and which act as its agents.

51.    Suncor Energy refers to its subsidiaries as part of, and Suncor acts as, a single enterprise:

- In its 2017 Annual Report, Suncor Energy explains that "[r]eferences to "we", "our", "Suncor", or "the company" mean Suncor Energy Inc., its subsidiaries, partnerships and joint arrangements, unless the context requires otherwise."

- The 2017 Annual Report explains that "Suncor's R[efining] &M[arketing] segments consists of two primary operations:

  **"Refining and Supply** operations refine crude oil and intermediate feedstock into a broad range of petroleum and petrochemical products.  Refining and Supply consists of:

  ". . . .Western North America operations include refineries located in Edmonton, Alberta and Commerce City, Colorado. . . .

  "**Marketing** operations sell refined petroleum products to retail, commercial and industrial customers through a combination of company-owned, Petro-Canada branded dealers in Canada and a Sunoco branded-dealer and other retail stations in Colorado . . . ."

52.    Suncor Energy directs the operations of its subsidiaries.  Its 2017 Annual Report advises shareholders of the planned maintenance of its refineries.  "The Edmonton refinery has a planned seven-week maintenance event, which includes a one-month full refinery turnaround, and the Commerce City refinery has a four-week turnaround event, both of which are scheduled to begin late in the first quarter of 2018 and extend into the second quarter of 2018 . . . and the Commerce City refinery has a two-week maintenance event scheduled to begin in the fourth quarter.  The anticipated impact of these maintenance events has been reflected in the company's

13

**App. 85**

2018 guidance."

53.    Suncor Energy prepares consolidated financial statements that include its

subsidiaries, such as Defendants Suncor USA and Suncor Energy Sales.

54.    Suncor Energy's control over Defendant Suncor Energy USA is reflected in other

locations of the 2017 Annual Report, which also states: "Refining and Marketing includes the

refining of crude oil products, and the distribution and marketing of these and other purchased

products through retail stations located in Canada and the United States (U.S.) . . . ."

55.    The Annual Report also lists "Material subsidiaries, each of which is a wholly

owned, either directly or indirectly, by the company as at (sic) December 31, 2017."  Defendant

Suncor USA is included in the chart that follows, as well as Suncor Energy (U.S.A.) Marketing

Inc.  This is not a complete listing of Suncor Energy subsidiaries.

56.    Other statements by Suncor Energy reflect its control over its subsidiaries:

- Suncor Energy refers to the refinery, operated by Suncor USA in Colorado, as "our Commerce City refinery";

- Suncor's CEO describes the Commerce City, Colorado refinery as "giv[ing] us increased control of our product from production straight through to the consumer";

- Suncor Energy publicly describes its "U.S. businesses" as a "vital link between the company's large scale oil sands resource base and the growing U.S. energy market;"

- Suncor Energy further notes that "[t]he various parts of Suncor's businesses are tightly connected";

- Suncor Energy "100% guarantee[s]" its crude oil marketing and trading business under Suncor Energy Marketing Inc.; and

- Suncor Energy describes its "Supply & Trading" function in a consolidated unified way that is directed by Suncor Energy: "We are Suncor Energy Inc.'s commercial centre of excellence for sales and marketing of selected energy

**App. 86**

products and services.  With offices in Calgary, Alta., Denver, Colo., and London, England . . . ."

57.     Defendant Suncor USA, a subsidiary of Suncor Energy, operates a refinery in Commerce City, Colorado that produces 98,000 barrels per day of gasoline and diesel fuel.  The Commerce City refinery processes Canadian tar sands crude from Suncor Energy's mining operations in Canada and products from fractured oil and gas production in Colorado.

58.     Defendant Suncor Energy Sales, Inc., a subsidiary of Suncor Energy operates 47 retail gasoline and/or diesel fuel stations in Colorado under the following trade names: Coastal Mart (1 station); Exxon (4 stations); and Phillips 66 (42 stations).

59.     References to Suncor, unless otherwise specified, will be to the collective Suncor corporate enterprise, including the Suncor Defendants.

60.     Suncor conducts its fossil fuel activities according to a common design across the corporate family, which is set by Suncor Energy.  On information and belief, the other members of the Suncor corporate family – subsidiaries, affiliates and other agents – do not have the ability to deviate from the common design and cannot refuse to produce, promote, refine, sell and/or transport Suncor fossil fuels.

61.     Suncor claims it is "the fifth largest North American energy company and has a place on the global stage as one of the largest independent energy companies in the world."  In 2017, Suncor produced approximately 685,000 barrels of oil per day and refined approximately 441,000.

62.     As a result of their fossil fuel activities at levels sufficient to contribute to alteration of the climate, the Suncor Defendants are responsible for billions of tons of excess GHG emissions.  Based on the GHG emissions that can be traced solely to fossil fuels produced

15

**App. 87**

by Suncor and its subsidiaries since 1988, the Suncor Defendants are responsible for the emission of approximately 2 billion tons of extra $CO_2$ into the atmosphere. Suncor is one of the largest sources of historic and present-day GHG emissions.

63.    A substantial amount of Suncor's fossil fuel products is derived from its Canadian tar sands operations. Approximately 20 percent of the products produced at the Commerce City refinery are derived from Suncor's Canadian tar sands operations. Suncor trumpets its plans to increase tar sands development over the coming decades.

64.    Suncor Energy publicly states that it has around 8 billion barrels of recoverable oil, the majority of which comes from the Canadian tar sands.

65.    With its focus on tar sands, Suncor's fossil fuel activities produce a proportionally greater amount of GHG emissions than most fossil fuel companies do.

66.    Tar sands are deposits of a petroleum-like substance known as bitumen. Mining and developing bitumen require a huge amount of energy, which itself releases enormous amounts of GHGs.[4] Barrels of converted bitumen also have a higher concentration of carbon, as compared to typical petroleum.

67.    The chart below, which was produced by the Carnegie Institute as part of a report, "Know Your Oil: Creating a Global Oil-Climate Index," shows the number of downstream emissions – those created by combustion of the fuels – for different companies' oil products. Both Suncor's own products, and products developed by Syncrude – a venture whose owners

---

[4] In 2014, Suncor's production and refining operations emitted more than 20 million tons of GHGs, a number which they now expect to increase to more than 25 million tons by 2019, as its tar sands operations continue to grow.

include Exxon and Suncor – rank among the highest emissions per barrel.



FIGURE 11
**OPEM GHG Emission Results for 30 Phase 1 OCI Test Oils**

Source: Authors' calculations

Note: Unlike the other OCI test oils, Cold Lake dilbit is not composed of a full barrel of oil.

68.    Additionally, the process of turning tar sands deposits into useable fuel produces huge amounts of petroleum coke ("petcoke"), a coal-like substance.  When combusted, petcoke produces substantially greater GHG emissions per unit of energy produced, as compared to other fossil fuels (including coal). Suncor is one of the largest sources of petcoke and has sold millions of tons of it.[5]

69.    Suncor is a very profitable fossil fuel company, deriving profits – in the tens of

---

[5] The GHGs resulting from tar sands products are no different from GHGs produced from other sources; the tar sands products simply produce *more* GHGs for the amount of energy they generate.  The fact that Suncor Energy has continued to invest heavily in these products, despite its knowledge of climate change, only further demonstrates its recklessness.

17

**App. 89**

billions of dollars since the late 1980s – primarily from the production and sale of fossil fuels.

70.     From no later than the late 1960s, Suncor knew that its fossil fuel products would, at the levels being used, release $CO_2$ and other GHGs into the atmosphere, and contribute to changes in the planet's climate, including in Colorado, and cause the harms Plaintiffs allege herein.

71.     On information and belief, through at least 2016, Suncor was a member of, had access to information held by, participated in, directed, benefited from, agreed with, consented to and ratified and/or adopted positions and actions taken by the American Petroleum Institute (API) together with other fossil fuel companies.[6]

### EXXON

72.     Defendant Exxon is a New Jersey corporation headquartered in Texas.  Exxon has done business in Colorado since at least the 1930s.

73.     Exxon is a multinational, vertically integrated, fossil fuel company.  While Exxon has many predecessor companies, its current incarnation was formed in 1999 with the merger of Exxon Corp. (originally the Standard Oil Company of New Jersey) and Mobil Corp. (originally the Standard Oil Company of New York).  Exxon has benefited from, and is responsible for, the actions of its many predecessor entities.

74.     Exxon controls and profits from fossil fuel activities across its corporate family, which includes many subsidiaries and joint ventures.

---

[6] For example, in its 2016 "Sustainability Report" Defendant Suncor stated that it was "a participant in the development of policy positions and contributes to the outcomes of [API] meetings" and that API's and Suncor's positions on climate change were "consistent."

75.     On information and belief, the fossil fuel activities across Exxon's entire corporate family are pursued according to a common design set and controlled by Exxon. According to that common design, the members of the corporate family – subsidiaries, affiliates and other agents – do not have the ability to deviate from the common design and cannot refuse to produce, promote, refine and sell and/or transport Exxon's fossil fuels.

76.     Exxon's filings with the U.S. Securities and Exchange Commission and other public statements consolidate production, refining and fossil fuel sales figures across the corporate family.  (Further references to "Exxon" will be references to the entire corporate enterprise, unless otherwise specified.)

77.     Exxon directs its subsidiaries and agents as a single enterprise. On its own website, Exxon declares that "*We* operate facilities or market products all over the world and explore for oil and natural gas on six continents."

78.     Exxon also states that:

- "*We* hold an industry-leading inventory of global oil and gas resources."

- "*We* are the world's largest integrated refiner . . ."

- "*We* sell natural gas in almost all major and developing markets."

- "*Our* total net oil and gas production available for sale in 2016 averaged 4.1 million oil-equivalent barrels per day."

79.     Specifically, Exxon manages the entire operation, across the corporate family, with regard to climate change. Specifically, Exxon states that:

- "In order to ensure that our corporate communications accurately reflect our internal policy positions, we employ a corporate-wide global climate change and greenhouse gas issue management team.  As issues related to climate change arise at the local, state, national and regional levels, our global team of experts evaluates and develops a company position consistent with our principles."

19

**App. 91**

- The Exxon "Board or individual/sub-set of the Board or other committee appointed by the Board" has "the highest level of direct responsibility for climate change within [the] organization."

- It has a company-wide price on carbon, which it uses "when evaluating the economics of ExxonMobil's potential projects."

80.    On information and belief, Exxon has control over the way that its fossil fuels are marketed by franchisees, distributors and other retail suppliers of Exxon fuels.  As noted by the Supreme Judicial Court of Massachusetts – the highest court in that State – Exxon's operative franchise agreement gave Exxon "the authority to review and approve, in its sole discretion, all forms of advertising and sales promotions . . . for the promotion and sale of any product, merchandise or services" that "uses or incorporates any Exxon trademark" or "relates to any Business operated at [Branded Franchise Agreement] Holder Branded Outlet." Moreover, franchise dealers expressly "agree to such review and control by Exxon."

81.    Exxon has supplied a substantial portion of all fossil fuels used worldwide.  Since the 1960s, it has sold billions of barrels of oil, trillions of cubic feet of natural gas and millions of tons of coal.  Historically, Exxon supplied nearly 10 percent of global oil demand.[7]

82.    As a result of its fossil fuel activities at levels sufficient to contribute to alteration of the climate, Exxon is responsible for billions of tons of GHG emissions.  For example, based on the GHG emissions that can be traced solely to fossil fuels *produced* by Exxon *since 1988*, it is responsible for more than 16 billion tons of carbon dioxide ($CO_2$).[8]  Exxon is one of the largest

---

[7] For example, in 2001, Exxon sold nearly 8 million barrels of oil per day, more than 10 percent of the approximately 75-million-barrel global demand.

[8] Exxon is responsible for far more than 16 billion tons of $CO_2$ because it sells far more than it

**App. 92**

sources of historic and present-day GHG emissions.

83.     Exxon now publicly purports to accept some of the truth of climate change – i.e., that it is largely caused by human activity, primarily fossil fuel use, and that increasing atmospheric temperatures will harm public health and property.  Nonetheless, Exxon's business plans include increased sales of fossil fuels and the development of more carbon-intensive fossil fuels, such as shale oil and tar sands.  Its reported fossil fuel reserves exceed 20 billion barrels of oil equivalent ("BOE").

84.     Exxon is one of the world's most profitable companies, deriving profits – in the hundreds of billions of dollars since the late 1980s – primarily from the production, refining, promoting, marketing and sale of fossil fuels.

85.     From no later than the late 1960s, Exxon knew that its fossil fuel products would, when used as expected at the levels they would be used, release $CO_2$ and other GHGs into the atmosphere, and contribute to changes in the planet's climate, including in the climate of Colorado, and cause the harms Plaintiffs allege herein.

86.     On information and belief, at all relevant times, Exxon was a member of, had access to information held by, participated in, directed, benefited from, agreed with, consented to, and ratified and/or adopted positions and actions taken by the American Petroleum Institute.

## II.    JURISDICTION AND VENUE

87.     Venue is proper in this Court pursuant to Colorado Revised Statutes § 16-13-307(2) and Colorado Rule of Civil Procedure 98 because the nuisance and trespass which

---

produces, and because it sold billions more barrels of fossil fuels before 1988. The precise amount will be revealed during discovery and trial.

**App. 93**

Defendants caused and contributed to exist in Boulder County, because the subject matter of the action is located in Boulder County, and because Defendants have committed a tort in Boulder County, including the carrying out of deceptive trade practices.

88.     Each Defendant is subject to personal jurisdiction in Colorado pursuant to Colorado Revised Statutes § 13-1-124 because each transacts business, committed and continues to commit tortious acts in Colorado and has caused substantial injury to Plaintiffs in Colorado. Each ton of $CO_2$ that can be traced to Defendants' fossil fuel operations in and contacts with Colorado caused and contributed to bringing about climate change, and exacerbates the impacts of climate change and Plaintiffs' injuries.

## SUNCOR ENERGY

89.     Suncor Energy is a Canadian corporation with its principal office at 150 6th Avenue S.W., Calgary, Alberta, Canada T2P 3E3. General personal jurisdiction is proper over Suncor Energy because it has substantial contacts and affiliations with Colorado, including through its subsidiaries, which make it essentially at home in the state. Specific personal jurisdiction is also proper over Suncor Energy because it has substantial contacts with Colorado by and through its fossil fuel activities in the state and because Plaintiffs' injuries arose out of, were caused and/or exacerbated in part by and/or relate to those activities.

90.     Suncor Energy – through its own direct actions and through the activities of its subsidiaries and agents acting pursuant to a common design coordinated and directed by Suncor Energy – has substantial contacts with Colorado relating to the claims in this case, including activities that give rise to the claims in this case. Suncor Energy's affiliations with Colorado are more substantial than with any other state in the United States.

22

**App. 94**

91.    With the knowledge that its fossil fuel activities were and are occurring at levels that have and continue to contribute to climate change in Colorado, and with knowledge that its actvities would result and were resulting in the harms of the types Plaintiffs allege herein, Suncor Energy has engaged in the following activities:

- promoted and continues to promote fossil fuels in Colorado with the intent that its fossil fuels be used and combusted;

- sold, sells and plans to continue selling fossil fuels to customers in Colorado through a network of gas stations and other suppliers – by its own admission, Suncor's products account for "35% of Colorado's gasoline and diesel fuel demand," and a third of the jet fuel supplies for Denver International Airport;

- operated, and continues to operate, "Colorado's only petroleum refinery" in Commerce City, Colorado, which produces over 100,000 barrels per day – approximately 20 percent of the products produced at the Commerce City refinery are derived from Suncor's Canadian tar sands operations; and

- operates pipeline systems that transport crude oil from Cheyenne, Wyoming, to Commerce City, Colorado.

92.    Suncor has also directly emitted substantial amounts of GHGs in Colorado from its fossil fuel activities, including refining and transportation activities.  Suncor's operations in Colorado emitted approximately one million metric tons of GHGs in 2016 alone.

93.    On its own, and/or through agents – including API and the company's affiliates – Suncor Energy has conspired to, funded and participated in efforts to mislead people and consumers in Colorado about, among other things, climate change and the risks of fossil fuel use.

**App. 95**

**SUNCOR USA**

94.     Defendant Suncor USA, a subsidiary of Suncor Energy, is a Delaware corporation and citizen of Colorado with its principal place of business located at 717 17th Street, Suite 2900, Denver, Colorado.  Suncor USA registered with the Office of the Colorado Secretary of State to transact business in the state beginning in June 2003 and has done business in Colorado continuously since that time.  Suncor USA is subject to general jurisdiction in Colorado.

**SUNCOR ENERGY SALES**

95.     Defendant Suncor Energy Sales, a subsidiary of Suncor Energy, is a Colorado corporation and citizen, with its principal office located at 717 17th Street, Suite 2900, Denver, Colorado.  Suncor Energy Sales is subject to general jurisdiction in Colorado.

**ADDITIONAL SUNCOR SUBSIDIARIES**

96.     In addition to the Suncor Defendants, Suncor also operates in Colorado through several other subsidiaries, including Petro-Canada Resources (USA), Suncor Energy Services, Suncor Energy (U.S.A.) Marketing and Suncor Energy (U.S.A.) Pipeline Co.

**Petro-Canada Resources (USA)**

97.     Petro-Canada Resources (USA) Inc., a subsidiary of Suncor Energy, is a Colorado corporation with its principal office located in Denver, Colorado.  Petro-Canada Resources (USA) Inc. registered with the Office of the Colorado Secretary of State to transact business in the state beginning in February 1980 and has done business in Colorado continuously since that time.

98.     Petro-Canada Resources (USA) Inc. produced fossil fuels in Colorado, including in Boulder County.

**App. 96**

**Suncor Energy Services**

99.     Suncor Energy Services, Inc., a subsidiary of Suncor Energy, is a Canadian corporation with its principal office located in Alberta, Canada.  Suncor Energy Services registered with the Office of the Colorado Secretary of State to transact business as a foreign entity pursuant to C.R.S. § 7-90-301, *et seq*. and § 7-90-803 in September 2009 and has done business in Colorado continuously since that time.

100.    Suncor Energy Services extracts and upgrades oil sands and markets refinery feedstock, diesel fuel and natural gas.

**Suncor Marketing**

101.    Suncor Energy (U.S.A.) Marketing, Inc. ("Suncor Marketing"), a subsidiary of Suncor Energy, is a Delaware corporation with its principal office located in Denver, Colorado. Suncor USA Marketing registered with the Office of the Colorado Secretary of State to transact business as a foreign entity pursuant to C.R.S. § 7-90-803 in September 2012 and has done business in Colorado continuously since that time.

102.    Suncor Marketing offers marketing, transportation, and storage of crude oil and natural gas products.  It also produces and distributes sulfur and petroleum coke.

**Suncor Pipeline**

103.    Suncor Energy (U.S.A.) Pipeline Co. ("Suncor Pipeline"), a subsidiary of Suncor Energy, is a Colorado corporation with its principal office located in Denver, Colorado.

104.    Suncor Pipeline operates pipeline systems that carry crude oil from Cheyenne, Wyoming, to Commerce City, Colorado.  It supplies the Suncor USA refinery located in Commerce City.

**App. 97**

# EXXON

105.    Defendant Exxon is a New Jersey corporation with its principal place of business in Irving, Texas.  Exxon has a registered agent for service of process in Colorado and has done business in Colorado since at least the 1930s.[9]  Exxon registered with the Office of the Colorado Secretary of State to transact business as a foreign entity in December 1972 and has done business in Colorado continuously pursuant to C.R.S. § 7-90-301, *et seq*. and § 7-90-803 since that time.

106.    Personal jurisdiction is proper over Exxon because it has substantial contacts with Colorado by and through its fossil fuel activities in the state, because it acted in concert with Colorado corporations, and because Plaintiffs' injuries arose out of, were caused and/or exacerbated in part by and/or relate to those activities.

107.    Exxon has substantial contacts with Colorado relating to the claims in this case, including activities that give rise to the claims in this case. With knowledge its fossil fuel activities were and are occurring at levels that have and continue to contribute to climate change in Colorado, and with knowledge that its activities would result and were resulting in the harms of the types Plaintiffs allege herein, on information and belief, Exxon has engaged in the following activities:

- promoted, promotes and plans to continue promoting fossil fuel use with the public and customers in Colorado;

- sold, sells and plans to continue selling its fossil fuels in Colorado through its own

---

[9] Its registered agent is Corporation Service Company, 1900 W. Littleton Boulevard, Littleton, Colorado.

gas stations, and through agreements with other retail distributors[10] – there are approximately 50 Exxon-branded gas stations in Colorado;

- produced a substantial amount of natural gas directly in Colorado – tens of millions of cubic feet between 1999 and 2011 alone – and through its agent, XTO, which claims to produce more than 130 million cubic feet a day;

- produced a substantial amount of crude oil directly in Colorado – hundreds of thousands of barrels between 1999 and 2011 alone - and through its agent, XTO, which produced hundreds of thousands of barrels between 2007 and 2018.

- produced coal in Colorado; and

- built a town in Garfield County, Colorado in connection with its Colony Oil Shale Project.

108.    Exxon states that it has been producing natural gas in Colorado's Piceance Basin "since the 1950s," and that it currently has an "interest in 300,000 acres in the Piceance Basin" holding potentially 45 trillion cubic feet of gas.  Exxon states it is "committed to building long-term partnerships in Rio Blanco County and northwest Colorado" through these Piceance operations.

109.    Exxon has sought to develop and has continuing plans to develop unconventional fossil fuels in Colorado, such as oil shale (i.e., kerogen) and coal-to-liquid and coal-to-gas synthetics.

110.    Exxon has also directly emitted substantial amounts of GHGs in Colorado from its production and transportation activities.  The company emitted more than 420,000 metric tons of GHGs in Colorado between 2011 and 2015 alone.

111.    On its own, and/or through agents – including API – Exxon has also conspired to,

---

[10] The quantity of Exxon's product which is sold in this state is information that is uniquely in Exxon's possession.

funded and participated in efforts to mislead people and consumers in Colorado about, among other things, the existence of climate change and the risks of fossil fuel use.

112.     Throughout the time period relevant to this litigation, Exxon has operated and done business in Colorado on its own behalf and through several agents.  These agents include, but are not limited to:

### XTO Energy Inc.

113.     XTO Energy Inc., a wholly owned subsidiary of Exxon, is a Delaware corporation with its principal office located in Fort Worth, Texas.  XTO Energy Inc. registered with the Office of the Colorado Secretary of State to transact business as a foreign entity in December 2002 and has done business pursuant to C.R.S. § 7-90-301, *et seq*. and § 7-90-803 continuously since that time.

114.     XTO Energy Inc. has developed and continues to develop fossil fuels in Colorado. XTO purports to be an expert "in developing tight gas, shale gas, coal bed methane and unconventional oil resources," and its western division is headquartered in Denver, Colorado. XTO operates across 553,392 acres in Colorado, producing 130 million cubic feet of gas per day.

### ExxonMobil Coal USA Inc.

115.     ExxonMobil Coal USA Inc. was a wholly owned subsidiary of Exxon and a Delaware corporation with its principal office located in Houston, Texas.  ExxonMobil Coal USA Inc. registered with the Office of the Colorado Secretary of State to transact business as a foreign entity in December 1979 and did business continuously until May 2002.  The company's purpose was to "acquire, mine, and sell coal; maintain shale, water, oil and gas interests.  [And to] [d]evelop [the] capability to produce synthetic liquids and gas, including research and

28

**App. 100**

development programs."

### Ellora Energy Inc.

116.    Ellora Energy Inc. is a Delaware corporation and a wholly owned subsidiary of Exxon.  Between June 2002 and January 2011, Ellora Energy Inc. was registered with the Colorado Secretary of State to transact business as a foreign entity, and it had its principal place of business at 5665 Flatiron Parkway, Boulder, Colorado.

117.    Ellora Energy Inc. produced and transported fossil fuels in Colorado, as well as at other locations across the United States.

118.    Exxon acquired Ellora Energy Inc. in 2010, and, on information and belief, Exxon also acquired Ellora Energy Inc.'s Colorado assets.

### ExxonMobil Pipeline Company

119.    ExxonMobil Pipeline Company is a wholly owned subsidiary of Exxon and a New York corporation with its principal office located in Irving, Texas.  ExxonMobil Pipeline Company registered with the Office of the Colorado Secretary of State to transact business as a foreign entity in 1934 and has done business pursuant to C.R.S. § 7-90-301, *et seq*. and § 7-90-803 consistently since that time.

### DEFENDANTS' SHARED CONTACTS WITH COLORADO

120.    Exxon and Suncor's contacts with Colorado also substantially overlap.

121.    Exxon and Suncor jointly own Syncrude Canada Ltd. – a large, if not the largest, tar sands developer in Canada – which produces synthetic crude derived from Canadian tar sands, and which, on information and belief, it promotes, refines and sells in Colorado.

122.    Suncor Energy Sales also has agreements with Exxon, through which it markets

**App. 101**

and sells Exxon fuels at wholesale and retail sites across Colorado.

## III.    STATEMENT OF FACTS

### A.  Defendants' actions have altered the climate in Colorado.

123.    Climate change is occurring and its cause is not in doubt: the emission of GHGs into the atmosphere, primarily from the increasing combustion of fossil fuels – including, in significant part, Defendants' fossil fuels – has increased the concentration of those gases in the atmosphere, trapping heat in the climate system, and warming the planet.[11]

124.    As the U.S. Government reports, "there is no convincing alternative explanation" for the observed warming trends.  As a result of this climate alteration – and as evidence of the reality of the climate crisis – all five of the warmest years on record have occurred since 2010.

### 1.  *The climate has been altered because of Defendants' fossil fuel activities.*

125.    Earth has a natural "greenhouse" effect: solar energy, primarily in the form of light, passes through the atmosphere; the Earth reradiates some of that energy back into space as thermal radiation – essentially, heat; and GHGs in the atmosphere, like carbon dioxide, trap some of that heat inside the Earth's climate system, thereby warming the atmosphere and oceans.

126.    This greenhouse effect has been altered and intensified by human greenhouse gas emissions caused and contributed to by the levels of Defendants' fossil fuel activities. Abnormally high concentrations of atmospheric GHGs – primarily $CO_2$ but also methane and other trace gases – which have accumulated at an unprecedented rate, are trapping more heat, artificially intensifying the greenhouse effect.  The human driven alteration of the greenhouse

---

[11] According to the U.S. Environmental Protection Agency, "almost all of the increase is due to anthropogenic emissions."

**App. 102**

effect has been confirmed from satellite measurements.

127.    GHGs have rapidly accumulated in the atmosphere because of the increasing use and combustion of fossil fuels, which were provided in significant quantities by Defendants. Fossil fuels produce GHGs, primarily $CO_2$, when they are combusted.  In addition, as fossil fuel use has grown – encouraged and constantly supplied by Defendants – GHG emissions have risen at an unparalleled rate.  The normal processes by which GHGs are reabsorbed by the Earth's plants, land and oceans cannot keep up with the rapid emission rate caused and contributed to by the levels of Defendants' fossil fuel activities, and the concentration of GHGs in the atmosphere has therefore increased, causing alteration of the climate, including in Colorado.

128.    Fossil fuel combustion is responsible for the majority of emissions that have caused GHG concentrations to reach hazardous and unprecedented levels.  For example, $CO_2$ emissions – by far the most prevalent and problematic GHG because of its long-lived warming impact – have increased roughly 90 percent since 1970, with fossil fuel combustion and industrial processes contributing to roughly 78 percent of total GHG emission increases from 1970 to 2011.

129.    As a result of the emissions caused and contributed to by the levels of Defendants' fossil fuel activities, atmospheric $CO_2$ now stands at 408 parts per million (ppm), a level which is unprecedented in human history.  The last time atmospheric $CO_2$ reached this level was approximately 3 million years ago, when average temperatures were considerably warmer (3.6 to 6.3°F, or 2 to 3.5°C) than today's temperatures, and sea levels were at least 30 feet higher.

130.    Atmospheric $CO_2$ levels continue to rise.  Defendants' fossil fuel activities caused

**App. 103**

and contributed to a rise in energy-related carbon emissions of around 32 billion tons in 2017, as emissions increased by 1.4 percent.  Since 1980, Exxon has had the single largest contribution of any American industrial producer of products that emit $CO_2$ when combusted to the rise in $CO_2$ levels and the third largest contribution of any producer in the world.

131.    The graph on the left depicts atmospheric $CO_2$ concentrations over the last 800,000 years.  The spike on the far right side of the graphs shows the trend in the past few centuries.  The graph on the right has the same scale of $CO_2$ concentration, but focuses only on atmospheric concentrations from 1750-2015.



132.    The Intergovernmental Panel on Climate Change (IPCC) is widely recognized (including by Defendants) as a leading scientific authority on climate change.  According to the IPCC, as a result of rising $CO_2$ and other GHGs, "[w]arming of the climate system is unequivocal."  The IPCC also reports that "[t]he atmosphere and oceans have warmed, the amounts of snow and ice have diminished, and sea levels have risen."

133.    According to the best available science, annual average temperatures over the contiguous United States have increased by 1.8°F (1.0°C) since 1895, with the majority of the increase occurring since the 1980s.  The western parts of the United States have been harder hit; Colorado has seen average temperatures rise by 2.5°F (1.4°C) over the last 50 years alone.

134.    Not only have the levels of Defendants' fossil fuel activities caused and

**App. 104**

contributed to this temperature increase, but Defendants' actions have also contributed to the increasing rate of warming. While global average temperatures rose at an average rate of 0.13°F (0.07°C) per decade since 1880, they have risen at an average rate of 0.31°F (0.17°C) per decade since 1970.

135.    Once $CO_2$ enters the atmosphere, a significant portion of it remains there, with a warming influence that lasts for hundreds (if not thousands) of years.  It also cannot be feasibly removed from the atmosphere with existing technology, "commit[ting] the world to some degree of irreversible warming and associated climate change resulting from emissions to date."

136.    According to the most recent report from the U.S. Government, "under all plausible future climate scenarios" – regardless of the trajectory of future fossil fuel emission rates in the near-term[12] – annual average temperatures are expected to rise by at least an additional 2.5°F (1.4°C) by 2050.  These projections[13] apply to Colorado, where temperatures are expected to rise an additional 2.5° to 5°F by 2050.

137.    While the floor for warming has been established, the ceiling – how bad it can get – will grow depending on future emissions.  Under a lower-intermediate emissions scenario,[14]

---

[12] For example, even if *all* emissions suddenly *stopped*, there would still be another 0.5°F increase expected over the next few decades due to time lags in the warming effects of the level of GHGs caused and contributed to by Defendants.

[13] "Projections" in this Complaint are based on and supported by data generated by General Circulation Models, which are approved by the IPCC, and which are the best available scientific representation of future climate scenarios, including their physical impacts.

[14] Emissions scenarios are often categorized into four different types—or Representative Concentration Pathways (RCP)—by the IPCC: RCP2.6, RCP4.5, RCP6, and RCP8.5.  The scenarios are used to compute and predict different climate futures based on a possible range of anthropogenic GHG emissions. RCP4.5 represents a lower-intermediate emissions scenario, while RCP8.5 represents a high emissions scenario.

**App. 105**

global temperatures are projected to rise by approximately 5.0°F (2.8°C) over pre-industrial averages by the end of the century. Under a high-emissions scenario, temperatures are projected to rise by 8.7°F (4.8°C) by the end of the century. Defendants' current conduct and planned increases in production of fossil fuels are consistent with at least the higher emission scenario, and may well be outside of any projected scenario.

138.    A 5.0°F (2.8°C) warming would have devastating impacts on people, property, the economy and the environment. An 8.7°F (4.8°C) warming would be catastrophic, leading, according to the IPCC, to "substantial species extinction, global and regional food insecurity, consequential constraints on common human activities and limited potential for adaptation in some cases."

   **2.   *The impacts of a climate altered by Defendants' conduct are being felt in Plaintiffs' communities*.**

139.    The seriousness of the impacts of climate change is not in question. In a 2013 Executive Order, the President of the United States recognized that "[t]he impacts of climate change – including an increase in prolonged periods of excessively high temperatures, more heavy downpours, an increase in wildfires, more severe droughts, permafrost thawing, ocean acidification, and sea-level rise – are already affecting communities, natural resources, ecosystems, economies, and public health across the Nation." As the Governor of Colorado recently reaffirmed, "climate change presents a broad range of challenges" that "will affect everyone" in the state.

140.    Colorado is extremely vulnerable to and is experiencing  the impacts of climate change, including increases in extreme hot summer days and increases in minimum nighttime temperatures, precipitation changes, larger and more frequent wildfires, increased concentrations

**App. 106**

of ground-level ozone, higher transmission of viruses and disease from insects, altered streamflows, bark beetle outbreaks, ecosystem damage, forest die-off, reduced snowpack, and drought.

141.    The U.S. Environmental Protection Agency (EPA) has noted "[t]hroughout the western United States heat waves are becoming more common, snow is melting earlier in spring, and less water flows through the Colorado River."

142.    The consequences of these changes are enormous.  As the EPA found, "[r]ising temperatures and recent droughts in the region have killed many trees by drying out soils, increasing the risk of forest fires, or enabling outbreaks of forest insects.  In the coming decades, the changing climate is likely to decrease water availability and agriculture yields in Colorado, and further increase the risk of wildfires."  These changes have already begun, and they have injured and will continue to injure people, property and the economy of Colorado, including in Plaintiffs' jurisdictions.

143.    Recent research has demonstrated that the observed trends in aridity in Colorado are attributable to human-driven climate change.  Further, most climate model projections underestimate the magnitude of the observed trends and therefore also underestimate future drought and decreases in soil moisture.

144.    Colorado's economy depends on snow, water and cool weather.  For example, the state's $41 billion agriculture industry is imperiled by rising temperatures and drought, while the $5 billion ski industry is in jeopardy as a result of "low-snow" winters and shorter seasons.

*Plaintiffs are experiencing rising temperatures and extreme heat.*

145.    Defendants' actions have already caused or contributed to rising temperatures in

35

**App. 107**

Colorado.  Colorado has seen average temperatures rise by 2.5°F over the last 50 years, with

over a 2°F rise since 1983.  Daily minimum temperatures and nighttime lows have also risen,

limiting relief for humans and plant life subjected to heat waves, especially in the summer

months.  The rapid warming is clearly attributable to human-driven climate change, as it is

inconsistent with natural variability.

146.    The rise in temperature is occurring across all seasons Specifically, Colorado is

experiencing some of the fastest warming summers in the United States.

147.    Temperatures in Colorado are projected to increase substantially by 2050 under

all emission scenarios.  According to research by the University of Colorado and others, under

even an increasingly unlikely lower-intermediate emission scenario, annual temperatures are

projected to rise an additional 2.5 to 5°F (above a 1971-2000 baseline) by mid-century; "the

typical year by 2050" is projected to be "warmer [than] the very warmest years of the past

century."

148.    Defendants' levels of fossil fuel activities have contributed to the increasing

likelihood of a high emissions scenario, where annual temperatures in Colorado are projected to

warm another 3.5 to 6.5°F by 2050.  A 6°F temperature rise would turn future Denver into the

temperature equivalent of today's Albuquerque, New Mexico. All Plaintiff communities will

suffer comparable temperature rises.

149.    In addition to increasing average temperatures, there has already been a notable

increase in the frequency of heat waves across the U.S. These are projected to become more

frequent and more severe.  Across the southwestern U.S., and Colorado, *a five- to ten-fold

increase in heat waves* is projected by mid-century.

**App. 108**

150.    Under an intermediate emissions scenario, average August maximum temperatures are expected to increase in San Miguel County.  The traditional cooling buffer months of March and October are projected to see increases in minimum temperatures, meaning that nighttime lows will offer less relief from heat and less of the cooler temperatures needed to preserve spring snowpack.

151.    The remote western edge of San Miguel County is predicted to see a significant increase in extreme heat days.  Climate change is projected to increase average temperatures in southwest Colorado an additional 1.5 to 2.5°F by 2025 and 2.5 to 5.5°F by 2050.  The desert climate of the western portions of the County are projected to migrate up into its valleys.

152.    The average temperature in the Boulder area is anticipated to rise an additional 1.5 to 4° F by 2040, and 4.3 to 9.6° F by 2100 under intermediate-emissions models.  The number of extreme heat days and daily minimum temperatures – which has *already* increased in Boulder – is projected to rise dramatically, particularly and dangerously in summer months.  Specifically, while Boulder averaged 5 days per year with temperatures of 95°F or above across the 20th century, it is expected to see at least 25 days a year above that mark by the mid-21st century, and 49 days by the end of the 21st century, *even under a lower-intermediate emissions scenario*.

153.    Warming temperatures and heat waves caused and contributed to by the levels of Defendants' fossil fuel activities are a threat to health, property and infrastructure.  Medical studies have linked heat waves to increases in premature deaths, and adverse economic impacts have been documented on extreme heat days, with particularly large effects on outdoor labor productivity in sections such as construction, transportation and agriculture. The levels of

Defendants' fossil fuel activities has thus already contributed to substantial economic losses in the Plaintiffs' communities.

154.    Analysis by the U.S. Department of Agriculture shows clearly that exposure to temperatures greater than 30°C (86°F) leads to large decreases in yields for major crops including corn, wheat and soybeans.  Hence, the increase in days with extreme heat has already harmed agricultural productivity and will continue to do so in the future.

*Plaintiffs are experiencing shifts in precipitation patterns and water availability.*

155.    Rising temperatures caused and contributed to by Defendants' actions also lead to changes in precipitation patterns, rainfall intensity and water availability.  These changes all have substantial implications for the people, property and infrastructure within Plaintiffs' jurisdictions.

156.    Measurements already reveal large, unambiguous decreases in snow extent in the Northern Hemisphere during spring, with a reduction of about 100,000 km$^2$ in snow-covered area during April since 1967.  Long, reliable records of both temperature and snow cover extent since the late 1960s show that snow cover clearly depends on Northern Hemisphere mid-latitude surface temperatures, with a decrease in April snow-covered area of ~4.5% per degree (C) of warming and roughly double that rate of loss in June.  Measurements show large losses in April snowpack in Plaintiffs' jurisdictions consistent with these overall Northern Hemisphere trends.  Climate change caused and contributed to by Defendants' fossil fuel activities is clearly linked to this decline in snowpack.  Models project further declines in snowpack, and recent analysis indicates that such projections are very likely underestimates.

157.    Colorado has already started to see a greater proportion of its precipitation falling as rain rather than snow, a trend that will continue as temperatures rise further.  This has caused a

**App. 110**

decline in snowpack, particularly at lower elevations, and further decline is projected due to warming.

158.    Any snowpack loss has significant consequences in Colorado, where snowpack is the largest reservoir of water and the source of 70 percent of the state's surface water; many areas depend on mountain glaciers and snowpack for their water supply, including for irrigation purposes.

159.    Earlier snowpack melt is also a serious concern; as EPA has recognized, "with increased runoff in the winter and early spring," there are "increase[d] flood concerns" and "substantially decreased summer flows."  This risk is compounded by projected precipitation changes, including the time of year for peak precipitation, and the intensity with which that precipitation falls.[15]

160.    San Miguel County faces increasing intensity of rainfall events.  Climate change is projected to increase the rainfall intensity of 5-year storm events, with the greatest intensity increases, in terms of inches of rainfall per hour, predicted for 15-minute storm levels.  This means that the County is projected to see increases in the intensity of short-duration rain events.

161.    The Boulder area is expected to see an increase in winter precipitation and a decrease in spring precipitation.  An increase in heavy precipitation events is expected during both seasons.  Climate change is projected to increase the rainfall intensity of 5-year storm events and 100-year storm events.  While storms under one-quarter inch of rainfall per day are projected to stay the same or decrease in frequency under future scenarios in Boulder, storms of

---

[15] A warmer atmosphere holds more moisture than a cooler one, which can mean heavier precipitation during rainfall events, causing more intense flooding.

**App. 111**

one-quarter to one-half inch and one-half to one inch are projected to increase on average, under all future emissions scenarios.

162.    The greatest intensity increases in Boulder, in terms of inches of rainfall per hour, are predicted for 15-minute storms.  This means that Boulder is projected to see an increase in the intensity of short duration rain events.

163.    Increases in high-intensity, short-duration rainfall events in excess of current infrastructure capacity are likely to have substantial impacts on drainage systems and other infrastructure, and create an increased risk of flooding, which threatens people, property and infrastructure in all Plaintiff communities.[16]

*Plaintiffs are experiencing an increased risk of drought.*

164.    Rising temperatures and shifting precipitation patterns caused and contributed to by the levels of Defendants' fossil fuel activities exacerbate the risk of drought.

165.    Total summer rainfall is more likely to decrease than increase in Colorado, with longer rainless periods also expected.  The higher temperatures will also lead to more evaporation, intensifying droughts when they occur.  The frequency and severity of droughts are projected to increase in many parts of Colorado.

166.    Because of climate change, over the next three decades, San Miguel County and the Boulder area are projected to see a significant increase in the expected number of months of drought and a shift away from mild droughts towards more moderate, severe and extreme droughts.  Droughts that were once mild will become more severe.  Increasing drought months

---

[16] Built in the mouth of canyons, the City of Boulder already rates as the number one flash flood risk community of Colorado's Front Range.

**App. 112**

and drought severity, in turn, have substantial implications for agriculture, wildfires and water availability.

167.    Plaintiffs are already experiencing these trends.  Recent research has demonstrated that the observed trends in aridity in Colorado are attributable to human-driven climate change, and furthermore that most climate model projections underestimate the magnitude of the observed trends and also likely underestimate future drought and decreases in soil moisture.

*Plaintiffs are experiencing an increased risk of wildfires.*

168.    More rain in winter, less snowpack, earlier snowmelt, drier spring soils and summers and increasing occurrence and intensity of drought are all increasing wildfire risk by setting the table for longer, more severe wildfire seasons and a general increase in wildfire vulnerability.

169.    Increasing temperatures and drought caused and contributed to by the levels of Defendants' fossil fuel activities have already led to increased wildfires in recent decades.  A recent study estimated that climate change has doubled the area of forest burned in the western United States since 1984.

170.    There has been a significant rise in the number of large fires in Colorado.  While there were only six fires larger than 1,000 acres in the 1970s, there were 35 in the 2000s and 19 in just the three years between 2010 and 2012 – a five-fold increase over 40 years.  This trend is expected to continue, with projections of a substantial increase in wildfire occurrence, duration and acres burned, as well as a longer fire season.

171.    Increased wildfire risk and occurrence is perilous in a state where over 2 million

41

**App. 113**

homes exist in the "Wildland-Urban Interface" (WUI) – where homes and other structures exist in and adjacent to wildfire-prone wildland.

172.    In San Miguel County, where many communities live in the WUI, the number of wildfire occurrences, as well as the acres of area burned, is expected to increase over the next three decades, and the wildfire threat will extend to higher elevations where historically there was a much lower wildfire risk and where mitigation has not been as high a priority.

173.    Almost 20 years ago, over 170,000 acres of San Miguel County qualified as moderate to high hazard for wildfire.  Even under an intermediate-low emissions scenario, San Miguel County is projected to see more than 300 additional wildfires (over a historic average) between 2020 and 2049, with the burn area projected to increase by over 40 percent.

174.    In the Boulder area, wildfires over the last three decades have destroyed over 260 structures and burned over 16,000 acres, much of it on public lands that the County and the City manage.

175.    Indeed, the majority of Boulder County already qualifies as a high-risk fire area, and is described as an "environment prone to extreme wildfire behavior."  Based on some metrics, the Boulder area has the highest wildfire risk in the state and has the tenth highest risk in the entire West.

176.    In recent years, the Boulder area has seen trends towards a decrease in shoulder seasons that traditionally provided a buffer from the May-September fire season.  Now, major fires are occurring nearly every month of the year.

177.    Boulder's wildfire risk is also projected to spread to areas that previously experienced low incidence of wildfire, such as higher elevation areas of the County.  Boulder is

**App. 114**

already seeing trends towards these higher altitude fires, which present a new threat to water reservoirs that provide water to the City and runoff that travels into the Boulder watershed.

178.    Fires are already occurring dangerously close to Boulder's water supplies, and it is predicted that a wildfire of a large scale could seriously impact higher-elevation water supplies.  For example, the Fourmile Fire of 2010 almost forced the closure of a water treatment plant for the City of Boulder that provides a substantial portion of the City's drinking water.

179.    The number of wildfire occurrences in the Boulder area, as well as acres of area burned, is expected to increase over the next three decades.  Under even the increasingly unlikely intermediate-low emissions scenario, an additional 150 wildfires (over a historic average) on average are predicted between 2020 and 2049, with the burn area projected to increase by nearly 40 percent on average in the Boulder area.

*Plaintiffs are experiencing increased risks to forest health.*

180.    Beyond fire, increasing temperatures and drought conditions caused and contributed to by the levels of Defendants' fossil fuel activities pose other risks to forest health.

181.    Across the Southwest, trees are dying because of increasing temperatures and drought as a result of climate change.  This trend will continue.

182.    Trees generally die faster when drought is accompanied by higher temperatures, so short droughts, which occur more frequently than long droughts, trigger mortality if temperatures are higher.  Even without an increase in drought frequency, rising temperatures alone lead to substantially greater tree mortality.  This not only affects forested land, but urban tree canopies that serve to improve air quality, promote stormwater management, decrease runoff into watersheds and reduce the effects of rising temperatures.

43

**App. 115**

183.    These conditions also lead to more severe insect outbreaks, such as the bark beetle epidemics seen across Colorado.  As the U.S. Forest Service reports, climate change has *already* led to an increase in bark beetle-induced damage.  In the last two decades, the mountain pine beetle affected trees across 4 million acres of forested watersheds in Colorado.  These recent outbreaks "have exceeded the frequencies, impacts, and ranges documented" in the last century, and the most recent outbreak in Colorado's Rocky Mountain National Park was the most severe ever seen.

184.    A growth in native beetle populations, and the resulting devastation, is directly linked to climate change and an increase in both summer and winter temperatures.  Warmer temperatures result in higher survival rates and faster development; beetles can now thrive where they were previously constrained by cold temperatures.  Under temperature increases of 4 to 5°F, certain bark beetle species have doubled both their reproductive and tree consumption rates.

185.    With rising temperatures, increased drought predictions and heavily forested lands, climate conditions in San Miguel County and in Boulder County will increasingly favor larger mountain pine and spruce beetle populations and outbreaks.

186.    The Boulder Plaintiffs have already experienced mountain pine beetle impacts in a recent epidemic linked to a warmer and drier climate.  Between 1996 and 2010, 122,455 acres of forest within Boulder County saw some level of damage related to mountain pine beetle.

*Plaintiffs are experiencing increased threats to public health.*

187.    From an emergency management perspective, climate change – caused and contributed to by the levels of Defendants' fossil fuel activities – threatens human life and health as a result of the projected increase in extreme weather events, floods and wildfires.

**App. 116**

188.    The rising temperatures also jeopardize human health in several other ways.  For example, according to a 2015 report commissioned by the State of Colorado, there are "[m]ajor public health areas of concern related to the effect of current . . . and future clim[a]te change . . . ," including heat-related illnesses, negative air quality effects, and changes in the occurrence and incidence of infectious and vector-borne diseases.

189.    Higher temperatures are problematic in a high-elevation, low-humidity state that is historically accustomed to cool nights which provide relief during heat waves.  Buildings throughout Colorado – including in San Miguel County and Boulder County – which were built based on historic climate patterns, often lack air-conditioning.  As temperatures rise and extreme events increase, operating without air conditioning may no longer be feasible, which would make necessary new cooling systems to protect vulnerable populations, or provide alternative sources of respite, such as central cooling centers where people could go for relief.

190.    Higher temperatures and the presence of sunlight are also associated with increased formation of ozone, which at the ground level is a pollutant that can cause respiratory damage.  According to the Colorado Climate Plan, "climate change is likely to result in higher ozone concentrations."

191.    Even short-term exposure to ozone is associated with severe health consequences such as respiratory inflammation, pulmonary function decrements, increased emergency department visits, and premature mortality.  These consequences are all the more severe for already-vulnerable populations, including children and the elderly.

192.    Ground-level ozone is at its highest levels during summer days that reach the upper 80s and mid-90s.  More warm summer days, plus warming spring and fall seasons, will

**App. 117**

extend the ozone season.

193.    Ground-level ozone concentrations are already a serious problem in Boulder County and the City of Boulder.  Climate change is making the problem worse.  Boulder County (including the City) is already within a Clean Air Act ozone nonattainment area.  In addition, the ability to come within the necessary federal ozone attainment goals will become more difficult under new climate realities.

194.    As stated in a report to the Colorado Energy Office, "[c]limate [also] plays a role in outbreaks of vector-borne and zoonotic infectious diseases and in the transmission of these diseases to humans."  For example, warmer weather and drought conditions lead to animal migrations, an increase in mosquito populations, mosquito-borne illnesses and the need for increased mosquito control.  In addition, multiple cases of the mosquito-borne West Nile Virus have occurred in Boulder County, and San Miguel County is also vulnerable to the virus.

195.    The threat of an increase in such harmful diseases creates the need for additional monitoring and surveillance.  For example, Boulder County public health staff anticipate, in the County's Climate Change Preparedness Plan, increases in plague and tularemia (spread by ticks and deer flies) if winters become warmer and rainier, as projected.

196.    Prevention, monitoring, and reporting costs associated with the spread of such illnesses will likely increase due to increased surveillance and treatment of mosquito-infested and other areas where humans have the likelihood of contact with infected animals.

**B.  Plaintiffs have acted to prevent climate change, but are still being harmed by, and must act to mitigate, its impacts on their property and residents.**

**1.  *Plaintiffs have made substantial efforts to reduce their own GHG emissions.***

197.    Plaintiffs have been national leaders in environmental sustainability and

46

**App. 118**

mitigating GHG emissions.  For example, "[r]ecognizing that local governments are the first responders in the fight against climate change, Boulder County has taken numerous steps to reduce its own heat-trapping emissions and to assist its residents and businesses to do the same."

198.    Boulder County, San Miguel County and the City of Boulder are all members of Colorado Communities for Climate Action, which advocates for state and federal actions to protect Colorado's climate for current and future generations.  Sustainability is at the very core of Plaintiffs' identities, each of which takes seriously its responsibility for stewardship of the natural environment.

*Boulder County has made efforts to reduce GHG emissions.*

199.    Boulder County's guiding values include "sustainability" which includes a commitment to environmental sustainability.  "Environmental protection and sustainability" is listed as one of the County's priority areas.  General environmental sustainability and management of public lands and natural resources for the future are listed as guiding principles of the County's 2017 State Legislative Agenda; supporting climate change preparedness and resiliency efforts, wildfire mitigation and protection of public lands served as legislative priorities.

200.    These are principles and ideals that Boulder County aggressively puts into place financially and through incentive programs.

201.    In 2017 the County budgeted for funds such as the Clean Energy Options Local Improvement District Fund and the Qualified Energy Conservation Bonds Fund, which were earmarked "for the creation of cost-effective programs aimed at reducing energy use and preventing climate change."  Conservation and sustainability expenditures under the 2017

**App. 119**

adopted budget amounted to $38,787,781.

202.    As part of a larger effort toward achieving Kyoto Protocol targets, the Boulder County Sustainable Energy Plan sets forth recommendations to achieve a reduction of greenhouse gas emissions 40 percent below the County's 2005 levels by the year 2020.

203.    In order to meet this goal, Boulder County has carried out numerous programs and initiatives.  EnergySmart assists families and businesses in increasing their energy efficiency, offering discounted energy efficiency evaluations to homeowners; over 15,000 homes and over 4,000 businesses have participated.  BuildSmart is Boulder County's residential green building code, which promotes the building of energy efficient structures and requires zero net energy for certain new homes.  Benefits Boulder County facilitates discounts on rooftop solar installations and electric vehicles.

204.    The Transportation Department works to help Boulder County residents and visitors with alternative modes of travel such as biking, walking and transit, and it is a County objective to "[f]oster a transportation system that reduces demand for and reliance upon petroleum."

*San Miguel County has made efforts to reduce GHG emissions.*

205.    San Miguel County produced its first Sustainability Inventory in 2006, its first Greenhouse Gas Inventory in 2010, and issues an Annual County Energy Report which tracks the County's energy use and $CO_2$ emissions.

206.    In 2007, San Miguel County joined with its towns and other groups to create The New Community Coalition (TNCC), which developed a 2007 baseline of $CO_2$ emissions for San Miguel County.  Since 2007, San Miguel County has spent approximately $560,000 on this

48

**App. 120**

effort.

207.    In 2012, TNCC changed its name to EcoAction Partners, which continues to be funded by San Miguel County and its towns.  It implements several programs to reduce GHG emissions, including providing free energy assessments to low- and middle-income households in order to prioritize and implement cost effective energy efficiency improvements; school programs that teach saving energy and reducing waste by establishing sustainable life habits; and the Greenlights LED lightbulb rebate program to encourage energy efficiency and save businesses and residents money.  EcoAction Partners also runs a Green Business Certification program to help businesses realize the financial benefits of energy efficiency.

208.    In 2009, San Miguel County adopted Colorado's Climate Action Plan, setting $CO_2$ emissions reduction targets of 20 percent below 2005 levels by 2020.  Also in 2009, San Miguel County signed onto the Cool Counties Initiative, setting a goal to reduce county GHG emissions 80 percent below 2009 levels by 2050.

209.    As part of the 2018 Board of County Commissioner goals, San Miguel County "will work towards becoming a carbon neutral organization."  In 2015, the Board of Commissioners approved $10,000 to hire an independent contractor to establish test sites in San Miguel County for a carbon sequestration project.

210.    San Miguel County works with numerous partners to reduce private sector energy consumption and $CO_2$ emissions as well.

211.    San Miguel County is initiating a Payments for Ecosystem Services pilot program that provides incentives to landowners in exchange for managing their land to provide an ecological service, including carbon sequestration to support cleaner air; it participated in the C-

**App. 121**

PACE program, which provides low-cost financing for renewable energy and energy-efficient installations in commercial developments; and it has used County-owned land for a solar power installation.

212.    San Miguel County was a partner in the 2017 Upper San Miguel Basin Forest Health Landscape Assessment (which deals with, among other things, the effects of climate change on forest health and wildfire risks) and is a member of the West Region Wildfire Council, a consortium of local, county, state and federal agencies that addresses wildfire risks in six counties in southwestern Colorado.

<em><u>The City of Boulder has made efforts to reduce GHG emissions.</u></em>

213.    In addition to collaborating with Boulder County on joint climate initiatives, the City of Boulder minimizes its own contributions to global climate change.

214.    The City established policies to reduce its GHG emissions to align itself with the goals of Kyoto as early as 2002. The City was the first community in the United States to tax itself to preserve open space, and the first to establish a carbon tax. In 2006, Boulder residents voted to authorize the City Council to level a tax to fund a climate action plan with the goal of GHG reduction.

215.    In 2016, the Boulder City Council adopted the City's Climate Commitment, which includes commitments to transition to 100 percent renewable energy by 2030 and reduce the City's GHG emissions to 80 percent below 2005 levels by 2050.

216.    In order to meet its goal, the City is investing in a number of ongoing energy and climate efforts, including the 2017 Energy Conservation Code that guides the effort to achieve net zero energy for the City's residential and commercial buildings, SmartRegs ordinances that

require certain housing in Boulder to meet energy efficiency standards by the year's end and solar rebate and grant programs that support businesses and individuals in financing solar installations.

217.    The City's transportation department focuses extensive efforts on reducing single-occupancy vehicle use and building miles of bikeways and pedestrian-friendly routes.  These and other efforts kept over 50,000 metric tons of emissions out of the atmosphere by 2015.

218.    The City is also exploring its own locally owned municipal electric utility in an effort to achieve its GHG and clean energy goals.

219.    Boulder County and the City of Boulder's Open Space Department have also begun to study the ability of carbon sequestration on agricultural lands and in forests to absorb extra carbon from the atmosphere.  In the words of a County Commissioner, "inaction is not an option."

220.    Nonetheless, "Boulder County and the City of Boulder have also realized that despite their best efforts to reduce GHG emissions, climate change impacts are inevitable and have the potential to exacerbate many of the challenges faced by Boulder County and its municipalities."

> **2.  *Plaintiffs and their residents have already been injured because of climate change caused and contributed to by Defendants' actions.  They are mitigating current climate impacts and will be forced to continue mitigating and adapting to climate change for the foreseeable future.***

221.    Plaintiffs and their communities have already suffered the impacts of Defendants' actions altering their climate.  Recent events have highlighted the costs to Plaintiffs of responding to extreme events, which will become more frequent with climate change.

222.    For example, in 2010, the Fourmile Canyon Fire swept through parts of Boulder

51

**App. 123**

County near Boulder, destroying 162 homes within the first 12 hours, and 6,181 acres in total. Fighting the fire required 900 firefighters and first responders. In spite of those efforts, the losses totaled hundreds of millions of dollars, making it the most expensive fire in Colorado's history at the time. In 2013, Boulder received nearly a year's worth of rain in 8 days, which caused over $2 billion in property damage across the Front Range, and in Boulder County alone destroyed or damaged more than 150 miles of roads and 30 bridges at a cost well in excess of $100 million. Municipal property damage in the City of Boulder amounted to $27 million.

223.    In response, the County administered a flood-damaged property buyout program amounting to $24.6 million to reduce the risk of future flood danger.

224.    Boulder County's 2017 State Legislative Agenda summarizes the reality:

> Data and forecasting reinforces recent experiences of communities along Colorado's Front Range – we will continue to be burdened by the negative effects of climate change, from drought to wildfires to floods. These ecosystem disruptions deeply affect residents and communities, and demand swift action and response on the part of local governments. With local emergency response agencies in place, county response is typically well-managed and triaged; however, the growing scale of disasters means that more programs and staff are necessary to aid in responding.

225.    Similarly, as the Mayor of the City of Boulder has told the U.S. EPA climate change "will affect Boulder's ability to deliver services including fire protection and other emergency services, flood control and public works projects, and health care and social services for vulnerable populations."

226.    As the 2012 Boulder County Climate Change Preparedness Plan recognizes, a "sense of urgency" is needed in the implementation of hazard mitigation projects such as wildfire fuels treatments, stormwater infrastructure improvements and floodplain property acquisitions "to offset the potential impacts of climate change."

**App. 124**

227.    All the Plaintiffs are expending considerable taxpayer dollars and undertaking adaptation measures to plan for, understand and protect their land, infrastructure, and residents from current and future anticipated climate impacts.

*The costs of monitoring and assessment necessitated by Defendants' climate alteration.*

228.    Assessing and understanding the severity of current and projected impacts of Defendants' climate alteration within the Plaintiff communities has been a substantial and expensive undertaking.  All Plaintiffs have had to spend staff time to better understand and respond to the impacts of climate change, and this will only increase along with climate change impacts.  In addition to taxing their internal resources, all Plaintiffs have also expended money on outside experts to help understand existing and projected vulnerabilities.

229.    In 2012, Boulder County and the City of Boulder jointly spent nearly $75,000 to hire a consultancy group to conduct a climate change preparedness study.

230.    Boulder County has also already spent thousands of additional dollars on additional studies and experts including, but not limited to:

- $14,000 in 2017, to study to analyze the economic impacts of climate change on, among other things, County infrastructure;

- a consultant to identify high-risk property acquisitions and develop prospective approaches to reducing public and private risk to river-related hazards; and

- a study of floodplain management and transportation system resiliency.

231.    Similarly, the City of Boulder has also already spent thousands of additional dollars on additional studies and experts including, but not limited to:

- $45,000 to analyze the impacts of extreme heat;

- approximately $15,000 to study the impacts of climate change on just two City-owned facilities;

**App. 125**

- thousands of dollars on several studies to analyze the impact of climate change on water issues;

- approximately $15,000 to study forest vulnerability to disturbances and climate change; and

- approximately $20,000 to study drought adaptation and sensitivity of plant species.

232.    San Miguel County, which operates with a much smaller annual budget, has likewise spent thousands of dollars on additional studies and experts in order to understand its risks including, but not limited to:

- approximately $5,000 for a forest health assessment that involved climate change projections;

- approximately $32,500 for an analysis of debris flow hazards to the County, which occur after heavy rainfall due to the County's steep topography; and

- a watershed study that considered, among other things, the impact of climate trends on the San Miguel Watershed.

233.    The monitoring and assessment costs incurred by Plaintiffs as a result of climate change caused and contributed to by Defendants' fossil fuel activities will continue to be necessary as the severity and timing of impacts will change as projected future emissions become actual emissions.

*Plaintiffs face damage and added costs to protect residents and drainage systems from flood and precipitation.*

234.    All Plaintiffs are susceptible to flooding, and climate change will exacerbate the risk of such flooding due to changes in rainfall intensity, storm frequency, the timing of snowpack melt and other extreme events.

235.    Increased temperatures and more extreme events associated with climate change

54

**App. 126**

also threaten ecosystems and vegetation that reduce runoff rates and flow velocities.

236.    San Miguel County is extremely susceptible to riverine flooding given the steep mountainous terrain and the multitude of creeks and streams that eventually flow into the San Miguel River.  The Town of Telluride and unincorporated community of Placerville are especially vulnerable to flooding and debris flows.  San Miguel County also experiences flash flooding due to intense cloudburst storms over small and steep watersheds in the summer monsoon season and early fall, and spring snow runoff can also cause riverine flooding with the combination of warmer spring temperatures and spring rain.

237.    In light of the increased precipitation projections and enhanced flood risk discussed above, Boulder County will need to upgrade its drainage and stormwater infrastructure or take other precautions to protect its residents from precipitation events.

238.    Both Counties will have to spend additional sums to assess the need and cost of future flood mitigation.  These assessments will reveal additional costs.  Boulder County has already hired a consultant to determine if additional property acquisitions need to be made due to increased flood risk.

239.    The City of Boulder has made significant investments in flood conveyance facilities over the last several decades and has identified approximately $170 million in additional investments – needed to accommodate industry standard one percent probability storms – based on historic data.  Projected changes – in storm frequency and intensity, changes in the timing of peak snowpack melt and the occurrence of other extreme events – may impact both the utility of prior investments and feasibility of planned future mitigation.  The City will have to spend additional sums to monitor and assess these impacts.

**App. 127**

240.    The 15 major drainageways that run through the City of Boulder rely heavily on the presence of healthy ecosystems and vegetation to mitigate impacts by encouraging infiltration that reduces peak runoff rates, reducing flow velocities and providing channel stability that reduces erosion and sediment transport.  Increased temperatures and more extreme events associated with climate change increase the risk of degrading the health and stability of these systems, which in turn results in more frequent and severe impacts during major precipitation events.  For example, wildfire has the potential to increase the damage associated with even small precipitation events, which would have historically had only small runoff.

241.    The City updates the floodplain mapping and mitigation studies on its 15 major drainageways on a periodic basis to reflect changes due to land development, new study technologies and the impacts of major floods that have occurred.  Changes in the base hydrology used for flood modeling, due to climate change, result in increased costs to maintain accurate mapping of hazards and require reevaluation of associated mitigation plans.

242.    Additionally, the City will likely need to take more proactive steps to respond to the increased flood risk.  For example, the City budgeted $500,000 annually for a program to reduce the dangers of flooding by purchasing and removing structures with the greatest life safety risk.  The program further prevents reconstruction in high-risk areas after a flood event through the City's purchase of private properties with flood-damaged structures.  To adequately mitigate the risks associated with increased flooding on account of climate change, the City will need more money for this program.

*Plaintiffs face damage and added costs to protect transportation infrastructure.*

243.    Transportation infrastructure is critical, and vulnerable to climate change.  All

Plaintiffs maintain hundreds of miles of roads, and in the face of climate change, they will need to spend tens of millions of dollars more than historically required to maintain and repair roads as they are degraded by the effects of climate change.

244.     Expected increases in temperature, rainfall intensity and flooding can all damage roads, increasing maintenance costs.

245.     Increased temperatures, as well as altered precipitation patterns and freeze-thaw cycles, lead to more potholes and other asphalt degradation such as rutting and shoving – intensifying the need for road repairs – because road materials are generally designed for historic climate conditions.  According to a climate vulnerability study commissioned by the Colorado Energy Office, road buckling increases at sustained temperatures over 90°F, which also shortens pavement life and causes bridge expansion; "[t]hese changes will necessitate increased maintenance and construction resulting in higher associated costs."

246.     With conservative estimates projecting an average temperature rise in Boulder of 4°F by 2040, temperatures are projected to more frequently exceed pavement mix design standards used for asphalt roads.  These, as well as cracking and erosion caused by altered precipitation patterns, are projected to cost the City of Boulder and Boulder County tens of millions of dollars, and San Miguel County millions of dollars.

247.     Roads may also be damaged by flooding, especially because many roads in western Boulder County tend to run adjacent to creeks, placing them at risk with any increase in flooding potential.  Flooding and major storm events also place significant stress on bridges, necessitating more repairs and/or bridge upgrades to prevent bridge failure.

248.     Boulder County and the City of Boulder have already spent over $100 million on

**App. 129**

repairs to roads and other infrastructure damaged by the 2013 flood, which is an example of the costs that it will increasingly bear in the future as climate change impacts increase. Reasonable adaptive adjustments that the Plaintiffs could currently undertake, in order to reduce future maintenance and repair costs to roads and bridges due to the impacts of climate change, are projected to cost in the millions of dollars. If Plaintiffs do not pay more for maintenance on an ongoing basis, they face even more substantial expenditures for repairs in the future. Whether they spend money on adaptation efforts now to upgrade and improve roads and bridges, or wait to bear the increased maintenance costs later, all Plaintiffs are projected to spend millions on their roads and/or bridges due to climate change.

### *The City of Boulder faces damage and added costs to protect its water supply.*

249.    The City of Boulder supplies water to thousands of people, mostly in the City's limits, and it owns substantial and valuable water rights. It has faced and will continue to face substantial additional costs to provide and to continue to provide water – an essential need – to its residents and other users on account of climate change caused and contributed to by Defendants' fossil fuel activities.

250.    Climate change impacts, including rising temperatures, earlier snowmelt runoff, precipitation changes, droughts, and wildfires have affected and are projected to continue to affect water supply and quality, as well as the infrastructure that the City uses to supply water. The City has spent and will be forced to spend substantial additional dollars to account for these impacts in added maintenance, monitoring and proactive adaptation costs. The costs to the City for not being able to provide water for a single day are estimated to be as high as $6.2 million.

251.    The City has spent, is spending and will continue to spend substantial staff

58

**App. 130**

resources and dollars to study the impacts of climate change on the adequacy and quality of its water supply.  In 2008, the City commissioned a report, costing thousands of dollars, on how climate change will affect its water supply.  In 2017, the City commissioned a new report, again looking at how climate change would affect its water supply and quality, costing $210,000. Since 2016, the City has spent tens of thousands of dollars to study how wildfires would affect the local watersheds.

252.    While the City has been historically able to supply water to users, climate change will likely impact its ability to do so in the future.[17]  The City will have to continue expending money and staff resources to monitor and analyze whether the City will have to expand its water supply and/or storage capacity.

253.    The City also faces increased challenges and will face additional costs associated with treating the water it supplies.[18]  Warmer water is more expensive to treat and the City will be forced to bear those costs in the future.  The debris and ash created from wildfires also poses a

---

[17] While projections concerning overall precipitation diverge relative to the location of the City of Boulder's water supply watersheds, there is a strong possibility that precipitation may decline. Even if overall precipitation remains constant, water supply may still be threatened. As peak snowpack melt occurs earlier in the year and summers become hotter and drier, water demand may increase, and stored water may be insufficient and the specific months when Boulder's most senior water rights are legally available may result in reduced water yield due to the change in runoff timing.  Similarly, the water the City receives from the West Slope may become scarcer as a result of changes in flows, precipitation and demand in the regions supplied by the Colorado River.  The City's water supply, watersheds and infrastructure will also be subject to an increased threat of damage from events such as wildfire and floods that are projected to increase with climate change.

[18] The City currently has the ability to manage seasonal variation in source water quality and choose between different sources in order to optimize treatment and reduce associated costs; in the future, climate change may reduce such flexibility.

**App. 131**

substantial risk to the quality of the City's water.[19]

254.    The City has already taken substantial steps to proactively protect its ability to treat water, in light of climate change risks.  Specifically, the City spent $40 million to cover a canal that transports West Slope water, in order to preserve water quality.  That decision was driven, in part, by the need to ensure that water supply infrastructure would be more resistant to the impacts of climate change.  Similarly, the City has expanded the emergency electrical generators at its critical water treatment facilities, in part, because of increasing extreme events – like floods, fires and storms – associated with climate change.

255.    The City will also likely face increased funding challenges due to the rising costs of water treatment and maintaining its water supply infrastructure on account of climate change. The City's water users pay for water based on their use, and those funds go towards maintaining the water supply infrastructure.  If, as appears likely, the City must limit water supply – for example, on account of projected drought brought on by climate change – it may have less revenue to offset the costs associated with the operation and maintenance of its critical infrastructure.

*Plaintiffs face damage and added costs to protect residents and property from wildfires.*

256.    All Plaintiffs expect increased costs from increased wildfire risk due to climate change caused and contributed to by the levels of Defendants' fossil fuel activities.  Plaintiffs' response, prevention, mitigation and/or recovery costs are increasing and will continue to

---

[19] Even minor precipitation events can flood the City's reservoirs, creeks, streams and canals with that ash and debris, leading to additional and sometimes insurmountable treatment costs, which the City will be forced to bear in the future.

**App. 132**

increase.

257.    The higher temperatures and extended periods of droughts that San Miguel County will face as a result of climate change will substantially increase its risk of wildfire and its consequential damages.  The number of wildfires and the size of the area burned are expected to increase over the next three decades, and the wildfire threat will extend to higher elevations, where historically there was a much lower wildfire risk, which could potentially include areas where mitigation has not been as high a priority.

258.    Since San Miguel County is the first responder for wildfires that start on private or state land, and its anticipated response costs for such fires can reach hundreds of thousands of dollars *per day*, the County faces enormous financial liabilities from increased wildfire risk.

259.    San Miguel County is already seeing a trend of larger, more frequent fires.  In 2002, the Burn Canyon fire, started by lightning, consumed a devastating 31,300 acres of forest, costing $35.3 million to fight.  In 2014, the Board of County Commissioners recognized that a "warming climate has accentuated" wildfire occurrence from natural patterns.

260.    San Miguel County also faces the likelihood of increased premiums for wildfire insurance it carries for County property as a result of this increased risk.

261.    Boulder County has responsibility for wildfire mitigation planning in a County - where in just one of its two wildfire management zones, over 8,700 households exist in wildfire-prone areas – in homes valued at over $3 billion.  Much of the City's invaluable water supply also comes from high-elevation, forested watersheds and reservoirs.

262.    The City of Boulder's Fire-Rescue Department is tasked with protecting life and property through fire prevention, education and risk reduction activities, fire suppression,

**App. 133**

emergency medical and rescue services, and coordination with neighboring fire districts.  The Department is responsible for "[p]rotecting more than $21 billion dollars' worth of property within Boulder."  As of 2007, the value of fire-prone structures and estimated contents in the City of Boulder's wildland-urban interface alone was $2.5 billion.

263.    Both Boulder County and the City of Boulder have already suffered substantial and additional costs related to the increasing wildfire risk, including general suppression costs, prevention costs, and rehabilitation costs (of roads, forests, watersheds).  These costs are significant, and Plaintiffs face the risk of continuing and increasing costs in the future as wildfires are likely to increase.

264.    With current trends and predicted increases in drought and heat combined with earlier snowmelt, the frequency of wildfires is increasing and will continue to do so, further endangering a high-risk area filled with homes, water reservoirs, ecological hotspots, and wildlife.

265.    Plaintiffs have already had to, or will need to, increase their fire mitigation and firefighting response costs due to the increased risk of wildfire caused by climate change.  The Boulder County Sheriff's Office has likewise increased staff in recent years in part to respond to these needs.

266.    Boulder County is also facing costs to adapt to and reduce wildfire risk, such as through its Wildfire Partners Program, which was created in 2014 in acknowledgment of an increased risk of fire from climate change.  This Program assists County homeowners to protect their homes against wildfire.

**App. 134**

*Plaintiffs face damage and added costs to protect and preserve their forests.*

267.    Related to but distinct from their responsibility for wildfire, Boulder County and the City of Boulder both own and have responsibility for thousands of acres of forest.  As discussed above, their forests have been damaged and will continue to be threatened in numerous ways by climate change trends, which have been caused and contributed to by the levels of Defendants' fossil fuel activities.  Boulder County and City have expended and will continue to expend substantial additional resources, including staff time, to preserve forest health and manage the impacts of dead trees and insect outbreaks.

268.    For example, between 1996 and 2010, 122,455 acres of forest in Boulder County saw some level of damage related to mountain pine beetle, which forced the County to hire extra staff to manage their forests.

269.    Because removal of beetle-killed trees reduces risk of wildfire in areas, Boulder County set up, and will continue to run at increasing cost, "sort yards" to provide a location to dispose of wood in order to facilitate the removal of dead trees to protect homes and public infrastructure.  Two main reasons that residents bring wood to the yards have been to mitigate wildfire risk and to remove trees killed by mountain pine beetle.

270.    Boulder County will see even more severe beetle outbreaks decimating its forests and in turn creating the potential for increased watershed debris due to climate change, necessitating additional forest maintenance and management demands – specifically, removal of beetle-killed trees (which threaten public safety by increasing wildfire risk, damaging utility lines, private property and public infrastructure) and a potential increase in insecticide spraying. In the face of a significant beetle outbreak, the County and the City will have to expend

**App. 135**

significant costs to hire contractors to remove beetle-killed trees.

271.    San Miguel County has partnered to fund a community-driven mapping effort to understand forest change in response to climate warming and drought trends, and to model potential climate change impacts on forest conditions given the potential for climate change to alter the landscape through beetle kill, disease and wildfire.  The information will be used to inform forest health and fire mitigation decisions.  According to the Project, "Douglas-fir in the upper San Miguel basin are experiencing mortality from an outbreak of the Douglas-fir beetle and defoliation from spruce budworm, both climate change-related disturbances."

272.    In addition to traditional forest space, the City of Boulder's Urban Forestry Division of the Parks and Recreation Department also directly manages approximately 51,000 public trees – out of an estimated total of 650,000 trees that form the City's "urban tree canopy" – in City parks and street rights-of-way.

273.    Climate change has increased both the need for and the costs of maintaining this tree canopy.  The tree canopy helps to cope with increasing temperatures due to climate change; trees help to combat the "urban heat island" effect and serve to slow and manage stormwater runoff.

274.    In the face of tree die-off from insect infestation, the City has an overarching goal to maintain the tree canopy in the developed portions of the City that are shaded by trees to moderate extreme temperatures, among other benefits.  Nevertheless, extreme weather and other events exacerbated by climate change, including significant temperature swings, insect outbreaks, floods, drought and late snowstorms, also harm the tree canopy and increase the costs of maintaining it.

275.    The costs of maintaining the urban forest are enormous.  For example, during springtime snowstorms in 2016, City urban forestry staff had to hire contractors at a cost of over $500,000 for pruning, hauling and chipping.  Extreme temperature fluctuations in November 2014 caused the mortality of over 500 elm trees that the City had to remove at the cost of $150,000.

*Plaintiffs face damage and added costs to maintain their open space.*

276.    All Plaintiffs maintain parks and open space areas which will be damaged by the effects of climate change caused and contributed to by the levels of Defendants' fossil fuel activities.

277.    Boulder County Parks and Open Space ("Boulder County Open Space") manages over 100 miles of trails and 30,000 acres of forests – forests that act as carbon sinks and provide a habitat for over ninety species of birds and large mammals, including bears and mountain lions.  It also owns water rights valued at approximately $200 million, and an interest in more than 100,000 acres of land, the geological diversity of which spans alpine tundra, sweeping plains and grasslands, and wooded mountains.  Boulder County Open Space is also responsible for weed control on over 30,000 acres of land.

278.    San Miguel County Parks and Open Space ("San Miguel Open Space") manages hundreds of acres of land, miles of trails and fairgrounds that are used for rodeos.  The Open Space Program also encompasses the Land Heritage Program, which uses County funds to place conservation easements on important lands for preservation purposes.

279.    The City of Boulder's Open Space and Mountain Parks Department ("City Open Space") manages over 45,000 acres of protected and preserved land, which includes wildlife

**App. 137**

habitats, floodplains, farm and ranchland, unique geologic features, cultural sites, greenways and over 150 miles of trails.  The City also owns water rights in the four major creek drainages in the Boulder Valley, including many senior water rights that provide reliable sources of irrigation in most years.  Its open space water portfolio is valued at $60-70 million.

280.    These public lands and water resources exist for the use and enjoyment of residents and visitors, and serve as vital spots for ecosystem protection, agricultural production, tourism, citizen health and wellness and revenue.  Boulder County Open Space has set policy and strategic goals of minimizing "impacts to open space resources . . . from oil and gas . . . and other third-party impacts," and adapting to human-caused climate change.  The San Miguel Open Space Commission's mission is "to seek to protect and conserve open space for people, natural habitat for flora and fauna, and agricultural lands for the farming and ranching communities throughout San Miguel County for this and future generations."

281.    With temperature rise, increases in precipitation intensity and increased duration and intensity of wildfires due to climate change caused or contributed to by Defendants' fossil fuel activities, all Plaintiffs are already taking or will need to take substantial and expensive protective and restorative measures on their public lands, including increased staff time to mitigate, repair, remove hazards and restore open space lands.

282.    Addressing climate change hazards to Open Space in Boulder means that Open Space has to adjust the way it designs trails, treats its forests, protects its diverse plant and animal species, manages invasive plans and supports its agricultural tenants.  Past events illustrate how significant these costs can be.  All of the City Open Space trails were damaged in the 2013 flood, with 64 percent of the trails experiencing significant to severe damage.  Facilities

**App. 138**

suffered from damage to fences, ditches, bridges, and water irrigation delivery systems.  The estimated cost for all City Open Space infrastructure repair due to the flood was over $7 million. In addition, 25 percent of Boulder County Open Space trails experienced damage, amounting to a repair cost of over $2 million.

283.    The City of Boulder is already spending large amounts of staff time and money on consultants to understand the impacts of climate change to ecosystems and currently has a climate change vulnerability study for plants underway.

284.    San Miguel Open Space is also initiating a Payments for Ecosystem Services program, which is a pilot to help farmers and ranchers improve soil ability to retain water and ease drought effects, and in 2017 committed $20,000 to study the ability of carbon sequestration on agricultural lands.

*Boulder County and City face damage and costs to maintain their agricultural property.*

285.    Both Boulder County and the City of Boulder have significant agricultural property that is vulnerable to climate change.

286.    Boulder County Open Space owns 25,000 acres of agricultural land, which it manages through its Agricultural Resources Division.  That land is divided into 120 leases and 67 agriculture tenants, who grow sugar beets, beans, alfalfa, grains and more, generating roughly $125,000 in profits for the County every year.

287.    City Open Space owns nearly 15,000 acres of lands that it currently leases to 26 local farmers and ranchers.  The land is primarily used for hay and forage production and livestock grazing.  Annual crops grown on 300 to 600 acres of the land currently include wheat, corn and barley.

**App. 139**

288.     Climate change caused and contributed to by Defendants' fossil fuel activities will increase heat waves, droughts, wildfires and shifts in spring runoff, all of which negatively affect agricultural lands, including by reducing water availability.  Climate change is expected to decrease the nutritional quality of grain crops, increase growth of some weeds, decrease the efficacy of herbicides, decrease the availability of irrigation water, decrease crop yields and bring higher winter minimum temperatures that could increase pest survival and the number of generations of insects that traditionally reproduce once per growing season.

289.     Not only is climate change jeopardizing the existing water supply, but it is also likely to increase future agricultural water demand.  Specifically, projected temperature increases, along with other changes in the climate, could increase water consumption by 2 to 26 percent, as soils and plants transpire more of their water.  Other climate-related changes to agriculture include that earlier growing seasons could leave crops more susceptible to late frosts, weeds may become more common due to rising $CO_2$ levels and temperatures and crop yields may otherwise decrease due to heat stress and increased drought severity.

290.     As early as 2012, in part due to climate change predictions, consultants recommended that Boulder County "continue to emphasize investments in water-efficiency improvements on irrigated agricultural land owned by the county."  These improvements are and will continue to be expensive; in 2016, for example, it cost the County nearly $75,000 to build four center-pivot sprinkler systems, which are expected to cut water usage in half.

291.     The City of Boulder has expended resources to develop its Agricultural Resources Management Plan, which recognizes the numerous risks posed by climate change and the need to "[i]dentify agricultural management practices that help prepare for a more arid future" and to

68

**App. 140**

"[r]esearch the potential for agricultural practices to mitigate climate change." This research will likely include costly crop substitution studies and other assessments.

292.    Boulder County Open Space has already expended resources in the planting of more water-efficient crops. City Open Space is also planning to increase the efficiency of water distribution, explore storm water retention strategies and increase use of more water-efficient crops.

*Plaintiffs face damage and increased costs to provide emergency management services.*

293.    The Plaintiff communities face increasing costs to provide emergency management services as a result of climate change, and the impacts discussed above, including increased wildfires, heavy rainfall, and other extreme weather events, caused and contributed to by the levels of Defendants' fossil fuel activities.

294.    The Boulder Office of Emergency Management (OEM) is a joint office that provides emergency management for both the County and the City and exists to create and coordinate a comprehensive emergency management program that enables "effective preparation for, efficient response to, and effective recovery from . . . disasters, in order to save lives . . . protect resources and develop a more resilient community." OEM has recognized climate change as a significant threat.

295.    With increasing trends of extreme events such as wildfires, drought and intense rainfall, more volatility from a warming climate, and the impending threat of an even greater frequency of extreme events in the future, OEM has had to hire more paid staff, needs to hire still more staff to handle future events and engages in supplemental community preparation efforts.

296.    Additionally, climate change contributes to OEM's need to make significant

**App. 141**

upgrades to its existing emergency management space, or build a new, fully built-out emergency operations center.  The upgrades or new center will cost in the millions to tens of millions of dollars.

297.    The City of Boulder is currently spending money to create sites and resilience centers in various parts of the city for sheltering purposes during severe storms due to an anticipated increase in extreme weather events.

298.    San Miguel County Emergency Management's mission is to "support [the] community's disaster preparedness, response, recovery and mitigation needs."  During the planning process for the newest version of its Multi-Hazard Mitigation Plan, encouragement of public involvement included educating the community on "potential mitigation and climate adaptation strategies."  Among the other natural risks San Miguel County deals with, power outages from severe weather is an ongoing concern.

299.    San Miguel County Emergency Management does not have the resources to respond to increasingly severe weather events brought on by climate change and is already expending funds to increase its capacity.  In recent years, San Miguel County has added a new full-time staff member, expanded its Emergency Management Operations Center, and expanded its outreach and training programs.

*Plaintiffs face increased costs to abate public health hazards in their communities.*

300.    All Plaintiffs have faced and will continue to face increased costs to abate climate change-related public health hazards in their communities – such as increases in rainfall intensity, heat, wildfires, smoke, ground-level ozone, exposure to toxic materials, increase in vector-borne disease and housing displacement – that are caused and contributed to by the levels

**App. 142**

of Defendants' fossil fuel activities.

301.    Preparedness for outbreaks of disease and heat or other extreme events is crucial, and the public costs of mitigating and responding to these health hazards are extremely high.

302.    Due to the expected continued heat rise in Boulder County, a place that historically rarely saw days above 95 degrees, Boulder County and the City of Boulder are expected to see increased public health heat risks, such as heat stroke, and their associated costs.

303.    Heat increase will affect everyone, but particularly vulnerable populations such as children, the elderly and those with existing medical conditions. The number of heat-related mortalities in the Boulder area is expected to increase above the historic average.

304.    Plaintiffs Boulder County and the City of Boulder will have increased costs connected with abating this public health hazard. For example, both may need to take steps to ensure that proper cooling systems are in place, especially in areas with vulnerable populations, given that Colorado has a high number of non-air-conditioned buildings due to its moderate temperature history.[20]

305.    Cooling centers that are available during heat waves, and/or assisting with home air-conditioning installation, could cost Boulder County and the City of Boulder millions of dollars by mid-century.

306.    Ground-level ozone – already a problem for the Boulder area – is also expected to

---

[20] Cooling costs for buildings can be incredibly high, reaching into the millions of dollars. For example, $37.7 million from a $575.5 million school construction bond for the Boulder Valley School District is being used to provide air-conditioning and better ventilation. This was done because of rising August temperatures and related health concerns for students. The schools had been built for open air cooling, in light of the area's historic climate.

**App. 143**

increase with rising temperatures.  The risk of increased ground-level ozone from warm temperatures may push San Miguel County, which is on the cusp of Clean Air Act non-attainment, into non-compliance.

307.    Exposure to ozone is associated with respiratory disease, cardiovascular disease, and even premature mortality; an increase likely will alter public health employee workloads and the number of emissions reduction programs the Boulder area requires in order to meet federal requirements for ozone attainment.

308.    All Plaintiffs will also face increasing costs to monitor and reduce ozone. According to the Climate Change Preparedness Plan, Boulder County "will likely need to expend more time and money in the future to avoid the monetary and health-related costs of being out-of-compliance with ozone attainment."

309.    Boulder County has already spent resources studying ground-level ozone, including how it is affected by climate change.  Moreover, all Plaintiffs have enacted a number of expensive GHG reduction programs, in part, because of the need for cleaner air in a changed/changing climate.

310.    Boulder County is also responsible for providing vaccination services and general disease control to residents, including mosquito control; the County needs to prepare for increasing costs to provide these services in light of climate change.  The City of Boulder uses ecosystem services to regulate mosquitos – ecosystems that will be damaged by human-caused climate change.

311.    Because disease outbreaks are linked to increased temperature, Colorado may see a spread in infectious diseases in the future.  For example, a trend towards warmer weather could

**App. 144**

lead to an increase in mosquito and other species and, thus, mosquito-borne illnesses or other arthropod-borne (e.g., ticks-borne) illnesses, which would in turn lead to the need for increased or adjusted vector control.  With warmer weather, mosquito and tick populations have increased in San Miguel County.

312.    Due to changing climate patterns such as warmer seasons, and increased drought, there is also the potential for animals to hibernate less, resulting in more human-animal interactions, which can increase incidence or risk of diseases, such as rabies.

313.    The costs of responding to and monitoring these health risks are substantial.

314.    The spread of West Nile virus is instructive.  West Nile virus first appeared in Colorado in 2002.  By 2003, Colorado had the highest number of West Nile virus deaths and cases in the country.  Prior to 2002, the City of Boulder did not have a mosquito control program.  Now, the City's mosquito management costs are increasing annually, amounting to a budget of roughly $250,000 for 2018.  In 2017, the budget for mosquito control in Boulder County was similarly high: $397,151.

315.    Both Boulder County and the City of Boulder have experienced increased monitoring and costs to educate the public about these public health hazards, as they inspect areas where animals live and collect species (including mosquitos) to test for disease rates.[21] County public health officials in San Miguel County have similarly spent time and resources to educate the public about West Nile virus, and work with local agencies to track and test

---

[21] Although predictions for vector-borne illness spread are difficult because they are also highly dependent on shifts in human behavior and human levels of immunity, the consequences of increases in such illnesses are dire enough that increases in monitoring and surveilling of the situation may be warranted.

**App. 145**

mosquito populations.  Last year, San Miguel County engaged in Zika outreach and education.

316.    The City of Boulder recently hired a consultant to study, among other things, alterations to ecosystems and species migration patterns due to a shifting climate, which will help the City understand public health risks.  Warmer weather and shorter hibernation seasons could result in more human-animal exposure, including to species that typically carry rabies, such as skunks.

317.    The City is also currently reviewing an adaptive management approach to its mosquito control program to address challenges from climate change, and has acknowledged that "[a] process needs to be developed in the event that a new mosquito-borne disease occurs in Boulder that could impact the community, particularly with the potential of new disease emergence with changing climate."

*    *    *

318.    The programs and adaptation measures that Plaintiffs have undertaken – such as new irrigation systems and stormwater infrastructure, increased wildfire defensive spaces, and more emergency management staff – are only the beginning of an adequate response to dealing with increased risks from climate change.

319.    These costs are occurring now and being borne by taxpayers in order to protect the safety, health and lives of residents and the property and infrastructure of Plaintiffs.  The costs will continue to grow for decades to come to adapt to new conditions.

320.    As detailed below, each of these costs and risks is a result of the Defendants' actions in causing and contributing to the alteration of the climate.

**App. 146**

**C. Defendants' fossil fuel activities have caused and will continue to cause Plaintiffs' damages and losses.**

321.    The Suncor Defendants and Exxon are responsible for causing, contributing to and increasing the impacts of climate change, which are injuring Plaintiffs.

322.    Defendants produced, promoted, refined, marketed and/or sold an enormous amount of fossil fuels – and plan to continue doing so.  Defendants' fossil fuels were used, are used and will continue to be used by their consumers in the intended, foreseeable and natural way: combustion.

323.    Since the 1960s, moreover, Defendants engaged in these fossil fuel activities at increasing levels knowing that increasing levels of these activities would cause and were causing significant alteration of the climate – leading to damages and losses of the types incurred by Plaintiffs – and that such alteration was substantially certain to occur if unchecked fossil fuel use continued.  They concealed this knowledge from their consumers and the public, including residents of Plaintiffs' communities.

324.    In addition, through the 1990s and 2000s – critical decades when fossil fuel use needed to be brought under control and alternatives needed to come into the market – Defendants affirmatively misrepresented what they knew about the causes and consequences of climate change.

325.    Today, Defendants continue to conduct their fossil fuel activities at levels that contribute to alteration of the climate, including in Colorado, and do not plan to stop or substantially reduce those activities.  Their plans include selling *more* fossil fuels, including fuels that have an even more significant impact on climate.  This is so even though Defendants, at least publicly, profess to acknowledge the dangers of climate change.

**App. 147**

326.    Defendants' fossil fuel activities caused and contributed to climate change, and continue to be a cause.  Defendants also accelerated, aggravated and continue to accelerate and aggravate the impacts of climate change.

**1.  *Defendants knew their fossil fuel activities would result in dangerous changes in the climate.***

327.    Decades ago, the Suncor Defendants and Exxon knew that climate change was occurring; that it was being caused by and that it was accelerating primarily because of the level of combustion of fossil fuels that was occurring; that climate alteration may be irreversible; and that it posed a serious danger to people and property, including in Colorado.

328.    Beginning in the 1960s, Defendants spent years studying climate change.  From the research conducted by Defendants, either themselves or through API, Defendants could not reasonably conclude that fossil fuel use at the levels it was occurring would have no impact on the climate, that impacts were unlikely or that those impacts would be insubstantial.

329.    Instead, Defendants' research demonstrated that their continued actions would cause a significant alteration of the climate.  Beginning in the 1960s, and throughout the 1970s and 1980s, industry-funded scientists advised Defendants that, while modeling may be imperfect, there was a growing consensus that fossil fuel use would result in likely catastrophic changes to the climate.

330.    During this time period, the Suncor Defendants and Exxon also knew what had to be done to prevent and/or lessen the impacts of anthropogenic climate change: GHG emissions had to be reduced, the growth of fossil fuel use needed to be curtailed and energy needed to be supplied by fossil fuel alternatives.  Defendants were warned that these actions needed to be taken imminently and that the transition would be too late if they delayed until the warming

**App. 148**

effects were significant.

331.    In later years, Defendants would emphasize what they claimed was the "uncertainty" of climate change, and its impacts.  This was disingenuous.

332.    During the 1970s and 1980s, Defendants were told that one (if not the primary) cause for any "uncertainty" was the extent of future fossil fuel use and growth.  In other words, if fossil fuel use were greatly curtailed, then the predicted climate impacts might not happen.  But such impacts were substantially certain if fossil fuel use continued to grow – exactly the path that Defendants took.  Therefore, Defendants' own plans and conduct were to blame for the problem of "uncertainty" that they would complain about.

333.    Defendants also knew that "uncertainty" did not mean human-caused climate change would necessarily be *less* serious than projected; instead, just the opposite might be true.  As an Exxon scientist warned the company in 1978, "there is no guarantee that better knowledge will lessen rather than augment the severity of the predictions."

*Defendants knew their fossil fuel activities were causing $CO_2$ in the atmosphere to rise.*

334.    In 1958, the American Petroleum Institute began research on "gaseous compounds in the atmosphere *to determine the amount of carbon of fossil fuel origin*."

335.    On information and belief – at that time and all other relevant times – Defendants or their predecessors were members of API and commissioned, funded, participated in or, at a minimum, were aware of this and subsequent API research.

336.    On information and belief, this research was provided to Defendants and remains in API's files.

337.    Defendants' and API's research continued through the 1960s culminating in a

1968 report, commissioned from the Stanford Research Institute (SRI), titled "Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants."  One of the report's conclusions was that atmospheric $CO_2$ was rising, and that fossil fuel combustion was by far the most likely "source [ ] for the additional $CO_2$ now being observed in the atmosphere." The authors explained that the increase in the concentration of $CO_2$ in the atmosphere was because "[t]*he natural scavenging processes for removing $CO_2$ from the atmosphere are not sufficient to maintain a stable equilibrium in the atmosphere in the presence of this increase in emissions.*"

338.   This point was underscored in a 1969 supplement that confirmed for API that "none of [the carbon sinks, e.g., the oceans and biosphere] [are] capable of counter-balancing" the "extremely large" $CO_2$ emissions resulting from fossil fuel combustion.

339.   From the early stages, this information – that atmospheric $CO_2$ was rising fast, and that fossil fuels (including Defendants' fossil fuel activities) were to blame – was shared with and known by top company managers.

340.   For example, Wilburn T. Askew – who became the president of Sun Company of Canada, Suncor's direct predecessor, in 1956 – served on API's technical committees. Mr. Askew and other members of Suncor received and/or had access to API's climate change research, including the 1968 and 1969 SRI reports, which were circulated by API in 1972, as part of "Environmental Research: A Status Report".

341.   As another example, an internal Exxon memo from 1977 – reporting that "current scientific opinion overwhelmingly favors attributing atmospheric carbon dioxide increase to fossil fuel combustion" – was circulated to the "Corporate Management Committee," which included Exxon's highest-level managers.

**App. 150**

342.    As the years went on, Defendants' managers were continually reminded that the levels of their fossil fuel activities were causing a rise in atmospheric $CO_2$.  A 1980 API report confirmed that there was "strong empirical evidence that . . . fossil fuel burning" was causing the rise in atmospheric $CO_2$ and that more than half of emitted $CO_2$ was remaining in the atmosphere. On information and belief, this report was shared with API member companies, including Defendants.

343.    The implications of the rise in atmospheric $CO_2$ were obvious and Defendants were told what was needed next: a reduction of $CO_2$ emissions.  The 1968 API Report summarized this recommendation: "Past and present studies of $CO_2$ are detailed and seem to explain adequately the present state of $CO_2$ in the atmosphere.  *What is lacking, however, is an application of these atmospheric $CO_2$ data to air pollution technology and work toward systems in which $CO_2$ emissions would be brought under control."*

**Defendants knew that climate alteration caused by their fossil fuel activities would likely cause adverse and hazardous impacts.**

344.    Defendants' interest in the rise in atmospheric $CO_2$ was not academic.  Defendants understood that rising $CO_2$ would trap heat and energy in the atmosphere, increasing temperature,[22] and bringing about changes in the climate – i.e., drought, heatwaves, flooding, and sea level rise, etc. – that would have a profound effect on human lives, property and livelihoods, including in Colorado.

345.    In the same 1968 API report, Defendants were told that "there seems to be *no*

---

[22] For example, SRI's 1968 paper for API reported that the "concern[ ] with the possible changes in atmospheric $CO_2$ content [is] because $CO_2$ plays a significant role in establishing the thermal balance of the earth."

**App. 151**

*doubt* that the potential damage to our environment could be severe" and that the lack of attention on $CO_2$ emissions was "ironic" because they "may be the cause of serious world-wide environmental changes."  Based on "[t]he latest available data", Defendants were warned that temperatures might increase by at least 1.1°F if the concentration of atmospheric $CO_2$ increased 25 percent, and that temperature increases would "be three times this figure" if $CO_2$ levels doubled.  The 1968 report concluded that – even if these projections were somewhat imprecise – "[s]ignificant temperature changes *are almost certain* to occur by the year 2000 and these could bring about climatic changes."

346.    Defendants spent the next two decades enhancing their understanding of the likely effects of their continued fossil fuel activities.  Defendants were consistently told that unchecked fossil fuel use would result in significant alteration of the climate.

347.    Throughout this time period Defendants recognized that – as one 1980 document notes – even if there is some uncertainty, "[t]he physical facts agree on the probability of large effects 50 years away . . . ."  Thirty-eight years after that statement, Plaintiffs, and others, are experiencing those effects.

348.    In 1979, API formed a task force to analyze climate impacts.

349.    As was the case during API's research efforts during the 1960s and 1970s, both Suncor and Exxon (or their predecessor companies) were members of the task force, and participated in the creation of or had access to the information produced by or available to the task force.

350.    The task force circulated a commissioned report in 1980, on "The $CO_2$ Problem," which added alarming projections to those contained in the 1968 report.  The 1980 report

**App. 152**

predicted a 4.5°F (2.5°C) temperature rise by 2038, which would have "major economic consequences." Indeed, the rise would effectively "halt" "world economic growth" by 2025. By 2067, the report predicted a 9°F (5°C) temperature rise – bringing "globally catastrophic effects." The report also warned that uncertainty might mean the impacts would happen even *faster* than initially recognized: there was a "1 in 10 chance [of a 4.5°F temperature rise] by 2005," not 2038.

351.    The 1980 report recognized that the severity of the climate problem would be measured, at least in part, on the ability of society to withstand and adapt to the impacts, what the API task force dubbed "building in resilience." The costs of adaptation were thus a foreseen response to human-caused climate change.

352.    The API task force appeared, at least internally, to take these warnings seriously. As reflected in task force meeting minutes, additional research was suggested to "investigate the market penetration requirements of introducing a new energy source into world wide use" and one of the suggested "overall goal[s]" of the task force was to "develop ground rules for energy release of fuels and the cleanup of fuels as they relate to $CO_2$ creation."

353.    In 1982, API commissioned another report, this time from Columbia University, on the matter of climate modeling. The Columbia report noted that despite some variation among climate models, the various models "*all* predict some kind of increase in temperature within a global mean range of 4C [7.2°F]." The report also recognized that "[s]uch a warming can have serious consequences for man's comfort and survival since patterns of aridity and rainfall can change, the height of the sea level can increase considerably, and the world food supply can be affected."

354. In addition to its participation in API's work, Exxon conducted its own climate research (some of which has been made public).[23] Much of this confirmed the research conducted for API and its members, but it also adds more detail.

355. Exxon scientists warned in 1982 that a "*clear scientific consensus* ha[d] emerged" that the "well-documented increase in $CO_2$" would result in "global temperature rise" and there was "*unanimous* agreement in the scientific community that [the projected] temperature increase [ ] would bring about significant changes in the earth's climate, including rainfall distribution and alterations in the biosphere."

356. Two years earlier, Exxon was warned that those changes would "have a dramatic impact on soil moisture, and, in turn, on agriculture." Specifically, the "American Midwest" was projected to "become drier should there be a temperature increase of the magnitude postulated for a doubling of atmospheric $CO_2$," with "weeds and pests" also projected "to thrive with increasing average global temperature."

357. Exxon was separately warned that climate change could bring about "a northward migration of the desert areas of the United States" with "corn and wheat belts . . . migrat[ing] to Canada."[24]

358. Privately, Exxon also clearly recognized that society would have to adapt to

---

[23] Over the last few years, information about Exxon's awareness of and research into climate change has become public. Suncor may have also undertaken independent research into climate and its impacts, which will likely be revealed during the course of this litigation.

[24] Another Exxon document included projections that at $CO_2$ levels of 500 ppm "[t]he flow of the Colorado River would diminish" making water shortages in the southwest "much more acute," and "[t]here would be less of a winter snow pack in the . . . Rockies, necessitating a major increase in storage reservoirs."

**App. 154**

climate change, and that it would cost billions of dollars. While an internal Exxon memo describes the threat of climate change as less "significant . . . [than] a nuclear holocaust or world famine," the required adaptation would be measured in percentage points "of the gross national product estimated in the middle of the next century."

359. Two other revelations from the internal Exxon statements from the 1970s and 1980s are particularly relevant in light of their later contrary and misleading statements. First, it was clear to Exxon that low range temperature change projections were not credible. For example, in 1980, Exxon employees noted – with seeming agreement – that projections of a temperature increase "on the order of 0.25C [.45°F] for a doubling of CO2" were "not held in high regard by the scientific community."

360. Second, Exxon employees noted that there might be "time lags" which would mask "much more significant effects" in the future. In other words, the temperature increases due to $CO_2$ buildup might occur substantially later than the emissions themselves, such that once they were felt, it would be too late to stop or reverse the impacts.

361. In August 1981, an Exxon scientist gave comments on a planning department document that had indicated that the "observable effects [of rising $CO_2$] in the year 2030" would likely not be catastrophic (without defining that term). The reviewing scientist, concerned that this language would lull company officers into a false sense of confidence, suggested edits, warning that "it is distinctly possible" that Exxon's projections of fossil fuel use "will later produce effects which will indeed be catastrophic (at least for a substantial fraction of the earth's population)," because of "time lags" and natural climate variability, which might hide the effects of an enhanced greenhouse effect.

**App. 155**

362.    In fact, the calculations dating back to the 1968 report were remarkably prescient. By 2000, $CO_2$ levels had increased about 25% over a century before, and global average temperatures were also about 1°F higher; in 1998, the global average temperature was 1.13°F above the 20th century average. Scientists have also confirmed that it takes decades for the warming from $CO_2$ in the atmosphere to be felt; temperatures continue to rise even if $CO_2$ levels do not. Indeed, temperatures have continued to rise, such that for 2014-2017, global temperatures were 1.54°F (0.86°C) above the 20th century average.

*Defendants knew fossil fuel use reduction was needed.*

363.    Exxon and the Suncor Defendants have known for years that if fossil fuel use continued at the same rate (or grew), the impacts of climate change would come faster and would be more damaging. Specifically, Defendants were told that the transition away from fossil fuels had to begin, that substantial shares of recoverable fossil fuels could not be exploited, and that more carbon-intensive fuels should not be promoted or sold, at least not if the impacts of climate change were to be prevented or kept manageable.

364.    As early as 1968, API's members, including Exxon and the Suncor Defendants, were warned that a substantial percentage of the known recoverable fossil fuels could not be burned, because if they were, atmospheric $CO_2$ concentrations would rise to 830 ppm – a catastrophic level. And, although this was obvious, API members were told that *use* rates would affect how fast climate change happened, and how severe it might be.

365.    Specifically, Defendants were told that if the "use of fuel continues to expand at about the 5% rate experienced more recently" then $CO_2$ concentrations would be "30% higher than in 1950 by the year 2000" and that "a 25% increase in $CO_2$ concentrations [was] realistic."

**App. 156**

366.     Similarly, in 1980, API's climate task force recognized "the probability of large [climate] effects 50 years away," but that the "immediate problem [would be] considerably eased" "[i]f fossil fuel rates are reduced."  This they understood implicated "the 50-year future of fossil fuel use" and the "roles" that "different categories of fossil or synthetic fuel play in future projections."

367.     The 1980 report made an additional and important point about the need for immediate action: because replacing fossil fuels with energy sources that did not emit such high amounts of GHGs would take time, "there [was] <u>no</u> leeway" in the "time for action."

368.     Throughout the 1980s, Exxon (including top company managers) continued to recognize and be told that "[m]itigation of the 'greenhouse effect' would require major reductions in fossil fuel combustion."

369.     Additionally, Exxon knew that waiting to act would exacerbate the problem – and indeed that, by the time the effects were felt, it would be too late.  In 1980, Exxon scientist Henry Shaw shared *his* edits to a national working group paper with the company, which noted that "there [would be] no likely technological 'fixes' (e.g., emission control devices or techniques) that will provide practical means of controlling $CO_2$ emissions resulting from combustion," and if "policy actions to control the increased $CO_2$ loading of the atmosphere are delayed until climate changes resulting from such an increase are discernible, then it is likely that they will occur too late to be effective."

*<u>Additional research did not contradict Defendants' early understanding about the causes and consequences of climate change, in spite of the uncertainty they professed publicly.</u>*

370.     While Defendants have often – at least for the last 25 years or so – publicly claimed that the causes and consequences of human-caused climate change are uncertain, they

**App. 157**

never abandoned or doubted what research had uncovered and the significant impacts that have been identified by their own experts throughout the 1960s, 1970s and 1980s.

371.    An internal industry memo from 1995 – drafted by a former Mobil employee and shared with API – said clearly that "[t]he scientific basis for the Greenhouse Effect and the potential impact of human emissions of greenhouse gases such as CO2 on climate is well established and cannot be denied."  Moreover, Defendants internally recognized that "contrarian theories" for global warming – which they peddled to the public – were not considered credible and did "not offer convincing arguments against the conventional model of greenhouse gas emissions-induced climate change."

372.    Defendants' own business operations also took into account the very climate hazards that they told the rest of the world not to worry about.  In 1996, while building offshore exploration facilities in Canada, Mobil Oil "made structural allowances for rising temperatures and sea levels."  The engineering consultant hired for the project admitted he "used the engineering standards of the day to incorporate potential impacts of Global warming on sea-level rise."

373.    Defendants also used climate change as a means of planning future fossil fuel development.  Exxon and its affiliates, for example, saw disappearing sea ice in the Arctic as a boon for oil production because it would substantially reduce the costs of development.

374.    Between 1986 and 1992, Exxon's research team was looking "at both the positive and negative effects that a warming Arctic would have on oil operations."  Those findings showed that warming would "only help lower exploration and development costs" in Arctic waters.  The basis for those findings was the same global climate change models that Exxon

**App. 158**

publicly claimed were unreliable.

375.    Defendants knew that the existence and likely consequences of anthropogenic climate change were certain enough for Defendants to plan their business operations around them.

## 2. *Defendants contributed to, accelerated, and exacerbated climate change by promoting and selling huge amounts of fossil fuels.*

376.    In spite of their knowledge, Suncor and Exxon produced, promoted, refined, marketed and sold massive and increasing amounts of fossil fuels.  In addition, despite recognizing the severity and imminence of climate change, Defendants developed and sold fossil fuels that contribute even more significantly to climate change than fuels refined from traditional crude oil.  Through this course of intentional conduct, Defendants caused billions of tons of excess $CO_2$ emissions and contributed to the dangerous and inexorable rise in atmospheric $CO_2$.

377.    While Defendants likely knew about the consequences of their fossil fuel activities even before the 1960s, the vast majority of $CO_2$ emissions have taken place since the 1960s, after they unquestionably knew about the dangers.  Indeed, nearly 75 percent of all industrial emissions were released since the 1960s, with more than half since the late 1980s, causing atmospheric $CO_2$ to rise.  Moreover, the growth rate of $CO_2$ emissions and $CO_2$ concentrations in the atmosphere is still rising.  While $CO_2$ concentration rose by 1 ppm per year between 1965 and 1975, it is now increasing by more than 2 ppm per year.

378.    Defendants' actions that have caused and contributed to climate change and Plaintiffs' injuries were taken with full knowledge of, or reckless indifference to, their effects.

379.    Even now, Exxon and Suncor are continuing their efforts and increasing their fossil fuel activities.  Both of their business plans – while playing lip service to the reality of

**App. 159**

climate change – include providing more fossil fuels through the middle of the century, including from more carbon-intensive sources. Far from bringing emissions under control, and helping to mitigate the impacts of climate change, this conduct will ensure and exacerbate the severity of impacts.

*Since the 1960s, Exxon has knowingly provided a substantial portion of the fossil fuels causing and aggravating climate change, and it plans to continue doing so – causing continuing harm to Plaintiffs.*

380.    Since the 1960s, Exxon has sold trillions of cubic feet of natural gas, billions of barrels of oil and millions of tons of coal and petroleum coke.

381.    On information and belief, Exxon's share of the fossil fuel market has been substantially the same or has increased over time, which means that it has sold greater absolute amounts of fossil fuels over time as overall consumption has increased.[25]

382.    Exxon intended its consumers to burn these fossil fuels in massive and increasing amounts, which it knew would, and in fact did, result in the release of billions of tons of $CO_2$ and other GHGs into the atmosphere. The emissions traceable to Exxon's products contributed to the overall rise in atmospheric $CO_2$, were a substantial factor in bringing about and aggravating the resulting climate change impacts and will continue to contribute to warming and climate change impacts for the foreseeable future.

383.    Exxon is one of the largest sources of GHG emissions both globally and historically.

384.    Moreover, and despite its knowledge of the grave threats fossil fuels pose to the

---

[25] For example, in 2016, Exxon's petroleum product sales were around 5.5 million barrels of oil equivalent per day.

**App. 160**

climate as far back as the 1950s, Exxon increased the development of dirtier fuels that contributed even more substantially to the concentration of atmospheric $CO_2$. Since the 1970s, Exxon has planned to develop and has been developing the Canadian tar sands. Canada's tar sands do not contain traditional crude oil. Instead, they are made up of bitumen.

385.    Bitumen is extracted, typically by mining, before it can be refined into useable fuel products. The process of turning bitumen into useable fuel creates enormous $CO_2$ emissions – around 3.2 to 4.5 times the emissions generated from conventional oil produced in North America.

386.    Moreover, the bitumen itself contains substantially more carbon than a comparable and conventional oil.

387.    Much of that carbon is found in petroleum coke, a byproduct of the refining process, around 80 percent of which is sold for fuel. When it is burned, petroleum coke produces even more $CO_2$ than coal – 5-10 percent more $CO_2$ than coal relative to the energy provided – and is one of the dirtiest fuels around in terms of air quality. By 1999, Exxon was one of the world's largest petroleum coke producers, making thousands of tons a day.

388.    Since the 1970s, Exxon's tar sands reserves have ballooned from under 1 billion barrels to 5.14 billion in 2015. In the last decade, tar sands as a percentage of Exxon's liquid holdings have increased from 17 percent to 35 percent.

389.    Beginning in the late 1960s Exxon also moved to acquire coal assets, and by the mid-1970s, it started coal mining in Latin America. By the early 1990s, Exxon was producing around 37 million metric tons of coal a year. Exxon maintained operational coal mines in the United States until 2009, and it continues to report profits from "coal and power" operations in

its filings to the U.S. Securities and Exchange Commission.

390.    Exxon has also helped breathe new life into coal-fired power generation.  Because petroleum coke is often cheaper than conventional coal and can be burned in coal-fired power plants, Exxon's petroleum coke production has helped to make coal-fired power generation dirtier and cheaper globally.

391.    Exxon has also been a leader in efforts to produce commercially viable liquid fuels from coal since the 1960s, and it has continued this effort despite its recognition, in internal documents, that "liquid fuels from coal produce substantially more $CO_2$ than gasoline from petroleum."

392.    Exxon plans to continue its reckless and tortious conduct.  Exxon predicts that oil and gas will account for an even larger share of the world's energy supply in 2040, a figure it has a direct role in determining.  Even under its rosy projections, which assume substantial emissions reductions through "efficiency," Exxon projects rising emissions through 2040 (see chart below).



393.    Exxon is planning accordingly, hoping to supply a quarter of the Americas' oil by then.

394.    Exxon confidently states in its most recent company-wide review that five of its major start-ups will contribute to an additional 250,000 BOE per day of working interest production, and that "several long-cycle project start-ups are anticipated in 2018 in Angola, Canada, Qatar, Russia and the United Arab Emirates, contributing about 340 thousand oil-equivalent barrels per day of working interest."

395.    Exxon also plans to continue increasing production of even dirtier fuels. Exxon states on its website that "oil sands production offers a unique opportunity to increase North American oil supplies," and is currently expanding its tar sands operations there, aiming to access around 4.6 billion barrels of tar sands oil for more than 40 years with the expansion of its Kearl project. Exxon's related petroleum coke business will likewise continue apace.

> *Since the 1960s, the Suncor Defendants have knowingly provided a substantial portion of the fossil fuels causing and aggravating climate change; and Suncor plans to continue doing so, causing harm to Plaintiffs.*

396.    Since the 1960s, the Suncor Defendants have produced, refined, marketed and sold trillions of cubic feet of natural gas, more than a billion barrels of oil, and millions of tons of petroleum coke.

397.    In 2016, Suncor was one of the world's largest oil producers, supplying more than 600,000 barrels of oil every day, almost entirely from the Canadian tar sands.

398.    On information and belief, Suncor's share of the fossil fuel market has increased since the 1960s. For example, between 2004 and 2016, Suncor's tar sands production increased 120 percent.

399.    Suncor intended its consumers to burn these fossil fuels in massive and increasing amounts, which it knew would, and in fact did, result in the release of billions of tons of $CO_2$ into

**App. 163**

the atmosphere.  The emissions traceable to Suncor's products contributed to the overall rise in atmospheric $CO_2$, were a substantial factor in bringing about and aggravating the resulting climate change impacts and will continue to contribute to those impacts for the foreseeable future.  Suncor is one of the largest sources of GHG emissions both globally and historically.

400.    Moreover, and despite its knowledge of the grave threats fossil fuels pose to the climate as far back as the 1950s, Suncor produced and promoted dirtier fuels that contributed even more substantially to the rise in the concentration of atmospheric $CO_2$.

401.    Indeed, according to an oil index recently established by the Carnegie Institute, Suncor's oil produces *the highest* GHG emissions in the world, whether one looks at the fuel's entire production lifecycle, or at combustion emissions alone.

402.    Suncor was substantially responsible for the development of the Canadian tar sands.  Despite the enormous costs and climatic risk, Suncor confidently states on its website, "skeptics said Canada's oil sands could never be developed commercially . . . [but] Suncor Energy proved them wrong."

403.    Suncor began developing tar sands in 1967.  At the latest, Suncor was told a year later about the dangers of unchecked fossil fuel use but plunged forward to this day regardless.

404.    Like Exxon, Suncor has taken advantage of its business' dirty by-product – petroleum coke.  Indeed, by 2008, Suncor was shipping "a half-million tons a year through Prince Rupert Ridley [Island] to Asian and Mexican ports."  By 2016, "[a]pproximately half of all coke produced [from the Canadian tar sands] . . . came from Suncor's operations."

405.    Suncor plans to continue producing and promoting more fossil fuels.  As its CEO, Steve Williams, recently said, "In 100 years time, the oilsands will still be being developed and

**App. 164**

still operating."

406.    Suncor is continuing to grow its production, promotion and sale of this fuel source, which results in fuels that have a greater GHG emissions.  Suncor plans to increase tar sands production in 2018 to more than 600,000 barrels a day, up from 505,000 barrels in 2016. And it plans to keep going in the near future: a tar sands project at Fort Hills, Alberta, Canada, will yield an additional 194,000 barrels a day, and 10 smaller projects, set for 2022, would add another 360,000 barrels a day to the company's production.

### 3.   *Defendants concealed and misrepresented to the public what they knew about climate change and the dangers of continued and increasing fossil fuel use.*

407.    Defendants conducted their fossil fuel activities without disclosing (and in spite of) the climate-altering dangers that they knew – and have long known – were associated with the use of fossil fuels.

408.    In addition to concealing the known risks of the levels of their fossil fuel activities, Exxon and the Suncor Defendants – separately, jointly and in coordination with others, such as API – directed, participated in and benefited from efforts to misleadingly cast doubt about the causes and consequences of climate change, including: (1) making affirmative and misleading statements suggesting that continued and unabated fossil fuel use was safe (in spite of internal knowledge to the contrary); and (2) attacking climate science and scientists who tried to report truthfully about the dangers of climate change.

409.    For example, in 1996, when opposing efforts to cut fossil fuel use, Exxon CEO Lee Raymond wrote that "scientific evidence remains inconclusive as to whether human activities affect global climate."

**App. 165**

410.    The Defendants undertook this course of conduct to mislead the public and consumers about the risks of alterations to the climate from fossil fuel use, in order to maintain fossil fuel demand and their fossil fuel business.  Defendants succeeded.  Through the 1990s, at a critical point when the fossil fuel usage needed to be brought under control, public concern about the risks and causes of climate change waned.[26]

411.    Defendants' concealment and misrepresentation substantially contributed to the unchecked growth in fossil fuel use, GHG emissions, and the atmospheric concentration of GHGs at levels that they knew would cause alterations in the climate.

*Defendants acted in groups that concealed and misrepresented the dangers of fossil fuel use.*

412.    Defendants acted together with, and through, groups and industry associations, such as API, in a concerted and coordinated effort to mislead the public and consumers of harm to the climate caused by the levels of their fossil fuel activities.

413.    Defendants set up, and have funded, directed and participated in efforts by such groups to mislead the public and fossil fuel consumers about the connection between unchecked fossil fuel use and dangerous climate alteration.

414.    Defendants used such groups to spread information that they knew to be false, and to give the impression that there was "independent" science that doubted the causes and consequences of climate change.

*Defendants promoted fossil fuels as necessary and responsible, while concealing their danger.*

415.    Defendants have promoted fossil fuels as safe, environmentally friendly and

---

[26] In 1992, 88 percent of American believed that global warming was a serious problem, but by 1997 that number had fallen to 42 percent (with only 28 percent of Americans thinking immediate action was needed).

**App. 166**

necessary.  They have made these representations in their own commercial advertisements and marketing materials, and through third-party advertisements and marketing materials designed to encourage fossil fuel use more generally.  At no point did Defendants or their associations disclose that continued reliance on and the increased unchecked use of fossil fuels were threatening the climate.

416.    For years, API has also blanketed the airwaves and print media, including in Boulder County, San Miguel County and elsewhere in Colorado, with misleading statements about the safety of, need for and benefits of fossil fuel use.  API did not disclose that continued reliance on and unchecked use of fossil fuels was threatening the climate.

*Defendants affirmatively misrepresented the causes and consequences of climate change.*

417.    By the late 1980s, the reality of climate change was increasingly identified in public settings – as was the role of fossil fuels in bringing it about.  In June 1988, James Hansen – then Director of the Goddard Institute of Space Studies at NASA – testified at a congressional hearing that "the greenhouse effect has been detected, and it is changing our climate now."

418.    In spite of their recognition that climate change posed a serious threat decades earlier, Defendants saw public awareness of climate change and its causes as a threat to their business.  Defendants acted to thwart public awareness and understanding through misleading advertising and other communications that cast doubt on the existence, causes and dangers associated with alterations to the climate, in order to preserve and promote fossil fuel use which maintained and increased their profits but which were at levels Defendants knew to be contributing to climate alteration.

419.    Exxon and its predecessors ran multiple advertisements downplaying the risks of

**App. 167**

climate change and emphasizing uncertainty, contrary to its own internal documents.  For

example, in 1997 Mobil ran advertisements in the New York Times claiming, "Scientists cannot

predict with certainty if temperatures will increase, by how much and where changes will occur.

We still don't know what role man-made greenhouse gases might play in warming the planet."

420.    Exxon continued these advertisements after its merger with Mobil.

421.    One 2000 Exxon advertisement claimed that climate science was "unsettled."  A

2001 Exxon advertisement criticized "the unrealistic and economically damaging Kyoto

process."  A 2004 Exxon advertisement again emphasized "[s]cientific uncertainties" that "limit

our ability to make objective, quantitative determinations regarding the human role in recent

climate change, or the degree and consequence of future change."

422.    Defendants also communicated through API, and groups that were created,

organized or controlled by API.

423.    For example, the Global Climate Coalition (GCC) – formed in the late 1980s as

the self-described "voice of U.S. businesses and industries that have a stake in the outcome of the

global climate change debate" – was largely run and directed by API.

424.    The GCC spent millions of dollars on advertising that tried to discredit climate

science, and cast doubt on the dangerous consequences of climate change.  In 1992, when 130

nations came together to sign the U.N. Framework Convention on Climate Change at the Rio de

Janeiro "Earth Summit," GCC spent millions in misleading marketing to discredit the science.

They distributed videos claiming that climate change would not be a problem, and that more

atmospheric carbon dioxide would actually be beneficial for the world.  Similarly, throughout the

1990s and early 2000s, GCC and its members spent millions more and distributed similarly

**App. 168**

deceptive materials designed to undermine support for the Kyoto Protocol, the followup to the Framework Convention.

425.    These GCC advertisements were intentionally misleading because its members knew that climate change was ongoing, and that its impacts were increasingly posing serious risks to the public – including communities such as Plaintiffs.  In a 1995 memo (also discussed above), a Mobil (now Exxon) representative told the GCC that "[t]he scientific basis for the Greenhouse Effect and the potential impact of human emissions of greenhouse gases such as $CO2$ on climate is well established and cannot be denied," and that "contrarian theories" to explain global warming were not credible.

426.    Another front group organized by API was the Global Climate Science Communications Team (GCSCT), through which Defendants acted to mislead the public about climate change.

427.    The GCSCT was organized in the late 1990s, largely in response to the signing of the Kyoto Protocol, including by the United States.  Its stated goal was to get "[a] majority of the American public" to "recognize[ ] that significant uncertainties exist in climate science" and to make climate change "a non-issue, meaning that the Kyoto Protocol is defeated and there are no further initiatives to thwart the threat of climate change."

428.    Defendants, through GCSCT, sought to achieve this by spreading misinformation about human-caused climate change and the credibility of climate science – in the media, to their consumers, and in classrooms across the United States.  While Defendants, per the GCSCT's "action plan", suggested that there was uncertainty about "whether (a) climate change actually is occurring, or (b) if it is, whether humans really have any influence on it," they clearly knew

otherwise.

429.    Defendants also acted through a cadre of claimed climate scientists, who they paid, directly or indirectly, to cast doubt on climate science.

430.    In the early 1990s, both API and Exxon funded and promoted the work of Fred Seitz, Fred Singer, and Singer's Science and Environmental Policy Project (SEPP).  Neither Seitz nor Singer was trained in climate science, but both had previously been hired by industry, including tobacco companies, to create doubt in the public mind (where there should have been none).

431.    Seitz, Singer and SEPP were used to attack climate science, and specifically the IPCC conclusions and process.  At first, Seitz and Singer claimed there was no climate warming or alteration.  When the evidence of warming of the climate became too hard to deny, they claimed the warming was simply natural variation.

432.    As just one example of their tactics, in 1998, Seitz helped to organize and distribute a sham petition "refuting" global warming.  The petition was formatted to look like it was sanctioned by the National Academy of Scientists and sent to thousands of American scientists.  Supposedly signed by 17,000 "scientists," the petition claimed to find "no convincing scientific evidence that human release of greenhouse gases is causing or will, in the foreseeable future, cause catastrophic heating of the Earth's atmosphere and disruption of the Earth's climate."  The list of signatories was filled not with 17,000 actual scientists, but fictitious names, deceased persons, and celebrities.

433.    The industry later turned to Wei-Hock (Willie) Soon, an aerospace engineer at the Harvard-Smithsonian Center for Astrophysics, who received over $1.2 million from Exxon,

**App. 170**

API and other fossil fuel interests from 2001-2012.  Soon wrote numerous papers suggesting non-fossil fuel causes of climate change and is best known for promoting the widely discredited idea that solar variability is responsible for climate change.  Soon's papers were rejected in the scientific community, for good reason.

434.    In 2015, it came to light that Soon was being funded by fossil fuel companies – a fact he had not disclosed – and that those funders were given the right to review his work before it was published.  Soon described his supposedly "academic" work for the Smithsonian as "deliverable" to his funders, i.e. produced in exchange for their funding.

435.    Defendants, and their agents, such as API, routinely referenced the work of Singer, Seitz and Soon when casting doubt on and/or trying to undermine public recognition of the scientific consensus around climate change caused and contributed to by their fossil fuel activities, in order to continue and increase those fossil fuel activities unabated.

*Doubt won Defendants years of inaction.*

436.    Despite the scientific consensus around the existence and causes of climate change, uncertainty in the minds of the American public and Defendants' consumers grew throughout the 1990s and 2000s as a result of Defendants' efforts.

437.    A poll reported in Time magazine in 2006 found that only 56 percent of Americans thought that average global temperatures had risen – despite scientific documentation that it had, including the IPCC's unequivocal statement, in its 2001 report, that average temperatures had risen.

438.    An ABC poll the same year found that while more than 80 percent of Americans believed that global warming was "probably happening," 64 percent did not believe the science

**App. 171**

was settled, perceiving "a lot of disagreement among scientists." Defendants concealed the knowledge that would have demonstrated that the science of climate change had been settled since at least the 1960s.

439.    The Pew Research Center in 2006 found that only 41 percent of Americans believed human activity such as burning fossil fuels was causing global warming – approximately equal to the number of people who said either that it was caused by natural patterns (21 percent) or that there was no solid evidence of warming (20 percent).

440.    By 2009, Pew Research Center found the number of Americans who said there was solid evidence that global temperatures are rising had *declined* to 57 percent, down from 71 percent in 2008. Only 35 percent of people thought the issue was very serious.

441.    There was a similar decline in the number of Americans who said temperatures are rising – down from 47 percent in 2008 to just 36 percent in 2009.

442.    In 2012, in response to the survey question: Do scientists believe that earth is getting warmer because of human activity? 43 percent replied no, 12 percent did not know and only 45 percent of the U.S. public accurately reported the scientific community's overwhelming consensus.

443.    Defendants' ongoing concealment of their knowledge of the causes and impacts of climate change in turn contributed to their ability to thwart attempts to prevent and mitigate the climate change harms caused and contributed to by their fossil fuel activities, further exacerbating and accelerating those harms.

## IV.    PLAINTIFFS' CLAIMS

### FIRST CAUSE OF ACTION
### (Public Nuisance)

444.    Plaintiffs reallege and reaffirm each and every allegation set forth in all the preceding paragraphs as if fully stated herein.

445.    Defendants' fossil fuel activities – i.e., knowingly producing, promoting, refining, marketing and selling a substantial amount of fossil fuels used at levels sufficient to alter the climate, and misrepresenting the dangers associated, with their use – has caused, created, contributed to and/or exacerbated dangerous alterations in the climate.

446.    The alterations in the climate substantially caused and contributed to by Defendants constitute a present and continuing public nuisance in Plaintiffs' communities. Plaintiffs have to mitigate the impacts and severity of the public nuisances caused and contributed to by the levels of Defendants' fossil fuel activities within their respective jurisdictions.

447.    Plaintiffs are specially injured by the public nuisance brought about by Defendants' actions altering the climate because of their special responsibility to respond to and abate its hazards, and because they and their property and assets are especially vulnerable to the impacts of climate change, including, specifically, but not exlusively, their:

- transportation infrastructure, including roads, bridges, and culverts;

- flood, stormwater and water supply infrastructure;

- agricultural and open space lands; and

- high elevation properties, including reservoirs and park lands.

448.    The impacts of climate change caused by Defendants' actions have interfered

**App. 173**

with and will continue to threaten and interfere with public rights in the Plaintiff communities, including the right to use and enjoy public property, spaces, parks, ecosystems and the environment; the right to public health, safety, emergency management, comfort and well-being; and the right to safe and unobstructed travel, transportation, commerce and exchange.

449.    The interference with and threat to public rights caused by Defendants' actions is substantial and includes, but is not limited to:

- increasing, longer duration, wider burning and more intense wildfires, including in areas where wildfire risk had previously been low or non-existent;

- increasing extreme precipitation events;

- rising temperatures and an increasing number of extreme temperature events;

- prolonged and more severe drought conditions; and

- the spread of pests, disease, and increasing threats to public health by, among other things, increasing allergens and ozone, as well as diminishing air quality.

450.    The harms caused by Defendants are and will continue to be borne by Plaintiffs and residents of the Plaintiff communities in the form of damage to property (valued in the billions of dollars); impairment of public health; obstructed movement within their communities; the loss of use and enjoyment of public property, the environment and local eco-systems and infrastructure; as well as added costs to protect, repair and remediate the harms caused by Defendants' alteration of the climate.

451.    Defendants have contributed to and continue to contribute to the creation and exacerbation of the public nuisance, in that the intended and foreseeable combustion of Defendants' fossil fuels at the levels at which they were being used has produced and will continue to produce a substantial amount of GHG emissions, measured in billions of excess tons

**App. 174**

of $CO_2$ and other GHGs.  Those excess tons have caused, contributed to, and/or exacerbated the impacts of climate change, including in Plaintiffs' communities.  Additionally, Defendants' fossil fuel activities and concealment and/or misrepresentation of the risk, known to Defendants, of the intended use of fossil fuels has also resulted in a substantial amount of excess GHG emissions, which caused, contributed to, and/or exacerbated the impacts of climate change.

452.    Defendants intentionally, negligently and/or recklessly created the interference incurred by Plaintiffs and the Plaintiff communities caused by climate change.  From decades ago, Defendants knew or should have known that climate change impacts – including those affecting the Plaintiff communities – were substantially certain to result when they produced, promoted, refined, marketed and sold fossil fuels intending that they would be combusted at significant rates.  Defendants knew or should have known that climate change impacts – including those affecting the Plaintiff communities – were substantially certain to result when they concealed and affirmatively misrepresented the truth about climate change and the negative impacts of fossil fuel use to the public and their consumers.

453.    The inteference with public rights is unreasonable.  For decades, Defendants have internalized the benefits of fossil fuel use, i.e., their profits, and externalized its costs, i.e., the impacts of climate change, onto communities such as Plaintiffs.  Defendants knew or should have known the costs to Plaintiffs and their communities of their fossil fuel activities and have not compensated Plaintiffs for those foreseen harms.  Defendants continue to produce, promote, refine, market and sell fossil fuels at levels that cause and contribute to alteration of the climate, continue to profit from rising sales and continue to not compensate Plaintiffs or their communities for the continued and added impacts that they suffer and will continue to suffer

**App. 175**

from as a direct and proximate result of Defendants' nuisance.

454.    Plaintiffs and their residents have been damaged, including in their exercise of

public and common rights, as a direct and proximate result of the public nuisance created by

Defendants.  Plaintiffs have spent and will have to spend substantial sums to mitigate this

interference.  Plaintiffs' damages and losses include, but are not limited to:

- costs to analyze and evaluate the future impacts of climate alteration, the response to such impacts and the costs of mitigating, adapting to, or remediating those impacts;

- costs associated with wildfire response, management and mitigation;

- costs of responding to, managing and repairing damage from bark beetle and other pest infestations;

- costs associated with increased drought conditions including alternate planting and increased landscape maintenance costs;

- costs associated with additional medical treatment and hospital visits necessitated by extreme heat vents, increased allergen exposure and exposure to vector-borne disease, mitigation measures and public education programs to reduce the occurrence of such health impacts;

- costs associated with repairing and replacing existing flood control and drainage measures and repairing flood damage;

- costs of repair, maintenance, mitigation and rebuilding and replacement of road systems to respond to the impacts of climate alteration;

- costs associated with alteration and repair of bridge structures to retain safety due to increases in streamflow rates;

- costs of repair of physical damage to buildings owned by Plaintiffs;

- costs of analysis of alternative building design and construction and costs to implement such alternative design and construction;

- loss of income from property owned by Plaintiffs due to reduced agricultural productivity or lease or rental income while property is unusable;

**App. 176**

- costs of public education programs concerning responses to climate alteration; and

- costs of reduced employee productivity.

455.    These damages and losses are the direct and proximate result of the public nuisance – climate alteration – that Defendants caused and contributed to.

456.    Wherefore, Plaintiffs pray for an award of damages, restitution for their costs of abating the nuisance and remediation by Defendants as set forth below.

## SECOND CAUSE OF ACTION
### (Private Nuisance)

457.    Plaintiffs reallege and reaffirm each and every allegation set forth in all the preceding paragraphs as if fully stated herein.

458.    Plaintiffs own, lease, occupy, manage, control and/or are otherwise in lawful possession of extensive real property within their jurisdictions.

459.    As a direct and proximate result of Defendants' conduct, as set forth above, Plaintiffs' property rights and interests, including their rights to the free and unthreatened use and enjoyment of that property, have been and will be unreasonably interfered with.

460.    Defendants, and each of them, by causing and/or contributing to climate change through their acts and omissions described above, have created conditions on and/or set in motion forces that cause interference with Plaintiffs' real property, and permitted those conditions and forces to persist, which constitute a nuisance.

461.    Plaintiffs' property has been and/or will be substantially harmed by the effects of climate change.  The conditions and forces Defendants created substantially and unreasonably interfere with, and will substantially interfere with, Plaintiffs' use and quiet enjoyment of rights

**App. 177**

to and interests in their real property, including by increasing the frequency and intensity of flooding, storms, the spread of invasive species and wildfire.

462.    The harms to and interference with Plaintiffs' property have become and/or will continue to be regular and severe.

463.    Plaintiffs have not consented to Defendants' conduct in creating the condition that has interfered with Plaintiffs' property.

464.    All of their harms will actually be borne by Plaintiffs as loss of use and enjoyment of public property and infrastructure.  The burden on Plaintiffs to mitigate, repair, remediate and prevent further grave interferences with their property is significant and severe.

465.    Defendants' conduct was and is negligent, reckless and intentional because Defendants knew or should have known their actions were substantially certain to interfere with Plaintiffs' property rights and interests.  Defendants have known for decades, or reasonably should have known, that their conduct was substantially certain to alter or contribute to alterations in the climate and is exacerbating climate change.

466.    Defendants' conduct was and is unreasonable because they have created and are creating the interference with Plaintiffs' property rights without compensating Plaintiffs for the harm they knowingly, recklessly or negligently created or will create.

467.    Defendants' conduct is continuing and has produced and will produce ongoing effects.

468.    Defendants' actions are a direct and proximate cause of Plaintiffs' damages and losses.

469.    Plaintiffs' real property has been damaged and their use and enjoyment of that

**App. 178**

property has been threatened by the nuisance created by Defendants; Plaintiffs have spent and

will have to spend substantial dollars to mitigate this interference.  Plaintiffs' damages and losses

include, but are not limited to:

- costs to analyze and evaluate the future impacts of climate alteration, the response to such impacts and the costs of mitigating, adapting to or remediating those impacts;

- costs associated with wildfire response, management and mitigation;

- costs of responding to, managing and repairing damage from pine beetle and other pest infestations;

- costs associated with increased drought conditions including alternate planting and increased landscape maintenance costs;

- costs associated with repairing and replacing existing flood control and drainage measures and repairing flood damage;

- costs of repair, maintenance, mitigation and rebuilding and replacement of road systems to respond to the impacts of climate alteration;

- costs associated with alteration and repair of bridge structures to retain safety due to increases in streamflow rates;

- costs of repair of physical damage to buildings owned by Plaintiffs;

- costs of analysis of alternative building design and construction and costs to implement such alternative design and construction; and

- loss of income from property owned by Plaintiffs due to reduced agricultural productivity or lease or rental income while property is unusable.

470.    These damages and losses are the direct and proximate result of climate alteration

by Defendants in excess of historical trends in climate variation.

471.    Wherefore, Plaintiffs pray for an award of damages, restitution of their costs to

abate the nuisance, and remediation of the nuisance by Defendants as set forth below.

**App. 179**

## THIRD CAUSE OF ACTION
### (Trespass)

472.    Plaintiffs reallege and reaffirm each and every allegation set forth in all the preceding paragraphs as if fully stated herein.

473.    Plaintiffs are the owners, in lawful possession, of real property.

474.    Defendants have each intentionally engaged in conduct that hascaused and contributed to climate change, which, in the usual course of events, has caused and will cause flood waters, fire, hail, rain, snow, wind and invasive species to enter Plaintiffs' property.

475.    Defendants knew, with substantial certainty, that their fossil fuel activities would cause and contribute to climate change and thus cause these invasions of Plaintiffs' property.

476.    This trespass is recurring, and will continue.

477.    Plaintiffs did not give Defendants permission for these invasions of their property.

478.    Defendants' trespasses are the direct and proximate cause of damages and losses to the Plaintiffs.

479.    Defendants' actions are and have been a cause of the injuries and damages to Plaintiffs' property.

480.    Plaintiffs' real property has been and will be damaged by Defendants' trespasses and Plaintiffs have spent and will spend substantial dollars to mitigate the damage caused by the trespasses.  Such damages and losses include, but are not limited to:

- costs to analyze and evaluate the future impacts of climate alteration, the response to such impacts and the costs of mitigating, adapting to or remediating those impacts;

- costs associated with wildfire response, management and mitigation;

- costs of responding to, managing and repairing damage from pine beetle and other

108

**App. 180**

pest infestations;

- costs associated with increased drought conditions including alternate planting and increased landscape maintenance costs;

- costs associated with repairing and replacing existing flood control and drainage measures and repairing flood damage;

- costs of repair, maintenance, mitigation and rebuilding and replacement of road systems to respond to the impacts of climate alteration;

- costs associated with alteration and repair of bridge structures to retain safety due to increases in stream flow rates;

- costs of repair of physical damage to buildings owned by Plaintiffs;

- costs of analysis of alternative building design and construction and costs to implement such alternative design and construction; and

- loss of income from property owned by Plaintiffs due to reduced agricultural productivity or lease or rental income while property is unusable;

481.    These damages and losses are the direct and proximate result of climate alteration by Defendants in excess of historical trends in climate variation.

482.    Wherefore, Plaintiffs pray for damages and other relief as set forth below.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

483.    Plaintiffs reallege and reaffirm each and every allegation set forth in all the preceding paragraphs as if fully stated herein.

484.    Defendants profited from the manufacture, distribution and/or sales of fossil fuel products at levels sufficient to alter the climate, including in Colorado, and continued to do so long after they were aware of the harms that have resulted and would result from Defendants' actions in causing and contributing to alteration of the climate.

485.    Further, Defendants have profited from and continue to profit from the

manufacture, distribution and/or sale of fossil fuels with that knowledge and have benefited from not incurring the costs necessary to reduce the impacts of Defendants' contributions to climate change on Plaintiffs, Plaintiffs' properties and Plaintiffs' communities.

486.    Plaintiffs have conferred a benefit upon Defendants by bearing the costs of the impacts of climate change while Defendants have not borne those costs, increasing the profits to Defendants.  Defendants received benefits from their actions and it would be unconscionable and contrary to equity for Defendants to retain those benefits obtained at the expense of Plaintiffs.

487.    Defendants have profited at the expense of Plaintiffs and the Plaintiff communities who have been damaged and must abate the hazards created by Defendants' fossil fuel products.

488.    Defendants have received a benefit at the expense of Plaintiffs and the Plaintiff communities and it would be unconscionable and contrary to equity for Defendants to retain that benefit.  The Court therefore should award as a remedy the profits obtained by Defendants at the expense of Plaintiffs.

**FIFTH CAUSE OF ACTION**
**(Violation of the Colorado Consumer Protection Act,**
**Colo. Rev. Stat. § 6-1-105(1), *et seq*.)**

489.    Plaintiffs reallege and reaffirm each and every allegation set forth in all the preceding paragraphs as if fully stated herein.

490.    Defendants engaged in and caused others to engage in deceptive trade practices in Colorado, including in Plaintiffs' communities.

491.    Defendants' deceptive trade practices included, but were not limited to:

- knowingly making false representations as to the characteristics, ingredients, uses, or benefits of their fossil fuel activities; and

**App. 182**

- failing to disclose material information concerning their goods and services, which information was known at the time of an advertisement or sale, including: the true cost and harms from the use of their products; the damage to the climate that the use of their goods and services would cause; and the impacts of the use of their fossil fuels and fossil fuel-derived products and services on Plaintiffs' property, social services and infrastructure.

492.    Defendants' failure to disclose such information was intended to induce the public and consumers at large to enter into transactions for the continued and expanding use of fossil fuels and fossil fuel products.

493.    Defendants' misrepresentations, false representations, concealment and omissions concerning their goods and services were materially false statements that induced the persons to whom they were made to act or to refrain from acting and had the capacity to deceive the recipient.

494.    The material information Defendants failed to disclose was information Defendants knew at the time of their advertisement or sale of their fossil fuels and fossil fuel derived products.

495.    Defendants' deceptive trade practices occurred in the course of Defendants' business.

496.    Defendants' deceptive trade practices significantly impacted Plaintiffs, their communities and the public.  A large number of consumers in Colorado, including in Plaintiffs' communities, were and continue to be directly affected by Defendants' deceptive trade practices. The consumers directly affected by the deceptive trade practices had minimal, if any, bargaining power.  The deceptive practices have previously impacted Colorado consumers.  Defendants' deceptive trade practices have a significant potential to impact other consumers in the future.

**App. 183**

497.    Defendants engaged in bad faith conduct in their deceptive trade practices meaning they acted fraudulently, willfully, knowingly and/or intentionally, causing damages and losses to Plaintiffs.

498.    Colorado residents, including residents in Plaintiffs' communities, that were the targets of these deceptive trade practices were, and are, actual and potential consumers of Defendants' goods or services.

499.    Plaintiffs and their residents were injured in the course of their business as a result of such deceptive trade practices.  Defendants' deceptive trade practices directly and proximately caused actual damages and losses to Plaintiffs and their residents.  Such damages and losses include, but are not limited to:

- costs to analyze and evaluate the future impacts of climate alteration, the response to such impacts and the costs of mitigating, adapting to or remediating those impacts;

- costs associated with wildfire response, management and mitigation;

- costs of responding to, managing and repairing damage from pine beetle and other pest infestations;

- costs associated with increased drought conditions including alternate planting and increased landscape maintenance costs;

- costs associated with additional medical treatment and hospital visits necessitated by extreme heat events, increased allergen exposure and exposure to vector-borne disease, as well as mitigation measures and public education programs to reduce the occurrence of such health impacts;

- costs associated with repairing and replacing existing flood control and drainage measures and repairing flood damage;

- costs of repair, maintenance, mitigation and rebuilding and replacement of road systems to respond to the impacts of climate alteration;

- costs associated with alteration and repair of bridge structures to retain safety due

**App. 184**

to increases in stream flow rates;

- costs of repair of physical damage to buildings owned by Plaintiffs;

- costs of analysis of alternative building design and construction and costs to implement such alternative design and construction;

- loss of income from property owned by Plaintiffs due to reduced agricultural productivity or lease or rental income while property is unusable;

- the cost of public education programs concerning responses to climate alteration; and

- the cost of reduced employee productivity.

500.    These damages and losses are the direct and proximate result of Defendants' deceptive trade practices.

## SIXTH CAUSE OF ACTION
### (Civil Conspiracy)

### *Against the Suncor Defendants*

501.    Plaintiffs reallege and reaffirm each and every allegation set forth in all the preceding paragraphs as if fully stated herein.

502.    The Suncor Defendants together, through their acts and omissions described above, and through the acts of other Suncor subsidiaries, joint ventures and affiliates not named as Defendants ("Suncor co-conspirators"), conspired to perform and did perform conduct which caused and/or contributed to alteration of the climate and resulting damages and losses to Plaintiffs.

503.    The Suncor Defendants and their Suncor co-conspirators jointly targeted their fossil fuel activities at the State of Colorado, including through the co-conspirators based in, doing business in and/or incorporated in Colorado.

**App. 185**

504.    The Suncor Defendants and their Suncor co-conspirators had concerted goals to maintain and/or to increase fossil fuel usage at levels they knew were sufficient to alter the climate, and to fail to disclose material information concerning their fossil fuel activities – specifically including, the damage to the climate that the use of their goods and services would cause – so as to maintain and increase their profits from the sale of their fossil fuel products and services in spite of the increasing alteration of the climate.

505.    The Suncor Defendants and their Suncor co-conspirators had a meeting of the minds to accomplish their goals to maintain and/or to increase fossil fuel usage at levels they knew were sufficient to alter the climate, and to withhold material information concerning the continuing and increasing harm caused by their fossil fuel activities, specifically concerning the damage to the climate that the use of their goods and services would cause and the impacts of the use of their fossil fuels and fossil fuel-derived products and services on Plaintiffs' property, social services and infrastructure.

506.    The Suncor Defendants and their Suncor co-conspirators acted to accomplish their goal to maintain and/or to increase fossil fuel usage through unlawful means, namely through misrepresentations, false representations, concealment and omissions concerning their goods and services which were materially false statements that induced the persons to purchase their goods and services.  The material information Defendants failed to disclose was information Defendants knew at the time of their advertisement, promotion and sale of their fossil fuels and fossil fuel-derived products.

507.    The Suncor Defendants' conduct, as well as that of the other Suncor co-conspirators, was and is negligent, reckless and unlawful because they knew or should have

**App. 186**

known their actions were substantially certain to interfere with Plaintiffs' property rights and interests. Defendants have known for decades, or reasonably should have known, that their conduct was substantially certain to alter or contribute to alterations in the climate and is exacerbating climate change.

508.    The Suncor Defendants' and Suncor co-conspirators' concerted unlawful actions performed to accomplish their goal were and are a direct and proximate cause of damages and losses to Plaintiffs. Plaintiffs' damages and losses include, but are not limited to:

- costs to analyze and evaluate the future impacts of climate alteration, the response to such impacts and the costs of mitigating, adapting to or remediating those impacts;

- costs associated with wildfire response, management and mitigation;

- costs of responding to, managing, and repairing damage from pine beetle and other pest infestations;

- costs associated with increased drought conditions including alternate planting and increased landscape maintenance costs;

- costs associated with repairing and replacing existing flood control and drainage measures and repairing flood damage;

- costs of repair, maintenance, mitigation and rebuilding and replacement of road systems to respond to the impacts of climate alteration;

- costs associated with alteration and repair of bridge structures to retain safety due to increases in streamflow rates;

- costs of repair of physical damage to buildings owned by Plaintiffs;

- costs of analysis of alternative building design and construction and costs to implement such alternative design and construction; and

- loss of income from property owned by Plaintiffs due to reduced agricultural productivity or lease or rental income while property is unusable.

509.    Pursuant to C.R.S. § 13-21-111.5(4), the Suncor Defendants and Suncor co-

**App. 187**

conspirators consciously conspired and deliberately pursued a common plan to commit tortious acts and therefore are jointly and severally liable to Plaintiffs.

510.     Wherefore, Plaintiffs pray for an award of damages against Defendants as set forth below.

### *Against Exxon*

511.     Plaintiffs reallege and reaffirm each and every allegation set forth in all the preceding paragraphs as is fully stated herein.

512.     Exxon, through its acts and omissions described above, and through the acts of other Exxon subsidiaries, joint ventures and affiliates not named as Defendants ("Exxon co-conspirators"), conspired to perform and did perform conduct which caused and/or contributed to alteration of the climate and resulting damages and losses to Plaintiffs.

513.     Exxon and the Exxon co-conspirators jointly targeted their fossil fuel activities at the State of Colorado, including through the co-conspirators based in, doing business in and/or incorporated in Colorado.

514.     Exxon and the Exxon co-conspirators had concerted goals to maintain and/or to increase fossil fuel usage at levels they knew were sufficient to alter the climate, and to fail to disclose material information concerning their fossil fuel activities – specifically including the damage to the climate that the use of their goods and services would cause – so as to maintain and increase their profits from the sale of their fossil fuel products and services in spite of the increasing alteration of the climate.

515.     Exxon and the Exxon co-conspirators had a meeting of the minds to accomplish their goals to maintain and/or to increase fossil fuel usage at levels they knew were sufficient to

**App. 188**

alter the climate, and to withhold material information concerning the continuing and increasing harm caused by their fossil fuel activities, specifically concerning the damage to the climate that the use of their goods and services would cause, and the impacts of the use of their fossil fuels and fossil fuel-derived products and services on Plaintiffs' property, social services and infrastructure.

516.    Exxon and the Exxon co-conspirators acted to accomplish their goal to maintain and/or to increase fossil fuel usage through unlawful means, namely through misrepresentations, false representations, concealment and omissions concerning their goods and services which were materially false statements that induced the persons to purchase their goods and services. The material information Exxon failed to disclose was information it knew at the time of its advertisement, promotion and sale of its fossil fuels and fossil fuel-derived products.

517.    Exxon's conduct, as well as that of the other Exxon co-conspirators, was and is negligent, reckless and unlawful because they knew or should have known their actions were substantially certain to interfere with Plaintiffs' property rights and interests.  Defendants have known for decades, or reasonably should have known, that their conduct was substantially certain to alter or contribute to alterations in the climate and is exacerbating climate change.

518.    Exxon's and the Exxon co-conspirators' concerted unlawful actions performed to accomplish their goal were and are a direct and proximate cause of damages and losses to Plaintiffs.  Plaintiffs' damages and losses include, but are not limited to:

- costs to analyze and evaluate the future impacts of climate alteration, the response to such impacts and the costs of mitigating, adapting to or remediating those impacts;

- costs associated with wildfire response, management and mitigation;

117

**App. 189**

- costs of responding to, managing and repairing damage from pine beetle and other pest infestations;

- costs associated with increased drought conditions including alternate planting and increased landscape maintenance costs;

- costs associated with repairing and replacing existing flood control and drainage measures and repairing flood damage;

- costs of repair, maintenance, mitigation and rebuilding and replacement of road systems to respond to the impacts of climate alteration;

- costs associated with alteration and repair of bridge structures to retain safety due to increases in streamflow rates;

- costs of repair of physical damage to buildings owned by Plaintiffs;

- costs of analysis of alternative building design and construction and costs to implement such alternative design and construction; and

- loss of income from property owned by Plaintiffs due to reduced agricultural productivity or lease or rental income while property is unusable.

519.    Pursuant to C.R.S. § 13-21-111.5(4), Exxon and the Exxon co-conspirators consciously conspired and deliberately pursued a common plan to commit tortious acts and therefore are jointly and severally liable to Plaintiffs.

520.    Wherefore, Plaintiffs pray for an award of damages against Defendants as set forth below.

### *Against all Defendants*

521.    Plaintiffs reallege and reaffirm each and every allegation set forth in all the preceding paragraphs as is fully stated herein.

522.    Exxon – through its acts and omissions described above, and through the acts of the other Exxon co-conspirators – and the Suncor Defendants – through the acts and omissions described above, and through the acts of other Suncor co-conspirators – jointly conspired to

**App. 190**

perform and did perform conduct which caused and/or contributed to alteration of the climate and resulting damages and losses to Plaintiffs.

523.    Specifically, the Suncor Defendants, Suncor co-conspirators, Exxon, and the Exxon co-conspirators, among other joint activities, jointly targeted substantial fossil fuel activities at the State of Colorado, including through co-conspirators who are Colorado entities.

524.    The co-conspirators had concerted goals that included maintaining and/or increasing fossil fuel usage at levels they knew were sufficient to alter the climate, and failing to disclose material information concerning their fossil fuel activities – specifically including the damage to the climate that the use of their goods and services would cause – to the public and consumers, including in Colorado, so as to maintain and increase their profits from the sale of their fossil fuel products and services in spite of the increasing alteration of the climate.

525.    The co-conspirators had a meeting of the minds to accomplish their goals to maintain and/or to increase fossil fuel usage at levels they knew were sufficient to alter the climate, and to withhold material information concerning the continuing and increasing harm caused by their fossil fuel activities from Colorado consumers, specifically concerning the damage to the climate that the use of their goods and services would cause and the impacts of the use of their fossil fuels and fossil fuel derived products and services on Plaintiffs' property, social services, and infrastructure.

526.    The co-conspirators acted to accomplish their goal to maintain and/or to increase fossil fuel usage in Colorado through unlawful means, namely through misrepresentations, false representations, concealment and omissions concerning their goods and services which were materially false statements that induced the persons to purchase their goods and services.  The

**App. 191**

material information the co-conspirators failed to disclose was information they knew at the time of their advertisement, promotion and sale of their fossil fuels and fossil fuel-derived products.

527.    The co-conspirators' conduct was and is negligent, reckless and unlawful because they knew or should have known their actions were substantially certain to interfere with Plaintiffs' property rights and interests.  Defendants have known for decades, or reasonably should have known, that their conduct was substantially certain to alter or contribute to alterations in the climate and is exacerbating climate change.

528.    The co-conspirators' concerted unlawful actions performed to accomplish their goal were and are a direct and proximate cause of damages and losses to Plaintiffs.  Plaintiffs' damages and losses include, but are not limited to:

- costs to analyze and evaluate the future impacts of climate alteration, the response to such impacts and the costs of mitigating, adapting to or remediating those impacts;

- costs associated with wildfire response, management and mitigation;

- costs of responding to, managing and repairing damage from pine beetle and other pest infestations;

- costs associated with increased drought conditions including alternate planting and increased landscape maintenance costs;

- costs associated with repairing and replacing existing flood control and drainage measures and repairing flood damage;

- costs of repair, maintenance, mitigation and rebuilding and replacement of road systems to respond to the impacts of climate alteration;

- costs associated with alteration and repair of bridge structures to retain safety due to increases in streamflow rates;

- costs of repair of physical damage to buildings owned by Plaintiffs;

- costs of analysis of alternative building design and construction and costs to

120

**App. 192**

implement such alternative design and construction; and

- loss of income from property owned by Plaintiffs due to reduced agricultural productivity or lease or rental income while property is unusable.

529.    Pursuant to C.R.S. § 13-21-111.5(4), the co-conspirators consciously conspired and deliberately pursued a common plan to commit tortious acts and therefore are jointly and severally liable to Plaintiffs for the fossil fuel activities directed at Colorado.

530.    Wherefore, Plaintiffs pray for an award of damages against Defendants as set forth below.

## V.    RELIEF REQUESTED

531.    Plaintiffs are entitled to the following relief:

532.    Monetary relief to compensate Plaintiffs for their **past** and **future** damages and costs to mitigate the impact of climate change, such as the costs to analyze, evaluate, mitigate, abate, and/or remediate the impacts of climate change.  These costs include, but are not limited to:

- costs to analyze and evaluate the future impacts of climate alteration, the response to such impacts and the costs of mitigating, adapting to or remediating those impacts;

- costs associated with wildfire response, management and mitigation;

- costs of responding to, managing and repairing damage from pine beetle and other pest infestations;

- costs associated with increased drought conditions including alternate planting and increased landscape maintenance costs;

- costs associated with additional medical treatment and hospital visits necessitated by extreme heat events, increased allergen exposure and exposure to vector-borne disease, as well as mitigation measures and public education programs to reduce the occurrence of such health impacts;

**App. 193**

- costs associated with repairing and replacing existing flood control and drainage measures and repairing flood damage;

- costs of repair, maintenance, mitigation and rebuilding and replacement of road systems to respond to the impacts of climate alteration;

- costs associated with alteration and repair of bridge structures to retain safety due to increases in streamflow rates;

- repair of physical damage to buildings owned by Plaintiffs;

- costs of analysis of alternative building design and construction and costs to implement such alternative design and construction;

- loss of income from property owned by Plaintiffs due to reduced agricultural productivity or lease or rental income while property is unusable;

- the cost of public education programs concerning responses to climate alteration; and

- the cost of reduced employee productivity.

533.    Damages to compensate Plaintiffs for past and reasonably certain future damages, including, but not limited to, decreased value in water rights; decreased value in agricultural holdings and real property; increased administrative and staffing costs; monitoring costs; costs of past mitigation efforts; and all other costs and harms previously described in this Complaint.

534.    Plaintiffs seek remediation and/or abatement of the hazards discussed above by Defendants by any other practical means.

535.    Pursuant to C.R.S. § 6-1-113(2), Plaintiffs seek three times the amount of actual damages sustained, plus the costs of the action together with reasonable attorneys' fees as determined by the Court.

536.    Pursuant to C.R.S. § 13-21-111.5(4), Plaintiffs seek a determination that Defendants consciously conspired and deliberately pursued a common plan to commit tortious

**App. 194**

acts and therefore are jointly liable to Plaintiffs.

537.    Plaintiffs seek costs and disbursements of this action as permitted by law.

538.    Plaintiffs seek attorneys' fees as permitted by law.

539.    Plaintiffs seek prejudgment and postjudgment interest as permitted by law.

540.    Additionally, Plaintiffs seek any other applicable remedies and any other relief as this Court deems just and proper.

541.    Plaintiffs seek to impose liability on Defendants in connection with misrepresentations about the known dangers of their products, in connection with their marketing of those products and in connection with the sale of those products.  Plaintiffs **do not** seek to impose liability, restrain or interfere with Defendants' ability to participate in public debates about climate change, or otherwise interfere with Defendants' speech.

542.    Plaintiffs **do not** seek to enjoin any oil and gas operations or sales in the State of Colorado, or elsewhere, or to enforce emissions controls of any kind.  Plaintiffs **do not** seek damages or abatement relief for injuries to or occurring on federal lands.  Plaintiffs **do not** seek damages or any relief based on any activity by Defendants that could be considered lobbying or petitioning of federal, state or local governments.

543.    None of the relief requested is inconsistent with any obligation of the U.S. under the United Nations Framework Convention on Climate Change, the Paris Agreement or any other U.S. international commitment.

**App. 195**

## VI.    JURY TRIAL DEMANDED

544.    Plaintiffs demand a trial by jury for all issues triable by a jury.

Dated:  June 11, 2018                              Respectfully submitted,

*/s/ Kevin S. Hannon*
Kevin S. Hannon, #16015
**DULY AUTHORIZED SIGNATURE OF
KEVIN S. HANNON ON FILE AT THE
HANNON LAW FIRM, LLC**

Marco Simons, *Pro Hac Vice*
D.C. Bar No. 492713
Alison Borochoff-Porte, *Pro Hac Vice*
NY Bar No. 5482468
Michelle C. Harrison, *Pro Hac Vice*
D.C. Bar No. 1026582
EarthRights International
1612 K Street NW, #401
Washington, DC 20006
(202) 466-5188
marco@earthrights.org
alison@earthrights.org
michelle@earthrights.org

David Bookbinder, *Pro Hac Vice*
D.C. Bar No. 455525
Niskanen Center
820 First Street, NE, Suite 675
Washington, DC 20002
dbookbinder@niskanencenter.org

**App. 196**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 18-cv-01672-WJM-SKC

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY;
BOARD OF COUNTY COMMISSIONERS OF SAN MIGUEL COUNTY; and
CITY OF BOULDER,

      Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC.;
SUNCOR ENERGY SALES INC.;
SUNCOR ENERGY INC.; and
EXXON MOBIL CORPORATION,

      Defendants.

---

## ORDER

---

Plaintiffs brought Colorado common law and statutory claims in Boulder County, Colorado District Court for injuries occurring to their property and citizens of their jurisdictions, allegedly resulting from the effects of climate change. Plaintiffs sue Defendants in the Amended Complaint ("Complaint") "for the substantial role they played and continue to play in causing, contributing to and exacerbating climate change." (ECF No. 7 ¶ 2.) Defendants filed a Notice of Removal (ECF No. 1) on June 29, 2018. Plaintiffs filed a Motion to Remand (ECF No. 34) on July 30, 2018.

For the reasons explained below, the Court grants Plaintiffs' Motion to Remand. Defendants' Motion to Reschedule Oral Argument on Plaintiffs' Motion to Remand (ECF No. 67), is denied as the Court finds that a hearing is not necessary.

**App. 197**

## I. BACKGROUND

Plaintiffs assert six state law claims: public nuisance, private nuisance, trespass, unjust enrichment, violation of the Colorado Consumer Protection Act, and civil conspiracy.  The Complaint alleges that Plaintiffs face substantial and rising costs to protect people and property within their jurisdictions from the dangers of climate alteration.  (ECF No. 7 ¶¶ 1–4, 11, 221–320.)  Plaintiffs allege that Defendants substantially contributed to the harm through selling fossil fuels and promoting their unchecked use while concealing and misrepresenting their dangers.  (*Id*. ¶¶ 2, 5, 13–18, 321–435.)  The fossil fuel activities have raised the emission and concentration of greenhouse gases ("GHGs") in the atmosphere.  (*Id*. ¶¶ 7, 15, 123–138, 321–38.)

As a result of the climate alterations caused and contributed to by Defendants' fossil fuel activities, Plaintiffs allege that they are experiencing and will continue to experience rising average temperatures and harmful changes in precipitation patterns and water availability, with extreme weather events and increased floods, drought, and wild fires.  (ECF No. 7 ¶¶ 145–179.)  These changes pose a threat to health, property, infrastructure, and agriculture.  (*Id*. ¶¶ 1–4, 180–196.)  Plaintiffs allege that they are sustaining damage because of services they must provide and costs they must incur to mitigate or abate those impacts.  (*Id*. ¶¶ 1, 4–5, 221–320.)  Plaintiffs seek monetary damages from Defendants, requiring them to pay their *pro rata* share of the costs of abating the impacts on climate change they have allegedly caused through their tortious conduct.  (*Id*. at ¶ 6.)  Plaintiffs do not ask the Court to stop or regulate Defendants' emissions of fossil fuels (*id*. at ¶¶ 6, 542), and do not seek injunctive relief.

Defendants' Notice of Removal asserts the following: (1) federal question jurisdiction— that Plaintiffs' claims arise under federal common law, and that this action necessarily and unavoidably raises disputed and substantial federal issues that give rise to jurisdiction under *Grable & Sons Metal Products, Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308 (2005) ("*Grable*"); (2) complete preemption; (3) federal enclave jurisdiction; (4) jurisdiction because the allegations arise from action taken at the direction of federal officers; (5) jurisdiction under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b); and (6) jurisdiction under 28 U.S.C. § 1452(a) because the claims are related to bankruptcy proceedings.

While there are no dispositive cases from the Supreme Court, the United States Court of Appeals for the Tenth Circuit, or other United States Courts of Appeal, United States District Court cases throughout the country are divided on whether federal courts have jurisdiction over state law claims related to climate change, such as raised in this case. *Compare California* v. *BP p.l.c.* ("*CA I*"), 2018 WL 1064293 (N.D. Cal. Feb. 27, 2018); *City of Oakland* v. *BP p.l.c. ("CA II*), 325 F. Supp. 3d 1017 (N.D. Cal. June 25, 2018); *City of New York v. BP p.l.c.*, 325 F. Supp. 3d 466 (S.D.N.Y. July 19, 2018) with *State of Rhode Island v. Chevron Corp.*, 2019 WL 3282007 (D. R.I. July 22, 2019); *Mayor and City Council of Baltimore v. BP P.L.C.* ("*Baltimore*"), 2019 WL 2436848 (D. Md. June 10, 2019), *appeal docketed*, No. 19-1644 (4th Cir. June 18, 2019); and *Cnty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018), *appeal docketed*, No. 18-15499 (9th Cir. May 27, 2018).

3

**App. 199**

## II. LEGAL STANDARD

Plaintiffs' Motion to Remand is brought pursuant to 28 U.S.C. § 1447(c).  The Motion to Remand asserts that the Court lacks subject matter jurisdiction over the claims in this case, which Plaintiffs contend are state law claims governed by state law.

Federal courts are courts of limited jurisdiction, "possessing 'only that power authorized by Congress and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (citation omitted).  Thus, "[f]ederal subject matter jurisdiction is elemental."  *Firstenberg v. City of Santa Fe*, 696 F.3d 1018, 1022 (10th Cir. 2012).  "It cannot be consented to or waived, and its presence must be established" in every case in federal court.  *Id*.

Here, Defendants predicate removal on the ground that the federal court has original jurisdiction over the claims.  28 U.S.C. § 1441(a).  Diversity jurisdiction has not been invoked.  Removal is appropriate "if, but only if, 'federal subject-matter jurisdiction would exist over the claim.'"  *Firstenberg*, 696 F.3d at 1023 (citation omitted).  If a court finds that it lacks subject matter jurisdiction at any time before final judgment is entered, it must remand the case to state court.  28 U.S.C. § 1447(c).

 The burden of establishing subject matter jurisdiction is on the party seeking removal to federal court, and there is a presumption against its existence.  *Salzer v. SSM Health Care of Okla. Inc.*, 762 F.3d 1130, 1134 (10th Cir. 2014).  "Removal statutes are to be strictly construed,. . . and all doubts are to be resolved against removal."  *Fajen v. Found. Reserve Ins. Co.*, 683 F.2d 331, 333 (10th Cir. 1982).  The party seeking removal must show that jurisdiction exists by a preponderance of the evidence.  *Dutcher v. Matheson*, 840 F.3d 1183, 1189 (10th Cir. 2016).

4

**App. 200**

### III. ANALYSIS

**A.    Federal Question Jurisdiction**

Defendants first argue that federal question jurisdiction exists.  Federal question jurisdiction exists for "all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  In determining whether such jurisdiction exists, a court must "look to the 'face of the complaint'" and ask whether it is "'drawn so as to claim a right to recover under the Constitution and laws of the United States'[.]" *Firstenberg*, 696 F.3d at 1023 (quoting *Bell v. Hood*, 327 U.S. 678, 681 (1946)).

"[T]he presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule', which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (citation omitted).  Under this rule, a case arises under federal law 'only when the plaintiff's statement of his own cause of action shows that it is based' on federal law."  *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1202 (10th Cir. 2012) (citation omitted).  The court need only examine "the well-pleaded allegations of the complaint and ignore potential defenses. . . .'"  *Id*. (citation omitted).

The well-pleaded complaint rule makes "the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law."  *Caterpillar*, 482 U.S. at 392; *see also Devon Energy*, 693 F.3d at 1202 ("By omitting federal claims from a complaint, a plaintiff can generally guarantee an action will be heard in state court.") (internal quotation marks omitted).  While the plaintiff may not circumvent

5

federal jurisdiction by artfully drafting the complaint to omit federal claims that are essential to the claim, *Caterpillar*, 482 U.S. at 392, the plaintiff "can elect the judicial forum–state of federal" depending on how the plaintiff drafts the complaint. *Firstenberg*, 696 F.3d at 1023. "Neither the plaintiff's anticipation of a federal defense nor the defendant's assertion of a federal defense is sufficient to make the case arise under federal law." *Id*. (internal quotation marks omitted).

For a plaintiff's well-pleaded complaint to establish that the claims arise under federal law within the meaning of § 1331, it "must establish one of two things: 'either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on a resolution of a substantial question of federal law.'" *Firstenberg*, 696 F.3d at 1023 (citation omitted). The "creation' test" in the first prong accounts for the majority of suits that raise under federal law." *See Gunn*, 568 U.S. at 257. However, where a claim finds its origins in state law, the Supreme Court has identified a "'special and small category' of cases" in which jurisdiction lies under the substantial question prong as they "implicate significant federal interests." *Id*. at 258; *see also Grable*, 545 U.S. at 312.

Defendants argue that both prongs of federal question jurisdiction are met. The Court will address each of these arguments in turn.

1.    Whether Federal Law Creates the Cause of Action

Defendants first assert that federal question jurisdiction exists because Plaintiffs' claims arise under federal law; namely, federal common law, such that federal law creates the cause of action. The Supreme Court has "held that a few areas, involving

6

**App. 202**

'uniquely federal interests,' . . . are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts—so-called 'federal common law.'" *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988) (citations omitted); *see also Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 850 (1985). The issue must involve "an area of uniquely federal interest", and federal common law will displace state law only where "a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law,' . . or the application of state law would 'frustrate specific objectives' of federal legislation." *Boyle*, 487 U.S. at 507 (citations omitted).

Defendants assert that this case belongs in federal court because it threatens to interfere with longstanding federal policies over matters of uniquely national importance, including energy policy, environmental protection, and foreign affairs. They note that two courts have held that claims akin to those brought by Plaintiffs are governed by federal common law, citing the decisions in *CA I*, *CA II*, and *City of New York*.[1]

    a.    *Relevant Case Law*

Defendants state over the past century that the federal government has recognized that a stable energy supply is critical for the preservation of our economy

---

[1] Notably, in another case ExxonMobil appeared to argue the opposite of what it argues here: that there is no uniquely federal interest in this type of case and a suit does not require "'the application of federal common law, merely because the conflict is not confined within the boundaries of a single state.'" (*See* ECF No. 50-1 at 55–60) (citation omitted). Instead, it asserted that "only suits by [states] *implicating a sovereign interest* in abating interstate pollution give rise to federal common law." (*Id.* at 58–60) (emphasis added).

7

**App. 203**

and national security, taken steps to promote fossil fuel production, and worked to decrease reliance on foreign oil. The government has also worked with other nations to craft a workable international framework for responding to global warming. This suit purportedly challenges those decisions by requiring the court to delve into the thicket of the "worldwide problem of global warming"— the solutions to which Defendants assert for "sound reasons" should be "determined by our political branches, not by our judiciary." *See CA II*, 2018 WL 3109726, at *9.

Plaintiffs thus target *global* warming, and the transnational conduct that term entails. (ECF No. 7 ¶¶ 125–38.) Defendants contend that the claims unavoidably require adjudication of whether the benefits of fossil fuel use outweigh its costs—not just in Plaintiffs' jurisdictions, or even in Colorado, but on a global scale. They argue that these claims do not arise out of state common law. Defendants further assert that this is why similar lawsuits have been brought in federal court, under federal law, and why, when those claims were dismissed, the plaintiffs made no effort to pursue their claims in state courts. *See, e.g.*, *Am. Elec. Power Co., Inc.* v. *Connecticut* ("*AEP*"), 564 U.S. 410 (2011); *Kivalina* v. *ExxonMobil Corp.* ("*Kivalina*"), 696 F.3d 849 (9th Cir. 2012). Defendants thus contend that the court has federal question jurisdiction because federal law creates the cause of action.

The Court first addresses the cases relied on by Defendants that address similar claims involving injury from global warming, beginning its analysis with the Supreme Court's decision in *AEP*. The *AEP* plaintiffs brought suit in federal court against five domestic emitters of carbon dioxide, alleging that by contributing to global warming,

8

they had violated the federal common law of interstate nuisance, or, in the alternative, state tort law.  564 U.S. at 418 (citation omitted).  They brought both federal and state claims, and asked for "a decree setting carbon-dioxide emission for each defendant." *Id*.  The plaintiffs did not seek damages.

The Court in *AEP* stated what while there is no federal general common law, there is an "emergence of a federal decisional law in areas of national concern", the "new" federal common law.  564 U.S. at 421 (internal quotation marks omitted).  This law "addresses 'subjects within national legislative power where Congress has so directed' or where the basic scheme of the Constitution so demands."  *Id*. (citation omitted).  The Court found that environmental protection is "undoubtedly an area within national legislative power, one in which federal courts may fill in statutory interstices, and, if necessary, even fashion federal law."  *Id*. (internal quotation marks omitted).  It further stated that when the court "deal[s] with air and water in their ambient or interstate aspects, there is federal common law.'"  *Id*. (*quoting Illinois v. City of Milwaukee*, 406 US. 91, 103 (1972)).

*AEP* also found that when Congress addresses a question previously governed by federal common law, "'the need for such an unusual exercise of law-making by federal courts disappears.'"  564 U.S. at 423 (citation omitted).  The test for whether congressional legislation excludes the declaration of federal common law is "whether the statute 'speak[s] directly to [the] questions at issue."  *Id*. at 424 (citation omitted).  The Court concluded that "the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide emissions from

**App. 205**

fossil-fuel fired power plants," *i.e.,* the Clean Air Act spoke directly "to emissions of carbon dioxide from the defendants' plants." *Id*. Since it found that federal common law was displaced, *AEP* did not decide the scope of federal common law, or whether the plaintiffs had stated a claim under it. *Id.* at 423 (describing the question as "academic"). It also did not address the state law claims. *Id*. at 429.

In *Kivalina*, the plaintiffs alleged that massive greenhouse gas emissions by the defendants resulted in global warming which, in turn, severely eroded the land where the City of Kivalina sat and threatened it with imminent destruction. 696 F.3d at 853. Relying on *AEP*, the Ninth Circuit found that the Clean Air Act displaced federal common law nuisance claims for damages caused by global warming. *Id*. at 856. It recognized that "federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id*. at 855 (citing *City of Milwaukee*, 406 US. at 103). Thus, *Kivalina* stated that "federal common law can apply to transboundary pollution suits," and noted that most often such suits are, as in that case, founded on a theory of public nuisance. *Id*. The *Kivalina* court found that the case was governed by *AEP* and the finding that Congress had "directly addressed the issue of greenhouse gas commissions from stationary sources," thereby displacing federal common law. *Id*. at 856. The fact that the plaintiffs sought damages rather than an abatement of emissions did not impact the analysis, according to *Kivalina*, because "the type of remedy asserted is not relevant to the applicability of the doctrine of displacement." *Id*. at 857. The *Kivalina* court affirmed the district court's dismissal of plaintiffs' claims. *Id*. at 858.

Both *AEP* and *Kivalina* were brought in federal court and asserted federal law claims.  They did not address the viability of state claims involving climate change that were removed to federal court, as is the case here.  This issue was addressed by the United States District Court for the Northern District of California in *CA I* and *CA II*.  In the *CA* cases, the Cities of Oakland and San Francisco asserted a state law public nuisance claim against ExxonMobil and a number of other worldwide producers of fossil fuels, asserting that the combustion of fossil fuels produced by the defendants had increased atmospheric levels of carbon dioxide, causing a rise in sea levels with resultant flooding in the cities.  *CA I*, 2018 WL 1064293, at *1.  Like the instant case, the plaintiffs did not seek to impose liability for direct emissions of carbon dioxide. Instead, they alleged "that—despite long-knowing that their products posed severe risks to the global climate—defendants produced fossil fuels while simultaneously engaging in large scale advertising and public relations campaigns to discredit scientific research on global warming, to downplay the risks of global warming, and to portray fossil fuels as environmentally responsible and essential to human well-being."  *Id*.  The plaintiffs sought an abatement fund to pay for infrastructure necessary to address rising sea levels.  *Id*.

*CA I* found that the plaintiffs' state law "nuisance claims—which address the national and international geophysical phenomenon of global warming—are necessarily governed by federal common law," citing *AEP*, *City of Milwaukee*, and *Kivalina*.  *CA I*, 2018 WL 1064293, at *2–3.  It stated that, as in those cases, "a uniform standard of decision is necessary to deal with the issues," explaining:

11

**App. 207**

> If ever a problem cried out for a uniform and comprehensive solution, it is the geophysical problem described by the complaints, a problem centuries in the making (and studying) with causes [including] the combustion of fossil fuels. The range of consequences is likewise universal—warmer weather in some places that may benefit agriculture but worse weather in others, . . . and—as here specifically alleged—the melting of the ice caps, the rising of the oceans, and the inevitable flooding of coastal lands. . . . [T]he scope of the worldwide predicament demands the most comprehensive view available, which in our American court system means our federal courts and our federal common law. A patchwork of fifty different answers to the same fundamental global issue would be unworkable.

*Id*. at *3.

The *CA I* court also found that federal common law applied despite the fact that "plaintiffs assert a novel theory of liability," *i.e.,* against the *sellers* of a product rather than direct *dischargers* of interstate pollutants. *CA I*, 2018 WL 1064293, at *3 (emphasis in original). Again, that is the situation in this case. The *CA I* court stated that "the transboundary problem of global warming raises exactly the sort of federal interests that necessitate a uniform solution," which is no " less true because plaintiffs' theory mirrors the sort of state-law claims that are traditionally applied to products made in other states and sold nationally." *Id*. The court found, however, that federal common law was not displaced by the Clean Air Act and the EPA as in *AEP* and *Kivalina* because the plaintiffs there sought only to reach domestic conduct, whereas the plaintiffs' claims in *CA I* "attack behavior worldwide." *Id*. at 4. It stated that those "foreign emissions are outside of the EPA and Clean Air Acts' reach." *Id*. Nonetheless, as the claims were based in federal law, the court found that federal jurisdiction existed and denied the plaintiffs' motions to remand. *Id*. at 5.

12

In *CA II*, the court granted the defendants' motion to dismiss.  325 F. Supp. 3d at 1019.  It reaffirmed that the plaintiffs' nuisance claims "must stand or fall under federal common law," including the state law claims.  *CA II*, 325 F. Supp. 3d at 1024.  It then held that the claims must be dismissed because they ran counter to the presumption against extraterritoriality and were "foreclosed by the need for federal courts to defer to the legislative and executive branches when it comes to such international problems." *Id*. at 1024–25.  The *CA II* court concluded that "[i]t may seem peculiar that an earlier order refused to remand this action to state court on the ground that plaintiffs' claims were necessarily governed by federal law, while the current order concludes that federal common law should not be extended to provide relief."  *Id*. at 1028.  But it found "no inconsistency," as "[i]t remains proper for the scope of plaintiffs' claims to be decided under federal law, given the international reach" of the claims.  *Id*. at 1028–29.

The *City of New York* case followed the rationale of *CA I* and *CA II*, and dismissed New York City's claims of public and private nuisance and trespass against multinational oil and gas companies related to the sale and production of fossil fuels. 325 F. Supp. 3d at 471–76.  On a motion to dismiss, the court found that the City's claims were governed by federal common law, not state tort law, because they were "based on the 'transboundary' emission of greenhouse gases" which "require a uniform standard of decision."  *Id*. at 472 (citing *CA I*, 2018 WL 10649293, at *3).  It also found that to the extent the claims involved domestic greenhouse emissions, the Clean Air Act displaced the federal common law claims pursuant to *AEP.  Id.*  To the extent the claims implicated foreign greenhouse emissions, they were "barred by the presumption

**App. 209**

against extraterritoriality and the need for judicial caution in the face of 'serious foreign policy consequences.'"  *Id*. at 475 (citation omitted).  The court in *City of New York* did not address federal jurisdiction or removal jurisdiction.

In summary, the above cases suggest that claims related to the emission or sale, production, or manufacture of fossil fuels are governed by federal common law, even if they are asserted under state law, but may displaced by the Clean Air Act and the EPA.  At first blush these cases appear to support Defendants' assertion that Plaintiffs' claims arise under federal law and should be adjudicated in federal court, particularly given the international scope of global warming that is at issue.

However, the Court finds that *AEP* and *Kivalina* are not dispositive.  Moreover, while the *CA I* decision has a certain logic, the Court ultimately finds that it is not persuasive.  Instead, the Court finds that federal jurisdiction does not exist under the creation prong of federal question jurisdiction, consistent with *San Mateo* and the two most recent cases that have addressed the applicable issues, as explained below.

The Court first notes that in *AEP* and *Kivalina*, the plaintiffs expressly invoked federal claims, and removal was neither implicated nor discussed.  Moreover, both cases addressed interstate emissions, which are not at issue here.  Finally, the cases did not address whether the state law claims were governed by federal common law.  The *AEP* Court explained that "the availability *vel non* of a state lawsuit depend[ed], *inter alia*, on the preemptive effect of the federal Act," and left the matter open for consideration on remand.  564 U.S. at 429.  Thus, "[f]ar from holding (as the defendants bravely assert) that state claims related to global warming are superseded

14

**App. 210**

by federal common law, the Supreme Court [in *AIG*] noted that the question of whether such state law claims survived would depend on whether they are preempted by the federal statute that had displaced federal common law (a question the Court did not resolve)." *San Mateo*, 294 F. Supp. 3d at 937.

Moreover, while *AEP* found that federal common law governs suits brought by a state to enjoin emitters of pollution in another state, it noted that the Court had never decided whether federal common law governs similar claims to abate out-of-state pollution brought by "political subdivisions" of a State, such as in this case.  564 U.S. at 421–22.  Thus, *AEP* does not address whether state law claims, such as those asserted in this case and brought by political subdivisions of a state, arise under federal law for purposes of removal jurisdiction.  The Ninth Circuit in *Kivalina* also did not address this issue.

The Court disagrees with the finding in *CA I* that removal jurisdiction is proper because the case arises under federal common law.  *CA I* found that the well-pleaded complaint rule did not apply and that federal jurisdiction exists "if the claims necessarily arise under federal common law.  2018 WL 1064293, at *5.  It based this finding on a citation to a single Ninth Circuit case, *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1184–85 (9th Cir. 2002).  *Id*.  *Wayne*, however, recognized the well-pleaded complaint rule, and did not address whether a claim that arises under federal common law is an exception to the rule.  294 F.3d at 1183-85.  Moreover, *Wayne* cited *City of Milwaukee* in support of its finding that federal jurisdiction would exist if the claims arose under federal law.  *City of Milwaukee* was, however, filed in federal court and

15

invoked federal jurisdiction such that the well-pleaded complaint rule was not at issue.

Thus, *CA I* failed to discuss or note the significance of the difference between removal jurisdiction, which implicates the well pleaded complaint rule, and federal jurisdiction that is invoked at the outset such as in *AEP* and *Kivalina*.  This distinction was recognized by the recent decision in *Baltimore*, which involved similar state law claims as to climate change that were removed to federal court.  2019 WL 2436848, at *1.  *Baltimore* found *CA I* was "well stated and presents an appealing logic," but disagreed with it because the court looked beyond the face of the plaintiffs' well pleaded complaint.  *Id*. at *7–8.  It also noted that *CA I* "did not find that the plaintiffs' state law claims fell within either of the carefully delineated exceptions to the well-pleaded complaint rule—*i.e.*, that they were completely preempted by federal law or necessarily raised substantial, disputed issues of federal law."  *Id*. at *8.  *Baltimore* found that the well-pleaded complaint rule was plainly not satisfied in that case because the City did not plead any claims under federal law.  *Id*. at *6.

      b.    *The Well-Pleaded Complaint Rule as Applied to Plaintiffs' Claims*

In a case that is removed to federal court, the presence or absence of federal-question jurisdiction is governed by the well-pleaded complaint rule, which gives rise to federal jurisdiction only when a federal question is presented on the face of the complaint.  *Caterpillar*, 482 U.S. at 392.  The Tenth Circuit has held that to support removal jurisdiction, "the required federal right or immunity must be an essential element of the plaintiff's cause of action, and . . . the federal controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for

16

removal." *Fajen*, 683 F.2d at 333 (citation and internal quotation marks omitted).

In this case, the Complaint on its face pleads only state law claims and issues, and no federal law or issue is raised in the allegations.  While Defendants argue that the Complaint raises inherently federal questions about energy, the environment, and national security, removal is not appropriate under the well-pleaded complaint rule because these federal issues are not raised or at issue in Plaintiffs' claims.  A defendant cannot transform the action into one arising under federal law, thereby selecting the forum in which the claim will be litigated, as to do so would contradict the well-pleaded complaint rule.  *Caterpillar*, 489 U.S. at 399.  Defendants, "in essence, want the Court to peek beneath the purported state-law facade of the State's public nuisance claim, see the claim for what it would need to be to have a chance at viability, and convert it to that (i.e., into a claim based on federal common law) for purposes of the present jurisdiction analysis."  *State of Rhode Island*, 2019 WL 3282007, at *2. That court found nothing in the artful-pleading doctrine which sanctioned the defendants' desired outcome.  *Id*.

Defendants cite no controlling authority for the proposition that removal may be based on the existence of an unplead federal common law claim—much less based on one that is questionable and not settled under controlling law.  Defendants rely on the Supreme Court's holding that the statutory grant of jurisdiction over cases arising under the laws of the United States "will support claims founded upon federal common law." *Nat'l Farmers Union Ins. Cos.*, 471 U.S. at 850–53.  However, the plaintiffs invoked federal jurisdiction in that case.  The same is true in other cases cited by Defendants,

17

including *City of Milwaukee* and *Boyle*, both of which were filed by plaintiffs in federal court and invoked federal jurisdiction.  *See, e.g.*, *State of Rhode Island*, 2019 WL 3282007, at *2 n. 2 (*Boyle* "does not help Defendants" as it "was not a removal case, but rather one brought in diversity"); *Arnold by and Through Arnold v. Blue Cross & Blue Shield*, 973 F. Supp. 726, 737 (S.D. Tex. 1997) (*Boyle* did not address removal jurisdiction, nor did it modify the *Caterpillar* rule that federal preemption of state law, even when asserted as an inevitable defense to a . . . state law claim, does not provide a basis for removal"), *overruled on other grounds*, *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1997).  Removal based on federal common law being implicated by state claims was not discussed or sanctioned in Defendants' cases.

A thoughtful analysis of the limits that removal jurisdiction poses on federal question jurisdiction was conducted in *E. States Health & Welfare Fund v. Philip Morris, Inc.*, 11 F. Supp. 2d 384 (S.D.N.Y. 1998).  That court noted that removal jurisdiction is "a somewhat different animal than original federal question jurisdiction—i.e., where the plaintiff files originally in federal court."  *Id*. at 389.  It explained:

> When a plaintiff files in federal court, there is no clash between the principle that the plaintiff can control the complaint—and therefore, the choice between state and federal forums—and the principle that federal courts have jurisdiction over federal claims; the plaintiff, after all, by filing in a federal forum is asserting reliance upon both principles, and the only question a defendant can raise is whether plaintiff has a federal claim.

> On the other hand, when a plaintiff files in state court and purports to only raise state law claims, for the federal court to assert jurisdiction it has to look beyond the complaint and partially recharacterize the plaintiffs' claims—which places the assertion of jurisdiction directly at odds with the principle of plaintiff as the master of the complaint.  It is for this reason that removal jurisdiction must be viewed with a somewhat more skeptical eye; the

> fact that a plaintiff in one case chooses to bring a claim as a federal one and thus invoke federal jurisdiction does not mean that federal *removal* jurisdiction will lie in an identical case if the plaintiff chooses not to file a federal claim.

*Id*. at 389–90.  The Court agrees with this well-reasoned analysis.

The cases cited by Defendants from other jurisdictions that found removal of state law claims to federal court was appropriate because the claims arose under or were necessarily governed by federal common law are not persuasive.  *See Wayne*, 294 F.3d at 1184–85; *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 926 (5th Cir. 1997); *CA I*, 2018 WL 1064293, at *2; *Blanco v. Fed. Express Corp*., No. 16-561, 2016 WL 4921437, at *2–3 (W.D. Okla. Sept. 15, 2016).  Those cases contradict *Caterpillar* and the tenets of the well-pleaded complaint rule.  They also fail to cite any Supreme Court or other controlling authority authorizing removal based on state law claims implicating federal common law.  While many of those cases relied on *City of Milwaukee* as authority for their holdings, the plaintiff in that case invoked federal common law and federal jurisdiction.  *City of Milwaukee* does not support a finding that a defendant can create federal jurisdiction by re-characterizing a state claim.

c.    *Ordinary Preemption*

Ultimately, Defendants' argument that Plaintiffs' state law claims are governed by federal common law appears to be a matter of ordinary preemption which—in contrast to complete preemption, which is discussed in Section III.B, *infra*,–would not provide a basis for federal jurisdiction.  *See Geddes v. Am. Airlines, Inc.*, 321 F.3d 1349, 1352

(11th Cir. 2003) (cited with approval in *Devon Energy*, 693 F.3d at 1203).[2] "Ordinary preemption 'regulates the interplay between federal and state laws when they conflict or appear to conflict . . . .'" *Baltimore*, 2019 WL 2436848, at *6 (citation omitted). The distinction between ordinary and complete preemption "is important because if complete preemption does not apply, but the plaintiff's state law claim is arguably preempted . . . the district court, being without removal jurisdiction, cannot resolve the dispute regarding preemption." *Colbert v. Union Pac. R. Co.*, 485 F. Supp. 2d 1236, 1243 (D. Kan. 2007) (internal quotation marks omitted).

When ordinary preemption applies, the federal court "'lacks the power to do anything other than remand to the state court where the preemption issue can be addressed and resolved.'" *Colbert*, 485 S. Supp. 2d at 1243 (citation omitted). Ordinary preemption is thus a defense to the complaint, and does not render a state-law claim removable to federal court. *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1221 (10th Cir. 2011); *see also Caterpillar*, 482 U.S. at 392–93 (under the well-pleaded complaint rule, courts must ignore potential defenses such as preemption).

Thus, the fact that a defendant asserts that federal common law is applicable "does not mean the plaintiffs' state law claims 'arise under' federal law for purposes of jurisdictional purposes." *E. States Health*, 11 F. Supp. 2d at 394. As that court explained, "[c]ouch it as they will in 'arising under' language, the defendants fail to explain why their assertion that federal common law governs . . . is not simply a

---

[2] The three forms of preemption that are frequently discussed in judicial opinions—express preemption, conflict preemption, and field preemption—are characterized as ordinary preemption. *Devon Energy*, 693 F.3d at 1203 n. 4.

20

preemption defense which, while it may very well be a winning argument on a motion to dismiss in the state court, will not support removal jurisdiction." *Id*.

This finding is consistent with the decision in *Baltimore*. The court there found the defendants' assertion that federal question jurisdiction existed because the City's nuisance claim "is in fact 'governed by federal common law'" was "'a cleverly veiled [ordinary] preemption argument." *Baltimore*, 2019 WL 2436848, at *6 (citing *Boyle*, 487 U.S. at 504). As the *Baltimore* defendants' argument amounted to an ordinary preemption defense, it did "not allow the Court to treat the City's public nuisance claim as if it had been pleaded under federal law for jurisdictional purposes." *Id*. The court also found that the *CA I* ruling was "at odds with the firmly established principle that ordinary preemption does not give rise to federal question jurisdiction." *Id*. at *8.

Because an ordinary preemption defense does not support remand, Defendants' federal common law argument could only prevail under the doctrine of complete preemption. Unlike ordinary preemption, complete preemption "is so 'extraordinary' that it 'converts an ordinary state law common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar*, 482 U.S. at 393 (citation omitted).

2. <u>Whether Plaintiffs' Right to Relief Necessarily Depends on Resolution of a Substantial Question of Federal Law (*Grable* Jurisdiction)</u>

Defendants also argue that federal jurisdiction exists under the second prong of the "arising under" jurisdiction, as Plaintiffs' claims necessarily depend on a resolution of a substantial question of federal law under *Grable*. They contend that the Complaint

raises federal issues under *Grable* "because it seeks to have a court determine for the entire United States, as well as Canada and other foreign actors, the appropriate balance between the production, sale, and use of fossil fuels and addressing the risks of climate change."  (ECF No. 1 ¶ 37.)  Such an inquiry, according to Defendants, "necessarily entails the resolution of substantial federal questions concerning important federal regulations, contracting, and diplomacy."  (*Id*.)  Thus, they assert that the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing . . . federal and state judicial responsibilities."  *Grable*, 545 U.S. at 313–14.

The substantial question doctrine "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."  *Grable*, 545 U.S. at 312.  To invoke this branch of federal question jurisdiction, the Defendants must show that "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn*, 568 U.S. at 258.

Jurisdiction under the substantial question doctrine "is exceedingly narrow—a special and small category of cases."  *Firstenberg*, 696 F.3d at 1023 (citation and internal quotation marks omitted).  "[M]ere need to apply federal law in a state-law claim will not suffice to open the 'arising under' door" of jurisdiction.  *Grable*, 545 U.S. at 313.  Instead, "'federal jurisdiction demands not only on a contested federal issue, but a

22

substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum.'" *Id*. (citation omitted).

   a.  *Necessarily Raised*

   The Court finds that the first prong of substantial question jurisdiction is not met because Plaintiffs' claims do not necessarily raise or depend on issues of federal law. The discussion of this issue in *Baltimore* is instructive.  In that case, the defendants contended that *Grable* jurisdiction existed because the claims raised a host of federal issues.  *Baltimore*, 2019 WL 2436848, at *9.  For example, the defendants asserted that the claims "'intrude upon both foreign policy and carefully balanced regulatory considerations at the national level, including the foreign affairs doctrine.'" *Id*. (citation omitted).  They also asserted that the claims "'have a significant impact on foreign affairs,' 'require federal-law-based cost-benefit analyses,'" and "'amount to a collateral attack on federal regulatory oversight of energy and the environment.'" *Id*. (citation omitted).  These allegations are almost identical to what Defendants assert in this case. (*See* ECF No. 48 at 22—"Plaintiffs' claims gravely impact foreign affairs"; 24—"Plaintiffs' claims require reassessment of cost-benefit analyses committed to, and already conducted by the Government"; 26—the claims "are a collateral attack on federal regulatory oversight of energy and the environment").

   *Baltimore* found that these issues were not "'necessarily raised' by the City's claims, as required for *Grable* jurisdiction."  2019 WL 2436848, at *9–10.  As to the alleged significant effect on foreign affairs, the court agreed that "[c]limate change is certainly a matter of serious national and international concern."  *Id*. at *10.  But it found

that defendants did "not actually identify any foreign policy that was implicated by the City's claims, much less one that is necessarily raised." *Id*. "They merely point out that climate change '*has* been the subject of international negotiations for decades.'" *Id*. *Baltimore* found that "defendants' generalized references to foreign policy wholly fail to demonstrate that a federal question is 'essential to resolving' the City's state law claims." *Id*. (citation omitted).

The Court finds the analysis in *Baltimore* equally persuasive as to Defendants' reliance on foreign affairs in this case, as they point to no specific foreign policy that is essential to resolving the Plaintiffs' claims. Instead, they cite only generally to non-binding, international agreements that do not apply to private parties, and do not explain how this case could supplant the structure of such foreign policy arrangements. Certainly Defendants have not shown that any interpretation of foreign policy is an essential element of Plaintiffs' claims. *Gilmore v. Weatherford*, 694 F.3d 1160, 1173 (10th Cir. 2012).

The *CA I* and *City of New York* decisions do not support Defendants' argument that the foreign policy issues raise substantial questions of law. Defendants note, for example, that the *City of New York* court dismissed the claims there on the merits "for severely infring[ing] upon the foreign-policy decisions that are squarely within the purview of the political branches of the U.S. Government." 325 F. Supp. 3d at 476. But as Defendants have acknowledged, at least at this stage of these proceedings, the Court is not considering the merits of Plaintiffs' claims or whether they would survive a motion to dismiss, only whether there is a basis for federal jurisdiction. (*See* ECF No. 1

24

¶ 20.)  While *CA I* and *City of New York* may ultimately be relevant to whether Plaintiffs'

claims should be dismissed, they do not provide a basis for *Grable* jurisdiction.  *See*

*Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation*, 770 F.3d 944, 948

(10th Cir. 2014) (federal law that is alleged as a barrier to the success of a state law

claim "is not a sufficient basis from which to conclude that the questions are

'necessarily raised'") (citation omitted).

     *Baltimore* also rejected cost-benefit analysis and collateral attack arguments as a

basis for *Grable* jurisdiction, finding that they "miss[ ] the mark."  2019 WL 2436848, at

*10.  This is because the nuisance claims were, as here, based on the "extraction,

production, promotion, and sale of fossil fuel products without warning consumers and

the public of their known risks", and did "not rely on any federal statutes or regulations"

or violations thereof.  *Id*.  "Although federal laws and regulations governing energy

production and air pollution may supply potential defenses," the court found that federal

law was "plainly not an element" of the City's state law nuisance claims.  *Id*.

      The same analysis surely applies here.  Plaintiffs' state law claims do not have

as an element any aspect of federal law or regulations.  Plaintiffs do not allege that any

federal regulation or decision is unlawful, or a factor in their claims, nor are they asking

the Court to consider whether the government's decisions to permit fossil fuel use and

sale are appropriate.

     As to jurisdiction under *Grable*, the Baltimore court concluded that, "[t]o be sure,

there are federal *interests* in addressing climate change."  2019 WL 2436848, at *11

(emphasis in original).  "Defendants have failed to establish, however, that a federal

25

*issue* is a 'necessary element' of the City's state law claims." *Id.* (citation omitted) (emphasis in original). Thus, even without considering the remaining requirements for *Grable* jurisdiction, the *Baltimore* court rejected the defendants' assertion that the case fell within "the 'special and small category' of cases in which federal question jurisdiction exists over a state law claim. *Id.* (citation omitted).

Two other courts have recently arrived at the same conclusion. The court in *State of Rhode Island* found that the defendants had not shown that federal law was "'an element and an essential one, of the [State]'s cause[s] of action.'" 2019 WL 3282007, at *4 (citation omitted). Instead, the court noted that the State's claims "are thoroughly state-law claims", and "[t]he rights, duties, and rules of decision implicated by the complaint are all supplied by state law, without reference to anything federal." *Id.* The court concluded:

> By mentioning foreign affairs, federal regulations, and the navigable waters of the United States, Defendants seek to raise issues that they may press in the course of this litigation, but that are not perforce presented by the State's claims. . . .These are, if anything, premature defenses, which even if ultimately decisive, cannot support removal.

*Id.* (internal citations omitted).

Similarly, the court in *San Mateo* found that the defendants had not pointed to a specific issue of federal law that necessarily had to be resolved to adjudicate the state law claims. 294 F. Supp. 3d at 938. Instead, "the defendants mostly gesture to federal law and federal concerns in a generalized way." *Id.* The court found that "[t]he mere potential for foreign policy implications", the "mere existence of a federal regulatory regime", or the possibility that the claims involved a weighing of costs and benefits did

26

not raise the kind of actually disputed, substantial federal issue necessary for *Grable* jurisdiction.  *Id*.  *San Mateo* concluded, "[o]n the defendants' theory, many (if not all) state tort claims that involve the balancing of interests and are brought against federally regulated entities would be removable", and "*Grable* does not sweep so broadly."  *Id*.

The Court agrees with the well-reasoned analyses in *Baltimore*, *State of Rhode Island*, and *San Mateo*, and adopts the reasoning of those decisions.  To the extent Defendants raise other issues not addressed in those cases, the Court finds that they also are not necessarily raised in Plaintiffs' Complaint.

Defendants here assert that Plaintiffs' claims raise a significant issue under *Grable* because they attack the decision of the federal government to enter into contracts with Defendant ExxonMobil to develop and sell fossil fuels.  (ECF No. 1 ¶ 43.) Further, they argue that the Complaint seeks to deprive the federal government of a mechanism for carrying out vital governmental functions, and frustrates federal objectives.  (*Id*. ¶ 44.)

Plaintiffs' claims, however, assert no rights under the contracts referenced by Defendants.  Nor do they challenge the contracts' validity, or require a court to interpret their meaning or importance.  The Complaint does not even mention the contracts. Defendants' argument appears to be based solely on their unsupported speculation about the potential impact that Plaintiffs' success would have on the government's ability to continue purchasing fossil fuels.  (*Id*. ¶¶ 43–44.)  Even if Defendants' speculation was well-founded, this would be relevant only to the substantiality prong of the *Grable* analysis.  *See Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 910 (10th Cir.

27

2007).  Defendants have not established the first requirement—that the issue is necessarily raised by the Plaintiffs.

  b.  *Substantiality*

The Court also finds that the second prong, substantiality, is not met.  To determine substantiality, courts "look[] to whether the federal law issue is central to the case."  *Gilmore*, 694 F.3d at 1175.  Courts distinguish "between 'a nearly pure issue of law' that would govern 'numerous' cases and issues that are 'fact-bound and situation-specific.'"  *Id*. at 1174 (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700–11 (2006)).  When a case "'involve[s] substantial questions of state as well as federal law,' this factor weighs against asserting federal jurisdiction."  *Id.* at 1175 (citation omitted).

The Court finds that the issues raised by Defendants are not central to Plaintiffs' claims, and the claims are "rife with legal and factual issues that are not related" to the federal issues.  *See Stark-Romero v. Nat'l R.R. Passenger Co. (Amtrak)*, No. CIV-09-295, 2010 WL 11602777, at *8 (D.N.M. Mar. 31, 2010).  This case is quite different from those where jurisdiction was found under the substantial question prong of jurisdiction.  For example, in *Grable*, "the meaning of the federal statute . . . appear[ed] to be the only legal or factual issue contested in the case."  545 U.S. at 315.  Similarly, in a Tenth Circuit case finding jurisdiction under *Grable*, "construction of the federal land grant" at issue "appear[ed] to be the only legal or factual issue contested in the case."  *Nicodemus v. Union Pac. Corp.,* 440 F.3d 1227, 1236 (10th Cir. 2006).  Here, it is plainly apparent that the federal issues raised by Defendants are not the only legal or

28

factual issue contested in the case. Plaintiffs' claims also do not involve a discrete legal question, and are "fact-bound and situation-specific," unlike *Grable*. *See Empire Healthchoice Assurance*, 547 U.S. at 701; *Bennett*, 484 F.3d at 910–11. Finally, the case does not involve a state-law cause of action that "is 'brought to enforce' a duty created by [a federal statute]," where "the claim's very success depends on giving effect to a federal requirement." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning*, ___ U.S. ___, 136 S. Ct. 1562, 1570 (2016).

The cases relied upon by Defendants are distinguishable, as Plaintiffs have shown in their briefing. For example, while Defendants cite *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), that case involved preemption under the Supremacy Clause because of a conflict between a state law and Congress's imposition of sanctions. It did not address *Grable* jurisdiction, and thus does not support Defendants' assertion that it is "irrelevant" to the jurisdictional issue that the "foreign agreements are not 'essential elements of any claim.'" (ECF No. 48 at 23.)

Based on the foregoing, the Court finds that federal jurisdiction does not exist under the second prong of the "arising under" jurisdiction, because Plaintiffs' claims do not  necessarily depend on a resolution of a substantial question of federal law. As Defendants have not met the first two prongs of the test for such jurisdiction under *Grable*, the Court need not address the remaining prongs.

**B.    Jurisdiction Through Complete Preemption**

Defendants also rely on the doctrine of complete preemption to authorize removal. Defendants argue that Plaintiffs' claims are completely preempted by the

government's foreign affairs power and the Clean Air Act, which they claim govern the United States' participation in worldwide climate policy efforts and national regulation of GHG emissions.

The complete preemption doctrine is an "independent corollary'" to the well-pleaded complaint rule. *Caterpillar*, 482 U.S. at 393. "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted claim is considered, from its inception, a federal claim, and therefore arises under federal law." *Id*. The complete preemption exception to the well-pleaded complaint rule is "quite rare," *Dutcher*, 733 F.3d at 985, representing "extraordinary pre-emptive power." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987). The Supreme Court and the Tenth Circuit have only recognized statutes as the basis for complete preemption. *See, e.g.*, *Caterpillar*, 482 U.S. at 393 (the doctrine "is applied primarily in cases raising claims pre-empted by § 301 of the" Labor Management Relations Act ("LMRA")); *Devon Energy*, 693 F.3d at 1204–05 (complete preemption is "so rare that the Supreme Court has recognized compete preemption in only three areas: § 301 of the [LMRA], § 502 of [the Employee Retirement Income Security Act]," and actions for usery under the National Bank Act).

Complete preemption is ultimately a matter of Congressional intent. Courts must decipher whether Congress intended a statute to provide the exclusive cause of action. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 9 (2003); *Metro. Life Ins. Co.*, 481 U.S. at 66 ("the touchstone of the federal district court's removal jurisdiction is not the 'obviousness' of the pre-emption defense, but the intent of Congress"). If

Congress intends preemption "completely to displace ordinarily applicable state law, and to confer federal jurisdiction thereby, it may be expected to make that atypical intention clear." *Empire Healthchoice Assurance*, 547 U.S. at 698.

"Thus, a state claim may be removed to federal courts in only two circumstances": "when Congress expressly so provides,. . . or when a federal statute wholly displaces the state law cause of action through complete pre-emption." *Beneficial Nat'l Bank*, 539 U.S. at 8. The court must ask, first, whether the federal question at issue preempts the state law relied on by the plaintiff and, second, whether Congress intended to allow removal in such a case, as manifested by the provision of a federal cause of action. *Devon Energy*, 693 F.3d at 1205.

     1.     <u>Complete Preemption Based on Emissions Standards</u>

Defendants argue that Congress allows parties to seek stricter nationwide emissions standards by petitioning the EPA, which is the exclusive means by which a party can seek such relief. *See* 42 U.S.C. § 7426(b). They assert that Plaintiffs' claims go far beyond the authority that the Clean Air Act reserves to states to regulate certain emissions within their own borders; Plaintiffs seek instead to impose liability for global emissions. Because these claims do not duplicate, supplement, or supplant federal law, *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209 (2004), Defendants argue they are completely preempted.

The Court rejects Defendants' argument. First, Defendants mischaracterize Plaintiffs' claims. Plaintiffs do not challenge or seek to impose federal emissions regulations, and do not seek to impose liability on emitters. They are also not seeking

31

**App. 227**

review of EPA regulatory actions related to GHGs, even those emissions created by the burning of Defendants' products, and are not seeking injunctive relief. Plaintiffs sue for harms caused by Defendants' sale of fossil fuels. The Clean Air Act is silent on that issue; it does not remedy Plaintiffs' harms or address Defendants' conduct. And neither EPA action, nor a cause of action against EPA, could provide the compensation Plaintiffs seek for the injuries suffered as a result of Defendants' actions.

For a statute to form the basis for complete preemption, it must provide a "replacement cause of action" that "substitute[s]" for the state cause of action. *Schmeling v. NORDAM*, 97 F.3d 1336, 1342–43 (10th Cir. 1996). "[T]he federal remedy at issue must vindicate the same basic right or interest that would otherwise be vindicated under state law." *Devon Energy*, 693 F.3d at 1207. The Clean Air Act provides no federal cause of action for damages, let alone one by a plaintiff claiming economic losses against a private defendant for tortious conduct. Moreover, the Clean Air Act expressly preserves many state common law causes of action, including tort actions for damages. *See* 42 U.S.C. § 7604(e) ("Nothing in this section shall restrict any right . . . under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief"). From this, it is apparent that Congress did not intend the Act to provide exclusive remedies in these circumstances, or to be a basis for removal under the complete preemption doctrine.

To the extent Defendants rely on *AEP*, the Supreme Court there held only that the Clean Air Act displaced federal common law nuisance action related to climate change; it did not review whether the Clean Air Act would preempt state nuisance law.

32

**App. 228**

564 U.S. at 429. In fact, the Court stated that "[n]one of the parties have briefed preemption or otherwise addressed the availability of a claim under state nuisance law," and the Court thus left "the matter open for consideration" by the state court on remand. *Id*. Every court that has considered complete preemption in this type of climate change case has rejected it, including the Baltimore, *State of Rhode Island*, and *San Mateo* courts.

In *Baltimore*, the court stated that while the Clean Air Act provides for private enforcement in certain situations, there was "an absence of any indication that Congress intended for these causes of action . . . to be the exclusive remedy for injuries stemming from air pollution." 2019 WL 2436848, at *13. To the contrary, it noted that the Clean Air Act "contains a savings clause that specifically preserves other causes of action." *Id*.

Similarly, the *State of Rhode Island* court stated, "statutes that have been found to completely preempt state-law causes of action . . . all do two things: They 'provide[] the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action.'" 2019 WL 3282007, at *3 (citation omitted). The court found that the defendants failed to show that the Clean Air Act does these things, and stated that "[a]s far as the Court can tell, the [Act] authorizes nothing like the State's claims, much less to the exclusion of those sounding in state law." *Id*. Further, it noted that the Act "itself says that controlling air pollution is 'the primary responsibility of States and local governments,'" and that the Act has a savings clause for citizen suits. *Id*. at *3–4 (citation omitted). The court concluded:

33

A statute that goes so far out of its way to preserve state prerogatives cannot be said to be an expression of Congress's 'extraordinary pre-emptive power' to convert state-law claims into federal-law claims. *Metro. Life Ins. Co.*, 481 U.S. at 65. No court has so held, and neither will this one.

*Id*. at *4.

Finally, the *San Mateo* court noted that the defendants did "not point to any applicable statutory provision that involves complete preemption." 294 F. Supp. 3d at 938. To the contrary, the Clean Air Act and the Clean Water Act both contain savings clauses that preserve state causes of action and suggest that Congress did not intend the federal causes of action under those statutes 'to be exclusive.'" *Id*. (citations omitted).

Other courts have held similarly, rejecting federal jurisdiction on the basis of complete preemption of state law claims by the Clean Air Act. The United States District Court for the Southern District of New York held that the Clean Air Act did not completely preempt the plaintiffs' state law claims for temporary nuisance, trespass, and negligence arising from alleged contamination from a steel mill, and thus did not provide a basis for federal jurisdiction. *Keltner v. SunCoke Energy, Inc.*, 2015 WL 3400234, at *4–5 (S.D. Ill. May 26, 2015). Similarly, the Northern District of Alabama found that federal jurisdiction did not exist because the Clean Air Act did not completely preempt the plaintiff's state law claims arising out of the operation of a coke plant. *Morrison v. Drummond Co.*, 2013 WL 1345721, at *3–4 (N.D. Ala. Mar. 23, 2015). *See also Cerny v. Marathon Oil Corp.*, 2013 WL 5560483, at *3–8 (W.D. Tex. Oct. 7, 2013) (complete preemption did not apply to the plaintiffs' state law claims arising from the

34

defendants' oil field operations so as to create federal jurisdiction).

While Defendants argue that Plaintiffs are attempting to do indirectly what they could not do directly, *i.e.,* "regulate the conduct of out-of-state sources," *Int'l Paper Co. v. Oulette*, 479 U.S. 481, 495 (1987), that is not an accurate characterization of the Plaintiffs' claims.  Plaintiffs do not seek to regulate the conduct of the Defendants or their emissions, nor do they seek injunctive relief to induce Defendants to take action to reduce emissions.  Defendants also rely on *Oulette* in arguing that suits such as this seeking damages, whether punitive or compensatory, can compel producers to "adopt different or additional means of pollution control" than those contemplated by Congress's regulatory scheme.  479 U.S. at 498 n.19.  For these reasons, Defendants assert that the Supreme Court recognized in *Oulette* that damages claims against producers of interstate products would be "irreconcilable" with the Clean Water Act (which Defendants analogize to the Clean Air Act), and the uniquely federal interests involved in regulating interstate emissions.  *Id.*

*Oulette* appears to involve only ordinary preemption, however, as there is no discussion of complete preemption.[3]  The same is true of another case relied on by Defendants, *North Carolina v. Tenn. Valley Auth.*, 615 F.3d 291 (4th Cir. 2010). Indeed, the Fourth Circuit stated that it "need not hold flatly that Congress has entirely preempted the field of emissions regulation."  *Id.* at 302.  Moreover, *Oulette* allowed state law claims based on the law of the source state under the saving clause, since the

---

[3] "Complete preemption is a term of art for an exception to the well-pleaded complaint rule."  *Meyer v. Conlon*, 162 F.3d 1264, 1268 n. 2 (10th Cir. 1998).  The Tenth Circuit has held that the doctrines of ordinary and complete preemption are not fungible.  *Id.*

35

Clean Water Act expressly allows source states to enact more stringent standards. 479 U.S. at 498–99.

Here, Defendants have not cited to any portion of the Clean Air Act or other statute that regulates the conduct at issue or allows states to enact more stringent regulations, such that similar restrictions on application of state law would apply. And Plaintiffs note that there no federal programs that govern or dictate how much fossil fuel Defendants produce and sell, or whether they can mislead the public when doing do. Plaintiffs assert that the EPA does not determine how much fossil fuel is sold in the United States or how it is marketed, nor does it issue permits to companies that market or sell fossil fuels. Rather, the EPA regulates sources that emit pollution and sets emission "floors," which states can exceed. *See* 42 U.S.C. § 7416. Defendants have not shown that the conduct alleged in this case conflicts with any of those efforts.

Plaintiffs' claims also do not relate to or impact Defendants' emissions, and the claims for monetary relief presents no danger of inconsistent state (or state and federal) emission standards. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489 n. 7 (2008) ("private claims for economic injury do not threaten similar interference with federal regulatory goals," unlike cases where nuisance claims seeking injunctive relief amounted to arguments for discharge standards different that those provided by statute). In any event, the issues raised by Defendants need to be resolved in connection with an ordinary preemption defense, a matter that does not give rise to federal jurisdiction.

36

2.    <u>Complete Preemption Based on the Foreign Affairs Doctrine</u>

Defendants also argue that complete preemption is appropriate based on the foreign affairs doctrine.  They assert that litigating inherently transnational activities intrudes on the government's foreign affairs power.  See *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 418 (2003) ("[S]tate action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state [action], and hence without any showing of conflict.").

 Defendants also cite *California v. GMC*, 2007 WL 2726871, at *14 (N.D. Cal. Sept. 17, 2007) (dismissing claims where the government "ha[d] made foreign policy determinations regarding the [U.S.'s] role in the international concern about global warming," and stating, a "global warming nuisance tort would have an inextricable effect on . . . foreign policy"); *CA II*, 2018 WL 3109726, at *7 ("[n]uisance suits in various United States judicial districts regarding conduct worldwide are far less likely to solve the problem and, indeed, could interfere with reaching a worldwide consensus."); and *New York City*, 2018 WL 3475470, at *6 ("[T]he City's claims are barred by the presumption against extraterritoriality and the need for judicial caution in the face of serious foreign policy consequences.").  Complete preemption is implicated, according to Defendants, because the government has exclusive power over foreign affairs.

The Court finds that Defendants' argument is without merit.  First, none of the above cases cited by Defendants dealt with or addressed complete preemption, and they do not support Defendants' arguments.  The Supreme Court in *Garamendi* discussed only conflict or field preemption.  539 U.S. at 419.  As the *Baltimore* court

37

**App. 233**

noted, those types of preemption are "forms of ordinary preemption that serve only as federal defenses to a state law claim." 2019 WL 2436848, at *5 (internal quotation marks omitted). In addition, the *GMC, CA II*, and *City of New York* cases did not address preemption at all, and certainly not complete preemption as providing a basis for removal jurisdiction.

Moreover, *Garamendi* is distinguishable. It dealt with the executive authority of the President to decide the policy regarding foreign relations and to make executive agreements with foreign countries or corporations. 539 U.S. at 413–15. The Court found that federal executive power preempted state law where, as in that case, "there is evidence of clear conflict between the policies adopted by the two." *Id*. at 420–21. The Court stated, "[t]he question relevant to preemption in this case is conflict, and the evidence here is 'more than sufficient to demonstrate that the state Act stands in the way of [the President's] diplomatic objectives.'" *Id*. at 427 (citation omitted). Here, no executive action is at issue, and Defendants have not demonstrated a clear conflict between Plaintiffs' claims and any particular foreign policy.

Accordingly, Defendants have not met their burden of showing that complete preemption applies based on the foreign affairs doctrine. While they suggest there might be an unspecified conflict with some unidentified specific policy, they have not shown that Congress expressly provided for complete preemption under the foreign-affairs doctrine, or that a federal statute wholly displaces the state law cause of action on this issue. *Beneficial Nat'l Bank*, 539 U.S. at 8.

The Court's finding that the foreign affairs doctrine does not completely preempt

38

**App. 234**

Plaintiffs' claims is also supported by the *Baltimore* and *State of Rhode Island* cases.

In *Baltimore*, the court held that the foreign affairs doctrine is "inapposite in the complete preemption context."  2019 WL 2436848, at *12.  It explained that "complete preemption occurs only when Congress intended for federal law to provide the 'exclusive cause of action' for the claim asserted."  *Id*.  "That does not exist here."  *Id*.  "That is, there is no congressional intent regarding the preemptive force of the judicially-crafted foreign affairs doctrine, and the doctrine obviously does not supply any substitute causes of action."  *Id*.  The *State of Rhode Island* court also rejected complete preemption under the foreign affairs doctrine, relying on *Baltimore* and finding the argument to be "without a plausible legal basis."  2019 WL 3282007, at *4 n. 3.

       3.    <u>Complete Preemption Under Federal Common Law</u>

Finally, while Defendants do not rely on federal common law as the basis for their complete preemption argument, federal common law would not provide a ground for such preemption.  As one court persuasively noted, "[w]hen the defendant asserts that federal common law preempts the plaintiff's claim, there is no congressional intent which the court may examine—and therefore congressional intent to make the action removable to federal court cannot exist."  *Merkel v. Fed. Express Corp.*, 886 F. Supp. 561, 566 (N.D. Miss. 1995) (emphasis omitted); *see also Singer v. DHL Worldwide Express, Inc.*, No. 06-cv-61932, 2007 U.S. Dist. LEXIS 37120, at *13-14 (S.D. Fla. May 22, 2007) (same).

Based on the foregoing, the Court rejects complete preemption as a basis for federal jurisdiction.

39

C.    **Federal Enclave Jurisdiction**

Causes of action "which arise from incidents occurring in federal enclaves" may also be removed as a part of federal question jurisdiction.  *Akin* v. *Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998).  "The United States has power and exclusive authority 'in all Cases whatsoever . . . over all places purchased' by the government 'or the erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings.'" *Id*. (quoting U.S. Const. art. I, § 8, cl. 17.)  These are federal enclaves within which the United States has exclusive jurisdiction.  *Id*.

Here, Plaintiffs seek relief for injuries occurring "within their respective jurisdictions" (ECF No. 7 ¶ 4), and allege that they "do not seek damages or abatement relief for injuries to or occurring on federal lands."  (*Id.* at ¶ 542.)  Plaintiffs assert that ends the inquiry.  *See, e.g.*, *Washington v. Monsanto Co.,* 274 F. Supp. 3d 1125, 1132 (W.D. Wash. 2017) (because plaintiff "assert[ed] that it does not seek damages for contamination to waters and land within federal territory, . . . none of its claims arise on federal enclaves").

Defendants argue, however, that Plaintiffs have alleged injuries in federal enclaves including: (i) an insect infestation across Rocky Mountain National Park (ECF No. 7 ¶183), that Defendants assert is partially within Boulder County; (ii) increased flood risk in the San Miguel River in San Miguel County (*id.* ¶¶ 31, 236), which Defendants assert is located in the Uncompahgre National Forest ("Uncompahgre"); and (iii) "heat waves, wildfires, droughts, and floods" which Defendants assert occur in Rocky Mountain National Park and Uncompahgre (*id.* ¶¶ 3, 162–63).  Plaintiffs do not

40

dispute that Rocky Mountain National Park and Uncompahgre are federal enclaves, but argue that the injury they have alleged did not occur there such that there is no federal enclave jurisdiction.

The Court finds that Defendants have not met their burden of showing that subject matter jurisdiction exists under the federal enclave doctrine. Uncompahgre National Forest is not mentioned in the Complaint. Rocky Mountain National Park is referenced only as a descriptive landmark (*see* ECF No. 7 ¶¶ 20, 30, 35), and to provide an example of the regional trends that have resulted from Defendants' climate alteration. (*Id.* ¶ 183.) The actual injury for which Plaintiffs seek compensation is injury to "their property" and "their residents," occurring "within their respective jurisdictions." (*See, e.g., id*. ¶¶ 1-4, 10, 11, 532-33.) They specifically allege that they "**do not** seek damages or abatement relief for injuries to or occurring to federal lands." (*Id*. ¶ 542 (emphasis in original).)

"[T]he location where Plaintiff was injured" determines whether "the right to removal exists." *Ramos v. C. Ortiz Corp.*, 2016 WL 10571684, at *3 (D.N.M. May 20, 2016). It is not the defendant's conduct, but the injury, that matters. *See Akin,* 156 F.3d at 1034–35 & n.5 (action against chemical manufacturers fell within enclave jurisdiction where the claimed exposure to the chemicals, not their manufacture or sale, "occurred within the confines" of U.S. Air Force base); *Baltimore*, 2019 WL 2436848, at *15 ("courts have only found that claims arise on federal enclaves, and thus fall within federal question jurisdiction, when all or most of the pertinent events occurred there").

Federal enclave jurisdiction thus does not exist here because Plaintiffs' claims

41

and injuries are alleged to have arisen exclusively on non-federal land.  That the alleged climate alteration by Defendants may have caused similar injuries to federal property does not speak to the nature of Plaintiffs' alleged injuries for which they seek compensation, and does not provide a basis for removal.  *See State of Rhode Island*, 2019 WL 3282007, at *5 (finding no federal enclave jurisdiction because while federal land that met the definition of a federal enclave in Rhode Island and elsewhere "may have been the site of Defendants' activities, the State's claims did not arise there, especially since its complaint avoids seeking relief for damages to any federal lands"); *Baltimore*, 2019 WL 2436848, at *15 ("The Complaint does not contain any allegations concerning defendants' conduct on federal enclaves and in fact, it expressly defines the scope of injury to exclude any federal territory . . . . [I]t cannot be said that federal enclaves were the 'locus' in which the City's claims arose merely because one of the twenty-six defendants . . . conducted some operations on federal enclaves for some unspecified period of time.").

**D.     Federal Officer Jurisdiction**

Defendants also argue that removal is appropriate under 28 U.S.C. § 1442 because the conduct that forms the basis of Plaintiffs' claims was undertaken at the direction of federal officers.  Section 1442(a)(1) provides that a civil action that is commenced in a State Court may be removed to the district court of the United States if the suit is "against or directed to . . . the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agent thereof in an official or individual capacity, for or related to any act under color of such

42

office. . . ."

For § 1442(a)(1) to constitute a basis for removal, a private corporation must show: "(1) that it acted under the direction of a federal officer; (2) that there is a causal nexus between the plaintiff's claims and the acts the private corporation performed under the federal officer's direction; and (3) that there is a colorable federal defense to the plaintiff's claims." *Greene v. Citigroup, Inc.*, 2000 WL 647190, at *6 (10th Cir. May 19, 2000). "The words 'acting under' are broad," and § 1442(a)(1) must be construed liberally. *Watson* v. *Phillip Morris Co., Inc.*, 551 U.S. 142, 147 (2007). "At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969).

Thus, the federal officer removal statute should not be read in a "narrow" manner, nor should the policy underlying it "be frustrated by a narrow, grudging interpretation." *Willingham*, 395 U.S. at 406; *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999). Under the statute, "suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Acker*, 527 U.S. at 431. Such jurisdiction is thus an exception to the rule that the federal question ordinarily must appear on the face of a properly pleaded complaint. *Id*. "Federal jurisdiction rests on a 'federal interest in the matter', . . . the very basic interest in the enforcement of federal law through federal officials." *Willingham*, 395 U.S. at 406.

Private actors invoking the statute bear a special burden of establishing the

43

official nature of their activities.  *See Freiberg v. Swinerton & Walberg Prop. Servs.*, 245 F. Supp. 2d 1144, 1150 (D. Colo. 2002).  The federal officer removal statute "authorizes removal by private parties 'only' if they were 'authorized to act with or for [federal officers or agents] in affirmatively executing duties under . . . federal law." *Watson*, 551 U.S. at 151 (quoting *City of Greenwood v. Peacock*, 384 U.S. 808, 824 (1966)).  "That relationship typically involves 'subjection, guidance, or control.'" *Id*. (citation omitted).  "[T]he private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id*. at 152 (emphasis in original).  This "does *not* include simply *complying* with the law." *Id*. (emphasis in original).  As the *Watson* court stated:

> it is a matter of statutory purpose. When a company subject to a regulatory order (even a highly complex order) complies with the order, it does not ordinarily create a significant risk of state-court "prejudice.". . . . Nor is a state-court lawsuit brought against such a company likely to disable federal officials from taking necessary action to enforce federal law. . . . Nor is such a lawsuit likely to deny a federal forum to an individual entitled to assert a federal claim of immunity.

*Id*. (internal citations omitted).

Here, Defendants assert that the conduct at issue in Plaintiffs' claims was undertaken, in part, while acting under the direction of federal officials.  Specifically, Defendants assert that federal officers exercised control over ExxonMobil through government leases issued to it.  (*See* ECF No. 1 ¶¶ 60, 69, 70–73, Exs. B and C.)  Under these leases, ExxonMobil contends that it was required to explore, develop, and produce fossil fuels.  (ECF No 1, Ex. C § 9.)

For example, Defendants assert that leases related to the outer Continental

Shelf ("OCS") obligated ExxonMobil to diligently develop the leased area, which included—under the direction of Department of the Interior ("DOI") officials—carrying out exploration, development, and production activities for the express purpose of maximizing the ultimate recovery of hydrocarbons from the leased area.[4]  Defendants argue that those leases provide that ExxonMobil "*shall*" drill for oil and gas pursuant to government-approved exploration plans (ECF No. 1, Ex. C § 9), and that the DOI may cancel the leases if ExxonMobil does not comply with federal terms governing land use. Given these directives and obligations, Defendants submit that ExxonMobil has acted under a federal officer's direction within the meaning of § 1442(a)(1).

The Court rejects Defendants' argument, finding that Defendants have not shown that they acted under the direction of a federal officer, or that there is a causal connection between the work performed under the leases and Plaintiffs' claims.  The federal leases were commercial leases whereby ExxonMobil contracted "for the exclusive right to drill for, develop, and produce oil and gas resources. . . ." (*See* ECF No. 1, Ex. B, p. 1)   While the leases require that ExxonMobil, like other OCS lessees, comply with federal law and regulations (*see* ECF No. 1, Ex. B ¶ 10, Ex. C §§ 10, 11), compliance with federal law is not enough for "acting under" removal, even if the company is "subjected to intense regulation."  *Watson*, 551 U.S. at 152-53.  Defendants also point to the fact that the leases require the timely drilling of wells and production

---

[4] Defendants cite *California* v. *Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981) (the Outer Continental Shelf Lands Act "has an objective—the expeditious development of OCS resources").  They further note that the Secretary of the Interior must develop serial leasing schedules that "he determines will best meet national energy needs for the five-year period" following the schedule's approval.  43 U.S.C. §1344(a).

(ECF No. 1, Ex. B ¶ 10, Ex. C §§ 10, 11), but the government does not control the manner in which Defendants drill for oil and gas, or develop and produce the product.

Similarly, Defendants have not shown that a federal officer instructed them how much fossil fuel to sell or to conceal or misrepresent the dangers of its use, as alleged in this case. They also have not shown that federal officer directed them to market fossil fuels at levels they knew would allegedly cause harm to the environment. At most, the leases appear to represent arms-length commercial transactions whereby ExxonMobil agreed to certain terms (that are not in issue in this case) in exchange for the right to use government-owned land for their own commercial purposes. Defendants have not shown that this is sufficient for federal officer jurisdiction. Defendants have also not shown that this lawsuit is "likely to disable federal officers from taking necessary action designed to enforce federal law", or "to deny a federal forum to an individual entitled to assert a federal claim of immunity." *Watson*, 551 U.S. at 152.

To the extent Defendants claim there is jurisdiction because ExxonMobil is "helping the government to produce an item that it needs," *Watson*, 551 U.S. at 153, this also does not suffice to provide jurisdiction in this Court. Federal officer jurisdiction requires an "unusually close" relationship between the government and the contractor. In *Watson*, the Supreme Court noted an example of a company that produced a chemical for the government for use in a war. *Id*. (discussing *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998)). As *Winters* explained in more detail, the Defense Department contracted with chemical companies "for a specific

46

mixture of herbicides, which eventually became known as Agent Orange"; required the companies to produce and provide the chemical "under threat of criminal sanctions"; "maintained strict control over the development and subsequent production" of the chemical; and required that it "be produced to its specifications." 149 F.3d at 398–99. The circumstances in *Winters* were far different than the circumstances in this case, and Defendants have thus not shown an unusually close relationship between ExxonMobil and the government.

Defendants also cite no support for their assertion that the government "specifically dictated much of ExxonMobil's production, extraction, and refinement of fossil fuels" (ECF No. 48 at 35), much less that it rises to the level of government control set forth in *Winters*. As Plaintiffs note, under Defendants' argument, "any state suit against a manufacturer whose product has at one time been averted and adapted for [government] use . . . would potentially be subject to removal, seriously undercutting the power of state courts to hear and decide basic tort law." *See Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 951 (E.D.N.Y. 1992).

*Baltimore* also counsels against finding federal jurisdiction under the federal officer removal statute. It found that the defendants failed plausibly to show that the charged conduct was carried out "for or relating to" the alleged official authority, as they did not show "that a federal officer controlled their total production and sales of fossil fuels, nor is there any indication that the federal government directed them to conceal the hazards of fossil fuels or prohibited them from providing warnings to consumers." *Baltimore*, 2019 WL 2436848, at *17. The court concluded, "[c]ase law makes clear

that this attenuated connection between the wide array of conduct for which defendants have been sued and the asserted official authority is not enough to support removal under § 1442(a)." *Id.*; *see also State of Rhode Island*, 2019 WL 3282007, at *5 (finding no causal connection between any actions Defendants took while "acting under" federal officers or agencies, and thus no grounds for federal-officer removal); *San Mateo*, 294 F. Supp. 3d at 939 (defendants failed to show a "causal nexus" between the work performed under federal direction and the plaintiffs' claims for injuries stemming from climate change because the plaintiffs' claims were "based on a wider range of conduct").

E.    **Jurisdiction Under the Outer Continental Shelf Lands Act**

Defendants next argue that Plaintiffs' claims arise out of Defendants' operations on the OCS. Federal courts have jurisdiction "of cases and controversies rising out of, or in connection with (A) any operation conducted on the [OCS] which involves exploration, development, or production of the minerals, of the subsoil and seabed of the [OCS], or which involves rights to such minerals. . . ." 43 U.S.C. § 1349(b)(1). When assessing jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), courts consider whether "(1) the activities that caused the injury constituted an operation conducted on the [OCS] that involved the exploration and production of minerals, and (2) the case arises out of, or in connection with the operation." *In Re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (internal quotation marks omitted).

Here, Defendants assert that jurisdiction is established because the case arises

48

out of or in connection with an operation conducted on the OCS in connection with the OCSLA leasing program in which ExxonMobil participated.  Plaintiffs seek potentially billions of dollars in abatement funds that inevitably would, according to Defendants, discourage OCS production and substantially interfere with the congressionally mandated goal of recovery of the federally-owned minerals.  ExxonMobil has participated in the OCSLA leasing program for decades, and continues to conduct oil and gas operations on the OCS.  By making all of Defendants' conduct the subject of their lawsuit, Defendants argue that Plaintiffs necessarily sweep in ExxonMobil's activities on the OCS.  Plaintiffs purportedly do not dispute that ExxonMobil operates extensively on the OCS, and Plaintiffs' claims do not distinguish between fossil fuels extracted from the OCS and those found elsewhere.  Thus, Defendants assert that at least some of the activities at issue arguably came from an operation conducted on the OCS.  The Court rejects Defendants' argument, as they have not shown that the case arose out of, or in connection with an operation conducted on the OCS.

The Court agrees with Plaintiffs that for jurisdiction to lie, a case must arise directly out of OCS operations.  For example, courts have found OCSLA jurisdiction where a person is injured on an OCS oil rig "exploring, developing or producing oil in the subsoil and seabed of the continental shelf." *Various Plaintiffs v. Various Defendants ("Oil Field Cases")*, 673 F. Supp. 2d 358, 370 (E.D. Pa. 2009); where oil was spilled from such a rig, *Deepwater Horizon*, 745 F.3d at 162, or in contract disputes directly relating to OCS operations, *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1225 (5th Cir. 1985); *cf. Fairfield Indus., Inc. v. EP Energy E&P Co.*,

2013 WL 12145968, at *5 (S.D. Texas May 2, 2013) (finding claims involving performance of contracts "would not influence activity on the OCS, nor require either party to perform physical acts on the OCS", and that the claims thus did not "have a sufficient nexus to an operation on the OCS to fall within the jurisdictional reach of OCSLA").  The fact that some of ExxonMobil's oil was apparently sourced from the OCS does not create the required direct connection.

As the *Baltimore* court found, "[e]ven under a 'broad' reading of the OCSLA jurisdictional grant endorsed by the Fifth Circuit [in *Deepwater Horizon*], defendants fail to demonstrate that OCSLA jurisdiction exists."  2019 WL 2436848, at *16. "Defendants were not sued merely for producing fossil fuel products, let alone for merely producing them on the OCS."  *Id*.  "Rather, the City's claims are based on a broad array of conduct, including defendants' failure to warn consumers and the public of the known dangers associated with fossil fuel products, all of which occurred globally."  *Id*.  The defendants there offered "no basis to enable th[e] Court to conclude that the City's claims for injuries stemming from climate change would not have occurred but for defendants' extraction activities on the OCS."  *Id.*; *see also San Mateo*, 294 F. Supp. 3d at 938–39 ("Removal under OCSLA was not warranted because even if some of the activities that caused the alleged injuries stemmed from operations on the [OCS], the defendants have not shown that the plaintiffs' causes of action would not have accrued *but for* the defendants' activities on the shelf" (emphasis in original)).

Defendants cite no case authority holding that injuries associated with downstream uses of OCS-derived oil and gas products creates OCSLA jurisdiction.

The cases cited by Defendants instead involved a more direct connection. *See*, *e.g., Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988) (finding that the exercise of take-or-pay rights, minimum-take rights, or both, by Sea Robin necessarily and physically had an immediate bearing on the production of the particular well at issue, "certainly in the sense of the volume of gas actually produced", and would have consequences as to production of the well).

Moreover, as Plaintiffs note, jurisdiction under OCSLA makes little sense for injuries in a landlocked state that are alleged to be caused by conduct that is not specifically related to the OCS. No court has read OCSLA so expansively. Defendants' argument would arguably lead to the removal of state claims that are only "tangentially related" to the OCS. *See Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co.*, 46 F. Supp. 3d 701, 704–05 (S.D. Texas 2014) (recognizing that the "but-for" test articulated by the Fifth Circuit in the *Deepwater Horizon* case "is not limitless," and that "a blind application of this test would result in federal court jurisdiction over all state law claims even tangentially related to offshore oil production on the OCS"; "Defendants' argument that the 'but-for' test extends jurisdiction to any claim that would not exist but for offshore production lends itself to absurd results").

The downstream impacts of fossil fuels produced offshore also does not create jurisdiction under OCSLA because Plaintiffs do not challenge conduct on any offshore "submerged lands." 43 U.S.C. § 1331(a). Defendants' argument that there is federal jurisdiction if any oil *sourced* from the OCS is some *part* of the conduct that creates the injury would, again, dramatically expand the statute's scope. Any spillage of oil or

51

gasoline involving some fraction of OCS-sourced oil—or any commercial claim over

such a commodity—could be removed to federal court.  It cannot be presumed that

Congress intended such an absurd result.  Plaintiffs' claims concern Defendants'

overall conduct, not whatever unknown fraction of their fossil fuels was produced on the

OCS.  No case holds removal is appropriate if some fuels from the OCS *contribute* to

the harm.  A case cannot be removed under OCSLA based on speculative impacts;

immediate and physical impact is needed.  *See Amoco Prod. Co.*, 844 F.2d at

1222–23.  Accordingly, the Court does not have jurisdiction under OCSLA.

## F.    Jurisdiction as the Claims Relate to Bankruptcy Proceedings

Finally, Defendants argue that this Court has jurisdiction and this action is

removable because Plaintiffs' claims are related to bankruptcy proceedings within the

meaning of 28 U.S.C. §§ 1452(a).  Subject to certain exceptions, that statute allows a

party to remove any claim or cause of action in a civil action . . . to the district court

where such civil action is pending, if such district court has jurisdiction of such claim or

cause of action under section 1334 of this title."  Section 1334(b) of the Bankruptcy

Code states that "the district courts shall have original but not exclusive jurisdiction of all

civil proceedings arising under title 11, or arising in or related to cases under title 11."

The Tenth Circuit has held that an action is "related to" bankruptcy if it "'could

conceivably have any effect on the estate being administered in bankruptcy.'"  *In re*

*Gardner*, 913 F.2d 1515, 1518 (10th Cir. 1990) (citation omitted).  "Although the

proceeding need not be against the debtor or his property, the proceeding is related to

the bankruptcy if the outcome could alter the debtor''s rights, liabilities, options, or

52

freedom of action in any way, thereby impacting on the handling and administration of the bankruptcy estate." *Id*. Removal is proper even after a bankruptcy plan has been confirmed if the case would impact a creditor's recovery under the reorganization plan. *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1233, 1237 (10th Cir. 1998).

Defendants assert that Plaintiffs' claims relate to ongoing bankruptcy proceedings because they could impact the estates of other bankrupt entities that are necessary and indispensable parties to this case. They note in that regard that 134 oil and gas producers filed for bankruptcy in the United States between 2015 and 2017. Peabody Energy and Arch Coal ("Peabody"), in particular, is alleged to have emerged from Chapter 11 bankruptcy in 2016. Defendants argue that the types of claims brought by Plaintiffs are irreconcilable with the "implementation," "execution," and "administration" of Peabody's "confirmed plan," citing *In Re Wiltshire Courtyard*, 729 F.3d 1279, 1289 (9th Cir. 2013). Defendants thus assert that this case is related to a bankruptcy proceeding and is therefore removable.

The Court, too, rejects Defendants' final argument. As the Ninth Circuit noted in the *Wiltshire Courtyard* case, "'to support jurisdiction, there must be a close nexus connecting a proposed [bankruptcy proceeding] with some demonstrable effect on the debtor or the plan of reorganization.'" 729 F.3d at 1289 (citation omitted). "[A] close nexus exists between a post-confirmation matter and a closed bankruptcy proceeding sufficient to support jurisdiction when the matter 'affect[s] the interpretation, implementation, consummation, execution, or administration of the confirmed plan.'" *Id*. (citation omitted).

53

**App. 249**

Here, none of the Defendants have  filed for bankruptcy.  To the extent Defendants argue that this case may effect other oil and gas producers who filed for bankruptcy, including Peabody or other unspecified bankrupt entities, this is entirely speculative.  Defendants have not shown any nexus, let alone a close nexus, between the claims in this case and a bankruptcy proceeding.  Thus, Defendants offer no evidence of how Plaintiffs' claims relate to any estate or affect any creditor's recovery, including Peabody.  Defendants suggest bankrupt entities are indispensable parties, but joint tortfeasors are not indispensable.  *See Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990).  Nor would it matter if Defendants have third-party claims against bankruptcy estates.  *See Pacor, Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984); *Union Oil Co. of California v. Shaffer*, 563 B.R. 191, 198–200 (E.D. La. 2016).  Plaintiffs do not seek any relief from a debtor in bankruptcy, advantage over creditors, or to protect any interest in the debtor's property.  *City & Cnty. of San Francisco v. PG & E Corp.*, 433 F.3d 1115, 1124–25 (9th Cir. 2006).  Thus, Defendants have failed to show that jurisdiction is proper under the bankruptcy removal statute.

As discussed in *Baltimore*, "Defendants fail to demonstrate that there is a 'close nexus' between this action and any bankruptcy proceedings . . . at most, defendants have only established that some day a question *might* arise as to whether a previous bankruptcy discharge precludes the enforcement of a portion of the judgment in this case against" the defendant.  2019 WL 2436848, at *19 (emphasis in original).  "This remote connection does not bring this case within the Court's "related to" jurisdiction under 28 U.S.C. § 1334(b).  *Id*.

54

**App. 250**

Moreover, one of the exceptions to removal are proceedings "by a governmental unit to enforce such governmental unit's police or regulatory powers."  28 U.S.C. § 1452(a).  *Baltimore* noted that an action such as this where the plaintiffs "assert claims for injuries stemming from climate change" are actions "on behalf of the public to remedy and prevent environmental damage, punish wrongdoers, and deter illegal activity."  2019 WL 2436848, at *19.  It found that "[a]s other courts have recognized, such an action falls squarely within the police or regulatory exception to § 1452."  *Id.* *See also Rhode Island*, 2019 WL 3282007, at *5; *San Mateo*, 294 F. Supp. 3d at 939. This Court agrees and adopts the *Baltimore* court's analysis on this point.  Accordingly, removal is also inappropriate because this case is a proceeding "by a governmental unit to enforce such governmental unit's police or regulatory powers."  28 U.S.C.  § 1452.

## IV. CONCLUSION

Plaintiffs' claims implicate important issues involving global climate change caused in part by the burning of fossil fuels.  While Defendants assert, maybe correctly, that this type of case would benefit from a uniform standard of decision, they have not met their burden of showing that federal jurisdiction exists.  Accordingly, the Court ORDERS as follows:

1.    Defendants' Motion to Reschedule Oral Argument on Plaintiffs' Motion to Remand (ECF No. 67) is DENIED.

2.    Plaintiffs' Motion to Remand (ECF No. 34) is GRANTED; and

3.    The Clerk shall REMAND this case to Boulder County District Court, and shall terminate this action.

Dated this 5th day of September, 2019.

BY THE COURT:

_____
William J. Martínez
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

BOARD OF COUNTY
COMMISSIONERS OF BOULDER
COUNTY; BOARD OF COUNTY
COMMISSIONERS OF SAN MIGUEL
COUNTY; and CITY OF BOULDER,

        Plaintiff,

        v.

SUNCOR ENERGY (U.S.A.) INC.;
SUNCOR ENERGY SALES INC.;
SUNCOR ENERGY INC.; and
EXXON MOBIL CORPORATION,

        Defendants.

Case No. 1:18-cv-1672-WJM-SKC

## **NOTICE OF APPEAL**

PLEASE TAKE NOTICE that defendants Suncor Energy (U.S.A.) Inc., Suncor Energy

Sales Inc., Suncor Energy Inc., and Exxon Mobil Corporation appeal to the United States Court of

Appeals for the Tenth Circuit from the order granting plaintiffs' motion to remand the case to state

court, entered September 5, 2019 (ECF No. 69).

        Respectfully submitted,

September 6, 2019

        By: */s/ Kannon K. Shanmugam*

        Kannon K. Shanmugam
        PAUL, WEISS, RIFKIND, WHARTON &
        GARRISON LLP
        2001 K Street, N.W.
        Washington, DC 20006-1047
        Telephone: (212) 223-7300
        Fax: (212) 223-7420
        E-mail: kshanmugam@paulweiss.com

**App. 253**

Theodore V. Wells, Jr.
Daniel J. Toal
Jaren Janghorbani
Nora Ahmed
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: twells@paulweiss.com
E-mail: dtoal@paulweiss.com
E-mail: jjanghorbani@paulweiss.com
E-mail: nahmed@paulweiss.com

Colin G. Harris
FAEGRE BAKER DANIELS LLP
1740 Walnut St., Suite 300
Boulder, CO 80302
Telephone: (303) 447-7700
Fax: (303) 447-7800
E-mail: colin.harris@FaegreBD.com

*Attorneys for Defendant Exxon Mobil Corporation*

By: */s/* Hugh Q. Gottschalk
Hugh Q. Gottschalk
Evan Bennett Stephenson
WHEELER TRIGG O'DONNELL LLP
370 17th Street, Suite 4500
Denver Colorado 80202
303-244-1800
gottschalk@wtotrial.com
stephenson@wtotrial.com

*Attorneys for Defendants,*
*Suncor Energy (U.S.A.) Inc., Suncor Energy Sales*
*Inc., and Suncor Energy Inc.*

2

**App. 254**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-01672-WJM-SKC

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY;
BOARD OF COUNTY COMMISSIONERS OF SAN MIGUEL COUNTY; and
CITY OF BOULDER,

      Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC.;
SUNCOR ENERGY SALES INC.;
SUNCOR ENERGY INC.; and
EXXON MOBIL CORPORATION,

      Defendants.

---

**ORDER**

---

This matter is before the Court on Defendants' Motion for a Stay of the Remand Order Pending Appeal filed September 13, 2019 (ECF No. 75).  Defendants seek to stay this Court's Order of September 5, 2019 (ECF No. 69) that granted Plaintiffs' Motion to Remand and ordered that the case be remanded to Boulder County District Court, Colorado.  Plaintiffs filed a response to the motion on September 19, 2019 (ECF No. 77), and Defendants filed a Reply on September 23, 2019 (ECF No. 78).  For the reasons explained below, Defendants' Motion for a Stay of the Remand Order Pending Appeal is denied.

**I. BACKGROUND**

Plaintiffs filed suit in Boulder County asserting state law claims of public nuisance, private nuisance, trespass, unjust enrichment, violation of the Colorado

**App. 255**

Consumer Protection Act, and civil conspiracy.  The claims arise from Plaintiffs' contention that they face substantial and rising costs to protect people and property within their jurisdictions from the dangers of climate alteration.  Plaintiffs allege that Defendants substantially contributed to climate alteration through selling fossil fuels and promoting their unchecked use while concealing and misrepresenting their dangers.  Plaintiffs seek monetary damages from Defendants, requiring them to pay their *pro rata* share of the costs of abating the impacts on climate change they have allegedly caused through their tortious conduct.

Defendants filed a Notice of Removal (ECF No. 1) on June 29, 2018.  Plaintiffs filed a Motion to Remand (ECF No. 34) on July 30, 2018.

The Court recognized in its Order granting Plaintiffs' Motion to Remand that Plaintiffs' claims implicate important issues involving climate change caused in part by the burning of fossil fuels.  (ECF No. 69 at 55.)  It found, however, that Defendants did not meet their burden of showing that federal jurisdiction exists on the six grounds upon which they based their removal: (1) federal question jurisdiction—that Plaintiffs' claims arise under federal common law, and that this action necessarily and unavoidably raises disputed and substantial federal issues that give rise to jurisdiction under *Grable & Sons Metal Products, Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308 (2005); (2) complete preemption; (3) federal enclave jurisdiction; (4) jurisdiction because the allegations arise from action taken at the direction of federal officers; (5) jurisdiction under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b); and (6) jurisdiction under 28 U.S.C. § 1452(a) because the claims are related to bankruptcy proceedings.

2

**App. 256**

Defendants assert that the Court should stay its remand order pending an appeal to the United States Court of Appeals for the Tenth Circuit. They note that courts have disagreed about whether climate change tort claims necessarily arise under federal common law, permitting removal to federal court. They further note that after the filing of the notice of appeal in this case, cases presenting this disputed question are now pending in four federal courts of appeals.

Defendants argue in support of their motion that the conflict of authority on this complex legal question and the state of climate change litigation nationwide justify the entry of a stay of this Court's remand order pending the appeal. Such a stay will protect Defendants' appellate rights while providing the Tenth Circuit with an opportunity to weigh in on issues that other federal courts of appeals are considering. Defendants argue that the lack of a stay, by contrast, will irreparably harm them because they will be subject to duplicative proceedings in federal and state court, and could effectively lose their right to appeal. Finally, Defendants argue that given the nature of Plaintiffs' claims related to climate change and the public interests involved, the balance of harms tilts decidedly in Defendants' favor.

## II. ANALYSIS

### A.    The Jurisdictional Grounds Subject to Appellate Review

"Generally speaking, federal courts of appeals may not review district court remand orders." *BP Am., Inc. v. Oklahoma ex rel. Edmondson*, 613 F.3d 1029, 1032 (10th Cir. 2010). This is mandated by 28 U.S.C. § 1447(d), which states that "[a]n order remanding a case to the State court from which is was removed is not reviewable on

3

**App. 257**

appeal or otherwise." Section 1447(d) "generally prohibits appellate review of remand orders based on a district court's lack of subject matter jurisdiction," as here. *City and Council of Baltimore v. BP P.L.C.* [*"Baltimore"*], 2019 WL 3464667, at *3 (D. Md. July 31, 2019) (citing *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 230 (2007). Congress's purpose in limiting appellate review of remand orders in § 1447(d) "is to avoid 'prolonged litigation on threshold nonmerits questions.'" *Id.* (quoting *Powerex*, 551 U.S. at 237.) As the *Baltimore* court noted, "[t]his rule is strict; it bars review 'even if the remand order is manifestly, inarguably erroneous,' . . . and even if the 'erroneous remand[ ] has undesirable consequences' for federal interests." *Id.* (quoting *Powerex Corp.*, 551 U.S. at 237; *In Re Norfolk S. Ry. Co.*, 756 F.3d 282, 287 (4th Cir. 2014)).

Based on the foregoing, appellate review would be foreclosed as to almost every basis under which Defendants relied in their Notice of Removal based on the Court's finding of lack of subject matter jurisdiction. Section 1447(d) does, however, contain exceptions to the bar of appellate review for claims brought under 28 U.S.C. §§ 1442 and 1443. Here, since Defendants asserted federal officer jurisdiction under § 1442, an appeal of the remand order is appropriate on that ground. Defendants argue that since an appeal is appropriate as to federal officer jurisdiction, the United States Court of Appeals of the Tenth Circuit may review the entire order and all grounds for removal addressed there. Plaintiffs argue, on the other hand, that the remaining grounds for removal other than federal officer jurisdiction are plainly unreviewable pursuant to § 1447(d).

4

There is a split of authority on that issue, and the Tenth Circuit has not definitively decided the issue. Eight Circuits have found, consistent with Plaintiffs' argument, that appellate jurisdiction is limited to the portion of the remand order tied to an express exception in § 1447(d).[1] *Accord Baltimore*, 2019 WL 3464667, at *4 (noting majority rule in holding that "only the issue of federal officer removal would be subject to review on defendants' appeal of the remand"). The Tenth Circuit also found to this effect in an unpublished decision. *Sanchez v. Onuska*, 1993 WL 307897, at *1 (10th Cir. 1993) ("the portion of the remand order in this case concerning the § 1441(c) removal is not reviewable and must be dismissed for lack of jurisdiction"). Only the Sixth and Seventh Circuits have found that the entire order is reviewable in that instance.[2] This Court finds it likely that the Tenth Circuit will follow the weight of authority and find that the only ground subject to appeal is federal officer jurisdiction under § 1442, consistent with its unpublished opinion in *Sanchez*.

---

[1] *See City of Walker v. Louisiana*, 877 F.3d 563, 567 n.2 (5th Cir. 2017); *Jacks v. Meridian Res. Co., LLC,* 701 F.3d 1224, 1229 (8th Cir. 2012); *Alabama v. Conley,* 245 F.3d 1292, 1293 n.1 (11th Cir. 2001); *State Farm Mutual Auto. Ins. Co. v. Baasch*, 644 F.2d 94, 96, 97 (2d Cir. 1981); *Davis v. Glanton*, 107 F.3d 1044, 1047 (3d Cir. 1997); *Noel v. McCain*, 538 F.2d 633, 635 (4th Cir. 1976); *Appalachian Volunteers, Inc. v. Clark*, 432 F.2d 530, 534 (6th Cir. 1970); *Patel v. Del Taco Inc,* 446 F.3d 996, 998 (9th Cir. 2006).

[2] *See Lu Junhong v. Boeing Co.*, 792 F.3d 805, 813 (7th Cir. 2015); *Mays* v. *City of Flint*, 871 F.3d 437, 442 (6th Cir. 2017). The Sixth Circuit in *Mays* did not, however, acknowledge a previous Sixth Circuit decision in *Appalachian Volunteers, Inc. v. Clark*, 432 F.3d 530, 534 (6th Cir. 1970), that followed the majority rule, and the parties conceded in *Mays* that the entire remand order was reviewable. Another decision cited by Defendants, *Decatur Hosp. Auth. v. Aetna Health, Inc.*, 854 F.3d 292 (5th Cir. 2017), does not necessarily support their argument. *Decatur* held only that a remand based on a *procedural defect* (timeliness) was reviewable in its entirety where it included a Section 1442 argument. *Id.* at 296. *Decatur* acknowledged that the court "cannot review a remand order (or a portion thereof) expressly based on a Section 1447(c) ground when the basis for removal is a statute that, like Section 1441, Section 1447(d) does not specifically exempt from Section 1447(c)'s bar."

Defendants rely, however, on the Tenth Circuit's decision in *Coffey v. Freeport McMoran Copper & Gold,* 581 F.3d 1240, 1247 (10th Cir. 2009), arguing it "strongly suggests" the Tenth Circuit would review the Court's "entire order" (ECF No. 75 at 6). They also rely on the Supreme Court's decision in decision in *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996). The Court finds these cases unpersuasive.

Unlike *Sanchez,* which turned on the Tenth Circuit's reading of Section 1447(d), *Coffey* analyzed the language in the Class Action Fairness Act ("CAFA"). CAFA provides that "notwithstanding section 1447(d), a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand." 581 F.3d at 1247 (quoting 28 U.S.C. § 1453(c)(1)). *Coffey* observed that § 1453(c)(1) contained "no language limiting the court's consideration solely to the CAFA issues in the remand order," and expressly authorized appellate review. *Id*. Here, by contrast, the plain language of Section 1447(d) makes remand orders "not reviewable," with two narrow exceptions.

Further, even though the Tenth Circuit in *Coffey* found it had discretion to review the whole order, it declined to do so, reasoning that since there would have been no appellate jurisdiction over the remand order absent the CAFA issue, review of the non-CAFA issue would "not fit within the reasons behind §1453(c)(2)," *i.e.* to "develop a body of appellate law interpreting [CAFA] without unduly delaying the litigation of class actions." *Id. Accord Parson v. Johnson & Johnson*, 749 F.3d 879, 892-93 (10th Cir. 2014) (declining to exercise discretion to review non-CAFA basis of remand order in part because "absent our jurisdiction over the CAFA remand order, there would have

6

**App. 260**

been no freestanding appellate jurisdiction to review the district court's ruling on diversity jurisdiction"). Thus, *Coffey* suggests the Tenth Circuit would be unlikely to review aspects of a remand order that would otherwise be unreviewable.

In *Yamaha*, the Supreme Court addressed the question whether, in an interlocutory appeal under 28 U.S.C. § 1292(b), a court of appeals could review only the particular question certified by the district court, or could instead address any issue encompassed in the district court's certified order. The Court concluded that a court of appeals may address "any issue fairly included within the certified order," and not only the particular question certified. *Yamaha*, 516 U.S. at 205. It observed that "the text of § 1292(b) indicates" that "appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Id.* It is questionable whether this analysis would apply to § 1447(d), as § 1292(b) expressly authorizes appellate review of orders certified by the district court, while § 1447(d) explicitly bars review of any kind, with only two specified, narrow exceptions.

Also, as the Tenth Circuit noted in *Coffey*, *Yamaha*'s holding that appellate jurisdiction extended to the entire order certified for interlocutory appeal (rather than the particular issue certified) was discretionary. *Coffey*, 581 F.3d at 1247 ("the appellate court *may* address any issue fairly included within the certified order") (quoting *Yamaha,* 516 U.S. at 205) (emphasis added). So even if Defendants are correct that *Yamaha* authorizes the Tenth Circuit to review issues beyond the federal officer statute, *Yamaha* does not require such consideration. And *Coffey* suggests that the Tenth Circuit is unlikely to go beyond review of the issue that gives it jurisdiction. That suggestion

seems particularly apt in this case given the fact that there are so many substantive arguments for jurisdiction which would need to be addressed.  Unlike the situation in *Junhong*, where 'the marginal delay from adding an extra issue to case where the time for briefing, argument, and decision has already been accepted" would be small, 792 F.3d at 813, the time needed to address the numerous additional jurisdictional issues presented in this case would be significant.

**B.      Whether a Stay of the Remand Order is Appropriate**

The power to grant a stay pending review of an appeal has been described as "part of a court's 'traditional equipment for the administrative of justice.'"  *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citation omitted).  It is "'firmly imbedded in our judicial system,' . . . and 'a power as old as the judicial system.'"  *Id.* (citation omitted).  Similarly, the power to "hold an order in abeyance" is "inherent", and allows a court "to act responsibly."  *Id*. at 426–27.

On the other hand, a court "may not resolve a conflict between considered review and effective relief by reflexively holding a final order in abeyance pending review."  *Nken*, 556 U.S. at 427.  "A stay is an 'intrusion into the ordinary processes of administrative and judicial review' . . . and accordingly 'is not a matter of right, even if irreparable injury might otherwise result. . . .'"  *Id*. (internal and external citations omitted).  "The parties and the public, while entitled to both careful review and a meaningful decision, are also generally entitled to the prompt execution of orders. . . ."  *Id*.

A stay is ultimately "'an exercise of judicial discretion,' and '[t]he propriety of its

8

issue is dependent upon the circumstances of the particular case.'"  *Nken*, 556 U.S. at 433 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672–73 (1926)).  "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion."  *Id*.

A court must consider four factors in determining whether a stay is warranted under the standard test:  "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicable will be irreparably injured absent a stay; (3) whether issuance of the say will substantially injure the other parties interested in the proceeding; and (4) where the public risk lies.'"  *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. at 770 (1987)).  The Supreme Court noted in *Nken* that there is substantial overlap between these and the factors governing preliminary injunctions "because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined."  *Id*.; *see also Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015).

The first two factors are the most critical.  *Nken*, 556 U.S. at 434.  Defendants argue that "[i]n cases where the appealing party demonstrates that 'the three 'harm' factors tip decidedly in its factor,' it need only show that the appeal will raise issues 'so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.'"  (ECF No. 75 at 3 (quoting *F.T.C. v. Mainstream Mktg. Servs., Inc.* ("*Mainstream II*"), 345 F.3d 850, 852 (10th Cir. 2003) (internal quotation marks omitted)).)  The Tenth Circuit has recently clarified in

connection with the appeal of a preliminary injunction that "any modified test which relaxes one of the prongs" and "thus deviates from the standard test is impermissible." *Diné Citizens Against Ruining Our Env't v. Jewell,* 839 F.3d 1276, 1282 (10th Cir. 2016). This holding has been interpreted to also apply to a stay pending an appeal, given the substantially same standards governing grants of preliminary injunctions and stays pending appeal. *Grogan v. Renfrow,* 2019 WL 2764404, at *4 (N.D. Okla. July 2, 2019); *Pueblo of Pojoaque v. New Mexico,* 233 F. Supp. 3d 1021, 1113–15 (D.N.M. 2017).

      1.   <u>Likelihood of Success on the Merits</u>

The Court turns to the first factor—whether Defendants have made a strong showing of likelihood of success on the merits. To satisfy this standard it is "not enough that the chance of success on the merits be "'better than negligible.'" *Nken,* 556 U.S. at 434 (citation omitted). The Court finds that Defendants have not made such a showing as to federal officer jurisdiction under 28 U.S.C. § 1442.

While Defendants argue that this case raises "complex and novel questions regarding jurisdiction" that have "divided multiple district courts" (ECF No. 75 at 7), this is not true as to the issue of federal officer removal jurisdiction. Defendants have cited no case that has accepted this argument in the context of climate change claims against companies, such as Defendants, that market and sell fossil fuels. Moreover, in the cases cited by Defendants, federal control was obvious for substantial periods of time, and the defendants in those cases established the necessary causal nexus between a significant period of federal control and the claims that is wholly absent here. The cases demonstrate the high degree of federal control needed to provide jurisdiction

10

under this statute. *See, e.g., Fina Oil & Chem. Co.,* 995 F. Supp. 705, 712 (E.D. Tex. 1998); *Lalonde v. Delta Field Erection*, 1998 U.S. Dist. LEXIS 23946, at \*29-30, 20 (M.D. La. Aug. 5, 1998). Defendants' essentially "attempt to re-hash the same argument(s)" as to why they believe they have a substantial basis for federal officer jurisdiction, which "does not demonstrate a likelihood of success on appeal." *Mainstream Mktg. Servs., Inc. v. F.T.C.* ("*Mainstream I*"), 284 F. Supp. 2d 1266, 1275 (D. Colo. 2003).

It is a closer question as to whether Defendants have demonstrated a likelihood of success if the Tenth Circuit were to review the other bases for federal jurisdiction, particularly in regard to the issue of whether Plaintiffs' claims arise under federal common law. This is the one jurisdictional ground that federal district courts are divided on, with two courts finding that jurisdiction exists on this basis and three courts finding that jurisdiction does not. *Compare California* v. *BP p.l.c.* ("*CA I*"), 2018 WL 1064293 (N.D. Cal. Feb. 27, 2018); *City of Oakland v. BP p.l.c. ("CA II*), 325 F. Supp. 3d 1017 (N.D. Cal. June 25, 2018); *and City of New York v. BP p.l.c.*, 325 F. Supp. 3d 466 (S.D.N.Y. July 19, 2018); *with State of Rhode Island v. Chevron Corp.*, 2019 WL 3282007 (D. R.I. July 22, 2019); *Mayor and City Council of Baltimore v. BP P.L.C.* ("*Baltimore*"), 2019 WL 2436848 (D. Md. June 10, 2019), *appeal docketed*, No. 19-1644 (4th Cir. June 18, 2019); *and Cnty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018), *appeal docketed*, No. 18-15499 (9th Cir. May 27, 2018).

Given this split of authority, Defendants may have shown that this issue is so "'serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and

deserving of more deliberate investigation.'" *Mainstream II*, 345 F.3d at 852. However, the Court finds that Defendants have not shown a strong likelihood of success on the merits on this issue, which is the applicable test. *Nken*, 556 U.S. at 434. The United States District Court for the Northern District of California that decided *CA I* and *CA II* (and which the *City of Oakland* court relied on) cited *American Electric Power Co., Inc. v. Connecticut,* 564 U.S. 410 (2011), and *Kivalina v. Exxon Mobil Corp.,* 696 F.3d 849 (9th Cir. 2012), in support of its finding of federal question jurisdiction. However, the plaintiffs in those cases expressly invoked federal claims, unlike this case which involves only state law claims asserted in state court, and those cases appear to be inapplicable. Moreover, as noted in this Court's Order of Remand, *CA I*, *CA II*, and *City of Oakland* did not address the well pleaded complaint rule, under which this Court found that federal jurisdiction did not exist. Defendants have not made any new argument that suggests they have a strong likelihood of success on the merits on this issue. Defendants also do not make any meaningful showing that there is federal question jurisdiction under *Grable,* or on any of the other grounds upon which they assert federal jurisdiction, and no cases have found jurisdiction under such arguments.

    2.   <u>Irreparable Injury</u>

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citation omitted). "Irreparable harm is not harm that is merely 'serious or substantial.'" *Id*. (citation omitted). "[S]imply showing some 'possibility of irreparable injury'" also fails to show irreparable injury. *Nken*, 556 U.S. at 434–35 (citation omitted).

12

The Court finds that Defendants have failed to establish this element. Defendants first argue that they will suffer irreparable harm if a stay is not granted because they will be forced to litigate this same case before the Tenth Circuit and in Colorado state court, and could face burdensome discovery in state court. The Court rejects this argument. The Supreme Court has made clear that "injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to show irreparable harm. *Sampson v. Murray,* 415 U.S. 61, 90 (1974); *see also Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury"); *Washington v. Monsanto Co.*, 2018 U.S. Dist. LEXIS 48501 (W.D. Wash. Mar. 23, 2018) (finding in a similar case where a private corporation was arguing removability under the federal officer statute that there was no irreparable injury even though "Defendants will incur some additional costs of pursuing an appeal without a stay").

Defendants also argue that state court proceedings could be potentially duplicative, mooted or otherwise wasteful if the Tenth Circuit rules in their favor. Similarly, they assert that the appeal could become moot if the state court enters judgment before the appeal is resolved, meaning that they would lose their appeal rights. Again, these arguments are "simply too speculative to rise to the level of 'irreparable injury.'" *Phoenix Glob. Ventures, Inc. v. Phoenix Hotel Assocs*., Ltd., 2004 WL 24079, at *8 (S.D.N.Y. Nov. 23, 2004) (quoting *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995)); *see also Baltimore*, 2019 WL 3464667, at *5; *Hall v. Dixon,* 2011 WL

13

767173, at \*8-9 (S.D. Tex. Feb. 25, 2011).

Similarly, Defendants' argument that discovery could be unduly burdensome in state court is speculative.  Moreover, Defendants would be subject to similar discovery if they were proceeding in federal court, and "the interim proceedings in state court may well advance the resolution of the case in federal court."  *Baltimore*, 2019 WL 3464667, at \*6; *see also Cesca Therapeutics, Inc. v. SynGen Inc.,* 2017 WL 1174062, at \*4–5 (E.D. Cal. Mar. 30, 2017) (finding that an argument as to "the loss of financial resources and time spent on discovery during the pendency" of the appeal "is not convincing", and noting that where, as here, a case is "in its earliest stages," "the risk of harm" to Defendants "if discovery proceeds is low").

Nor would state court rulings present "issues of comity."  (*See* ECF No. 75 at 9.) It is not unusual for cases to be removed after substantial state litigation.  28 U.S.C. § 1450 recognizes this, and provides that "[a]ll injunctions, orders and other proceedings" in state court prior to removal remain in force unless "dissolved or modified" by the district court.

Finally, Defendants argue irreparable injury because "it is not entirely clear 'how procedurally, [this case] would make [its] way from state court back to federal court and whether [its] doing so would offend the Anti-[I]njunction Act, 28 U.S.C. § 2283, or the notions of comity underpinning it.'"  (ECF No. 75 at 10 (quoting *Barlow v. Colgate Palmolive Co*, 772 F.3d 1001, 1014 n. 2 (4th Cir. 2014) (Wynn J., concurring in part and dissenting in part)).)  This argument is rejected.  Justice Wynn's partial concurring opinion made no finding that returning from the state court to federal court would actually offend the Anti-Injunction Act or the notions of comity; he only noted that the

14

**App. 268**

majority opinion had not addressed the issue or the procedure for how the case would make its way back to state court. *Barlow*, 772 F.3d at 1014.  It is this Court's view that federal courts are fully capable of ensuring that the proceeding in state court returns to federal court if a remand order is vacated, including by enjoining state proceedings if the state court failed to give effect to the decision reversing remand.  *See Bryan v. BellSouth Communcs., Inc.,* 492 F.3d 231, 240 (4th Cir. 2007); *In re Meyerland Co.,* 910 F.2d 1257, 1263 (5th Cir. 1990). [3]

3.   <u>Whether Plaintiffs Would Be Substantially Injured if a Stay is Entered and the Public Risk</u>

The last two factors merge and are considered together when the party opposing a stay is a governmental body, as here.  *See Nken*, 556 U.S. at 435.  Defendants argue that a stay will not permanently deprive Plaintiffs of access to state court, it will only delay the vindication of their claim.  They also argue that the Complaint demonstrates the lack of harm, as a substantial portion of the damages Plaintiffs seek stems from purported costs that they have not yet incurred and may not incur for decades. Defendants assert that this does not counsel against a stay.  Defendants also assert that Plaintiffs "'would actually be served by granting a stay,' because they would not 'incur additional expenses from simultaneous litigation before a definitive ruling on appeal is issued.'"  (ECF No. 75 at 11 (quoting *Raskas v. Johnson & Johnson*, 2013 WL

---

[3] The Tenth Circuit's decision in *Chandler v. O'Bryan,* 445 F.2d 1045 (10th Cir. 1971), cited by Defendants, does not say otherwise.  It held only that the Tenth Circuit could not enjoin a case that had been remanded to state court in a prior federal proceeding.  *Id*. at 1057–58. Similarly, the First Circuit's decision in *FDIC* v. *Santiago Plaza*, 598 F.2d 634, 636 (1st Cir. 1979), is inapposite, as it held only that a district court cannot enjoin a state court proceeding once it has remanded the case to state court as it lacks jurisdiction.

1818133, at *2 (E.D. Mo. Apr. 29, 2013)).)

The Court disagrees, finding that the last two factors also weigh against a stay. As the District of Maryland found in the *Baltimore* case, "[t]his case is in its earliest stages and a stay pending appeal would further delay litigation on the merits" of the claims. 2019 WL 3464667, at *6. Plaintiffs' claims in this case were filed over a year ago. The Court agrees with *Baltimore*'s finding that "[t]his favors denial of a stay, particularly given the seriousness of the [Plaintiffs'] allegations and the amount of damages at stake." *Id*. Moreover, the public interest is furthered by the timely conclusion of legal disputes, *Desktop Images v. Ames,* 930 F. Supp. 1450, 1452 (D. Colo. 1996), and not by the interference with state court proceedings, *Maui Land & Pineapple Co. v. Occidental Chem. Corp.,* 24 F. Supp. 2d 1083, 1087 (D. Haw. 1998).

### III. CONCLUSION

Based on the foregoing, Defendant's request for a stay of the remand order is denied. Defendants have not shown a likelihood of success or irreparable injury, or that the other factors weigh in favor of a stay. Accordingly, the Court ORDERS as follows:

1.  Defendant's Motion for Stay of Remand Pending Appeal filed September 13, 2019 (ECF No. 75) is DENIED; and

2.  The Clerk shall REMAND this case to Boulder County District Court, and shall terminate this action.

Dated this 7th day of October, 2019.

BY THE COURT:

_____

William J. Martinez
United States District Judge

**Andreina Garcia Garcia**

| | |
|---|---|
| **From:** | Andreina Garcia Garcia |
| **Sent:** | Tuesday, October 08, 2019 11:52 AM |
| **To:** | Marizela.cano@judicial.state.co.us |
| **Subject:** | FW: Our Case number: 18-cv-1672-WJM-SKC Your case number: 2018-cv-030349 |
| **Attachments:** | 18-cv-1672 - Remand Order.pdf; 18-cv-1672 - Remand Order 2.pdf |

**From:** Andreina Garcia Garcia
**Sent:** Tuesday, October 08, 2019 11:50 AM
**To:** 'Marizela.cano@judicial.stat.co.us' <Marizela.cano@judicial.stat.co.us>
**Subject:** Our Case number: 18-cv-1672-WJM-SKC Your case number: 2018-cv-030349

Good morning

The above captioned case has been ordered remanded to your district pursuant to an order of the Court.

Attached is a certified copy of the Order remanding this case.

The Parties are directed to file all future pleadings with the Boulder County District Court.

Thank you,


**Andreina García García**
Case Administration Specialist
United States District Court - District of Colorado
Phone:  303-335-2360
Andreina_GarciaGarcia@cod.uscourts.gov

**App. 272**

## CERTIFICATE OF DIGITAL SUBMISSION,
## ANTIVIRUS SCAN, AND PRIVACY REDACTIONS

I hereby certify, pursuant to the Tenth Circuit CM/ECF User's Manual, that the attached Appendix of Appellants, as submitted in digital form via the Court's electronic-filing system, has been scanned for viruses using Malwarebytes Anti-Malware (version 2019.11.18.07, updated Nov. 18, 2019) and, according to that program, is free of viruses.  I also certify that any hard copies submitted are exact copies of the document submitted electronically, and that all required privacy redactions have been made.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

NOVEMBER 18, 2019

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, counsel for appellant Exxon Mobil Corporation and a member of the Bar of this Court, certify that, on November 18, 2019, the attached Appendix of Appellants was filed with the Clerk of the Court through the electronic-filing system. I further certify that all parties required to be served have been served.

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM
