**ORAL ARGUMENT REQUESTED**

**No. 19-1330**

# In the United States Court of Appeals for the Tenth Circuit

_____

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY, ET AL.,
PLAINTIFFS-APPELLEES

*v.*

SUNCOR ENERGY (U.S.A.) INC., ET AL.,
DEFENDANTS-APPELLANTS

_____

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO (CIV. NO. 18-1672)
(THE HONORABLE WILLIAM J. MARTINEZ, J.)*

_____

**BRIEF OF APPELLANTS**

_____

THEODORE V. WELLS, JR.
DANIEL J. TOAL
JAREN JANGHORBANI
NORA AHMED
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

COLIN G. HARRIS
FAEGRE BAKER DANIELS LLP
  *1470 Walnut Street, Suite 300*
  *Boulder, CO 80302*

KANNON K. SHANMUGAM
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*

HUGH QUAN GOTTSCHALK
EVAN B. STEPHENSON
WHEELER TRIGG O'DONNELL LLP
  *370 Seventeenth Street, Suite 4500*
  *Denver, CO 80202*

## CORPORATE DISCLOSURE STATEMENT

Appellant Exxon Mobil Corporation has no parent corporation, and no publicly held company owns 10% or more of its stock.

Appellant Suncor Energy Sales Inc. is wholly owned by appellant Suncor Energy (U.S.A.) Inc., which is wholly owned by Suncor Energy (U.S.A.) Holdings Inc., which is wholly owned by appellant Suncor Energy Inc.  Suncor Energy Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock.

**STATEMENT REGARDING ORAL ARGUMENT**

Appellants respectfully submit that oral argument would be helpful to the disposition of this appeal. This case presents important and novel questions concerning the jurisdiction of federal courts over tort claims alleging that fossil-fuel producers are liable for the effects of global climate change.

# TABLE OF CONTENTS

Page

Statement of jurisdiction.................................................................1

Statement of the issues ..................................................................1

Statement of the case ....................................................................2

Summary of argument ....................................................................3

Standard of review.........................................................................7

Argument.......................................................................................7

I.    This Court has jurisdiction to review the district court's entire
      remand order ........................................................................7

      A.    A court of appeals has jurisdiction to review the entirety of
            any remand order appealable under 28 U.S.C. § 1447(d)..............8

      B.    Plaintiffs' arguments for limiting the scope of review under
            Section 1447(d) are unpersuasive ...................................12

II.   Plaintiffs' claims were properly removed ...................................16

      A.    Removal was proper because plaintiffs' claims arise under
            federal common law .........................................................16

            1.    Federal courts have jurisdiction over claims
                  governed by federal common law .........................17

            2.    Federal common law governs claims alleging harm
                  from global climate change.....................................18

            3.    Plaintiffs' claims are governed by, and arise under,
                  federal common law................................................22

            4.    The well-pleaded complaint rule is no obstacle to
                  removal...................................................................25

      B.    Removal was proper because plaintiffs' claims raise
            disputed and substantial federal issues...........................27

            1.    Plaintiffs' claims necessarily raise federal issues ..............28

                  a.    Plaintiffs' claims substantially affect foreign
                        affairs .........................................................28

Page

Table of contents—continued:

   b. Plaintiffs' claims amount to a collateral attack on cost-benefit analyses committed to the federal government ................................................................30

  2. The federal interests implicated are substantial ...............32

  3. The federal interests are disputed, and their adjudication in federal court would not disrupt the federal-state balance ...........................................................33

 C. Removal was proper because federal law would completely preempt plaintiffs' claims if they arose under state law .............33

 D. Removal was proper under the federal-officer removal statute ...................................................................................37

  1. ExxonMobil acted under the direction of federal officers ...................................................................................38

  2. The complaint alleges a sufficient causal nexus between plaintiffs' claims and ExxonMobil's federally directed activities .................................................................42

  3. ExxonMobil has colorable defenses to plaintiffs' claims .......................................................................................43

 E. Removal was proper because this action arises in part from activities in federal enclaves .........................................................43

 F. Removal was proper because plaintiffs' claims arise out of ExxonMobil's operations on the outer continental shelf.............45

Conclusion....................................................................................................49

Remand order of district court,
 D. Ct. Dkt. No. 69 (Sept. 5, 2019)..................................................Addendum

iv

# TABLE OF AUTHORITIES

Page

## CASES

*Aetna Health Inc.* v. *Davila*, 542 U.S. 200 (2004) ................................34

*Akin* v. *Ashland Chemical Co.*, 156 F.3d 1030 (10th Cir. 1998) ................43, 44

*Alabama* v. *Conley*, 245 F.3d 1292 (11th Cir. 2001)...........................12

*Allen* v. *United Services Automobile Ass'n*,
  907 F.3d 1230 (10th Cir. 2018)........................................13

*American Electric Power Co.* v. *Connecticut*,
  564 U.S. 410 (2011)........................................17, 19, 20, 21, 22, 23, 24

*American Insurance Ass'n* v. *Garamendi*,
  539 U.S. 396 (2003)........................................28, 29

*Amoco Production Co.* v. *Sea Robin Pipeline Co.*,
  844 F.2d 1202 (5th Cir. 1988)....................................45, 47

*Appalachian Volunteers, Inc.* v. *Clark*, 432 F.2d 530 (6th Cir. 1970) ............12

*Beneficial National Bank* v. *Anderson*, 539 U.S. 1 (2003) ...............................34

*Bennett* v. *Southwest Airlines Co.*, 484 F.3d 907 (7th Cir. 2007) ..............31, 32

*Blanco* v. *Federal Express Corp.*, Civ. No. 16-561,
  2016 WL 4921437 (W.D. Okla. Sept. 15, 2016) ............................26

*Board of Commissioners* v. *Tennessee Gas Pipeline Co.*,
  850 F.3d 714 (5th Cir. 2017)...........................................31

*Boyle* v. *United Technologies Corp.*, 487 U.S. 500 (1988) ................................43

*California* v. *BP p.l.c.*, Civ. No. 17-06011,
  2018 WL 1064293 (N.D. Cal. Feb. 27, 2018) ..............................21, 22, 24, 28

*California* v. *General Motors Corp.*, Civ. No. 06-5755,
  2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) ................................23

v

Page

Cases—continued:

*California* v. *Watt*, 668 F.2d 1290 (D.C. Cir. 1981)..............................................45

*Cannon* v. *University of Chicago*, 441 U.S. 677 (1979) .....................................10

*Caterpillar, Inc.* v. *Williams*, 482 U.S. 386 (1987).............................................25

*City of Albuquerque* v. *Soto Enterprises, Inc.*,
    864 F.3d 1089 (10th Cir. 2017)...........................................................................7

*City of New York* v. *BP p.l.c.*,
    325 F. Supp. 3d 466 (S.D.N.Y. 2018),
    *appeal pending*, No. 18-2188 (2d Cir.) ........................................18, 22, 23, 28

*City of Oakland* v. *BP p.l.c.*,
    325 F. Supp. 3d 1017 (N.D. Cal. 2018),
    *appeal pending*, No. 18-6663 (9th Cir.).....................................................18, 22

*City of Walker* v. *Louisiana*, 877 F.3d 563 (5th Cir. 2017) ...............................13

*Coffey* v. *Freeport McMoran Copper & Gold*,
    581 F.3d 1240 (10th Cir. 2009)............................................................11, 13, 14

*Colorado Department of Public Health & Environment* v.
    *United States*, 693 F.3d 1214 (10th Cir. 2012)................................................43

*Connecticut* v. *American Electric Power Co.*,
    582 F.3d 309 (2d Cir. 2009),
    *rev'd on other grounds*, 564 U.S. 410 (2011) ..................................................19

*Consolidation Coal Co.* v. *Director, Office of Workers'*
    *Compensation Programs*, 864 F.3d 1142 (10th Cir. 2017)...........................10

*Davis* v. *Glanton*, 107 F.3d 1044 (3d Cir. 1997)..................................................12

*Decatur Hospital Authority* v. *Aetna Health, Inc.*,
    854 F.3d 292 (5th Cir. 2017)..............................................................................10

*E.P. Operating Ltd. Partnership* v. *Placid Oil Co.*,
    26 F.3d 563 (5th Cir. 1994)..........................................................................46, 48

Page

Cases—continued:

*Erie Railroad Co.* v. *Tompkins*, 304 U.S. 64 (1938) ..................................17, 19

*Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U.S. 546 (2005).............16

*Fayard* v. *North Carolina Vehicle Services, LLC*,
　533 F.3d 42 (1st Cir. 2008) ................................................................37

*Firstenberg* v. *City of Santa Fe*, 696 F.3d 1018 (10th Cir. 2012).....................25

*Franchise Tax Board* v. *Construction Laborers Vacation Trust*,
　463 U.S. 1 (1983)................................................................................34

*Fung* v. *Abex Corp.*, 816 F. Supp. 569 (N.D. Cal. 1992) ...................................44

*Geier* v. *American Honda Motor Co.*, 529 U.S. 861 (2000)...............................37

*Goncalves* v. *Rady Children's Hospital San Diego*,
　865 F.3d 1237 (9th Cir. 2017).....................................................41, 42

*Grable & Sons Metal Products, Inc.* v. *Darue Engineering &
　Manufacturing*, 545 U.S. 308 (2005) .........................................5, 6, 27, 28, 33

*Greene* v. *Citigroup, Inc.*, Civ. No. 99-1030,
　2000 WL 647190 (10th Cir. May 19, 2000) ......................................38

*Grynberg Production Corp.* v. *British Gas, p.l.c.*,
　817 F. Supp. 1338 (E.D. Tex. 1993)..................................................32

*Gunn* v. *Minton*, 568 U.S. 251 (2013) ..............................................................27

*Hansen* v. *Harper Excavating, Inc.*,
　641 F.3d 1216 (10th Cir. 2011)........................................................34

*Illinois* v. *City of Milwaukee*, 406 U.S. 91 (1972) ....................18, 19, 20, 21, 24

*International Paper Co.* v. *Ouellette*, 479 U.S. 481 (1987)...................19, 24, 36

*Jacks* v. *Meridian Resource Co.*, 701 F.3d 1224 (8th Cir. 2012) ..........12, 13, 14

Page

Cases—continued:

*Jefferson County* v. *Acker*, 527 U.S. 423 (1999)....................................................42

*Johnson* v. *City of Shelby*, 135 S. Ct. 346 (2014) ...............................................26

*Kight* v. *Kaiser Foundation Health Plan*,
  34 F. Supp. 2d 334 (E.D. Va. 1999) ..................................................18

*Kircher* v. *Putnam Funds Trust*, 547 U.S. 633 (2006) ........................................9

*Labram* v. *Havel*, 43 F.3d 918 (4th Cir. 1995) ....................................................26

*Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*,
  754 F.2d 1223 (5th Cir. 1985)..........................................................46

*Lexington Insurance Co.* v. *Precision Drilling Co.*,
  830 F.3d 1219 (10th Cir. 2016).........................................................13

*Lu Junhong* v. *Boeing Co.*, 792 F.3d 805 (7th Cir. 2015) ....4, 8, 9, 12, 13, 14, 15

*Maryland* v. *Soper*, 270 U.S. 9 (1926)..................................................................43

*Massachusetts* v. *EPA*, 549 U.S. 497 (2007) ................................................33, 35

*Mays* v. *City of Flint*, 871 F.3d 437 (6th Cir. 2017) ...............................10, 13, 14

*McKay* v. *City & County of San Francisco*, Civ. No. 16-3561,
  2016 WL 7425927 (N.D. Cal. Dec. 23, 2016) ...................................31

*Milk 'N' More, Inc.* v. *Beavert*, 963 F.2d 1342 (10th Cir. 1992)........................7

*Missouri* v. *Illinois*, 200 U.S. 496 (1906) ...........................................................19

*National Farmers Union Insurance Cos.* v. *Crow Tribe of
  Indians*, 471 U.S. 845 (1985) ..........................................................17

*Native Village of Kivalina* v. *ExxonMobil Corp.*:
  663 F. Supp. 2d 863 (N.D. Cal. 2009)..............................................20
  696 F.3d 849 (9th Cir. 2012)........................................19, 20, 21, 23

Page

Cases—continued:

*New England Legal Foundation* v. *Costle*,
  666 F.2d 30 (2d Cir. 1981) ...............................................................35

*New SD, Inc.* v. *Rockwell International Corp.*,
  79 F.3d 953 (9th Cir. 1996) .............................................................18

*Nicodemus* v. *Union Pacific Corp.*, 440 F.3d 1227 (10th Cir. 2006)...............32

*Noel* v. *McCain*, 538 F.2d 633 (4th Cir. 1976)......................................12

*North Carolina ex rel. Cooper* v. *Tennessee Valley Authority*,
  615 F.3d 291 (4th Cir. 2010)......................................................34, 36

*NSA Telecommunications Records Litigation, In re*,
  483 F. Supp. 2d 934 (N.D. Cal. 2007) ...........................................32

*Parker Drilling Management Services, Ltd.* v. *Newton*,
  139 S. Ct. 1881 (2019) ..................................................................45

*Parson* v. *Johnson & Johnson*, 749 F.3d 879 (10th Cir. 2014) .........................11

*Patel* v. *Del Taco, Inc.*, 446 F.3d 996 (9th Cir. 2006) .............................12

*Pet Quarters, Inc.* v. *Depository Trust & Cleaning Corp.*,
  559 F.3d 772 (8th Cir. 2009)..........................................................31

*Rodrigue* v. *Aetna Casualty & Surety Co.*, 395 U.S. 352 (1969) .....................45

*Ronquille* v. *Aminoil Inc.*, Civ. No. 14-164,
  2014 WL 4387337 (E.D. La. Sept. 4, 2014).....................................46

*Rosseter* v. *Indutrial Light & Magic*, Civ. No. 08-4545,
  2009 WL 210452 (N.D. Cal. Jan. 27, 2009).....................................45

*Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922 (5th Cir. 1997)...............18

*San Diego Building Trades Council* v. *Garmon*, 359 U.S. 236 (1959)............36

Page

Cases—continued:

*Sanchez* v. *Onuska*, No. 93-2155,
 1993 WL 307897 (10th Cir. Aug. 13, 1993) ..............................................12, 13

*Sanderson* v. *Health Mesa Homeowners' Ass'n*,
 183 P.3d 679 (Colo. App. 2008) ......................................................................41

*Savoie* v. *Huntington Ingalls, Inc.*, 817 F.3d 457 (5th Cir. 2016) ...................41

*Sawyer* v. *Foster Wheeler LLC*, 860 F.3d 249 (4th Cir. 2017) ...................38, 42

*Standard Fire Insurance Co.* v. *Knowles*, 568 U.S. 588 (2013)........................26

*State Farm Mutual Automobile Insurance Co.* v. *Baash*,
 644 F.2d 94 (2d Cir. 1981) ..............................................................................12

*Swint* v. *Chambers County Commission*, 514 U.S. 35 (1995) ..........................15

*Tennessee Gas Pipeline* v. *Houston Casualty Insurance Co.*,
 87 F.3d 150 (5th Cir. 1996)..............................................................................46

*Texas Industries, Inc.* v. *Radcliffe Materials, Inc.*, 451 U.S. 630 (1981)........17

*United States* v. *Hansen*, 929 F.3d 1238 (10th Cir. 2019) ................................12

*United States* v. *Porter*, 745 F.3d 1035 (10th Cir. 2014)....................................7

*United States* v. *Standard Oil Co.*, 332 U.S. 301 (1947)...................................18

*Virginia* v. *United States*, 74 F.3d 517 (4th Cir. 1996)......................................35

*Watson* v. *Philip Morris Cos.*, 551 U.S. 142 (2007) ...............................38, 39, 41

*Wayne* v. *DHL Worldwide Express*, 294 F.3d 1179 (9th Cir. 2002) ................18

*West Virginia ex rel. McGraw* v. *Eli Lilly & Co.*,
 476 F. Supp. 2d 230 (E.D.N.Y. 2007)..............................................................32

*Willingham* v. *Morgan*, 395 U.S. 402 (1969) ....................................................38

*Yamaha Motor Corp., U.S.A.* v. *Calhoun*, 516 U.S. 199 (1996)....4, 9, 10, 13, 14

Page

## CONSTITUTION, STATUTES, RULE, AND REGULATIONS

U.S. Const. Art. I, § 8, cl. 3 ..................................................43

U.S. Const. Art. I, § 8, cl. 17 ................................................43

U.S. Const. Amend. I..............................................................43

U.S. Const. Amend. XIV, § 1, cl. 2 ......................................43

Act of Oct. 21, 1998, Pub. L. No. 105-276, 112 Stat. 2461 .....................30

Act of Oct. 20, 1999, Pub. L. No. 106-74, 113 Stat. 1047 .....................30

Act of Oct. 27, 2000, Pub. L. No. 106-377, 114 Stat. 1441 ...................30

Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* ..................6, 35

    5 U.S.C. § 553(e)................................................................35

Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4...................11

    28 U.S.C. § 1453(c)(1) ..........................................................11

Clean Air Act, 42 U.S.C. §§ 7401-7671q ......................6, 34, 35, 36, 37

    42 U.S.C. § 7401(b)(1)...........................................................34

    42 U.S.C. § 7604(a)..............................................................35

    42 U.S.C. § 7604(e)..............................................................37

    42 U.S.C. § 7607(b)(1)...........................................................35

Outer Continental Shelf Lands Act, 43 U.S.C. § 1331-1356b .........45, 46, 47, 48

    43 U.S.C. § 1332 ................................................................45

    43 U.S.C. § 1332(3)..............................................................39

    43 U.S.C. § 1349(b) ...........................................................1, 16

Page

Statutes, rule, and regulations—continued:

43 U.S.C. § 1349(b)(1) ...............................................................45, 47

Removal Clarification Act of 2011, Pub. L. No. 112-51,
125 Stat. 545 ...............................................................10, 12, 13, 14

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1292(b) ...........................................................................9

28 U.S.C. § 1331 ...............................................1, 4, 5, 16, 17, 18, 25, 43

28 U.S.C. § 1334(b) ...........................................................................1

28 U.S.C. § 1367(a) ......................................................................1, 16

28 U.S.C. § 1441 .............................................................................16

28 U.S.C. § 1441(a) ...........................................................................1

28 U.S.C. § 1442 .............................................1, 3, 4, 6, 8, 16, 37, 38, 40, 42

28 U.S.C. § 1442(a)(1) .......................................................................37

28 U.S.C. § 1447(c) ..........................................................................15

28 U.S.C. § 1447(d) ............................1, 4, 7, 8, 9, 10, 11, 12, 13, 14, 15

28 U.S.C. § 1452 ...............................................................................1

42 U.S.C. § 13384 ............................................................................31

Colo. Rev. Stat. § 3-1-122 ................................................................44

Colo. Rev. Stat. § 3-1-130 ................................................................44

40 C.F.R. § 51.166(b)(1)(i) ...............................................................34

40 C.F.R. § 52.21(b)(1)(i) .................................................................34

43 C.F.R. § 3162.1(a) .......................................................................31

Page

## MISCELLANEOUS

Daniel R. Coquillette et al.,
  *Moore's Federal Practice* (3d ed. 2019) ........................................11

Exec. Order No. 12,287 (1981)..............................................................29

Exec. Order No. 12,866 (1993)..............................................................31

75 Fed. Reg. 25,324 (May 7, 2010) .......................................................35

77 Fed. Reg. 62,624 (Oct. 15, 2012) .....................................................34

81 Fed. Reg. 73,478 (Oct. 25, 2016) .....................................................34

President Gerald Ford, *Address to the Nation on Energy
  Programs* (May 27, 1975).................................................................29

President Ronald Reagan, *Statement on Signing Executive
  Order 12287: Providing for the Decontrol of Crude Oil and
  Refined Petroleum Products* (Jan. 28, 1981)..................................29

Restatement (Second) of Torts (1979)............................................23, 30

S. Res. 98, 105th Cong., 1st Sess. (1997) .............................................29

President Donald Trump, *Remarks by President Trump at the
  Unleashing American Energy Event* (June 29, 2017)...................30

Charles A. Wright et al.,
  *Federal Practice and Procedure* (2d ed. 2019) ......................10, 26

## STATEMENT OF RELATED CASES

There are no prior or related appeals in this case.

## STATEMENT OF JURISDICTION

On June 29, 2018, appellants removed this action from the District Court of Boulder County, Colorado, to the United States District Court for the District of Colorado. *See* App. 12. On September 5, 2019, the district court entered an order granting plaintiffs' motion to remand this case to state court. *See* App. 197. Defendants noticed their appeal the following day. *See* App. 253. On October 8, 2019, the district court certified the remand order to the state court. *See* App. 272. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1447(d). In appellants' view, the district court had jurisdiction under 28 U.S.C. §§ 1331, 1334(b), 1441(a), 1442, 1452, and 1367(a), and 43 U.S.C. § 1349(b).

## STATEMENT OF THE ISSUES

1.     Whether 28 U.S.C. § 1447(d) permits this Court to review the entirety of a district court's remand order where the removing defendants premised removal in part on the federal-officer removal statute, 28 U.S.C. § 1442.

2.     Whether the district court had jurisdiction over appellees' climate-change-related tort claims, permitting appellants to remove this case from state to federal court.

## STATEMENT OF THE CASE

Appellees, plaintiffs in this action, are three local governments in Colorado:  the Board of County Commissioners of Boulder County, the Board of County Commissioners of San Miguel County, and the City of Boulder.  Appellants, defendants below, are four energy companies:  Suncor Energy (U.S.A.) Inc., Suncor Energy Sales Inc., Suncor Energy Inc., and Exxon Mobil Corporation (ExxonMobil).  In 2018, plaintiffs filed the underlying complaint against defendants in Colorado state court, alleging that defendants have contributed to global climate change, which in turn has caused harm in Colorado.  *See* App. 73-77.  The complaint pleads a variety of claims that plaintiffs assert arise under state law, including public and private nuisance.  *See id.*  Several similar cases filed by state and municipal governments against various energy companies are pending in courts across the country.  *See*, *e.g.*, *Rhode Island* v. *Shell Oil Products Co.*, No. 19-1818 (1st Cir.); *City of New York* v. *B.P. p.l.c.*, No. 18-2188 (2d Cir.); *Mayor & City Council of Baltimore* v. *BP p.l.c.*, No. 19-1644 (4th Cir.); *County of San Mateo* v. *Chevron Corp.*, No. 18-15499 (9th Cir.) (consolidated with three similar cases); *City of Oakland* v. *B.P. p.l.c.*, No. 18-16663 (9th Cir.).

Defendants removed this case to federal court.  Defendants contended that federal jurisdiction over plaintiffs' climate-change claims is present on several grounds, including on the grounds that claims asserting harm from

global climate change necessarily arise under federal common law and that the allegations in the amended complaint pertain to actions defendants took under the direction of federal officers. Plaintiffs, in turn, moved to remand the case to state court.

On September 5, 2019, the district court granted plaintiffs' motion to remand. *See* App. 251. Defendants appealed the district court's remand order and sought a stay of that order. *See* App. 253. Defendants' attempts to obtain a stay were ultimately unsuccessful, and the remand order issued on October 8, 2019. *See* App. 255-272.

Meanwhile, plaintiffs filed a motion in this Court seeking to "partial[ly] dismiss[]" the appeal, contending that the Court lacks jurisdiction to determine whether removal was proper on any ground other than removal under the federal-officer removal statute, 28 U.S.C. § 1442. After the motion was fully briefed, the Court referred the motion to the merits panel.

## SUMMARY OF ARGUMENT

This case belongs in federal court because it threatens to interfere with longstanding federal policies over matters of uniquely national importance, including energy policy, environmental protection, and foreign affairs. Plaintiffs seek to hold defendants liable for the impacts of climate change in their respective jurisdictions based on defendants' lawful production, promotion, refining, marketing, and sale of fossil fuels, not only in the United States,

but throughout the world. Plaintiffs' alleged injuries result from greenhouse-gas emissions associated with the use of fossil fuels by billions of consumers worldwide—including plaintiffs themselves. Despite plaintiffs' efforts artfully to plead their claims as novel state-law torts, federal jurisdiction exists over these claims on multiple independent grounds.

I.    This Court has appellate jurisdiction under 28 U.S.C. § 1447(d) to review the district court's remand order, as defendants premised removal in part on 28 U.S.C. § 1442, the federal-officer removal statute. The plain text of Section 1447(d) provides that, when a case is removed under Section 1442, the remand "*order*"—not just the applicability of the federal-officer ground for removal—is reviewable on appeal. "To say that a district court's 'order' is reviewable is to allow appellate review of the *whole* order, not just of particular issues or reasons." *Lu Junhong* v. *Boeing Co.*, 792 F.3d 805, 811 (7th Cir. 2015) (citing *Yamaha Motor Corp., U.S.A.* v. *Calhoun*, 516 U.S. 199, 205 (1996)).

II.    The district court had original jurisdiction over this action on multiple grounds, any one of which was sufficient to support removal.

A.    First and foremost, the district court had jurisdiction because federal common law governs plaintiffs' claims. Claims governed by federal common law arise under federal law for purposes of 28 U.S.C. § 1331, regardless of whether the plaintiff attempts to label them as "state-law claims." Federal common law governs claims that concern the regulation of

air and water in their ambient or interstate aspects; as courts have recognized, that includes claims alleging that energy companies caused injury by contributing to global climate change. That makes good sense. If state law were to govern claims such as these, energy companies and emissions sources would be subjected to a patchwork of non-uniform state-law standards, and States, in turn, would be empowered to regulate in areas reserved for the federal government. The district court disagreed with the foregoing analysis, but only by misunderstanding defendants' argument and by misapplying the well-pleaded complaint rule. Contrary to the district court's characterization, defendants' argument is not a preemption defense, and the well-pleaded complaint rule does not allow plaintiffs to prohibit removal merely by asserting that their claims arise under state law.

B.    In addition, plaintiffs' claims necessarily raise substantial and disputed issues of federal law, permitting the exercise of federal-question jurisdiction under Section 1331. *See Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Manufacturing*, 545 U.S. 308, 312-313 (2005). Specifi-cally, plaintiffs' claims necessarily affect foreign affairs—the exclusive prov-ince of the federal government—and seek collaterally to attack cost-benefit analyses in the energy and environmental context that are committed to, and already have been conducted by, the federal government. Those issues are substantial, hotly disputed, and can be resolved by federal courts without

disrupting the federal-state balance.  Removal was therefore permissible under *Grable* as well.

C.    Federal-question jurisdiction was also present because federal law completely preempts plaintiffs' state-law claims.  The Clean Air Act, in conjunction with the Administrative Procedure Act, sets out specific and exclusive procedures for parties—including state and local governments—to challenge nationwide emissions standards in federal court.  Plaintiffs bypassed those procedures by filing this action in state court, seeking to impose restrictions on interstate and international greenhouse-gas emissions resulting from the combustion of defendants' fossil fuels.  That attempt to use state tort law to subvert the Environmental Protection Agency's decisionmaking authority under the Clean Air Act should not be countenanced.

D.    The federal-officer removal statute, 28 U.S.C. § 1442, also supported removal here.  Acting at the federal government's direction and subject to its extensive control, ExxonMobil has explored and recovered minerals from the outer continental shelf for decades.  And because plaintiffs' theory of liability sweeps so broadly, plaintiffs' claims have sufficient causal nexus with the conduct that ExxonMobil took at the direction of a federal officer.  ExxonMobil also has colorable federal defenses against the claims asserted here, further permitting removal under the federal-officer removal statute.

6

E.     In addition, removal was proper because plaintiffs allege harms that occurred in federal enclaves:  namely, Rocky Mountain National Park and the Uncompahgre National Forest.

F.     Finally, removal was proper because plaintiffs' claims arise out of ExxonMobil's substantial operations on the outer continental shelf.  By alleging that all of ExxonMobil's conduct caused their injuries, plaintiffs necessarily include activities that took place there.

## STANDARD OF REVIEW

This Court reviews questions of its appellate jurisdiction and of statutory interpretation de novo.  *See*, *e.g.*, *City of Albuquerque* v. *Soto Enterprises, Inc.*, 864 F.3d 1089, 1091 (10th Cir. 2017); *United States* v. *Porter*, 745 F.3d 1035, 1040 (10th Cir. 2014).  A district court's remand order that rests on conclusions of law is also reviewed de novo.  *See Milk 'N' More, Inc.* v. *Beavert*, 963 F.2d 1342, 1345 (10th Cir. 1992).

## ARGUMENT

## I.     THIS COURT HAS JURISDICTION TO REVIEW THE DISTRICT COURT'S ENTIRE REMAND ORDER

As a general matter, 28 U.S.C. § 1447(d) precludes appellate review of an order remanding a case to state court.  But Section 1447(d) also contains an express exception:  "an order remanding a case to the State court from which it was removed pursuant to [S]ection 1442 or 1443 of this title shall be reviewable by appeal or otherwise."  28 U.S.C. § 1447(d).  Defendants removed this

case in part under 28 U.S.C. § 1442, the federal-officer removal statute, providing this Court with jurisdiction to review the district court's "order remanding [the] case" to state court. *Id.*

In their motion for partial dismissal, plaintiffs argued that this Court's review is limited to the federal-officer ground for removal. That is incorrect. The text of Section 1447(d) and case law from the Supreme Court, this Court, and other courts of appeals support the conclusion that this Court has jurisdiction to review the district court's entire remand order. Plaintiffs' arguments to the contrary lack merit, and the Court should therefore consider all of defendants' arguments for removal.

### A.    A Court Of Appeals Has Jurisdiction To Review The Entirety Of Any Remand Order Appealable Under 28 U.S.C. § 1447(d)

In an appeal of a remand order in a case removed under the federal-officer removal statute, the court of appeals is not limited to reviewing the federal-officer ground for removal. The text of Section 1447(d), the purposes underlying it, and relevant case law demonstrate why.

1.    As the Seventh Circuit recently explained when construing Section 1447(d), "[t]o say that a district court's 'order' is reviewable is to allow appellate review of the *whole* order, not just of particular issues or reasons." *Lu Junhong* v. *Boeing Co.*, 792 F.3d 805, 811 (2015). Looking "beyond the text of § 1447(d) to the reasons that led to its enactment" leads to "the same con-

clusion." *Id.* at 813.  By generally prohibiting appellate review of remand orders, Section 1447(d) "was enacted to prevent appellate delay in determining where litigation will occur" when a case is removed to federal court.  *Id.*; *see Kircher* v. *Putnam Funds Trust*, 547 U.S. 633, 640 (2006).  "But once Congress has authorized appellate review of a remand order" under the exception to the general prohibition, "a court of appeals has been authorized to take the time necessary to determine the right forum." *Lu Junhong*, 792 F.3d at 813.  "The marginal delay from adding an extra issue to a case where the time for briefing, argument, and decision has already been accepted is likely to be small." *Id.*

The Supreme Court's decision in *Yamaha Motor Corp., U.S.A.* v. *Calhoun*, 516 U.S. 199 (1996), supports the foregoing analysis.  In *Yamaha*, the Court faced the question whether, in an interlocutory appeal under 28 U.S.C. § 1292(b), a court of appeals could review only the particular question certified by the district court, or could instead address any issue encompassed in the district court's certified order.  The Court took the latter view, holding that a court of appeals may address "any issue fairly included within the certified order." *Id.* at 205.  Citing the text of Section 1292(b), the Court reasoned that "appellate jurisdiction applies to the *order* certified to the court of appeals[] and is not tied to the particular question formulated by the district court." *Id.*

The same reasoning applies here. Section 1447(d) authorizes appellate review of remand "order[s]" in cases removed under the federal-officer removal statute. This Court can thus address "any issue fairly included within the certified order." *Yamaha*, 516 U.S. at 205. Notably, Congress authorized appellate review of cases removed under the federal-officer removal statute in the Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545—after the Supreme Court's decision in *Yamaha*. Congress is of course presumed to be aware of judicial interpretations of relevant statutory text. *See Cannon* v. *University of Chicago*, 441 U.S. 677, 697-698 (1979); *Consolidation Coal Co.* v. *Director, Office of Workers' Compensation Programs*, 864 F.3d 1142, 1148 (10th Cir. 2017).

2.    This Court has not addressed the scope of appellate review under Section 1447(d) in a precedential opinion. But two other courts of appeals have agreed with the Seventh Circuit's interpretation. *See Mays* v. *City of Flint*, 871 F.3d 437, 442 (6th Cir. 2017); *Decatur Hospital Authority* v. *Aetna Health, Inc.*, 854 F.3d 292, 296 (5th Cir. 2017). So have key legal commentators. The leading federal treatise on civil procedure explains that appellate review of a remand order under Section 1447(d) "should . . . be extended to all possible grounds for removal underlying the order." 15A Charles A. Wright *et al.*, *Federal Practice and Procedure* § 3914.11, at 706 (2d ed. 2019) (Wright & Miller). Another notes that the foregoing interpretation "comports with related case

law holding that when an appellate court has jurisdiction to review an 'order,' it may review all of the reasons supporting the order." 16 Daniel R. Coquillette *et al.*, *Moore's Federal Practice* § 107.156[2][g], at 107-527 (3d ed. 2019).

This Court's decision in *Coffey* v. *Freeport McMoran Copper & Gold*, 581 F.3d 1240 (2009), counsels in favor of review of the district court's entire order, not simply the ground that permitted appeal. In *Coffey*, this Court addressed an appeal under the removal provisions of the Class Action Fairness Act (CAFA). CAFA provides that, "notwithstanding [S]ection 1447(d), a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action." 28 U.S.C. § 1453(c)(1). Because that language did not limit the court of appeals to review of the applicability of the grounds for removal set out in CAFA, the court concluded that it could review *any* ground for removal asserted by the defendant and addressed in the district court's order. *Coffey*, 581 F.3d at 1247; *accord Parson* v. *Johnson & Johnson*, 749 F.3d 879, 893 (10th Cir. 2014). The same conclusion follows here, where the relevant statutory text likewise does not limit the scope of appellate review and indeed affirmatively authorizes review of the entire "order" being appealed.

To be sure, some courts of appeals have concluded that appellate jurisdiction over remand orders appealable under Section 1447(d) is limited to re-

11

view of the applicability of the specific ground for removal listed in that provision. But all of those cases predate the Seventh Circuit's comprehensive analysis in *Lu Junhong*, *supra*, and all but one predate the Removal Clarification Act. *See Jacks* v. *Meridian Resource Co.*, 701 F.3d 1224, 1229 (8th Cir. 2012); *Patel* v. *Del Taco, Inc.*, 446 F.3d 996, 998 (9th Cir. 2006); *Alabama* v. *Conley*, 245 F.3d 1292, 1293 n.1 (11th Cir. 2001); *Davis* v. *Glanton*, 107 F.3d 1044, 1052 (3d Cir. 1997); *State Farm Mutual Automobile Insurance Co.* v. *Baash*, 644 F.2d 94, 97 (2d Cir. 1981); *Noel* v. *McCain*, 538 F.2d 633, 635 (4th Cir. 1976); *Appalachian Volunteers, Inc.* v. *Clark*, 432 F.2d 530 (6th Cir. 1970). Accordingly, the better view today is that, in an appeal authorized by Section 1447(d), a court of appeals can consider any of the grounds for removal fairly encompassed in the remand order being reviewed.

## B.  Plaintiffs' Arguments For Limiting The Scope Of Review Under Section 1447(d) Are Unpersuasive

In their motion for partial dismissal, plaintiffs make a number of arguments to support their contention that the Court's review of the remand order is limited to consideration of the federal-officer ground for removal. Each of those arguments lacks merit.

Plaintiffs first suggest (Mot. 2, 5-6) that this Court's decision in *Sanchez* v. *Onuska*, No. 93-2155, 1993 WL 307897 (Aug. 13, 1993), controls the scope of appellate review in this case. But "[i]t goes without saying" that, because *Sanchez* was unpublished, it is not binding. *United States* v. *Hansen*, 929 F.3d

1238, 1268 (10th Cir. 2019). And this Court routinely declines to follow its un-published decisions when they fail to persuade. *See*, *e.g.*, *Allen* v. *United Services Automobile Ass'n*, 907 F.3d 1230, 1239 n.5 (2018); *Lexington Insurance Co.* v. *Precision Drilling Co.*, 830 F.3d 1219, 1224 (2016). *Sanchez* is unper-suasive because it contravenes the plain text of Section 1447(d), *see Lu Jun-hong*, 792 F.3d at 811, and because it is inconsistent with this Court's more recent decision in *Coffey*. *Sanchez* also predates the Supreme Court's decision in *Yamaha* and Congress's subsequent enactment of the Removal Clarifica-tion Act, which confirmed Congress's intent to authorize plenary review on appeal of orders denying removal under the federal-officer removal statute. *See* p. 10, *supra*.

Plaintiffs next contend (Mot. 8) that the Sixth Circuit's decision in *Mays*, *supra*, which sided with the Seventh Circuit, carries no weight because the issue was not briefed by the parties in that case. If that is plaintiffs' position, then they cannot rely on *City of Walker* v. *Louisiana*, 877 F.3d 563 (5th Cir. 2017) and *Jacks*, *supra*—cases in which the parties did not fully brief the scope of appellate review under the exceptions in Section 1447(d). That explains why the Fifth Circuit in *Walker* limited its discussion of the issue to dicta in a foot-note. *See* 877 F.3d at 566 n.2. In *Jacks*, the Eighth Circuit purported to rest its holding on the "plain language" of Section 1447(d), but it offered no real

rationale for its conclusion—neglecting *Yamaha* and the Removal Clarification Act altogether. *See* 701 F.3d at 1229. The Sixth Circuit's decision in *Mays*, by contrast, incorporated by reference *Lu Junhong*'s comprehensive analysis. *See Mays*, 871 F.3d at 442.

In the face of the Supreme Court's decision in *Yamaha*, plaintiffs attempt to circumvent it, arguing (Mot. 12-13) that the rationale of *Yamaha* should be limited to the statute at issue in that case. But this Court in *Coffey* already applied *Yamaha*'s rationale to another statutory provision concerning removal—which contains statutory language that mirrors the language of Section 1447(d) in all relevant respects. *See Coffey*, 581 F.3d at 1247.

Plaintiffs' further argue that Section 1447(d) presents a "moral hazard problem" not present in *Yamaha*—specifically, a risk that removing defendants will "try to manufacture appealability" by invoking federal-officer removal in order to obtain the benefit of appellate review, in contravention of Congress's intent to "ensure that determination of jurisdiction is a quick process." Mot. 9, 11-12. But once there is some appellate review, "[t]he marginal delay from adding an extra issue to a case where the time for briefing, argument, and decision has already been accepted is likely to be small." *Lu Junhong*, 792 F.3d at 813. And to the extent that litigants attempt to use federal-officer removal simply as a "hook to allow appeal of some different subject,"

such a "frivolous" invocation of federal-officer removal could "lead[] to sanctions," including fee-shifting under 28 U.S.C. § 1447(c). *Lu Junhong*, 792 F.3d at 813; *see* Fed. R. App. P. 38.

Plaintiffs' analogy to *Swint* v. *Chambers County Commission*, 514 U.S. 35 (1995), is misguided. *See* Mot. 9-10. In that case, the Supreme Court held that, under the collateral-order doctrine, an appellate court with interlocutory jurisdiction over a qualified-immunity ruling applicable only to some of the appellants did not have discretion to exercise pendent appellate jurisdiction over a separate, non-final merits ruling applicable to the remaining appellants. 514 U.S. at 40-42, 50. To the extent that the Court rejected arguments sounding in judicial economy in *Swint*, it did so because those arguments "drift[ed] away from" the relevant statutory text. *Id.* at 45.

That is not the case here. In this case, only one order (applicable to all of the appellants) was appealed, and "nothing is 'pendent' when considering all of the issues that led to th[at] order." *Lu Junhong*, 792 F.3d at 812 (distinguishing *Swint*). In addition, unlike the statute at issue in *Swint*, the plain text of Section 1447(d) supports broad appellate review.

In sum, this Court has jurisdiction under Section 1447(d) to review all of the grounds for removal fairly encompassed in the district court's remand order. And as we will now explain, the district court's exercise of jurisdiction over this case was warranted on multiple grounds.

## II.   PLAINTIFFS' CLAIMS WERE PROPERLY REMOVED

Under 28 U.S.C. § 1441, a defendant in a civil action filed in state court may remove the case to federal court if the federal court would have jurisdiction over the case.  Removal is permitted so long as at least one claim falls within the jurisdiction of the federal court.  *See* 28 U.S.C. § 1367(a); *Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U.S. 546, 563 (2005).  The district court below had jurisdiction over this action on a number of grounds, including under the federal-question statute (28 U.S.C. § 1331), the federal-officer removal statute (28 U.S.C. § 1442), and the Outer Continental Shelf Lands Act (43 U.S.C. § 1349(b)).  The district court therefore erred in remanding this case to state court, and its remand order should be vacated.

### A.   Removal Was Proper Because Plaintiffs' Claims Arise Under Federal Common Law

Plaintiffs in this action allege that the combustion of defendants' fossil-fuel products led to greenhouse-gas emissions, which contributed to global climate change and in turn caused harm to their localities.  But it is well established that claims that seek redress related to interstate (and indeed international) emissions are governed by federal common law, not state law.  And claims governed by federal common law "arise under" federal law for purposes of 28 U.S.C. § 1331 and thus are removable under 28 U.S.C. § 1441.  Removal of this case was proper on that basis.

### 1. Federal Courts Have Jurisdiction Over Claims Governed By Federal Common Law

Although "[t]here is no federal general common law," *Erie Railroad Co.* v. *Tompkins*, 304 U.S. 64, 78 (1938), there remain "some limited areas" in which the governing legal rules will be supplied not by state law, but by "what has come to be known as federal common law." *Texas Industries, Inc.* v. *Radcliffe Materials, Inc.*, 451 U.S. 630, 640 (1981) (internal quotation marks omitted). Federal common law supplies the rule of decision in cases in which the subject matter of the plaintiff's claims implicates "uniquely federal interests." *Id.* at 641. Such interests arise where the issue is by nature "within national legislative power," *American Electric Power Co.* v. *Connecticut*, 564 U.S. 410, 421 (2011) (citation omitted); where there is a "demonstrated need for a federal rule of decision," *id.* at 422; or where "the interstate or international nature of the controversy makes it inappropriate for state law to control," *Texas Industries*, 451 U.S. at 641.

Under 28 U.S.C. § 1331, federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." That includes claims "founded upon federal common law as well as those of a statutory origin." *National Farmers Union Insurance Cos.* v. *Crow Tribe of Indians*, 471 U.S. 845, 850 (1985). Accordingly, if the "dispositive issues stated in the complaint require the application of federal common

17

law," the action "arises under" federal law for purposes of Section 1331.  *Illinois* v. *City of Milwaukee*, 406 U.S. 91, 100 (1972).

Consistent with the foregoing principles, courts have long recognized that federal jurisdiction exists if federal common law supplies the rule of decision, even if the plaintiff purports to assert only state-law claims.  *See Wayne* v. *DHL Worldwide Express*, 294 F.3d 1179, 1184 (9th Cir. 2002); *Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922, 926 (5th Cir. 1997); *New SD, Inc.* v. *Rockwell International Corp.*, 79 F.3d 953, 954-955 (9th Cir. 1996); *Kight* v. *Kaiser Foundation Health Plan*, 34 F. Supp. 2d 334, 340 (E.D. Va. 1999).  So considered, the question before the Court is one of choice of law:  regardless of what the plaintiff says, which sovereign's law in fact supplies the rule of decision for the plaintiffs' claim?  *See United States* v. *Standard Oil Co.*, 332 U.S. 301, 307-309 (1947).  Notably, that jurisdictional question is separate from the question whether federal common law provides a right of action—a separate merits inquiry.  *See id.* at 316; *City of Oakland* v. *BP p.l.c.*, 325 F. Supp. 3d 1017, 1028 (N.D. Cal. 2018), *appeal pending*, No. 18-6663 (9th Cir.);  *City of New York* v. *BP p.l.c.*, 325 F. Supp. 3d 466, 471 (S.D.N.Y. 2018), *appeal pending*, No. 18-2188 (2d Cir.).

### 2.     *Federal Common Law Governs Claims Alleging Harm From Global Climate Change*

Plaintiffs allege that greenhouse-gas emissions from the combustion of fossil fuels has contributed to global climate change, and they seek redress

from defendants for harms allegedly caused by climate change. As many courts have recognized, claims seeking redress for such climate-change-induced harms arise under federal common law.

a. Federal common law governs any "transboundary pollution suit[]" brought by one State to address pollution emanating from another. *Native Village of Kivalina* v. *ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012); *see also Milwaukee*, 406 U.S. at 103. "[S]uch claims have been adjudicated in federal courts" under federal common law "for over a century." *Connecticut* v. *American Electric Power Co.*, 582 F.3d 309, 331 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410; *International Paper Co.* v. *Ouellette,* 479 U.S. 481, 487 (1987); *see, e.g., Missouri* v. *Illinois*, 200 U.S. 496 (1906). Even after *Erie*, the Supreme Court reaffirmed that interstate pollution "is a matter of federal, not state, law" and "should be resolved by reference to federal common law." *Ouellette*, 479 U.S. at 488 (citation omitted).

The Supreme Court's decision in *American Electric Power, supra*, demonstrates the principle in action. There, the plaintiffs sued several electric utilities, contending that the utilities' greenhouse-gas emissions contributed to global climate change and created a "substantial and unreasonable interference with public rights, in violation of the federal common law of interstate nuisance, or, in the alternative, of state tort law." 564 U.S. at 418 (internal quotation marks and citation omitted). In determining whether plaintiffs had

properly stated a claim for relief, the Supreme Court determined that federal common law governs claims involving "air and water in their ambient or interstate aspects." *Id.* at 421. The Court rejected the notion that state law could govern public-nuisance claims related to global climate change, stating that "borrowing the law of a particular State would be inappropriate." *Id.* at 422.

The Ninth Circuit's decision in *Kivalina*, *supra*, applies the same logic to claims indistinguishable from those asserted here. In *Kivalina*, a municipality asserted a public-nuisance claim for damages to its property allegedly resulting from the defendant energy companies' "emissions of large quantities" of greenhouse gases. 696 F.3d at 853-854. The village contended that its claim arose under federal and (alternatively) state common law. *Native Village of Kivalina* v. *ExxonMobil Corp.*, 663 F. Supp. 2d 863, 869 (N.D. Cal. 2009). The district court dismissed the federal claim and declined to exercise supplemental jurisdiction over any related state-law claims. *Id.* at 882-883. On appeal, the Ninth Circuit held that federal common law governed plaintiffs' nuisance claim. *Kivalina*, 696 F.3d at 855. Citing *American Electric Power* and *Milwaukee*, the Ninth Circuit began from the premise that "federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.* Given the interstate and transnational character of claims asserting damage from global greenhouse-gas emissions, the court concluded that the suit fell within that rule. *Id.*

b.      Applying *American Electric Power* and *Kivalina*, two federal district courts have recently concluded that federal common law governs tort claims against fossil-fuel producers seeking redress for injuries allegedly caused by global climate change.

In *California* v. *BP p.l.c.*, Civ. No. 17-06011, 2018 WL 1064293 (N.D. Cal. Feb. 27, 2018), the district court denied motions to remand climate-change-related tort claims brought by the cities of San Francisco and Oakland, California. *See id.* at *1. The court concluded that claims addressing "the national and international geophysical phenomenon of global warming . . . are necessarily governed by federal common law." *Id.* at *2. The court reasoned that, "as in *Milwaukee I*, [*American Electric Power*], and *Kivalina*, a uniform standard of decision is necessary to deal with the issues" related to global climate change "raised in plaintiffs' complaints." *Id.* at *3. "If ever a problem cried out for a uniform and comprehensive solution," the court continued, "it is the geophysical problem described by the complaints." *Id.* Indeed, the court recognized that "the scope of the worldwide predicament demands the most comprehensive view available, which in our American court system means our federal courts and our federal common law." *Id.* For that reason, the court explained, a "patchwork of fifty different answers to the same fundamental global issue would be unworkable." *Id.*

The court affirmed that reasoning in its subsequent decision dismissing the case for failure to state a claim: "Although the scope of plaintiffs' claims is determined by federal law, there are sound reasons why regulation of the worldwide problem of global warming should be determined by our political branches, not by our judiciary." *City of Oakland* v. *BP p.l.c*, 325 F. Supp. 3d at 1029, *appeal pending*, No. 18-16663 (9th Cir.).

To the same effect is the district court's decision in *City of New York*, *supra*, *appeal pending*, No. 18-2188 (2d Cir.). There, as here, the plaintiff relied on "[d]efendants' worldwide fossil fuel production and the use of their fossil fuel products[,] [which] continue[] to emit greenhouse gases and exacerbate global warming." *Id.* at 471. But the court rejected the plaintiff's contention that its claims were actually based on "defendants' production and sale of fossil fuels." *Id.* at 471-472. Instead, the court observed that the plaintiff was "seeking damages for global-warming related injuries resulting from greenhouse gas emissions, and not only the production of [d]efendants' fossil fuels." *Id.* Accordingly, the plaintiff's claims were "based on the 'transboundary' emission of greenhouse gasses," and the claims thus "ar[o]se under federal common law and require[d] a uniform standard of decision." *Id.* at 472.

### 3.   *Plaintiffs' Claims Are Governed By, And Arise Under, Federal Common Law*

As in *American Electric Power*, *Kivalina*, *California*, and *City of New York*, plaintiffs' suit here is a classic "transboundary pollution suit[]."

22

*Kivalina*, 696 F.3d at 855.  Plaintiffs' climate-change-related claims are based on interstate and international emissions of greenhouse gases over the course of decades—even centuries—allegedly resulting in part from the use of fossil-fuel products produced or sold by defendants and consumed throughout the world.  *See, e.g.*, App. 73-77.

Because plaintiffs "seek[] damages for global warming-related injuries caused by greenhouse gas emissions," their claims implicate interstate and international concerns and invoke uniquely federal interests and responsibilities.  *City of New York*, 325 F. Supp. 3d at 473.  For example, because plaintiffs assert public-nuisance claims, the court likely will need to weigh the gravity of the harm caused by defendants' contribution to global climate change against the utility of their production of fossil-fuel products.  *See generally* Restatement (Second) of Torts §§ 821B, 826-831 (1979).  And that will require a determination of "what amount of carbon-dioxide emissions is unreasonable" given what is "practical, feasible, and economically viable."  *American Electric Power*, 564 U.S. at 428 (internal quotation marks omitted); *see City of New York*, 325 F. Supp. 3d at 473; *California* v. *General Motors Corp.*, Civ. No. 06-5755, 2007 WL 2726871, at *8 (N.D. Cal. Sept. 17, 2007).  Such a determination squarely implicates the federal government's interest in setting national and international policy on matters involving energy, the environment, and national security.  *See American Electric Power*, 564 U.S. at 427.

In light of those national and international concerns, there is an "overriding federal interest in the need for a uniform rule of decision." *Milwaukee*, 406 U.S. at 105 n.6. Indeed, "[i]f *ever* a problem cried out for a uniform and comprehensive solution, it is the geophysical problem of global warming." *California*, 2018 WL 1064293, at *3 (emphasis added).

Allowing state law to govern plaintiffs' claims would potentially permit suits alleging climate-change-related injuries to proceed under the law of all fifty States. Out-of-state actors (such as several of the defendants here) would very quickly find themselves subject "to a variety of" "vague" and "indeterminate" state common-law tort standards, and states would be empowered to "do indirectly what they could not do directly—regulate the conduct of out-of-state sources." *Ouellette*, 479 U.S. at 495-496. As the federal government explained in its amicus brief in *American Electric Power*, "resolving such claims would require each court to consider numerous and far-reaching technological, economic, scientific, and policy issues" and to decide "whether and to what extent each defendant should be deemed liable under general principles of nuisance law for some share of the injuries associated with global climate change." TVA Br. at 37, *American Electric Power*, *supra* (No. 10-174), 2011 WL 317143. That could lead to "widely divergent results" based on "different assessments of what is 'reasonable.'" *Id.*

In sum, plaintiffs' claims squarely implicate the strong federal interest in addressing transboundary pollution suits in a uniform manner. Federal common law must control, and a federal forum is necessary.

### 4. *The Well-Pleaded Complaint Rule Is No Obstacle To Removal*

In concluding that it lacked federal-question jurisdiction over plaintiffs' claims, the district court relied on the well-pleaded complaint rule. In particular, the court reasoned that, "[w]hile [d]efendants argue that the [c]omplaint raises inherently federal questions about energy, the environment, and national security, removal is not appropriate under the well-pleaded complaint rule because these federal issues are not raised or at issue in [p]laintiffs' claims." App. 213. The district court instead viewed defendants' invocation of federal common law as raising an ordinary preemption defense. In holding that removal was inappropriate, the district court fundamentally misunderstood both defendants' argument and the well-pleaded complaint rule.

The well-pleaded complaint rule provides that federal-question jurisdiction under 28 U.S.C. § 1331 exists only when "a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc.* v. *Williams*, 482 U.S. 386, 392 (1987). "Neither the plaintiff's anticipation of a federal defense nor the defendant's assertion of a federal defense is sufficient to make the case arise under federal law." *Firstenberg* v. *City of Santa Fe*, 696 F.3d 1018, 1023 (10th Cir. 2012).

The problem with the district court's reasoning is that defendants are not invoking federal common law as a defense to plaintiffs' state-law claims. Rather, defendants are arguing that federal common law supplies the rule of decision for those claims. And because that is clear from the face of the complaint—that is, from the nature of plaintiffs' allegations and the claims asserted—the well-pleaded complaint rule is satisfied.

The district court's contrary interpretation of the well-pleaded complaint rule gives dispositive force to the labels that a plaintiff applies to the claims in its complaint, rather than the substance of the allegations. But the well-pleaded complaint rule does not allow a plaintiff to "exalt form over substance," *Standard Fire Insurance Co.* v. *Knowles*, 568 U.S. 588, 595 (2013), by affixing a state-law label to a claim that is necessarily federal in nature. That is, the plaintiff cannot "block removal" by attempting to "disguise [an] inherently federal cause of action." Wright & Miller § 3722.1; *see Blanco* v. *Federal Express Corp.*, Civ. No. 16-561, 2016 WL 4921437, at *2-*3 (W.D. Okla. Sept. 15, 2016). That is consistent with the general rule that courts do not rely on "[l]egal labels characterizing a claim" to determine whether the complaint is sufficient. *Labram* v. *Havel*, 43 F.3d 918, 920 (4th Cir. 1995); *see Johnson* v. *City of Shelby*, 135 S. Ct. 346 (2014). That is because it is the substance of the claims, not the labels applied to them, that controls.

So too here.  Although plaintiffs label their claims as arising under state common law, the federal issues implicated by the substance of plaintiffs' allegations demand the application of federal common law.  The district court therefore had jurisdiction over this action, and it erred in remanding the case to state court.

### B.    Removal Was Proper Because Plaintiffs' Claims Raise Disputed And Substantial Federal Issues

Federal jurisdiction is also present because plaintiffs' claims raise disputed and substantial federal issues.  It is "commonsense" that "a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."  *Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Manufacturing*, 545 U.S. 308, 312-313 (2005).  That form of federal-question jurisdiction, often referred to as *Grable* jurisdiction, will lie "if a federal issue is:  (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn* v. *Minton*, 568 U.S. 251, 258 (2013); *see Grable*, 545 U.S. at 313-314.  Plaintiffs' claims necessarily raise several disputed and substantial federal issues that justify federal jurisdiction.

### 1.    *Plaintiffs' Claims Necessarily Raise Federal Issues*

The first *Grable* prong is satisfied because plaintiffs' claims necessarily raise issues that relate to the federal government's conduct of foreign affairs and amount to a collateral attack on cost-benefit analyses committed to, and already performed by, the federal government.

### a.    *Plaintiffs' Claims Substantially Affect Foreign Affairs*

Plaintiffs' claims raise substantial federal issues because they "implicate countless foreign governments and their laws and policies." *City of New York*, 325 F. Supp. 3d at 475; *see American Insurance Ass'n* v. *Garamendi*, 539 U.S. 396, 424 (2003). Climate-change litigation "necessarily involves the relationships between the United States and all other nations," because such claims "depend on a global complex of geophysical cause and effect involving all nations of the planet." *California*, 2018 WL 1064293, at *5; *accord City of New York*, 325 F. Supp. 3d at 475-476. Because plaintiffs' claims implicate the "exercise of state power that touches on foreign relations," state law "must yield to the National Government's policy, given the concern for uniformity in this country's dealings with foreign nations that animated the Constitution's allocation of the foreign relations power to the National Government." *Garamendi*, 539 U.S. at 413 (internal quotation marks omitted).

The district court disagreed, determining that there was "no specific foreign policy" at issue in this case. App. 220-221. To the contrary, the federal

government has long employed a policy of pursuing economic growth rather than imposing emissions limits under imbalanced international agreements— a policy that adjudication of this case would "more than incidental[ly] [a]ffect." *Garamendi*, 539 U.S. at 418. As early as 1975, President Ford created a comprehensive energy plan to "make [this] country independent of foreign sources of energy," as it had "become increasingly at the mercy of others for the fuel on which [the] entire economy runs." President Gerald Ford, *Address to the Nation on Energy Programs* (May 27, 1975). In the early 1980s, President Reagan eliminated federal controls on domestic oil production and marketing, recognizing that the elimination of price controls "will end the entitlements system, which has been in reality a subsidy for the importation of foreign oil," and "is a positive first step towards a balanced energy program." President Ronald Reagan, *Statement on Signing Executive Order 12287: Providing for the Decontrol of Crude Oil and Refined Petroleum Products* (Jan. 28, 1981); *see* Exec. Order No. 12,287 (1981).

In the 1990s, in response to President Clinton's signing of the Kyoto Protocol, an international commitment to reduce greenhouse-gas emissions, the Senate resolved that the nation should not be a signatory to any protocol that "would result in serious harm to the economy" or fail to regulate the emissions of developing nations. *See* S. Res. 98, 105th Cong., 1st Sess. (1997). Congress then enacted a series of laws barring the Environmental Protection

Agency from implementing or funding the Kyoto Protocol. *See* Act of Oct. 27, 2000, Pub. L. No. 106-377, 114 Stat. 1441A-41; Act of Oct. 20, 1999, Pub. L. No. 106-74, 113 Stat. 1080; Act of Oct. 21, 1998, Pub. L. No. 105-276, 112 Stat. 2496. More recently, President Trump cited foreign-affairs implications in his decision to withdraw from the Paris Agreement, which had been designed to manage greenhouse-gas-emissions mitigation, adaptation, and finance. *See Depositary Notification, United Nations* (Aug. 4, 2017); President Donald Trump, *Remarks by President Trump at the Unleashing American Energy Event* (June 29, 2017). Plaintiffs' claims, if successful, would thus interfere with longstanding federal policy and require a factfinder to substitute its own judgment as to its reasonableness. For that reason, plaintiffs' lawsuit necessarily implicates federal issues.

> b.    *Plaintiffs' Claims Amount To A Collateral Attack On Cost-Benefit Analyses Committed To The Federal Government*

In alleging that defendants are liable for public and private nuisance, plaintiffs contend that defendants "unreasonably" interfered with public and private rights. App. 177. Plaintiffs' claims therefore "necessarily raise[]" the question whether any alleged harms caused by defendants' conduct in extracting, refining, and promoting fossil fuels outweigh the enormous societal benefits of those activities. *See* Restatement (Second) of Torts §§ 826-831 (1979). The federal government, however, has already conducted such weighing of the

costs and benefits of fossil-fuel production and use. For decades, agencies have been compelled under federal law to strike the appropriate balance. *See*, *e.g.*, 42 U.S.C. § 13384 (directing the Energy Secretary to provide to Congress a "comparative assessment of alternative policy mechanisms for reducing the generation of greenhouse gases"); 43 C.F.R. § 3162.1(a) (requiring federal oil and gas lessees to drill in a manner that "results in maximum ultimate economic recovery of oil and gas with minimum waste"); *see also* Exec. Order No. 12,866 (1993) (requiring that agencies impose significant regulation "only upon a reasoned determination that the benefits  .  .  .  justify its costs").

The district court disagreed with the foregoing analysis, determining that reasonableness balancing may be accomplished without reference to federal law. *See* App. 219-220. But that is *precisely* the issue: plaintiffs aim to achieve through state tort law what they could not achieve in the federal legislative and regulatory process—namely, a determination that defendants' activities are unreasonable. Federal courts have long concluded that such collateral attacks on federal legislative and regulatory determinations implicate federal issues for purposes of federal-question jurisdiction. *See Board of Commissioners* v. *Tennessee Gas Pipeline Co.*, 850 F.3d 714, 724-725 (5th Cir. 2017); *Pet Quarters, Inc.* v. *Depository Trust & Cleaning Corp.*, 559 F.3d 772, 779 (8th Cir. 2009); *Bennett* v. *Southwest Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007); *McKay* v. *City & County of San Francisco*, Civ. No. 16-3561, 2016

31

WL 7425927, at *4-*5 (N.D. Cal. Dec. 23, 2016); *West Virginia ex rel. McGraw*
v. *Eli Lilly & Co.*, 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007).

### 2.    *The Federal Interests Implicated Are Substantial*

This case sits at the intersection of federal energy and environmental
regulation and necessarily implicates foreign policy and national security.  Any
one of those qualifies as a "substantial" federal interest.  *See Bennett*, 484 F.3d
at 910; *In re NSA Telecommunications Records Litigation*, 483 F. Supp. 2d
934, 943 (N.D. Cal. 2007); *Grynberg Production Corp.* v. *British Gas, p.l.c.*, 817
F. Supp. 1338, 1356 (E.D. Tex. 1993).

The district court, however, deemed the federal issues at play insubstan-
tial because they were not the "only legal or factual issue contested in the
case."  App. 224-225.  That is not the test.  "A case should be dismissed for
want of a substantial federal question *only* when the federal issue is (1) wholly
insubstantial or obviously frivolous, (2) foreclosed by prior cases which have
settled the issue one way or another, or (3) so patently without merit as to
require no meaningful consideration."  *Nicodemus* v. *Union Pacific Corp.*, 440
F.3d 1227, 1236 (10th Cir. 2006) (emphasis added).  None of those considera-
tions applies here, and the federal issues implicated are therefore substantial.

### 3.   The Federal Interests Are Disputed, And Their Adjudication In Federal Court Would Not Disrupt The Federal-State Balance

Although the district court declined to analyze the final two *Grable* requirements, each is clearly satisfied here.  Plaintiffs cannot deny that the federal questions presented here are disputed.  Their claims question whether, pursuant to a host of federal statutes, regulators should have struck a different balance between the harms and benefits of defendants' conduct.  Defendants contend that those claims amount to an impermissible collateral attack on federal policies that expressly encourage the precise conduct on which plaintiffs predicate their claims.  *See* App. 147-148.  And the exercise of federal jurisdiction over this action would be fully consistent with federalism principles.  The "sovereign prerogatives" to force States to reduce greenhouse-gas emissions and negotiate emissions treaties, after all, are "lodged in the Federal Government."  *Massachusetts* v. *EPA*, 549 U.S. 497, 519-520 (2007).  The district court therefore had jurisdiction over this action under *Grable* as well.

### C.   Removal Was Proper Because Federal Law Would Completely Preempt Plaintiffs' Claims If They Arose Under State Law

The district court also had federal jurisdiction because federal law would completely preempt plaintiffs' claims if they did arise under state law.  Complete preemption occurs where federal law has a "preemptive force  .  .  .  so powerful as to displace entirely any state cause of action," such that "any complaint that comes within the scope of the federal cause of action necessarily

33

'arises under' federal law." *Franchise Tax Board* v. *Construction Laborers Vacation Trust*, 463 U.S. 1, 23-24 (1983). A cause of action pleaded under state law is preempted under the "complete preemption" doctrine if a federal statutory scheme "provide[s] the exclusive cause of action for the claim asserted," *Beneficial National Bank* v. *Anderson*, 539 U.S. 1, 8 (2003), and the state-law claim "duplicates, supplements, or supplants" the federal cause of action, *Aetna Health Inc.* v. *Davila*, 542 U.S. 200, 209 (2004). When applicable, complete preemption renders a case "removable from state to federal court from the outset." *Hansen* v. *Harper Excavating, Inc.*, 641 F.3d 1216, 1221 (10th Cir. 2011). Even if plaintiffs' claims were properly characterized as arising under state law, *but see* pp. 18-25, *supra*, they would be completely preempted by the Clean Air Act (CAA), 42 U.S.C. §§ 7401-7671q.

1.    Enacted to promote "the public health and welfare and the productive capacity" of citizens, 42 U.S.C. § 7401(b)(1), the CAA has been the source of "extensive[]" nationwide emissions regulations, *North Carolina ex rel. Cooper* v. *Tennessee Valley Authority*, 615 F.3d 291, 298 (4th Cir. 2010). In particular, the Environmental Protection Agency (EPA) has used its authority under the CAA to regulate the types of greenhouse-gas emissions at issue in this litigation. *See, e.g.*, 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(1)(i); 81 Fed. Reg. 73,478 (Oct. 25, 2016); 77 Fed. Reg. 62,624 (Oct. 15, 2012).

The CAA, in conjunction with the Administrative Procedure Act, outlines specific and exclusive procedures for parties—including state and local governments—to challenge nationwide emissions standards in federal court. *See Virginia* v. *United States*, 74 F.3d 517, 523 (4th Cir. 1996); *New England Legal Foundation* v. *Costle*, 666 F.2d 30, 31, 33 (2d Cir. 1981). The CAA authorizes private parties to challenge EPA rulemakings or the absence of rulemakings. *See* 42 U.S.C. § 7604(a). And it establishes a path for private parties to petition EPA to undertake new rulemakings, the response to which is reviewable in federal court. *See* 42 U.S.C. § 7607(b)(1); 5 U.S.C. § 553(e). Those procedures led to the Supreme Court's decision in *Massachusetts* that greenhouse gases were air pollutants that could be regulated under the CAA, *see* 549 U.S. at 510, and eventually led to the regulation of greenhouse gases from motor vehicles, *see* 75 Fed. Reg. 25,324 (May 7, 2010). Numerous state and local governments are currently using those procedures to challenge EPA's action, or inaction, regarding nationwide greenhouse-gas emissions. *See*, *e.g.*, *Maryland* v. *EPA*, No. 18-1285 (D.C. Cir.); *New York* v. *EPA*, No. 17-1185 (D.C. Cir.); *New York* v. *Pruitt*, No. 18-773 (D.D.C.).

Plaintiffs bypassed those procedures by filing this action in state court, seeking to impose restrictions on interstate and international greenhouse-gas emissions resulting from the combustion of defendants' fossil fuels. But "[i]f courts across the nation were to use the vagaries of public nuisance doctrine

to overturn the carefully enacted rules governing airborne emissions, it would be increasingly difficult for anyone to determine what standards govern." *Cooper*, 615 F.3d at 298.  As one court put it:  "An EPA-sanctioned state permit may set one standard, a judge in a nearby state in another, and a judge in another state a third.  Which standard is the hapless source to follow?"  *Id.*

2.    The district court concluded that the CAA could not displace plaintiffs' claims because it does not afford a cause of action *for damages*.  *See* App. 228.  As a preliminary matter, plaintiffs' allegations reveal that they are suing defendants to induce *actions* to reduce greenhouse-gas emissions, even if plaintiffs disclaim any interest in equitable remedies.  The complaint, for instance, refers to defendants' "unchecked production, promotion, refining, marketing and sale of fossil fuels," and notes that "[d]efendants plan to increase their fossil fuel activities in the future."  App. 74-75.  As the Supreme Court has noted, the "obligation to pay compensation can be, and indeed is designed to be, a potent method of governing conduct and controlling policy."  *San Diego Building Trades Council* v. *Garmon*, 359 U.S. 236, 247 (1959); *see Ouellette,* 479 U.S. at 498 n.19.

In any event, even assuming that plaintiffs were seeking damages merely to compensate them for their alleged injuries, the CAA would still completely preempt their claims.  For "complete preemption to operate, the fed-

eral claim need not be co-extensive with the ousted state claim"; "the super-seding federal scheme may be more limited or different in its scope and still completely preempt." *Fayard* v. *North Carolina Vehicle Services, LLC*, 533 F.3d 42, 46 (1st Cir. 2008).

The district court noted that the CAA contains a "saving clause," *see* App. 231-232, but that clause is exceedingly narrow:  it carves out a limited space for state common law but does *not* extend to interstate and international greenhouse-gas emissions such as those at issue here.  *See* 42 U.S.C. § 7604(e) (preserving "any right which any person  .  .  .  may have under  .  .  .  common law to seek enforcement of any emission standard or limitation or to seek any other relief"); *cf. Geier* v. *American Honda Motor Co.*, 529 U.S. 861, 870 (2000) (noting that, under ordinary preemption principles, courts "decline[] to give broad effect to savings clauses where doing so would upset the careful regulatory scheme established by federal law").  The saving clause thus supplies no valid basis for avoiding complete preemption here.

### D.    Removal Was Proper Under The Federal-Officer Removal Statute

The federal-officer removal statute, 28 U.S.C. § 1442, allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof  .  .  .  for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  The right of removal is "made absolute whenever a suit in a state court is for any act 'under color' of federal

office, regardless of whether the suit could originally have been brought in federal court." *Willingham* v. *Morgan*, 395 U.S. 402, 406 (1969).  A private actor may remove a case under Section 1442 if it can show that (1) "it acted under the direction of a federal officer," (2) "there is a causal nexus between the plaintiff's claims and the acts the private corporation performed under the federal officer's direction," and (3) "there is a colorable federal defense to the plaintiff's claims." *Greene* v. *Citigroup, Inc.*, Civ. No. 99-1030, 2000 WL 647190, at *2 (10th Cir. May 19, 2000); *see Sawyer* v. *Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017).  All three requirements are satisfied here.

### 1.    *ExxonMobil Acted Under The Direction Of Federal Officers*

Whether a party acted "under" the direction of a federal officer "typically" focuses on the existence of "subjection, guidance, or control" from the officer, with the party endeavoring to "assist, or to help carry out, the [officer's] duties or tasks." *Watson* v. *Philip Morris Cos.*, 551 U.S. 142, 151-152 (2007) (emphasis omitted).  That test is satisfied when a party "fulfill[s] the terms of a contractual agreement" with the government and "perform[s] a job that, in the absence of a contract with a private firm, the [g]overnment itself would have had to perform." *Id.* at 153-154.  Such is the case here.

a.    ExxonMobil and its affiliates are participants in a decades-long leasing program with the Department of the Interior in which they have explored and recovered oil and gas on the outer continental shelf.  *See* App. 38-

40.  Without the assistance of private firms such as ExxonMobil, "the Government itself would have had to perform" the tasks necessary to discover and extract fossil fuels from the outer continental shelf, *Watson*, 551 U.S. at 153-154—a "vital national resource reserve held by the Federal Government for the public," 43 U.S.C. § 1332(3).

By the terms of that program, ExxonMobil is subject to the Department of the Interior's extensive control.  Under the applicable lease agreements, ExxonMobil is obligated diligently to "develop[]  .  .  .  the leased area," including carrying out exploration, development, and production activities approved by officials in the Department of the Interior for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area." App. 64, § 10.  All drilling takes place only "in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"—all of which are subject to extensive review and approval by federal authorities and must conform to "diligence" and "sound conservation practices." App. 64, §§ 9-10.  The federal government reserves the right to control the rates of mining and production.  *See* App. 50, § 10.  And in the ordinary course, 20% of all crude and natural gas produced under the leases must be offered to small or independent refiners.  *See* App. 50 § 15(c); App. 68, § 15(c).

In times of war or other exigencies, moreover, the federal government is entitled to a right of first refusal on all mined materials. *See* App. 50, § 15(d); App. 68, § 15(d).

b.    Those facts notwithstanding, the district court held that removal was not permissible under Section 1442 because, in its view, the federal government did not exercise sufficient control over ExxonMobil's activities. *See* App. 242-244. But each of the justifications the district court offered for that determination is flawed.

The district court first expressed the view that "the government does not control the manner in which [d]efendants drill for oil and gas, or develop and produce the product." App. 242. Yet the operative leases explicitly afford the federal government the right to control the rates of mining and production. *See* App. 50, § 10.

The district court next observed that ExxonMobil "ha[d] not shown that a federal officer instructed [it] how much fossil fuel to sell." *See* App. 242. But the lease terms clearly establish that the federal government retained the right to obligate lessees (including ExxonMobil) to "drill such wells and produce at such rates" as specified, as well as the right of first refusal during times of war. *See* App. 50, §§ 10, 15(d); App. 68, § 15(d). What is more, 20% of all crude and natural gas produced under the leases must be ordinarily offered to small or independent refiners. *See* App. 50, § 15(c); App. 68, § 15(c).

The district court also faulted ExxonMobil for not demonstrating that a federal officer "instructed [it] how much fossil fuel to sell or to conceal or misrepresent the dangers of [fossil-fuel] use" or "directed them to market fossil fuels at levels they knew would allegedly cause harm to the environment." App. 242. But no such showing was necessary. "[R]emoval of the entire case is appropriate so long as a single claim satisfies the federal officer removal statute." *Savoie* v. *Huntington Ingalls, Inc.*, 817 F.3d 457, 463 (5th Cir. 2016). While some of plaintiffs' claims depend on the presence of scienter or misrepresentations, others plainly do not. *See*, *e.g.*, App. 180-181 (common-law trespass); *Sanderson* v. *Health Mesa Homeowners' Ass'n*, 183 P.3d 679, 683 (Colo. App. 2008) (noting that, under Colorado law, liability for trespass "requires only an intent to do the act that itself constitutes, or inevitably causes, the intrusion").

Citing the Supreme Court's decision in *Watson*, *supra*, the district court stated that "[f]ederal officer jurisdiction requires an 'unusually close' relationship between the government and the contractor." App. 242. That statement from *Watson*, however, "appears to be descriptive—an attempt to define what the lower courts were doing—not a command to the lower courts to follow a certain test." *Goncalves* v. *Rady Children's Hospital San Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017). Under the framework set forth by this Court and

others, ExxonMobil has established the requisite level of control by a federal
officer to support removal under Section 1442.

### 2. The Complaint Alleges A Sufficient Causal Nexus Between Plaintiffs' Claims And ExxonMobil's Federally Directed Activities

"[T]he hurdle erected by [the causal-nexus] requirement is quite low."
*Goncalves*, 865 F.3d at 1244 (internal quotation marks omitted).  A defendant
need show only that "the charged conduct relate[s] to an act under color of
federal office." *Sawyer*, 860 F.3d at 258.  Defendants have cleared that hurdle.
Taking plaintiffs' causal allegation as true, *see Jefferson County* v. *Acker*, 527
U.S. 423, 432 (1999), defendants' "worldwide" supply of fossil fuels—which
necessarily encompasses activities taken at federal direction—caused the in-
juries of which plaintiffs complain.  *See* App. 92.  While defendants dispute that
allegation, a defendant need not admit causation in order to permit removal.
*See Maryland* v. *Soper*, 270 U.S. 9, 32-33 (1926).

The district court disagreed that the requisite causal nexus was present.
In so doing, the court relied entirely on its reasoning as to why ExxonMobil
did not act "under" a federal officer for purposes of the first prong.  *See* App.
243.  The two requirements are distinct, however, and the district court's rea-
soning on the first prong was incorrect in any event.  *See* pp. 40-41, *supra*.

### 3. *ExxonMobil Has Colorable Defenses To Plaintiffs' Claims*

The final requirement for removal under the federal-officer removal statute is that there be a "colorable" federal defense to plaintiff's claims. ExxonMobil has multiple such defenses.  ExxonMobil intends to assert that plaintiffs' claims are preempted by federal law, *see Colorado Department of Public Health & Environment* v. *United States*, 693 F.3d 1214, 1222 (10th Cir. 2012); that the government-contractor defense applies, *see Boyle* v. *United Technologies Corp.*, 487 U.S. 500, 511-512 (1988); and that plaintiffs' claims are barred by the Commerce Clause, the Due Process Clause, and the First Amendment.  *See* App. 44.  Because all of the requirements for federal-officer removal were satisfied, the district court erred in remanding the case to state court.

### E. Removal Was Proper Because This Action Arises In Part From Activities In Federal Enclaves

Federal enclaves—"all places purchased" by the government "for the erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings"—are within the federal government's "power and exclusive authority." *Akin* v. *Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *see* U.S. Const. Art. I, § 8, cl. 17.  Accordingly, actions that "arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction."  *Akin*, 156 F.3d at 1034; *see* 28 U.S.C. § 1331.

In their complaint, plaintiffs claim to have suffered multiple injuries within federal enclaves. Specifically, they allege an insect infestation across Rocky Mountain National Park; an increased flood risk in the San Miguel River in Uncompahgre National Forest; and "heat waves, wildfires, droughts, and floods" in both locations. App. 73, 80, 111, 116, 127; *see* Colo. Rev. Stat. §§ 3-1-122, 3-1-130. Those allegations create federal jurisdiction and thus permit removal. *See Akin*, 156 F.3d at 1034.

The district court declined to exercise federal-enclave jurisdiction, but the reasons it offered for doing so do not withstand scrutiny. To begin with, the district court noted that plaintiffs' complaint did not specify that certain affected areas were located in federal enclaves. *See* App. 237. But that is of no moment. Plaintiffs cannot escape federal-court jurisdiction simply by describing a location in a federal enclave but omitting the magic words "federal enclave." *See Fung* v. *Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992).

In addition, the district court relied on plaintiffs' disclaimer of relief for injuries related to federal enclaves. *See* App. 237. What matters, however, is not plaintiffs' theory of damages, but instead whether events pertinent to liability took place within a federal enclave. *See Akin*, 156 F.3d at 1034; *Rosseter* v. *Industrial Light & Magic*, Civ. No. 08-4545, 2009 WL 210452, at *2 (N.D.

Cal. Jan. 27, 2009). If the identified occurrences on federal enclaves were irrelevant to plaintiffs' claims, plaintiffs would have had no reason to include them in their pleadings. Federal jurisdiction lies on that basis as well

### F. Removal Was Proper Because Plaintiffs' Claims Arise Out Of ExxonMobil's Operations On The Outer Continental Shelf

The federal-question statute and the federal-officer removal statute are not the only bases for removal jurisdiction in this case. Removal was also proper because plaintiffs' claims arise out of ExxonMobil's operations under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331-1356b.

1. OCSLA is designed to achieve "the efficient exploitation of the minerals" on the outer continental shelf by establishing a program to explore and to lease the shelf's oil and gas resources. *Amoco Production Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988); *see* 43 U.S.C. § 1332; *California* v. *Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981). OCSLA supplies a body of federal law applicable to the outer continental shelf, *see Rodrigue* v. *Aetna Casualty & Surety Co.*, 395 U.S. 352, 355 (1969), and grants federal courts jurisdiction over actions "arising out of, or in connection with . . . any operation conducted on the outer [c]ontinental [s]helf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer [c]ontinental [s]helf." 43 U.S.C. § 1349(b)(1); *see Parker Drilling Management Services, Ltd.* v. *Newton*, 139 S. Ct. 1881, 1887 (2019).

The scope of OCSLA's jurisdictional provision is "very broad." *Tennessee Gas Pipeline* v. *Houston Casualty Insurance Co.*, 87 F.3d 150, 154 (5th Cir. 1996). In enacting that provision, Congress "intended for the judicial power of the United States to be extended to the entire range of legal disputes that it knew would arise relating to resource development" on the outer continental shelf. *Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985). "Exploration," "development," and "production" have been construed to "encompass the full range of oil and gas activity from locating mineral resources through the construction, operation, servicing and maintenance of facilities to produce those resources." *E.P. Operating Ltd. Partnership* v. *Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).

A plaintiff's claims "aris[e] out" of those operations so long as they contribute to the injuries alleged. *See Tennessee Gas*, 87 F.3d at 155. That is, jurisdiction under OCSLA is present where "at least part of the work" that the plaintiff alleges caused the injury "arose out of or in connection with" the defendant's operations on the outer continental shelf. *Ronquille* v. *Aminoil Inc.*, Civ. No. 14-164, 2014 WL 4387337, at *2 (E.D. La. Sept. 4, 2014).

2.    The district court had jurisdiction under OCSLA. To begin with, ExxonMobil indisputably engages in significant "operation[s]" on the outer continental shelf. As the complaint recognizes, ExxonMobil and its affiliates

46

have explored and recovered oil and gas on the outer continental shelf for dec-ades.  *See* App. 92-93.  Today, ExxonMobil owns lease interests in one of the "largest [oil fields] in the Gulf of Mexico," capable of producing up to 250,000 barrels of oil per day.  App. 40.

By their own terms, moreover, plaintiffs' claims arise in part from ExxonMobil's operations on the outer continental shelf.  Plaintiffs allege that ExxonMobil has released "billions of tons of the excess greenhouse gas emis-sions in the atmosphere" and take issue with all of ExxonMobil's conduct that allegedly "exacerbated dangerous alterations in the climate."  App. 76, 173.  By alleging that *all* of ExxonMobil's conduct caused their injuries, plaintiffs nec-essarily include activities on the outer continental shelf.  *See* 43 U.S.C. § 1349(b)(1).

The exercise of federal jurisdiction here would further OCSLA's pur-poses.  Congress "intended" that "any dispute that alters the progress of pro-duction activities" on the outer continental shelf, and thus "threatens to impair the total recovery of the federally[] owned minerals from the reservoir or res-ervoirs underlying" the outer continental shelf, be within OCSLA's "grant of federal jurisdiction." *Amoco*, 844 F.2d at 1210.  That is precisely the case here.  Plaintiffs seek potentially billions of dollars in damages from defendants in this action.  *See* App. 192-195.  An award of that magnitude from a state court would substantially discourage production on the outer continental shelf and

would jeopardize the future viability of the federal outer-continental-shelf leasing program.

3. The district court did not dispute that ExxonMobil engaged in operations on the outer continental shelf. Nor did it conclude that this litigation would not affect exploration efforts on the outer continental shelf. Instead, the district court deemed the connection between plaintiffs' claims and ExxonMobil's operations too indirect to support jurisdiction under OCSLA. *See* App. 244-250. As with federal-officer jurisdiction, however, plaintiffs' own pleadings belie that conclusion. Accepting plaintiffs' causal allegations as true, *see E.P. Operating*, 26 F.3d at 570, "[t]he emissions traceable to [ExxonMobil's] products . . . were a substantial factor in bringing about and aggravating the resulting climate change impacts and will continue to contribute to those impacts for the foreseeable future." App. 160. For that reason, federal jurisdiction lies under OCSLA, in addition to the myriad other bases for jurisdiction discussed above. Defendants therefore properly removed this case to federal court, and the district court erred in granting plaintiffs' motion to remand.

## CONCLUSION

The remand order of the district court should be vacated and the case remanded for further proceedings.

Respectfully submitted,

/s/ Hugh Quan Gottschalk

HUGH QUAN GOTTSCHALK
EVAN B. STEPHENSON
WHEELER TRIGG O'DONNELL LLP
  *370 Seventeenth Street, Suite 4500*
  *Denver, CO 80202*
  *(303) 244-1800*
  *gottschalk@wtotrial.com*

*Attorneys for Suncor Energy*
*(U.S.A.) Inc., Suncor Energy Sales*
*Inc., and Suncor Energy, Inc.*

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

THEODORE V. WELLS, JR.
DANIEL J. TOAL
JAREN JANGHORBANI
NORA AHMED
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

COLIN G. HARRIS
FAEGRE BAKER DANIELS LLP
  *1470 Walnut Street, Suite 300*
  *Boulder, CO 80302*

*Attorneys for Exxon Mobil*
*Corporation*

NOVEMBER 20, 2019

# ADDENDUM

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-01672-WJM-SKC

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY;
BOARD OF COUNTY COMMISSIONERS OF SAN MIGUEL COUNTY; and
CITY OF BOULDER,

      Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC.;
SUNCOR ENERGY SALES INC.;
SUNCOR ENERGY INC.; and
EXXON MOBIL CORPORATION,

      Defendants.

---

## ORDER

---

      Plaintiffs brought Colorado common law and statutory claims in Boulder County, Colorado District Court for injuries occurring to their property and citizens of their jurisdictions, allegedly resulting from the effects of climate change.  Plaintiffs sue Defendants in the Amended Complaint ("Complaint") "for the substantial role they played and continue to play in causing, contributing to and exacerbating climate change." (ECF No. 7 ¶ 2.)  Defendants filed a Notice of Removal (ECF No. 1) on June 29, 2018.  Plaintiffs filed a Motion to Remand (ECF No. 34) on July 30, 2018.

      For the reasons explained below, the Court grants Plaintiffs' Motion to Remand. Defendants' Motion to Reschedule Oral Argument on Plaintiffs' Motion to Remand (ECF No. 67), is denied as the Court finds that a hearing is not necessary.

## I. BACKGROUND

Plaintiffs assert six state law claims: public nuisance, private nuisance, trespass, unjust enrichment, violation of the Colorado Consumer Protection Act, and civil conspiracy.  The Complaint alleges that Plaintiffs face substantial and rising costs to protect people and property within their jurisdictions from the dangers of climate alteration.  (ECF No. 7 ¶¶ 1–4, 11, 221–320.)  Plaintiffs allege that Defendants substantially contributed to the harm through selling fossil fuels and promoting their unchecked use while concealing and misrepresenting their dangers.  (*Id*. ¶¶ 2, 5, 13–18, 321–435.)  The fossil fuel activities have raised the emission and concentration of greenhouse gases ("GHGs") in the atmosphere.  (*Id*. ¶¶ 7, 15, 123–138, 321–38.)

As a result of the climate alterations caused and contributed to by Defendants' fossil fuel activities, Plaintiffs allege that they are experiencing and will continue to experience rising average temperatures and harmful changes in precipitation patterns and water availability, with extreme weather events and increased floods, drought, and wild fires.  (ECF No. 7 ¶¶ 145–179.)  These changes pose a threat to health, property, infrastructure, and agriculture.  (*Id*. ¶¶ 1–4, 180–196.)  Plaintiffs allege that they are sustaining damage because of services they must provide and costs they must incur to mitigate or abate those impacts.  (*Id*. ¶¶ 1, 4–5, 221–320.)  Plaintiffs seek monetary damages from Defendants, requiring them to pay their *pro rata* share of the costs of abating the impacts on climate change they have allegedly caused through their tortious conduct.  (*Id*. at ¶ 6.)  Plaintiffs do not ask the Court to stop or regulate Defendants' emissions of fossil fuels (*id*. at ¶¶ 6, 542), and do not seek injunctive relief.

Defendants' Notice of Removal asserts the following: (1) federal question jurisdiction— that Plaintiffs' claims arise under federal common law, and that this action necessarily and unavoidably raises disputed and substantial federal issues that give rise to jurisdiction under *Grable & Sons Metal Products, Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308 (2005) ("*Grable*"); (2) complete preemption; (3) federal enclave jurisdiction; (4) jurisdiction because the allegations arise from action taken at the direction of federal officers; (5) jurisdiction under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b); and (6) jurisdiction under 28 U.S.C. § 1452(a) because the claims are related to bankruptcy proceedings.

While there are no dispositive cases from the Supreme Court, the United States Court of Appeals for the Tenth Circuit, or other United States Courts of Appeal, United States District Court cases throughout the country are divided on whether federal courts have jurisdiction over state law claims related to climate change, such as raised in this case. *Compare California* v. *BP p.l.c.* ("*CA I*"), 2018 WL 1064293 (N.D. Cal. Feb. 27, 2018); *City of Oakland* v. *BP p.l.c. ("CA II*), 325 F. Supp. 3d 1017 (N.D. Cal. June 25, 2018); *City of New York v. BP p.l.c.*, 325 F. Supp. 3d 466 (S.D.N.Y. July 19, 2018) with *State of Rhode Island v. Chevron Corp.*, 2019 WL 3282007 (D. R.I. July 22, 2019); *Mayor and City Council of Baltimore v. BP P.L.C.* ("*Baltimore*"), 2019 WL 2436848 (D. Md. June 10, 2019), *appeal docketed*, No. 19-1644 (4th Cir. June 18, 2019); and *Cnty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018), *appeal docketed*, No. 18-15499 (9th Cir. May 27, 2018).

3

## II. LEGAL STANDARD

Plaintiffs' Motion to Remand is brought pursuant to 28 U.S.C. § 1447(c).  The Motion to Remand asserts that the Court lacks subject matter jurisdiction over the claims in this case, which Plaintiffs contend are state law claims governed by state law.

Federal courts are courts of limited jurisdiction, "possessing 'only that power authorized by Congress and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (citation omitted).  Thus, "[f]ederal subject matter jurisdiction is elemental."  *Firstenberg v. City of Santa Fe*, 696 F.3d 1018, 1022 (10th Cir. 2012).  "It cannot be consented to or waived, and its presence must be established" in every case in federal court.  *Id*.

Here, Defendants predicate removal on the ground that the federal court has original jurisdiction over the claims.  28 U.S.C. § 1441(a).  Diversity jurisdiction has not been invoked.  Removal is appropriate "if, but only if, 'federal subject-matter jurisdiction would exist over the claim.'"  *Firstenberg*, 696 F.3d at 1023 (citation omitted).  If a court finds that it lacks subject matter jurisdiction at any time before final judgment is entered, it must remand the case to state court.  28 U.S.C. § 1447(c).

 The burden of establishing subject matter jurisdiction is on the party seeking removal to federal court, and there is a presumption against its existence.  *Salzer v. SSM Health Care of Okla. Inc.*, 762 F.3d 1130, 1134 (10th Cir. 2014).  "Removal statutes are to be strictly construed,. . . and all doubts are to be resolved against removal."  *Fajen v. Found. Reserve Ins. Co.*, 683 F.2d 331, 333 (10th Cir. 1982).  The party seeking removal must show that jurisdiction exists by a preponderance of the evidence.  *Dutcher v. Matheson*, 840 F.3d 1183, 1189 (10th Cir. 2016).

4

### III. ANALYSIS

**A.    Federal Question Jurisdiction**

Defendants first argue that federal question jurisdiction exists.  Federal question

jurisdiction exists for "all civil actions arising under the Constitution, laws, or treaties of

the United States."  28 U.S.C. § 1331.  In determining whether such jurisdiction exists, a

court must "look to the 'face of the complaint'" and ask whether it is "'drawn so as to

claim a right to recover under the Constitution and laws of the United States'[.]"

*Firstenberg*, 696 F.3d at 1023 (quoting *Bell v. Hood*, 327 U.S. 678, 681 (1946)).

"[T]he presence or absence of federal-question jurisdiction is governed by the

'well-pleaded complaint rule', which provides that federal jurisdiction exists only when a

federal question is presented on the face of the plaintiff's properly pleaded complaint."

*Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (citation omitted).  Under this rule,

a case arises under federal law 'only when the plaintiff's statement of his own cause of

action shows that it is based' on federal law."  *Devon Energy Prod. Co., L.P. v. Mosaic*

*Potash Carlsbad, Inc.*, 693 F.3d 1195, 1202 (10th Cir. 2012) (citation omitted).  The

court need only examine "the well-pleaded allegations of the complaint and ignore

potential defenses. . . .'"  *Id*. (citation omitted).

The well-pleaded complaint rule makes "the plaintiff the master of the claim; he

or she may avoid federal jurisdiction by exclusive reliance on state law."  *Caterpillar*,

482 U.S. at 392; *see also Devon Energy*, 693 F.3d at 1202 ("By omitting federal claims

from a complaint, a plaintiff can generally guarantee an action will be heard in state

court.") (internal quotation marks omitted).  While the plaintiff may not circumvent

federal jurisdiction by artfully drafting the complaint to omit federal claims that are essential to the claim, *Caterpillar*, 482 U.S. at 392, the plaintiff "can elect the judicial forum–state of federal" depending on how the plaintiff drafts the complaint. *Firstenberg*, 696 F.3d at 1023.  "Neither the plaintiff's anticipation of a federal defense nor the defendant's assertion of a federal defense is sufficient to make the case arise under federal law."  *Id*. (internal quotation marks omitted).

 For a plaintiff's well-pleaded complaint to establish that the claims arise under federal law within the meaning of § 1331, it "must establish one of two things:  'either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on a resolution of a substantial question of federal law.'" *Firstenberg*, 696 F.3d at 1023 (citation omitted).  The "creation' test" in the first prong accounts for the majority of suits that raise under federal law."  *See Gunn*, 568 U.S. at 257.  However, where a claim finds its origins in state law, the Supreme Court has identified a "'special and small category' of cases" in which jurisdiction lies under the substantial question prong as they "implicate significant federal interests."  *Id*. at 258; *see also Grable*, 545 U.S. at 312.

Defendants argue that both prongs of federal question jurisdiction are met.  The Court will address each of these arguments in turn.

1.    <u>Whether Federal Law Creates the Cause of Action</u>

Defendants first assert that federal question jurisdiction exists because Plaintiffs' claims arise under federal law; namely, federal common law, such that federal law creates the cause of action.  The Supreme Court has "held that a few areas, involving

6

'uniquely federal interests,' . . . are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts—so-called 'federal common law.'" *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988) (citations omitted); *see also Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 850 (1985).  The issue must involve "an area of uniquely federal interest", and federal common law will displace state law only where "a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law,' . . or the application of state law would 'frustrate specific objectives' of federal legislation."  *Boyle*, 487 U.S. at 507 (citations omitted).

Defendants assert that this case belongs in federal court because it threatens to interfere with longstanding federal policies over matters of uniquely national importance, including energy policy, environmental protection, and foreign affairs.  They note that two courts have held that claims akin to those brought by Plaintiffs are governed by federal common law, citing the decisions in *CA I*, *CA II*, and *City of New York*.[1]

    a.    *Relevant Case Law*

Defendants state over the past century that the federal government has recognized that a stable energy supply is critical for the preservation of our economy

---

[1] Notably, in another case ExxonMobil appeared to argue the opposite of what it argues here: that there is no uniquely federal interest in this type of case and a suit does not require "'the application of federal common law, merely because the conflict is not confined within the boundaries of a single state.'"  (*See* ECF No. 50-1 at 55–60) (citation omitted).  Instead, it asserted that "only suits by [states] *implicating a sovereign interest* in abating interstate pollution give rise to federal common law."  (*Id*. at 58–60) (emphasis added).

and national security, taken steps to promote fossil fuel production, and worked to decrease reliance on foreign oil.  The government has also worked with other nations to craft a workable international framework for responding to global warming.  This suit purportedly challenges those decisions by requiring the court to delve into the thicket of the "worldwide problem of global warming"— the solutions to which Defendants assert for "sound reasons" should be "determined by our political branches, not by our judiciary."  *See CA II*, 2018 WL 3109726, at *9.

Plaintiffs thus target *global* warming, and the transnational conduct that term entails.  (ECF No. 7 ¶¶ 125–38.)  Defendants contend that the claims unavoidably require adjudication of whether the benefits of fossil fuel use outweigh its costs—not just in Plaintiffs' jurisdictions, or even in Colorado, but on a global scale.  They argue that these claims do not arise out of state common law.  Defendants further assert that this is why similar lawsuits have been brought in federal court, under federal law, and why, when those claims were dismissed, the plaintiffs made no effort to pursue their claims in state courts.  *See, e.g.*, *Am. Elec. Power Co., Inc.* v. *Connecticut* ("*AEP*"), 564 U.S. 410 (2011); *Kivalina* v. *ExxonMobil Corp.* ("*Kivalina*"), 696 F.3d 849 (9th Cir. 2012).  Defendants thus contend that the court has federal question jurisdiction because federal law creates the cause of action.

The Court first addresses the cases relied on by Defendants that address similar claims involving injury from global warming, beginning its analysis with the Supreme Court's decision in *AEP*.  The *AEP* plaintiffs brought suit in federal court against five domestic emitters of carbon dioxide, alleging that by contributing to global warming,

8

they had violated the federal common law of interstate nuisance, or, in the alternative, state tort law.  564 U.S. at 418 (citation omitted).  They brought both federal and state claims, and asked for "a decree setting carbon-dioxide emission for each defendant." *Id*.  The plaintiffs did not seek damages.

The Court in *AEP* stated what while there is no federal general common law, there is an "emergence of a federal decisional law in areas of national concern", the "new" federal common law.  564 U.S. at 421 (internal quotation marks omitted).  This law "addresses 'subjects within national legislative power where Congress has so directed' or where the basic scheme of the Constitution so demands."  *Id*. (citation omitted).  The Court found that environmental protection is "undoubtedly an area within national legislative power, one in which federal courts may fill in statutory interstices, and, if necessary, even fashion federal law."  *Id*. (internal quotation marks omitted).  It further stated that when the court "deal[s] with air and water in their ambient or interstate aspects, there is federal common law.'"  *Id*. (*quoting Illinois v. City of Milwaukee*, 406 US. 91, 103 (1972)).

*AEP* also found that when Congress addresses a question previously governed by federal common law, "'the need for such an unusual exercise of law-making by federal courts disappears.'"  564 U.S. at 423 (citation omitted).  The test for whether congressional legislation excludes the declaration of federal common law is "whether the statute 'speak[s] directly to [the] questions at issue."  *Id*. at 424 (citation omitted).  The Court concluded that "the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide emissions from

fossil-fuel fired power plants," *i.e.,* the Clean Air Act spoke directly "to emissions of carbon dioxide from the defendants' plants." *Id*. Since it found that federal common law was displaced, *AEP* did not decide the scope of federal common law, or whether the plaintiffs had stated a claim under it. *Id.* at 423 (describing the question as "academic"). It also did not address the state law claims. *Id*. at 429.

In *Kivalina*, the plaintiffs alleged that massive greenhouse gas emissions by the defendants resulted in global warming which, in turn, severely eroded the land where the City of Kivalina sat and threatened it with imminent destruction. 696 F.3d at 853. Relying on *AEP*, the Ninth Circuit found that the Clean Air Act displaced federal common law nuisance claims for damages caused by global warming. *Id*. at 856. It recognized that "federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id*. at 855 (citing *City of Milwaukee*, 406 US. at 103). Thus, *Kivalina* stated that "federal common law can apply to transboundary pollution suits," and noted that most often such suits are, as in that case, founded on a theory of public nuisance. *Id*. The *Kivalina* court found that the case was governed by *AEP* and the finding that Congress had "directly addressed the issue of greenhouse gas commissions from stationary sources," thereby displacing federal common law. *Id*. at 856. The fact that the plaintiffs sought damages rather than an abatement of emissions did not impact the analysis, according to *Kivalina*, because "the type of remedy asserted is not relevant to the applicability of the doctrine of displacement." *Id*. at 857. The *Kivalina* court affirmed the district court's dismissal of plaintiffs' claims. *Id*. at 858.

10

Both *AEP* and *Kivalina* were brought in federal court and asserted federal law claims.  They did not address the viability of state claims involving climate change that were removed to federal court, as is the case here.  This issue was addressed by the United States District Court for the Northern District of California in *CA I* and *CA II*.  In the *CA* cases, the Cities of Oakland and San Francisco asserted a state law public nuisance claim against ExxonMobil and a number of other worldwide producers of fossil fuels, asserting that the combustion of fossil fuels produced by the defendants had increased atmospheric levels of carbon dioxide, causing a rise in sea levels with resultant flooding in the cities.  *CA I*, 2018 WL 1064293, at *1.  Like the instant case, the plaintiffs did not seek to impose liability for direct emissions of carbon dioxide.  Instead, they alleged "that—despite long-knowing that their products posed severe risks to the global climate—defendants produced fossil fuels while simultaneously engaging in large scale advertising and public relations campaigns to discredit scientific research on global warming, to downplay the risks of global warming, and to portray fossil fuels as environmentally responsible and essential to human well-being."  *Id*.  The plaintiffs sought an abatement fund to pay for infrastructure necessary to address rising sea levels.  *Id*.

*CA I* found that the plaintiffs' state law "nuisance claims—which address the national and international geophysical phenomenon of global warming—are necessarily governed by federal common law," citing *AEP*, *City of Milwaukee*, and *Kivalina*.  *CA I*, 2018 WL 1064293, at *2–3.  It stated that, as in those cases, "a uniform standard of decision is necessary to deal with the issues," explaining:

11

> If ever a problem cried out for a uniform and comprehensive solution, it is the geophysical problem described by the complaints, a problem centuries in the making (and studying) with causes [including] the combustion of fossil fuels. The range of consequences is likewise universal—warmer weather in some places that may benefit agriculture but worse weather in others, . . . and—as here specifically alleged—the melting of the ice caps, the rising of the oceans, and the inevitable flooding of coastal lands. . . . [T]he scope of the worldwide predicament demands the most comprehensive view available, which in our American court system means our federal courts and our federal common law. A patchwork of fifty different answers to the same fundamental global issue would be unworkable.

*Id*. at *3.

The *CA I* court also found that federal common law applied despite the fact that "plaintiffs assert a novel theory of liability," *i.e.,* against the *sellers* of a product rather than direct *dischargers* of interstate pollutants.  *CA I*, 2018 WL 1064293, at *3 (emphasis in original).  Again, that is the situation in this case.  The *CA I* court stated that "the transboundary problem of global warming raises exactly the sort of federal interests that necessitate a uniform solution," which is no " less true because plaintiffs' theory mirrors the sort of state-law claims that are traditionally applied to products made in other states and sold nationally."  *Id*.  The court found, however, that federal common law was not displaced by the Clean Air Act and the EPA as in *AEP* and *Kivalina* because the plaintiffs there sought only to reach domestic conduct, whereas the plaintiffs' claims in *CA I* "attack behavior worldwide."  *Id*. at 4.  It stated that those "foreign emissions are outside of the EPA and Clean Air Acts' reach."  *Id*.  Nonetheless, as the claims were based in federal law, the court found that federal jurisdiction existed and denied the plaintiffs' motions to remand.  *Id*. at 5.

12

In *CA II*, the court granted the defendants' motion to dismiss.  325 F. Supp. 3d at 1019.  It reaffirmed that the plaintiffs' nuisance claims "must stand or fall under federal common law," including the state law claims.  *CA II*, 325 F. Supp. 3d at 1024.  It then held that the claims must be dismissed because they ran counter to the presumption against extraterritoriality and were "foreclosed by the need for federal courts to defer to the legislative and executive branches when it comes to such international problems." *Id*. at 1024–25.  The *CA II* court concluded that "[i]t may seem peculiar that an earlier order refused to remand this action to state court on the ground that plaintiffs' claims were necessarily governed by federal law, while the current order concludes that federal common law should not be extended to provide relief."  *Id*. at 1028.  But it found "no inconsistency," as "[i]t remains proper for the scope of plaintiffs' claims to be decided under federal law, given the international reach" of the claims.  *Id*. at 1028–29.

The *City of New York* case followed the rationale of *CA I* and *CA II*, and dismissed New York City's claims of public and private nuisance and trespass against multinational oil and gas companies related to the sale and production of fossil fuels. 325 F. Supp. 3d at 471–76.  On a motion to dismiss, the court found that the City's claims were governed by federal common law, not state tort law, because they were "based on the 'transboundary' emission of greenhouse gases" which "require a uniform standard of decision."  *Id*. at 472 (citing *CA I*, 2018 WL 10649293, at \*3).  It also found that to the extent the claims involved domestic greenhouse emissions, the Clean Air Act displaced the federal common law claims pursuant to *AEP. Id.*  To the extent the claims implicated foreign greenhouse emissions, they were "barred by the presumption

13

against extraterritoriality and the need for judicial caution in the face of 'serious foreign policy consequences.'" *Id*. at 475 (citation omitted). The court in *City of New York* did not address federal jurisdiction or removal jurisdiction.

In summary, the above cases suggest that claims related to the emission or sale, production, or manufacture of fossil fuels are governed by federal common law, even if they are asserted under state law, but may displaced by the Clean Air Act and the EPA. At first blush these cases appear to support Defendants' assertion that Plaintiffs' claims arise under federal law and should be adjudicated in federal court, particularly given the international scope of global warming that is at issue.

However, the Court finds that *AEP* and *Kivalina* are not dispositive. Moreover, while the *CA I* decision has a certain logic, the Court ultimately finds that it is not persuasive. Instead, the Court finds that federal jurisdiction does not exist under the creation prong of federal question jurisdiction, consistent with *San Mateo* and the two most recent cases that have addressed the applicable issues, as explained below.

The Court first notes that in *AEP* and *Kivalina*, the plaintiffs expressly invoked federal claims, and removal was neither implicated nor discussed. Moreover, both cases addressed interstate emissions, which are not at issue here. Finally, the cases did not address whether the state law claims were governed by federal common law. The *AEP* Court explained that "the availability *vel non* of a state lawsuit depend[ed], *inter alia*, on the preemptive effect of the federal Act," and left the matter open for consideration on remand. 564 U.S. at 429. Thus, "[f]ar from holding (as the defendants bravely assert) that state claims related to global warming are superseded

14

by federal common law, the Supreme Court [in *AIG*] noted that the question of whether such state law claims survived would depend on whether they are preempted by the federal statute that had displaced federal common law (a question the Court did not resolve)." *San Mateo*, 294 F. Supp. 3d at 937.

Moreover, while *AEP* found that federal common law governs suits brought by a state to enjoin emitters of pollution in another state, it noted that the Court had never decided whether federal common law governs similar claims to abate out-of-state pollution brought by "political subdivisions" of a State, such as in this case. 564 U.S. at 421–22. Thus, *AEP* does not address whether state law claims, such as those asserted in this case and brought by political subdivisions of a state, arise under federal law for purposes of removal jurisdiction. The Ninth Circuit in *Kivalina* also did not address this issue.

The Court disagrees with the finding in *CA I* that removal jurisdiction is proper because the case arises under federal common law. *CA I* found that the well-pleaded complaint rule did not apply and that federal jurisdiction exists "if the claims necessarily arise under federal common law. 2018 WL 1064293, at *5. It based this finding on a citation to a single Ninth Circuit case, *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1184–85 (9th Cir. 2002). *Id*. *Wayne*, however, recognized the well-pleaded complaint rule, and did not address whether a claim that arises under federal common law is an exception to the rule. 294 F.3d at 1183-85. Moreover, *Wayne* cited *City of Milwaukee* in support of its finding that federal jurisdiction would exist if the claims arose under federal law. *City of Milwaukee* was, however, filed in federal court and

15

invoked federal jurisdiction such that the well-pleaded complaint rule was not at issue.

Thus, *CA I* failed to discuss or note the significance of the difference between removal jurisdiction, which implicates the well pleaded complaint rule, and federal jurisdiction that is invoked at the outset such as in *AEP* and *Kivalina*.  This distinction was recognized by the recent decision in *Baltimore*, which involved similar state law claims as to climate change that were removed to federal court.  2019 WL 2436848, at *1.  *Baltimore* found *CA I* was "well stated and presents an appealing logic," but disagreed with it because the court looked beyond the face of the plaintiffs' well pleaded complaint.  *Id*. at *7–8.  It also noted that *CA I* "did not find that the plaintiffs' state law claims fell within either of the carefully delineated exceptions to the well-pleaded complaint rule—*i.e.*, that they were completely preempted by federal law or necessarily raised substantial, disputed issues of federal law."  *Id*. at *8.  *Baltimore* found that the well-pleaded complaint rule was plainly not satisfied in that case because the City did not plead any claims under federal law.  *Id*. at *6.

      b.    *The Well-Pleaded Complaint Rule as Applied to Plaintiffs' Claims*

In a case that is removed to federal court, the presence or absence of federal-question jurisdiction is governed by the well-pleaded complaint rule, which gives rise to federal jurisdiction only when a federal question is presented on the face of the complaint.  *Caterpillar*, 482 U.S. at 392.  The Tenth Circuit has held that to support removal jurisdiction, "the required federal right or immunity must be an essential element of the plaintiff's cause of action, and . . . the federal controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for

removal." *Fajen*, 683 F.2d at 333 (citation and internal quotation marks omitted).

In this case, the Complaint on its face pleads only state law claims and issues, and no federal law or issue is raised in the allegations. While Defendants argue that the Complaint raises inherently federal questions about energy, the environment, and national security, removal is not appropriate under the well-pleaded complaint rule because these federal issues are not raised or at issue in Plaintiffs' claims. A defendant cannot transform the action into one arising under federal law, thereby selecting the forum in which the claim will be litigated, as to do so would contradict the well-pleaded complaint rule. *Caterpillar*, 489 U.S. at 399. Defendants, "in essence, want the Court to peek beneath the purported state-law facade of the State's public nuisance claim, see the claim for what it would need to be to have a chance at viability, and convert it to that (i.e., into a claim based on federal common law) for purposes of the present jurisdiction analysis." *State of Rhode Island*, 2019 WL 3282007, at *2. That court found nothing in the artful-pleading doctrine which sanctioned the defendants' desired outcome. *Id.*

Defendants cite no controlling authority for the proposition that removal may be based on the existence of an unplead federal common law claim—much less based on one that is questionable and not settled under controlling law. Defendants rely on the Supreme Court's holding that the statutory grant of jurisdiction over cases arising under the laws of the United States "will support claims founded upon federal common law." *Nat'l l Farmers Union Ins. Cos.*, 471 U.S. at 850–53. However, the plaintiffs invoked federal jurisdiction in that case. The same is true in other cases cited by Defendants,

including *City of Milwaukee* and *Boyle*, both of which were filed by plaintiffs in federal court and invoked federal jurisdiction. *See, e.g.*, *State of Rhode Island*, 2019 WL 3282007, at *2 n. 2 (*Boyle* "does not help Defendants" as it "was not a removal case, but rather one brought in diversity"); *Arnold by and Through Arnold v. Blue Cross & Blue Shield*, 973 F. Supp. 726, 737 (S.D. Tex. 1997) (*Boyle* did not address removal jurisdiction, nor did it modify the *Caterpillar* rule that federal preemption of state law, even when asserted as an inevitable defense to a . . . state law claim, does not provide a basis for removal"), *overruled on other grounds*, *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1997). Removal based on federal common law being implicated by state claims was not discussed or sanctioned in Defendants' cases.

A thoughtful analysis of the limits that removal jurisdiction poses on federal question jurisdiction was conducted in *E. States Health & Welfare Fund v. Philip Morris, Inc.*, 11 F. Supp. 2d 384 (S.D.N.Y. 1998). That court noted that removal jurisdiction is "a somewhat different animal than original federal question jurisdiction—i.e., where the plaintiff files originally in federal court." *Id*. at 389. It explained:

> When a plaintiff files in federal court, there is no clash between the principle that the plaintiff can control the complaint—and therefore, the choice between state and federal forums—and the principle that federal courts have jurisdiction over federal claims; the plaintiff, after all, by filing in a federal forum is asserting reliance upon both principles, and the only question a defendant can raise is whether plaintiff has a federal claim.
>
> On the other hand, when a plaintiff files in state court and purports to only raise state law claims, for the federal court to assert jurisdiction it has to look beyond the complaint and partially recharacterize the plaintiffs' claims—which places the assertion of jurisdiction directly at odds with the principle of plaintiff as the master of the complaint. It is for this reason that removal jurisdiction must be viewed with a somewhat more skeptical eye; the

fact that a plaintiff in one case chooses to bring a claim as a federal one and thus invoke federal jurisdiction does not mean that federal *removal* jurisdiction will lie in an identical case if the plaintiff chooses not to file a federal claim.

*Id*. at 389–90.  The Court agrees with this well-reasoned analysis.

The cases cited by Defendants from other jurisdictions that found removal of state law claims to federal court was appropriate because the claims arose under or were necessarily governed by federal common law are not persuasive.  *See Wayne*, 294 F.3d at 1184–85; *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 926 (5th Cir. 1997); *CA I*, 2018 WL 1064293, at \*2; *Blanco v. Fed. Express Corp*., No. 16-561, 2016 WL 4921437, at \*2–3 (W.D. Okla. Sept. 15, 2016).  Those cases contradict *Caterpillar* and the tenets of the well-pleaded complaint rule.  They also fail to cite any Supreme Court or other controlling authority authorizing removal based on state law claims implicating federal common law.  While many of those cases relied on *City of Milwaukee* as authority for their holdings, the plaintiff in that case invoked federal common law and federal jurisdiction.  *City of Milwaukee* does not support a finding that a defendant can create federal jurisdiction by re-characterizing a state claim.

       c.   *Ordinary Preemption*

Ultimately, Defendants' argument that Plaintiffs' state law claims are governed by federal common law appears to be a matter of ordinary preemption which—in contrast to complete preemption, which is discussed in Section III.B, *infra*,–would not provide a basis for federal jurisdiction.  *See Geddes v. Am. Airlines, Inc.*, 321 F.3d 1349, 1352

(11th Cir. 2003) (cited with approval in *Devon Energy*, 693 F.3d at 1203).[2]  "Ordinary preemption 'regulates the interplay between federal and state laws when they conflict or appear to conflict . . . .'"  *Baltimore*, 2019 WL 2436848, at *6 (citation omitted).  The distinction between ordinary and complete preemption "is important because if complete preemption does not apply, but the plaintiff's state law claim is arguably preempted . . .  the district court, being without removal jurisdiction, cannot resolve the dispute regarding preemption."  *Colbert v. Union Pac. R. Co.*, 485 F. Supp. 2d 1236, 1243 (D. Kan. 2007) (internal quotation marks omitted).

When ordinary preemption applies, the federal court "'lacks the power to do anything other than remand to the state court where the preemption issue can be addressed and resolved.'"  *Colbert*, 485 S. Supp. 2d at 1243 (citation omitted).  Ordinary preemption is thus a defense to the complaint, and does not render a state-law claim removable to federal court.  *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1221 (10th Cir. 2011); *see also Caterpillar*, 482 U.S. at 392–93 (under the well-pleaded complaint rule, courts must ignore potential defenses such as preemption).

Thus, the fact that a defendant asserts that federal common law is applicable "does not mean the plaintiffs' state law claims 'arise under' federal law for purposes of jurisdictional purposes."  *E. States Health*, 11 F. Supp. 2d at 394.  As that court explained, "[c]ouch it as they will in 'arising under' language, the defendants fail to explain why their assertion that federal common law governs . . . is not simply a

---

[2] The three forms of preemption that are frequently discussed in judicial opinions—express preemption, conflict preemption, and field preemption—are characterized as ordinary preemption.  *Devon Energy*, 693 F.3d at 1203 n. 4.

preemption defense which, while it may very well be a winning argument on a motion to dismiss in the state court, will not support removal jurisdiction." *Id*.

This finding is consistent with the decision in *Baltimore*. The court there found the defendants' assertion that federal question jurisdiction existed because the City's nuisance claim "is in fact 'governed by federal common law'" was "'a cleverly veiled [ordinary] preemption argument." *Baltimore*, 2019 WL 2436848, at *6 (citing *Boyle*, 487 U.S. at 504). As the *Baltimore* defendants' argument amounted to an ordinary preemption defense, it did "not allow the Court to treat the City's public nuisance claim as if it had been pleaded under federal law for jurisdictional purposes." *Id*. The court also found that the *CA I* ruling was "at odds with the firmly established principle that ordinary preemption does not give rise to federal question jurisdiction." *Id*. at *8.

Because an ordinary preemption defense does not support remand, Defendants' federal common law argument could only prevail under the doctrine of complete preemption. Unlike ordinary preemption, complete preemption "is so 'extraordinary' that it 'converts an ordinary state law common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar*, 482 U.S. at 393 (citation omitted).

> 2.  Whether Plaintiffs' Right to Relief Necessarily Depends on Resolution of a Substantial Question of Federal Law (*Grable* Jurisdiction)

Defendants also argue that federal jurisdiction exists under the second prong of the "arising under" jurisdiction, as Plaintiffs' claims necessarily depend on a resolution of a substantial question of federal law under *Grable*. They contend that the Complaint

raises federal issues under *Grable* "because it seeks to have a court determine for the entire United States, as well as Canada and other foreign actors, the appropriate balance between the production, sale, and use of fossil fuels and addressing the risks of climate change." (ECF No. 1 ¶ 37.) Such an inquiry, according to Defendants, "necessarily entails the resolution of substantial federal questions concerning important federal regulations, contracting, and diplomacy." (*Id*.) Thus, they assert that the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing . . . federal and state judicial responsibilities." *Grable*, 545 U.S. at 313–14.

The substantial question doctrine "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312. To invoke this branch of federal question jurisdiction, the Defendants must show that "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.

Jurisdiction under the substantial question doctrine "is exceedingly narrow—a special and small category of cases." *Firstenberg*, 696 F.3d at 1023 (citation and internal quotation marks omitted). "[M]ere need to apply federal law in a state-law claim will not suffice to open the 'arising under' door" of jurisdiction. *Grable*, 545 U.S. at 313. Instead, "'federal jurisdiction demands not only on a contested federal issue, but a

22

substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum.'" *Id*. (citation omitted).

       a.    *Necessarily Raised*

The Court finds that the first prong of substantial question jurisdiction is not met because Plaintiffs' claims do not necessarily raise or depend on issues of federal law. The discussion of this issue in *Baltimore* is instructive.  In that case, the defendants contended that *Grable* jurisdiction existed because the claims raised a host of federal issues.  *Baltimore*, 2019 WL 2436848, at *9.  For example, the defendants asserted that the claims "'intrude upon both foreign policy and carefully balanced regulatory considerations at the national level, including the foreign affairs doctrine.'"  *Id*. (citation omitted).  They also asserted that the claims "'have a significant impact on foreign affairs,' 'require federal-law-based cost-benefit analyses,'" and "'amount to a collateral attack on federal regulatory oversight of energy and the environment.'"  *Id*. (citation omitted).  These allegations are almost identical to what Defendants assert in this case. (*See* ECF No. 48 at 22—"Plaintiffs' claims gravely impact foreign affairs"; 24—"Plaintiffs' claims require reassessment of cost-benefit analyses committed to, and already conducted by the Government"; 26—the claims "are a collateral attack on federal regulatory oversight of energy and the environment").

*Baltimore* found that these issues were not "'necessarily raised' by the City's claims, as required for *Grable* jurisdiction."  2019 WL 2436848, at *9–10.  As to the alleged significant effect on foreign affairs, the court agreed that "[c]limate change is certainly a matter of serious national and international concern."  *Id*. at *10.  But it found

that defendants did "not actually identify any foreign policy that was implicated by the City's claims, much less one that is necessarily raised." *Id*. "They merely point out that climate change '*has* been the subject of international negotiations for decades.'" *Id*. *Baltimore* found that "defendants' generalized references to foreign policy wholly fail to demonstrate that a federal question is 'essential to resolving' the City's state law claims." *Id*. (citation omitted).

The Court finds the analysis in *Baltimore* equally persuasive as to Defendants' reliance on foreign affairs in this case, as they point to no specific foreign policy that is essential to resolving the Plaintiffs' claims. Instead, they cite only generally to non-binding, international agreements that do not apply to private parties, and do not explain how this case could supplant the structure of such foreign policy arrangements. Certainly Defendants have not shown that any interpretation of foreign policy is an essential element of Plaintiffs' claims. *Gilmore v. Weatherford*, 694 F.3d 1160, 1173 (10th Cir. 2012).

The *CA I* and *City of New York* decisions do not support Defendants' argument that the foreign policy issues raise substantial questions of law. Defendants note, for example, that the *City of New York* court dismissed the claims there on the merits "for severely infring[ing] upon the foreign-policy decisions that are squarely within the purview of the political branches of the U.S. Government." 325 F. Supp. 3d at 476. But as Defendants have acknowledged, at least at this stage of these proceedings, the Court is not considering the merits of Plaintiffs' claims or whether they would survive a motion to dismiss, only whether there is a basis for federal jurisdiction. (*See* ECF No. 1

24

¶ 20.)  While *CA I* and *City of New York* may ultimately be relevant to whether Plaintiffs'

claims should be dismissed, they do not provide a basis for *Grable* jurisdiction.  *See*

*Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation*, 770 F.3d 944, 948

(10th Cir. 2014) (federal law that is alleged as a barrier to the success of a state law

claim "is not a sufficient basis from which to conclude that the questions are

'necessarily raised'") (citation omitted).

     *Baltimore* also rejected cost-benefit analysis and collateral attack arguments as a

basis for *Grable* jurisdiction, finding that they "miss[ ] the mark."  2019 WL 2436848, at

*10.  This is because the nuisance claims were, as here, based on the "extraction,

production, promotion, and sale of fossil fuel products without warning consumers and

the public of their known risks", and did "not rely on any federal statutes or regulations"

or violations thereof.  *Id.*  "Although federal laws and regulations governing energy

production and air pollution may supply potential defenses," the court found that federal

law was "plainly not an element" of the City's state law nuisance claims.  *Id.*

      The same analysis surely applies here.  Plaintiffs' state law claims do not have

as an element any aspect of federal law or regulations.  Plaintiffs do not allege that any

federal regulation or decision is unlawful, or a factor in their claims, nor are they asking

the Court to consider whether the government's decisions to permit fossil fuel use and

sale are appropriate.

     As to jurisdiction under *Grable*, the Baltimore court concluded that, "[t]o be sure,

there are federal *interests* in addressing climate change."  2019 WL 2436848, at *11

(emphasis in original).  "Defendants have failed to establish, however, that a federal

*issue* is a 'necessary element' of the City's state law claims." *Id*. (citation omitted) (emphasis in original). Thus, even without considering the remaining requirements for *Grable* jurisdiction, the *Baltimore* court rejected the defendants' assertion that the case fell within "the 'special and small category' of cases in which federal question jurisdiction exists over a state law claim. *Id*. (citation omitted).

Two other courts have recently arrived at the same conclusion. The court in *State of Rhode Island* found that the defendants had not shown that federal law was "'an element and an essential one, of the [State]'s cause[s] of action.'" 2019 WL 3282007, at *4 (citation omitted). Instead, the court noted that the State's claims "are thoroughly state-law claims", and "[t]he rights, duties, and rules of decision implicated by the complaint are all supplied by state law, without reference to anything federal." *Id*. The court concluded:

> By mentioning foreign affairs, federal regulations, and the navigable waters of the United States, Defendants seek to raise issues that they may press in the course of this litigation, but that are not perforce presented by the State's claims. . . .These are, if anything, premature defenses, which even if ultimately decisive, cannot support removal.

*Id*. (internal citations omitted).

Similarly, the court in *San Mateo* found that the defendants had not pointed to a specific issue of federal law that necessarily had to be resolved to adjudicate the state law claims. 294 F. Supp. 3d at 938. Instead, "the defendants mostly gesture to federal law and federal concerns in a generalized way." *Id*. The court found that "[t]he mere potential for foreign policy implications", the "mere existence of a federal regulatory regime", or the possibility that the claims involved a weighing of costs and benefits did

26

not raise the kind of actually disputed, substantial federal issue necessary for *Grable* jurisdiction. *Id*. *San Mateo* concluded, "[o]n the defendants' theory, many (if not all) state tort claims that involve the balancing of interests and are brought against federally regulated entities would be removable", and "*Grable* does not sweep so broadly." *Id*.

The Court agrees with the well-reasoned analyses in *Baltimore*, *State of Rhode Island*, and *San Mateo*, and adopts the reasoning of those decisions. To the extent Defendants raise other issues not addressed in those cases, the Court finds that they also are not necessarily raised in Plaintiffs' Complaint.

Defendants here assert that Plaintiffs' claims raise a significant issue under *Grable* because they attack the decision of the federal government to enter into contracts with Defendant ExxonMobil to develop and sell fossil fuels. (ECF No. 1 ¶ 43.) Further, they argue that the Complaint seeks to deprive the federal government of a mechanism for carrying out vital governmental functions, and frustrates federal objectives. (*Id*. ¶ 44.)

Plaintiffs' claims, however, assert no rights under the contracts referenced by Defendants. Nor do they challenge the contracts' validity, or require a court to interpret their meaning or importance. The Complaint does not even mention the contracts. Defendants' argument appears to be based solely on their unsupported speculation about the potential impact that Plaintiffs' success would have on the government's ability to continue purchasing fossil fuels. (*Id*. ¶¶ 43–44.) Even if Defendants' speculation was well-founded, this would be relevant only to the substantiality prong of the *Grable* analysis. *See Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 910 (10th Cir.

27

2007). Defendants have not established the first requirement—that the issue is necessarily raised by the Plaintiffs.

   b. *Substantiality*

  The Court also finds that the second prong, substantiality, is not met. To determine substantiality, courts "look[] to whether the federal law issue is central to the case." *Gilmore*, 694 F.3d at 1175. Courts distinguish "between 'a nearly pure issue of law' that would govern 'numerous' cases and issues that are 'fact-bound and situation-specific.'" *Id*. at 1174 (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh,* 547 U.S. 677, 700–11 (2006)). When a case "'involve[s] substantial questions of state as well as federal law,' this factor weighs against asserting federal jurisdiction." *Id.* at 1175 (citation omitted).

  The Court finds that the issues raised by Defendants are not central to Plaintiffs' claims, and the claims are "rife with legal and factual issues that are not related" to the federal issues. *See Stark-Romero v. Nat'l R.R. Passenger Co. (Amtrak)*, No. CIV-09-295, 2010 WL 11602777, at *8 (D.N.M. Mar. 31, 2010). This case is quite different from those where jurisdiction was found under the substantial question prong of jurisdiction. For example, in *Grable*, "the meaning of the federal statute . . . appear[ed] to be the only legal or factual issue contested in the case." 545 U.S. at 315. Similarly, in a Tenth Circuit case finding jurisdiction under *Grable*, "construction of the federal land grant" at issue "appear[ed] to be the only legal or factual issue contested in the case." *Nicodemus v. Union Pac. Corp.,* 440 F.3d 1227, 1236 (10th Cir. 2006). Here, it is plainly apparent that the federal issues raised by Defendants are not the only legal or

28

factual issue contested in the case.  Plaintiffs' claims also do not involve a discrete legal question, and are "fact-bound and situation-specific," unlike *Grable*.  *See Empire Healthchoice Assurance*, 547 U.S. at 701; *Bennett*, 484 F.3d at 910–11.  Finally, the case does not involve a state-law cause of action that "is 'brought to enforce' a duty created by [a federal statute]," where "the claim's very success depends on giving effect to a federal requirement."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning*, ___ U.S. ___, 136 S. Ct. 1562, 1570 (2016).

The cases relied upon by Defendants are distinguishable, as Plaintiffs have shown in their briefing.  For example, while Defendants cite *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), that case involved preemption under the Supremacy Clause because of a conflict between a state law and Congress's imposition of sanctions.  It did not address *Grable* jurisdiction, and thus does not support Defendants' assertion that it is "irrelevant" to the jurisdictional issue that the "foreign agreements are not 'essential elements of any claim.'"  (ECF No. 48 at 23.)

Based on the foregoing, the Court finds that federal jurisdiction does not exist under the second prong of the "arising under" jurisdiction, because Plaintiffs' claims do not  necessarily depend on a resolution of a substantial question of federal law.  As Defendants have not met the first two prongs of the test for such jurisdiction under *Grable*, the Court need not address the remaining prongs.

**B.    Jurisdiction Through Complete Preemption**

Defendants also rely on the doctrine of complete preemption to authorize removal.  Defendants argue that Plaintiffs' claims are completely preempted by the

government's foreign affairs power and the Clean Air Act, which they claim govern the United States' participation in worldwide climate policy efforts and national regulation of GHG emissions.

The complete preemption doctrine is an "independent corollary'" to the well-pleaded complaint rule. *Caterpillar*, 482 U.S. at 393. "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted claim is considered, from its inception, a federal claim, and therefore arises under federal law." *Id*. The complete preemption exception to the well-pleaded complaint rule is "quite rare," *Dutcher*, 733 F.3d at 985, representing "extraordinary pre-emptive power." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987). The Supreme Court and the Tenth Circuit have only recognized statutes as the basis for complete preemption. *See, e.g.*, *Caterpillar*, 482 U.S. at 393 (the doctrine "is applied primarily in cases raising claims pre-empted by § 301 of the" Labor Management Relations Act ("LMRA")); *Devon Energy*, 693 F.3d at 1204–05 (complete preemption is "so rare that the Supreme Court has recognized compete preemption in only three areas: § 301 of the [LMRA], § 502 of [the Employee Retirement Income Security Act]," and actions for usery under the National Bank Act).

Complete preemption is ultimately a matter of Congressional intent. Courts must decipher whether Congress intended a statute to provide the exclusive cause of action. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 9 (2003); *Metro. Life Ins. Co.*, 481 U.S. at 66 ("the touchstone of the federal district court's removal jurisdiction is not the 'obviousness' of the pre-emption defense, but the intent of Congress"). If

Congress intends preemption "completely to displace ordinarily applicable state law, and to confer federal jurisdiction thereby, it may be expected to make that atypical intention clear." *Empire Healthchoice Assurance*, 547 U.S. at 698.

"Thus, a state claim may be removed to federal courts in only two circumstances": "when Congress expressly so provides,. . . or when a federal statute wholly displaces the state law cause of action through complete pre-emption." *Beneficial Nat'l Bank*, 539 U.S. at 8.  The court must ask, first, whether the federal question at issue preempts the state law relied on by the plaintiff and, second, whether Congress intended to allow removal in such a case, as manifested by the provision of a federal cause of action.  *Devon Energy*, 693 F.3d at 1205.

> 1.    <u>Complete Preemption Based on Emissions Standards</u>

Defendants argue that Congress allows parties to seek stricter nationwide emissions standards by petitioning the EPA, which is the exclusive means by which a party can seek such relief.  *See* 42 U.S.C. § 7426(b).  They assert that Plaintiffs' claims go far beyond the authority that the Clean Air Act reserves to states to regulate certain emissions within their own borders; Plaintiffs seek instead to impose liability for global emissions.  Because these claims do not duplicate, supplement, or supplant federal law, *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209 (2004), Defendants argue they are completely preempted.

The Court rejects Defendants' argument.  First, Defendants mischaracterize Plaintiffs' claims.  Plaintiffs do not challenge or seek to impose federal emissions regulations, and do not seek to impose liability on emitters.  They are also not seeking

review of EPA regulatory actions related to GHGs, even those emissions created by the burning of Defendants' products, and are not seeking injunctive relief.  Plaintiffs sue for harms caused by Defendants' sale of fossil fuels.  The Clean Air Act is silent on that issue; it does not remedy Plaintiffs' harms or address Defendants' conduct.  And neither EPA action, nor a cause of action against EPA, could provide the compensation Plaintiffs seek for the injuries suffered as a result of Defendants' actions.

For a statute to form the basis for complete preemption, it must provide a "replacement cause of action" that "substitute[s]" for the state cause of action. *Schmeling v. NORDAM*, 97 F.3d 1336, 1342–43 (10th Cir. 1996).  "[T]he federal remedy at issue must vindicate the same basic right or interest that would otherwise be vindicated under state law."  *Devon Energy*, 693 F.3d at 1207.  The Clean Air Act provides no federal cause of action for damages, let alone one by a plaintiff claiming economic losses against a private defendant for tortious conduct.  Moreover, the Clean Air Act expressly preserves many state common law causes of action, including tort actions for damages.  *See* 42 U.S.C. § 7604(e) ("Nothing in this section shall restrict any right . . . under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief").  From this, it is apparent that Congress did not intend the Act to provide exclusive remedies in these circumstances, or to be a basis for removal under the complete preemption doctrine.

To the extent Defendants rely on *AEP*, the Supreme Court there held only that the Clean Air Act displaced federal common law nuisance action related to climate change; it did not review whether the Clean Air Act would preempt state nuisance law.

32

564 U.S. at 429. In fact, the Court stated that "[n]one of the parties have briefed preemption or otherwise addressed the availability of a claim under state nuisance law," and the Court thus left "the matter open for consideration" by the state court on remand. *Id*. Every court that has considered complete preemption in this type of climate change case has rejected it, including the Baltimore, *State of Rhode Island*, and *San Mateo* courts.

In *Baltimore*, the court stated that while the Clean Air Act provides for private enforcement in certain situations, there was "an absence of any indication that Congress intended for these causes of action . . . to be the exclusive remedy for injuries stemming from air pollution." 2019 WL 2436848, at *13. To the contrary, it noted that the Clean Air Act "contains a savings clause that specifically preserves other causes of action." *Id*.

Similarly, the *State of Rhode Island* court stated, "statutes that have been found to completely preempt state-law causes of action . . . all do two things: They 'provide[] the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action.'" 2019 WL 3282007, at *3 (citation omitted). The court found that the defendants failed to show that the Clean Air Act does these things, and stated that "[a]s far as the Court can tell, the [Act] authorizes nothing like the State's claims, much less to the exclusion of those sounding in state law." *Id*. Further, it noted that the Act "itself says that controlling air pollution is 'the primary responsibility of States and local governments,'" and that the Act has a savings clause for citizen suits. *Id*. at *3–4 (citation omitted). The court concluded:

33

> A statute that goes so far out of its way to preserve state prerogatives cannot be said to be an expression of Congress's 'extraordinary pre-emptive power' to convert state-law claims into federal-law claims. *Metro. Life Ins. Co.*, 481 U.S. at 65. No court has so held, and neither will this one.

*Id*. at *4.

Finally, the *San Mateo* court noted that the defendants did "not point to any applicable statutory provision that involves complete preemption." 294 F. Supp. 3d at 938. To the contrary, the Clean Air Act and the Clean Water Act both contain savings clauses that preserve state causes of action and suggest that Congress did not intend the federal causes of action under those statutes 'to be exclusive.'" *Id*. (citations omitted).

Other courts have held similarly, rejecting federal jurisdiction on the basis of complete preemption of state law claims by the Clean Air Act. The United States District Court for the Southern District of New York held that the Clean Air Act did not completely preempt the plaintiffs' state law claims for temporary nuisance, trespass, and negligence arising from alleged contamination from a steel mill, and thus did not provide a basis for federal jurisdiction. *Keltner v. SunCoke Energy, Inc.*, 2015 WL 3400234, at *4–5 (S.D. Ill. May 26, 2015). Similarly, the Northern District of Alabama found that federal jurisdiction did not exist because the Clean Air Act did not completely preempt the plaintiff's state law claims arising out of the operation of a coke plant. *Morrison v. Drummond Co.*, 2013 WL 1345721, at *3–4 (N.D. Ala. Mar. 23, 2015). *See also Cerny v. Marathon Oil Corp.*, 2013 WL 5560483, at *3–8 (W.D. Tex. Oct. 7, 2013) (complete preemption did not apply to the plaintiffs' state law claims arising from the

defendants' oil field operations so as to create federal jurisdiction).

While Defendants argue that Plaintiffs are attempting to do indirectly what they could not do directly, *i.e.,* "regulate the conduct of out-of-state sources," *Int'l Paper Co. v. Oulette*, 479 U.S. 481, 495 (1987), that is not an accurate characterization of the Plaintiffs' claims.  Plaintiffs do not seek to regulate the conduct of the Defendants or their emissions, nor do they seek injunctive relief to induce Defendants to take action to reduce emissions.  Defendants also rely on *Oulette* in arguing that suits such as this seeking damages, whether punitive or compensatory, can compel producers to "adopt different or additional means of pollution control" than those contemplated by Congress's regulatory scheme.  479 U.S. at 498 n.19.  For these reasons, Defendants assert that the Supreme Court recognized in *Oulette* that damages claims against producers of interstate products would be "irreconcilable" with the Clean Water Act (which Defendants analogize to the Clean Air Act), and the uniquely federal interests involved in regulating interstate emissions.  *Id.*

*Oulette* appears to involve only ordinary preemption, however, as there is no discussion of complete preemption.[3]  The same is true of another case relied on by Defendants, *North Carolina v. Tenn. Valley Auth.*, 615 F.3d 291 (4th Cir. 2010). Indeed, the Fourth Circuit stated that it "need not hold flatly that Congress has entirely preempted the field of emissions regulation."  *Id*. at 302.  Moreover, *Oulette* allowed state law claims based on the law of the source state under the saving clause, since the

---

[3] "Complete preemption is a term of art for an exception to the well-pleaded complaint rule."  *Meyer v. Conlon*, 162 F.3d 1264, 1268 n. 2 (10th Cir. 1998).  The Tenth Circuit has held that the doctrines of ordinary and complete preemption are not fungible.  *Id*.

Clean Water Act expressly allows source states to enact more stringent standards. 479 U.S. at 498–99.

Here, Defendants have not cited to any portion of the Clean Air Act or other statute that regulates the conduct at issue or allows states to enact more stringent regulations, such that similar restrictions on application of state law would apply. And Plaintiffs note that there no federal programs that govern or dictate how much fossil fuel Defendants produce and sell, or whether they can mislead the public when doing do. Plaintiffs assert that the EPA does not determine how much fossil fuel is sold in the United States or how it is marketed, nor does it issue permits to companies that market or sell fossil fuels. Rather, the EPA regulates sources that emit pollution and sets emission "floors," which states can exceed. *See* 42 U.S.C. § 7416. Defendants have not shown that the conduct alleged in this case conflicts with any of those efforts.

Plaintiffs' claims also do not relate to or impact Defendants' emissions, and the claims for monetary relief presents no danger of inconsistent state (or state and federal) emission standards. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489 n. 7 (2008) ("private claims for economic injury do not threaten similar interference with federal regulatory goals," unlike cases where nuisance claims seeking injunctive relief amounted to arguments for discharge standards different that those provided by statute). In any event, the issues raised by Defendants need to be resolved in connection with an ordinary preemption defense, a matter that does not give rise to federal jurisdiction.

2.    <u>Complete Preemption Based on the Foreign Affairs Doctrine</u>

Defendants also argue that complete preemption is appropriate based on the foreign affairs doctrine.  They assert that litigating inherently transnational activities intrudes on the government's foreign affairs power.  See *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 418 (2003) ("[S]tate action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state [action], and hence without any showing of conflict.").

Defendants also cite *California v. GMC*, 2007 WL 2726871, at *14 (N.D. Cal. Sept. 17, 2007) (dismissing claims where the government "ha[d] made foreign policy determinations regarding the [U.S.'s] role in the international concern about global warming," and stating, a "global warming nuisance tort would have an inextricable effect on . . . foreign policy"); *CA II*, 2018 WL 3109726, at *7 ("[n]uisance suits in various United States judicial districts regarding conduct worldwide are far less likely to solve the problem and, indeed, could interfere with reaching a worldwide consensus."); and *New York City*, 2018 WL 3475470, at *6 ("[T]he City's claims are barred by the presumption against extraterritoriality and the need for judicial caution in the face of serious foreign policy consequences.").  Complete preemption is implicated, according to Defendants, because the government has exclusive power over foreign affairs.

The Court finds that Defendants' argument is without merit.  First, none of the above cases cited by Defendants dealt with or addressed complete preemption, and they do not support Defendants' arguments.  The Supreme Court in *Garamendi* discussed only conflict or field preemption.  539 U.S. at 419.  As the *Baltimore* court

37

noted, those types of preemption are "forms of ordinary preemption that serve only as federal defenses to a state law claim."  2019 WL 2436848, at *5 (internal quotation marks omitted).  In addition, the *GMC, CA II*, and *City of New York* cases did not address preemption at all, and certainly not complete preemption as providing a basis for removal jurisdiction.

Moreover, *Garamendi* is distinguishable.  It dealt with the executive authority of the President to decide the policy regarding foreign relations and to make executive agreements with foreign countries or corporations.  539 U.S. at 413–15.  The Court found that federal executive power preempted state law where, as in that case, "there is evidence of clear conflict between the policies adopted by the two."  *Id*. at 420–21.  The Court stated, "[t]he question relevant to preemption in this case is conflict, and the evidence here is 'more than sufficient to demonstrate that the state Act stands in the way of [the President's] diplomatic objectives.'"  *Id*. at 427 (citation omitted).  Here, no executive action is at issue, and Defendants have not demonstrated a clear conflict between Plaintiffs' claims and any particular foreign policy.

Accordingly, Defendants have not met their burden of showing that complete preemption applies based on the foreign affairs doctrine.  While they suggest there might be an unspecified conflict with some unidentified specific policy, they have not shown that Congress expressly provided for complete preemption under the foreign-affairs doctrine, or that a federal statute wholly displaces the state law cause of action on this issue.  *Beneficial Nat'l Bank*, 539 U.S. at 8.

The Court's finding that the foreign affairs doctrine does not completely preempt

Plaintiffs' claims is also supported by the *Baltimore* and *State of Rhode Island* cases. In *Baltimore*, the court held that the foreign affairs doctrine is "inapposite in the complete preemption context." 2019 WL 2436848, at *12. It explained that "complete preemption occurs only when Congress intended for federal law to provide the 'exclusive cause of action' for the claim asserted." *Id*. "That does not exist here." *Id*. "That is, there is no congressional intent regarding the preemptive force of the judicially-crafted foreign affairs doctrine, and the doctrine obviously does not supply any substitute causes of action." *Id*. The *State of Rhode Island* court also rejected complete preemption under the foreign affairs doctrine, relying on *Baltimore* and finding the argument to be "without a plausible legal basis." 2019 WL 3282007, at *4 n. 3.

      3.    <u>Complete Preemption Under Federal Common Law</u>

      Finally, while Defendants do not rely on federal common law as the basis for their complete preemption argument, federal common law would not provide a ground for such preemption. As one court persuasively noted, "[w]hen the defendant asserts that federal common law preempts the plaintiff's claim, there is no congressional intent which the court may examine—and therefore congressional intent to make the action removable to federal court cannot exist." *Merkel v. Fed. Express Corp.*, 886 F. Supp. 561, 566 (N.D. Miss. 1995) (emphasis omitted); *see also Singer v. DHL Worldwide Express, Inc.*, No. 06-cv-61932, 2007 U.S. Dist. LEXIS 37120, at *13-14 (S.D. Fla. May 22, 2007) (same).

      Based on the foregoing, the Court rejects complete preemption as a basis for federal jurisdiction.

**C.     Federal Enclave Jurisdiction**

Causes of action "which arise from incidents occurring in federal enclaves" may also be removed as a part of federal question jurisdiction.  *Akin* v. *Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998).  "The United States has power and exclusive authority 'in all Cases whatsoever . . . over all places purchased' by the government 'or the erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings.'" *Id*. (quoting U.S. Const. art. I, § 8, cl. 17.)  These are federal enclaves within which the United States has exclusive jurisdiction.  *Id*.

Here, Plaintiffs seek relief for injuries occurring "within their respective jurisdictions" (ECF No. 7 ¶ 4), and allege that they "do not seek damages or abatement relief for injuries to or occurring on federal lands."  (*Id.* at ¶ 542.)  Plaintiffs assert that ends the inquiry.  *See, e.g.*, *Washington v. Monsanto Co.,* 274 F. Supp. 3d 1125, 1132 (W.D. Wash. 2017) (because plaintiff "assert[ed] that it does not seek damages for contamination to waters and land within federal territory, . . . none of its claims arise on federal enclaves").

Defendants argue, however, that Plaintiffs have alleged injuries in federal enclaves including: (i) an insect infestation across Rocky Mountain National Park (ECF No. 7 ¶183), that Defendants assert is partially within Boulder County; (ii) increased flood risk in the San Miguel River in San Miguel County (*id.* ¶¶ 31, 236), which Defendants assert is located in the Uncompahgre National Forest ("Uncompahgre"); and (iii) "heat waves, wildfires, droughts, and floods" which Defendants assert occur in Rocky Mountain National Park and Uncompahgre (*id.* ¶¶ 3, 162–63).  Plaintiffs do not

dispute that Rocky Mountain National Park and Uncompahgre are federal enclaves, but argue that the injury they have alleged did not occur there such that there is no federal enclave jurisdiction.

The Court finds that Defendants have not met their burden of showing that subject matter jurisdiction exists under the federal enclave doctrine. Uncompahgre National Forest is not mentioned in the Complaint. Rocky Mountain National Park is referenced only as a descriptive landmark (*see* ECF No. 7 ¶¶ 20, 30, 35), and to provide an example of the regional trends that have resulted from Defendants' climate alteration. (*Id.* ¶ 183.) The actual injury for which Plaintiffs seek compensation is injury to "their property" and "their residents," occurring "within their respective jurisdictions." (*See, e.g., id*. ¶¶ 1-4, 10, 11, 532-33.) They specifically allege that they "**do not** seek damages or abatement relief for injuries to or occurring to federal lands." (*Id*. ¶ 542 (emphasis in original).)

"[T]he location where Plaintiff was injured" determines whether "the right to removal exists." *Ramos v. C. Ortiz Corp.*, 2016 WL 10571684, at *3 (D.N.M. May 20, 2016). It is not the defendant's conduct, but the injury, that matters. *See Akin,* 156 F.3d at 1034–35 & n.5 (action against chemical manufacturers fell within enclave jurisdiction where the claimed exposure to the chemicals, not their manufacture or sale, "occurred within the confines" of U.S. Air Force base); *Baltimore*, 2019 WL 2436848, at *15 ("courts have only found that claims arise on federal enclaves, and thus fall within federal question jurisdiction, when all or most of the pertinent events occurred there").

Federal enclave jurisdiction thus does not exist here because Plaintiffs' claims

and injuries are alleged to have arisen exclusively on non-federal land.  That the alleged climate alteration by Defendants may have caused similar injuries to federal property does not speak to the nature of Plaintiffs' alleged injuries for which they seek compensation, and does not provide a basis for removal.  *See State of Rhode Island*, 2019 WL 3282007, at *5 (finding no federal enclave jurisdiction because while federal land that met the definition of a federal enclave in Rhode Island and elsewhere "may have been the site of Defendants' activities, the State's claims did not arise there, especially since its complaint avoids seeking relief for damages to any federal lands"); *Baltimore*, 2019 WL 2436848, at *15 ("The Complaint does not contain any allegations concerning defendants' conduct on federal enclaves and in fact, it expressly defines the scope of injury to exclude any federal territory . . . . [I]t cannot be said that federal enclaves were the 'locus' in which the City's claims arose merely because one of the twenty-six defendants . . . conducted some operations on federal enclaves for some unspecified period of time.").

## D.    Federal Officer Jurisdiction

Defendants also argue that removal is appropriate under 28 U.S.C. § 1442 because the conduct that forms the basis of Plaintiffs' claims was undertaken at the direction of federal officers.  Section 1442(a)(1) provides that a civil action that is commenced in a State Court may be removed to the district court of the United States if the suit is "against or directed to . . . the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agent thereof in an official or individual capacity, for or related to any act under color of such

42

office. . . ."

For § 1442(a)(1) to constitute a basis for removal, a private corporation must show: "(1) that it acted under the direction of a federal officer; (2) that there is a causal nexus between the plaintiff's claims and the acts the private corporation performed under the federal officer's direction; and (3) that there is a colorable federal defense to the plaintiff's claims." *Greene v. Citigroup, Inc.*, 2000 WL 647190, at *6 (10th Cir. May 19, 2000). "The words 'acting under' are broad," and § 1442(a)(1) must be construed liberally. *Watson* v. *Phillip Morris Co., Inc.*, 551 U.S. 142, 147 (2007). "At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969).

Thus, the federal officer removal statute should not be read in a "narrow" manner, nor should the policy underlying it "be frustrated by a narrow, grudging interpretation." *Willingham*, 395 U.S. at 406; *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999). Under the statute, "suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Acker*, 527 U.S. at 431. Such jurisdiction is thus an exception to the rule that the federal question ordinarily must appear on the face of a properly pleaded complaint. *Id*. "Federal jurisdiction rests on a 'federal interest in the matter', . . . the very basic interest in the enforcement of federal law through federal officials." *Willingham*, 395 U.S. at 406.

Private actors invoking the statute bear a special burden of establishing the

43

official nature of their activities.  *See Freiberg v. Swinerton & Walberg Prop. Servs.*, 245 F. Supp. 2d 1144, 1150 (D. Colo. 2002).  The federal officer removal statute "authorizes removal by private parties 'only' if they were 'authorized to act with or for [federal officers or agents] in affirmatively executing duties under . . . federal law." *Watson*, 551 U.S. at 151 (quoting *City of Greenwood v. Peacock*, 384 U.S. 808, 824 (1966)).  "That relationship typically involves 'subjection, guidance, or control.'" *Id*. (citation omitted). "[T]he private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id*. at 152 (emphasis in original).  This "does *not* include simply *complying* with the law." *Id*. (emphasis in original).  As the *Watson* court stated:

> it is a matter of statutory purpose. When a company subject to a regulatory order (even a highly complex order) complies with the order, it does not ordinarily create a significant risk of state-court "prejudice.". . . . Nor is a state-court lawsuit brought against such a company likely to disable federal officials from taking necessary action to enforce federal law. . . . Nor is such a lawsuit likely to deny a federal forum to an individual entitled to assert a federal claim of immunity.

*Id.* (internal citations omitted).

Here, Defendants assert that the conduct at issue in Plaintiffs' claims was undertaken, in part, while acting under the direction of federal officials.  Specifically, Defendants assert that federal officers exercised control over ExxonMobil through government leases issued to it.  (*See* ECF No. 1 ¶¶ 60, 69, 70–73, Exs. B and C.) Under these leases, ExxonMobil contends that it was required to explore, develop, and produce fossil fuels.  (ECF No 1, Ex. C § 9.)

For example, Defendants assert that leases related to the outer Continental

44

Shelf ("OCS") obligated ExxonMobil to diligently develop the leased area, which included—under the direction of Department of the Interior ("DOI") officials—carrying out exploration, development, and production activities for the express purpose of maximizing the ultimate recovery of hydrocarbons from the leased area.[4]  Defendants argue that those leases provide that ExxonMobil "*shall*" drill for oil and gas pursuant to government-approved exploration plans (ECF No. 1, Ex. C § 9), and that the DOI may cancel the leases if ExxonMobil does not comply with federal terms governing land use. Given these directives and obligations, Defendants submit that ExxonMobil has acted under a federal officer's direction within the meaning of § 1442(a)(1).

The Court rejects Defendants' argument, finding that Defendants have not shown that they acted under the direction of a federal officer, or that there is a causal connection between the work performed under the leases and Plaintiffs' claims.  The federal leases were commercial leases whereby ExxonMobil contracted "for the exclusive right to drill for, develop, and produce oil and gas resources. . . ." (*See* ECF No. 1, Ex. B, p. 1)   While the leases require that ExxonMobil, like other OCS lessees, comply with federal law and regulations (*see* ECF No. 1, Ex. B ¶ 10, Ex. C §§ 10, 11), compliance with federal law is not enough for "acting under" removal, even if the company is "subjected to intense regulation."  *Watson*, 551 U.S. at 152-53.  Defendants also point to the fact that the leases require the timely drilling of wells and production

---

[4] Defendants cite *California* v. *Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981) (the Outer Continental Shelf Lands Act "has an objective—the expeditious development of OCS resources").  They further note that the Secretary of the Interior must develop serial leasing schedules that "he determines will best meet national energy needs for the five-year period" following the schedule's approval.  43 U.S.C. §1344(a).

(ECF No. 1, Ex. B ¶ 10, Ex. C §§ 10, 11), but the government does not control the manner in which Defendants drill for oil and gas, or develop and produce the product.

Similarly, Defendants have not shown that a federal officer instructed them how much fossil fuel to sell or to conceal or misrepresent the dangers of its use, as alleged in this case. They also have not shown that federal officer directed them to market fossil fuels at levels they knew would allegedly cause harm to the environment. At most, the leases appear to represent arms-length commercial transactions whereby ExxonMobil agreed to certain terms (that are not in issue in this case) in exchange for the right to use government-owned land for their own commercial purposes. Defendants have not shown that this is sufficient for federal officer jurisdiction. Defendants have also not shown that this lawsuit is "likely to disable federal officers from taking necessary action designed to enforce federal law", or "to deny a federal forum to an individual entitled to assert a federal claim of immunity." *Watson*, 551 U.S. at 152.

To the extent Defendants claim there is jurisdiction because ExxonMobil is "helping the government to produce an item that it needs," *Watson*, 551 U.S. at 153, this also does not suffice to provide jurisdiction in this Court. Federal officer jurisdiction requires an "unusually close" relationship between the government and the contractor. In *Watson*, the Supreme Court noted an example of a company that produced a chemical for the government for use in a war. *Id*. (discussing *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998)). As *Winters* explained in more detail, the Defense Department contracted with chemical companies "for a specific

mixture of herbicides, which eventually became known as Agent Orange"; required the companies to produce and provide the chemical "under threat of criminal sanctions"; "maintained strict control over the development and subsequent production" of the chemical; and required that it "be produced to its specifications." 149 F.3d at 398–99. The circumstances in *Winters* were far different than the circumstances in this case, and Defendants have thus not shown an unusually close relationship between ExxonMobil and the government.

Defendants also cite no support for their assertion that the government "specifically dictated much of ExxonMobil's production, extraction, and refinement of fossil fuels" (ECF No. 48 at 35), much less that it rises to the level of government control set forth in *Winters*. As Plaintiffs note, under Defendants' argument, "any state suit against a manufacturer whose product has at one time been averted and adapted for [government] use . . . would potentially be subject to removal, seriously undercutting the power of state courts to hear and decide basic tort law." *See Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 951 (E.D.N.Y. 1992).

*Baltimore* also counsels against finding federal jurisdiction under the federal officer removal statute. It found that the defendants failed plausibly to show that the charged conduct was carried out "for or relating to" the alleged official authority, as they did not show "that a federal officer controlled their total production and sales of fossil fuels, nor is there any indication that the federal government directed them to conceal the hazards of fossil fuels or prohibited them from providing warnings to consumers." *Baltimore*, 2019 WL 2436848, at *17. The court concluded, "[c]ase law makes clear

that this attenuated connection between the wide array of conduct for which defendants have been sued and the asserted official authority is not enough to support removal under § 1442(a)." *Id.*; *see also State of Rhode Island*, 2019 WL 3282007, at *5 (finding no causal connection between any actions Defendants took while "acting under" federal officers or agencies, and thus no grounds for federal-officer removal); *San Mateo*, 294 F. Supp. 3d at 939 (defendants failed to show a "causal nexus" between the work performed under federal direction and the plaintiffs' claims for injuries stemming from climate change because the plaintiffs' claims were "based on a wider range of conduct").

E.      **Jurisdiction Under the Outer Continental Shelf Lands Act**

        Defendants next argue that Plaintiffs' claims arise out of Defendants' operations on the OCS.  Federal courts have jurisdiction "of cases and controversies rising out of, or in connection with (A) any operation conducted on the [OCS] which involves exploration, development, or production of the minerals, of the subsoil and seabed of the [OCS], or which involves rights to such minerals. . . ."  43 U.S.C. § 1349(b)(1).  When assessing jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), courts consider whether "(1) the activities that caused the injury constituted an operation conducted on the [OCS] that involved the exploration and production of minerals, and (2) the case arises out of, or in connection with the operation."  *In Re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (internal quotation marks omitted).

        Here, Defendants assert that jurisdiction is established because the case arises

48

out of or in connection with an operation conducted on the OCS in connection with the OCSLA leasing program in which ExxonMobil participated.  Plaintiffs seek potentially billions of dollars in abatement funds that inevitably would, according to Defendants, discourage OCS production and substantially interfere with the congressionally mandated goal of recovery of the federally-owned minerals.  ExxonMobil has participated in the OCSLA leasing program for decades, and continues to conduct oil and gas operations on the OCS.  By making all of Defendants' conduct the subject of their lawsuit, Defendants argue that Plaintiffs necessarily sweep in ExxonMobil's activities on the OCS.  Plaintiffs purportedly do not dispute that ExxonMobil operates extensively on the OCS, and Plaintiffs' claims do not distinguish between fossil fuels extracted from the OCS and those found elsewhere.  Thus, Defendants assert that at least some of the activities at issue arguably came from an operation conducted on the OCS.  The Court rejects Defendants' argument, as they have not shown that the case arose out of, or in connection with an operation conducted on the OCS.

The Court agrees with Plaintiffs that for jurisdiction to lie, a case must arise directly out of OCS operations.  For example, courts have found OCSLA jurisdiction where a person is injured on an OCS oil rig "exploring, developing or producing oil in the subsoil and seabed of the continental shelf."  *Various Plaintiffs v. Various Defendants ("Oil Field Cases")*, 673 F. Supp. 2d 358, 370 (E.D. Pa. 2009); where oil was spilled from such a rig, *Deepwater Horizon*, 745 F.3d at 162, or in contract disputes directly relating to OCS operations, *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1225 (5th Cir. 1985); *cf. Fairfield Indus., Inc. v. EP Energy E&P Co.*,

2013 WL 12145968, at *5 (S.D. Texas May 2, 2013) (finding claims involving performance of contracts "would not influence activity on the OCS, nor require either party to perform physical acts on the OCS", and that the claims thus did not "have a sufficient nexus to an operation on the OCS to fall within the jurisdictional reach of OCSLA"). The fact that some of ExxonMobil's oil was apparently sourced from the OCS does not create the required direct connection.

As the *Baltimore* court found, "[e]ven under a 'broad' reading of the OCSLA jurisdictional grant endorsed by the Fifth Circuit [in *Deepwater Horizon*], defendants fail to demonstrate that OCSLA jurisdiction exists." 2019 WL 2436848, at *16. "Defendants were not sued merely for producing fossil fuel products, let alone for merely producing them on the OCS." *Id*. "Rather, the City's claims are based on a broad array of conduct, including defendants' failure to warn consumers and the public of the known dangers associated with fossil fuel products, all of which occurred globally." *Id*. The defendants there offered "no basis to enable th[e] Court to conclude that the City's claims for injuries stemming from climate change would not have occurred but for defendants' extraction activities on the OCS." *Id.*; *see also San Mateo*, 294 F. Supp. 3d at 938–39 ("Removal under OCSLA was not warranted because even if some of the activities that caused the alleged injuries stemmed from operations on the [OCS], the defendants have not shown that the plaintiffs' causes of action would not have accrued *but for* the defendants' activities on the shelf" (emphasis in original)).

Defendants cite no case authority holding that injuries associated with downstream uses of OCS-derived oil and gas products creates OCSLA jurisdiction.

50

The cases cited by Defendants instead involved a more direct connection.  *See*, *e.g.,*
*Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988)
(finding that the exercise of take-or-pay rights, minimum-take rights, or both, by Sea
Robin necessarily and physically had an immediate bearing on the production of the
particular well at issue, "certainly in the sense of the volume of gas actually produced",
and would have consequences as to production of the well).

Moreover, as Plaintiffs note, jurisdiction under OCSLA makes little sense for
injuries in a landlocked state that are alleged to be caused by conduct that is not
specifically related to the OCS.  No court has read OCSLA so expansively.  Defendants'
argument would arguably lead to the removal of state claims that are only "tangentially
related" to the OCS.  *See Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co.*, 46
F. Supp. 3d 701, 704–05 (S.D. Texas 2014) (recognizing that the "but-for" test
articulated by the Fifth Circuit in the *Deepwater Horizon* case "is not limitless," and that
"a blind application of this test would result in federal court jurisdiction over all state law
claims even tangentially related to offshore oil production on the OCS"; "Defendants'
argument that the 'but-for' test extends jurisdiction to any claim that would not exist but
for offshore production lends itself to absurd results").

The downstream impacts of fossil fuels produced offshore also does not create
jurisdiction under OCSLA because Plaintiffs do not challenge conduct on any offshore
"submerged lands."  43 U.S.C. § 1331(a).  Defendants' argument that there is federal
jurisdiction if any oil *sourced* from the OCS is some *part* of the conduct that creates the
injury would, again, dramatically expand the statute's scope.  Any spillage of oil or

51

gasoline involving some fraction of OCS-sourced oil—or any commercial claim over such a commodity—could be removed to federal court.  It cannot be presumed that Congress intended such an absurd result.  Plaintiffs' claims concern Defendants' overall conduct, not whatever unknown fraction of their fossil fuels was produced on the OCS.  No case holds removal is appropriate if some fuels from the OCS *contribute* to the harm.  A case cannot be removed under OCSLA based on speculative impacts; immediate and physical impact is needed.  *See Amoco Prod. Co.*, 844 F.2d at 1222–23.  Accordingly, the Court does not have jurisdiction under OCSLA.

## F.     Jurisdiction as the Claims Relate to Bankruptcy Proceedings

Finally, Defendants argue that this Court has jurisdiction and this action is removable because Plaintiffs' claims are related to bankruptcy proceedings within the meaning of 28 U.S.C. §§ 1452(a).  Subject to certain exceptions, that statute allows a party to remove any claim or cause of action in a civil action . . . to the district court where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."  Section 1334(b) of the Bankruptcy Code states that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

The Tenth Circuit has held that an action is "related to" bankruptcy if it "'could conceivably have any effect on the estate being administered in bankruptcy.'"  *In re Gardner*, 913 F.2d 1515, 1518 (10th Cir. 1990) (citation omitted).  "Although the proceeding need not be against the debtor or his property, the proceeding is related to the bankruptcy if the outcome could alter the debtor''s rights, liabilities, options, or

52

freedom of action in any way, thereby impacting on the handling and administration of the bankruptcy estate." *Id*. Removal is proper even after a bankruptcy plan has been confirmed if the case would impact a creditor's recovery under the reorganization plan. *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1233, 1237 (10th Cir. 1998).

Defendants assert that Plaintiffs' claims relate to ongoing bankruptcy proceedings because they could impact the estates of other bankrupt entities that are necessary and indispensable parties to this case. They note in that regard that 134 oil and gas producers filed for bankruptcy in the United States between 2015 and 2017. Peabody Energy and Arch Coal ("Peabody"), in particular, is alleged to have emerged from Chapter 11 bankruptcy in 2016. Defendants argue that the types of claims brought by Plaintiffs are irreconcilable with the "implementation," "execution," and "administration" of Peabody's "confirmed plan," citing *In Re Wiltshire Courtyard*, 729 F.3d 1279, 1289 (9th Cir. 2013). Defendants thus assert that this case is related to a bankruptcy proceeding and is therefore removable.

The Court, too, rejects Defendants' final argument. As the Ninth Circuit noted in the *Wiltshire Courtyard* case, "'to support jurisdiction, there must be a close nexus connecting a proposed [bankruptcy proceeding] with some demonstrable effect on the debtor or the plan of reorganization.'" 729 F.3d at 1289 (citation omitted). "[A] close nexus exists between a post-confirmation matter and a closed bankruptcy proceeding sufficient to support jurisdiction when the matter 'affect[s] the interpretation, implementation, consummation, execution, or administration of the confirmed plan.'" *Id*. (citation omitted).

53

Here, none of the Defendants have filed for bankruptcy. To the extent Defendants argue that this case may effect other oil and gas producers who filed for bankruptcy, including Peabody or other unspecified bankrupt entities, this is entirely speculative. Defendants have not shown any nexus, let alone a close nexus, between the claims in this case and a bankruptcy proceeding. Thus, Defendants offer no evidence of how Plaintiffs' claims relate to any estate or affect any creditor's recovery, including Peabody. Defendants suggest bankrupt entities are indispensable parties, but joint tortfeasors are not indispensable. *See Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990). Nor would it matter if Defendants have third-party claims against bankruptcy estates. *See Pacor, Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984); *Union Oil Co. of California v. Shaffer*, 563 B.R. 191, 198–200 (E.D. La. 2016). Plaintiffs do not seek any relief from a debtor in bankruptcy, advantage over creditors, or to protect any interest in the debtor's property. *City & Cnty. of San Francisco v. PG & E Corp.*, 433 F.3d 1115, 1124–25 (9th Cir. 2006). Thus, Defendants have failed to show that jurisdiction is proper under the bankruptcy removal statute.

As discussed in *Baltimore*, "Defendants fail to demonstrate that there is a 'close nexus' between this action and any bankruptcy proceedings . . . at most, defendants have only established that some day a question *might* arise as to whether a previous bankruptcy discharge precludes the enforcement of a portion of the judgment in this case against" the defendant. 2019 WL 2436848, at *19 (emphasis in original). "This remote connection does not bring this case within the Court's "related to" jurisdiction under 28 U.S.C. § 1334(b). *Id*.

Moreover, one of the exceptions to removal are proceedings "by a governmental unit to enforce such governmental unit's police or regulatory powers." 28 U.S.C. § 1452(a). *Baltimore* noted that an action such as this where the plaintiffs "assert claims for injuries stemming from climate change" are actions "on behalf of the public to remedy and prevent environmental damage, punish wrongdoers, and deter illegal activity." 2019 WL 2436848, at *19. It found that "[a]s other courts have recognized, such an action falls squarely within the police or regulatory exception to § 1452." *Id*. *See also Rhode Island*, 2019 WL 3282007, at *5; *San Mateo*, 294 F. Supp. 3d at 939. This Court agrees and adopts the *Baltimore* court's analysis on this point. Accordingly, removal is also inappropriate because this case is a proceeding "by a governmental unit to enforce such governmental unit's police or regulatory powers." 28 U.S.C. § 1452.

## IV. CONCLUSION

Plaintiffs' claims implicate important issues involving global climate change caused in part by the burning of fossil fuels. While Defendants assert, maybe correctly, that this type of case would benefit from a uniform standard of decision, they have not met their burden of showing that federal jurisdiction exists. Accordingly, the Court ORDERS as follows:

1.    Defendants' Motion to Reschedule Oral Argument on Plaintiffs' Motion to Remand (ECF No. 67) is DENIED.

2.    Plaintiffs' Motion to Remand (ECF No. 34) is GRANTED; and

3.    The Clerk shall REMAND this case to Boulder County District Court, and shall terminate this action.

Dated this 5th day of September, 2019.

BY THE COURT:

_____

William J. Martínez
United States District Judge

56

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellant Exxon Mobil Corporation and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 27(d)(2)(A), that the attached Brief of Appellants is proportionally spaced, has a typeface of 14 points or more, and contains 11,080 words.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

NOVEMBER 20, 2019

## CERTIFICATE OF DIGITAL SUBMISSION,
## ANTIVIRUS SCAN, AND PRIVACY REDACTIONS

I hereby certify, pursuant to the Tenth Circuit CM/ECF User's Manual, that the attached Brief of Appellants, as submitted in digital form via the Court's electronic-filing system, has been scanned for viruses using Malwarebytes Anti-Malware (version 2019.11.20.10, updated Nov. 20, 2019) and, according to that program, is free of viruses. I also certify that any hard copies submitted are exact copies of the document submitted electronically, and that all required privacy redactions have been made.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

NOVEMBER 20, 2019

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, counsel for appellant Exxon Mobil Corporation and a member of the Bar of this Court, certify that, on November 20, 2019, the attached Brief of Appellants was filed with the Clerk of the Court through the electronic-filing system.  I further certify that all parties required to be served have been served.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM